UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| VIBO CORPORATION, INC. d/b/a | ) | |
| GENERAL TOBACCO | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| JACK CONWAY, in his official capacity | ) | |
| as Attorney General of the Commonwealth of | ) | |
| Kentucky, et al. | ) | *(ELECTRONICALLY FILED)* |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT
OF MOTION FOR PRELIMINARY INJUCTIVE RELIEF**

John K. Bush
Christie A. Moore
Helen A. Thompson
GREENEBAUM DOLL & McDONALD PLLC
3500 National City Tower
Louisville, KY 40202
(502) 589-4200

COUNSEL FOR PLAINTIFF
VIBO CORPORATION, INC.
D/B/A GENERAL TOBACCO

## TABLE OF CONTENTS

Introduction ................................................................................................................1

Facts ...................................................................................................................3

1.  The MSA's Discriminatory Payment Structure .................................................3

2.  General Tobacco's Negotiations With The Settling States.................................7

3.  The Settling States' 30-Day Notice of Intent to Sue .........................................8

4.  General Tobacco's Claim .................................................................................9

Argument ............................................................................................................9

I.  GENERAL TOBACCO HAS A SUBSTANTIAL LIKELIHOOD OF
    SUCCESS ON THE MERITS ........................................................................11

A.  General Tobacco Is Likely To Prove That The MSA Is An Essential Facility
    And Therefore Its Discriminatory Payment Requirements Between SPMs
    Violate The Sherman Act...............................................................................11

    1.  General Tobacco's Competitors Control the MSA And the Market .........14

    2.  The MSA Cannot Be Practically Or Reasonably Duplicated ...................15

    3.  Failure To Offer The MSA On Non-Discriminatory Terms To All SPMs
        Is An Effective Denial Of Use Of The Facility .......................................17

    4.  The MSA Should Be Revised To Provide All SPMs With
        Non-Discriminatory Terms for Access to the Market ...............................19

B.  General Tobacco Is Likely To Prove That the MSA's Discriminatory
    Provisions Violate Equal Protection................................................................20

    1.  The MSA Irrationally Discriminates Between Similarly Situated SPMS. .................20

C.  General Tobacco Is Likely To Prove That The MSA's Discriminatory
    Provision Violates Due Process .......................................................................25

D.  General Tobacco Is Likely To Prove That The MSA Imposes Extraterritorial
    Taxes In Violation Of The Commerce Clause And Due Process ......................28

    1.  The MSA Violates The Dormant Commerce Clause Because It
        Discriminates In Favor Of Early Market Entrants.....................................29

2.   The MSA Violates The Dormant Commerce Clause and The
Due Process Clause Because Participating Manufacturers Are
Required To Pay Each Settling State For Out-of-State Sales For
Sales In States That They Have Not Even Joined the MSA ......................................30

E.   General Tobacco Is Likely To Prove that the MSA Violates the Compact
Clause ....................................................................................................................32

F.   General Tobacco is Likely To Succeed on Its Fraud In the Inducement Claim ..............34

II.   UNLESS THE PRELIMINARY INJUNCTION ISSUES, GENERAL
TOBACCO WILL SUFFER IRREPARABLE AND IMMEDIATE HARM. .................35

III.   THE ISSUANCE OF A PRELIMINARY INJUNCTION WILL NOT
SUBSTANTIALLY HARM THE INTERESTS OF OTHERS.......................................37

IV.   THE ISSUANCE OF A PRELIMINARY INJUNCTION WILL SERVE
THE PUBLIC INTEREST...........................................................................................37

V.   NO SECURITY IS REQUIRED IN THESE CIRCUMSTANCES................................37

Conclusion. .........................................................................................................................38

## Introduction

Vibo Corporation, Inc. d/b/a General Tobacco ("General Tobacco"), by counsel, respectfully submits this memorandum in support of its motion for a preliminary injunction.

General Tobacco is a tobacco product manufacturer that sells high quality tobacco products for adult consumption and is a signatory of the 1998 tobacco Master Settlement Agreement ("MSA"), filed as Exhibit A to the Complaint.  Since joining the MSA, General Tobacco has paid approximately $470,000,000.00 to Kentucky and the other jurisdictions that are parties to the MSA (the "Settling States")[1], in addition to approximately $36,000,000.00 currently in escrow as purportedly required by General Tobacco's Adherence Agreement[2] for future payment to the Settling States.  The MSA, however, subjects General Tobacco to adverse and unlawful discriminatory financial treatment in comparison to certain other tobacco product manufacturers.

As explained below, the MSA gives extremely preferential financial treatment to certain tobacco product manufacturers to the detriment of General Tobacco and other manufacturers in violation of federal antitrust and constitutional law.  The MSA and General Tobacco's Adherence Agreement should be reformed to eliminate these disparities.  In the alternative, Plaintiff is entitled to rescission of its MSA membership because the Settling States fraudulently induced General Tobacco to join the MSA. General Tobacco brings this motion requesting the Court to issue a preliminary injunction enjoining the Defendant Attorneys General, while this suit is pending, from enforcing any of the MSA's discriminatory terms, through actions such as (a) imposing any penalty on General Tobacco, including the de-listing of, or failure to certify any of its brands on, any approved list of

---

[1]  The jurisdictions whose officials are Defendants are referred to herein as the "Settling States," as that term is defined in the MSA.  The Settling States are forty-six States (i.e., all States except Florida, Minnesota, Mississippi and Texas), the District of Columbia, and five U.S. island territories (American Samoa, Guam, the Northern Marianas, Puerto Rico and the U.S. Virgin Islands).

[2]  The Adherence Agreement, filed as Exhibit B to the Complaint, was entered into by General Tobacco with the Settling States, which required General Tobacco to agree to the terms of the Adherence Agreement in order to join the MSA.

cigarettes that may be sold in the Defendant Attorneys General's jurisdictions, and (b) attempting to take possession of any of General Tobacco's escrowed funds based on any claimed right under the MSA or any other agreement between General Tobacco and the Settling States.

The need for this motion arose because on October 27, 2008, without any prior warning, the Settling States abruptly ended negotiations with General Tobacco to reduce its onerous and discriminatory alleged MSA payment obligations.  On that date, 42 Attorneys General issued a purported notice of intent to sue, despite the fact that (a) General Tobacco had since April 2008 through the time of the notice made regular $750,000.00 weekly payments to the Settling States (totaling $20,250,000.00 as of October 27, 2008), in addition to approximately $58,000,000.00 already paid to the Settling States in April 2008, Declaration of Krista Holt ("Holt Decl.") ¶ 45; attached as Exhibit 1 and (b) as of October 27, 2008 had on deposit in escrow approximately $36,000,000.00 in full compliance with the purported escrow requirements of General Tobacco's Adherence Agreement. Declaration of J. Ronald Denman ("Denman Decl.") ¶11, attached as Exhibit 2.

The October 27, 2008 notice was particularly jarring because for over two years, the Settling States had accepted well over one hundred million of dollars in MSA payments from General Tobacco while negotiating to amend the Adherence Agreement and at no point during that period gave any indication that they intended to bring any legal action claiming General Tobacco to be in breach of the MSA or the Adherence Agreement.  General Tobacco satisfies all of the prerequisites for a preliminary injunction.  First, General Tobacco is likely to prevail on the merits of its claims that the MSA unlawfully imposes more severe payment obligations and other restrictions on General Tobacco than those imposed on certain other tobacco product manufacturers in the MSA.  Second, if the Defendant Attorneys General are allowed to de-list or refuse to certify General Tobacco's brands on approved governmental lists, General Tobacco will suffer irreparable harm because such de-listing or refusal to certify would prevent General Tobacco from selling its product in the Settling States, thereby destroying General Tobacco's business and driving General Tobacco into bankruptcy.  Moreover, if

2

the Settling States took possession of the escrowed funds, they would likely claim sovereign immunity and refuse to return those funds to General Tobacco after it prevails in this litigation.  Third, the balance of harms also favors injunctive relief because allowing General Tobacco's brands to remain on the governmental approved lists and General Tobacco's escrowed funds to remain intact will not harm Defendants in any manner that cannot be rectified at the conclusion of this lawsuit, in the unlikely event that General Tobacco's claims did not succeed.  Finally, the public interest is furthered by allowing General Tobacco's brands to remain on governmental approved lists and General Tobacco's escrowed funds to remain intact, both of which will maintain the status quo during the pendency of this litigation.  (Denman Decl. ¶ 11).

## Facts

### 1.    The MSA's Discriminatory Payment Structure.

The MSA was executed by the Settling States with the four largest U.S. tobacco companies (the "Original Participating Manufacturers" or "OPMs") in 1998, and later joined by smaller U.S. tobacco companies (the "Subsequent Participating Manufacturers" or "SPMs").  (See MSA attached to Complaint as Exhibit A; Denman Decl. ¶ 8.[3]  General Tobacco has been an SPM since 2004.  (Denman Decl. ¶ 8).  Kentucky and the other Settling States, in the aggregate, have received payments under the MSA of approximately $470,000,000.00 from General Tobacco since the company joined the MSA.  (Id. ¶ 14).  General Tobacco also has deposited $36,000,000.00, which is currently in escrow as purportedly required by General Tobacco's Adherence Agreement for future payment to the Settling States.  (Id. ¶ 11).

---

[3]  The Defendants in the present action fall into three categories:  (1) the Attorneys General of the Settling States; (2) the OPMs, which include Defendant Philip Morris Inc. ("Philip Morris"), Defendant R.J. Reynolds Tobacco Co. ("Reynolds"), Brown & Williamson Corp. ("B&W") (now a subsidiary of Defendant Reynolds American, Inc., which is also Reynolds' parent) and Defendant Lorillard Tobacco Co. ("Lorillard"); and (3) certain Subsequent Participating Manufacturers called "grandfathered SPMs," which receive preferential treatment under the MSA that is the subject of this lawsuit.

Importantly, General Tobacco does not seek to destroy the MSA.  General Tobacco supports the public health goals, including the elimination of marketing to youth, of the MSA.  (Id. ¶ 7).  The MSA, however, has fundamental flaws – the subject of this action – that are harming consumer welfare, as well as literally destroying General Tobacco's businesses, and must be corrected because they are unlawful and contrary to the public interest.

One of the MSA's flaws at issue here is that its provisions imposing payment obligations on SPMs wrongly discriminate in favor of those tobacco product manufacturers that were already in the industry in 1998, when the MSA was executed, over those companies like General Tobacco, which entered the industry later.  The non-OPM manufacturers in existence when the MSA was created had the opportunity to receive preferential treatment if they joined the MSA within ninety days of its execution (the "Preferential Signing Period")[4].  The SPMs that joined the MSA during the Preferential Signing Period are known as the "grandfathered Subsequent Participating Manufacturers" or "grandfathered SPMs", and their average per-carton payment obligations to the Settling States are far less than what is required of General Tobacco and other non-grandfathered SPMs that did not enter the industry until after the Preferential Signing Period was over.  (Holt Decl. ¶ 7, 22, 31; Declaration of Prof. Jeremy Bulow ("Bulow Decl.") ¶ 16, attached hereto as Exhibit 3).  Indeed, grandfathered SPMs have sold billions of dollars in cigarettes without making any MSA payment at all, while General Tobacco and other non-grandfathered SPMs must make MSA payments for every carton they have ever sold.  (Holt Decl. ¶ 19, 21, 22, 28; Bulow Decl. ¶ 16, 29, 30, 31, 35).  This disparity of treatment under the MSA exists through no fault of General Tobacco, which has never had any opportunity to join the MSA on terms comparable to those offered to grandfathered SPMs.  (See Denman Decl. ¶ 16).

---

[4]  The Preferential Signing Period was originally sixty days, as set forth in MSA § IX(i)(4)(A), but was later extended to ninety days pursuant to an Amendment to the MSA executed on January 20, 1999.

The unfair advantage given to grandfathered SPMs by the MSA is primarily threefold.  First, the grandfathered SPMs, unlike General Tobacco and other non-grandfathered SPMs, have no purported obligation under the MSA to render payments for tobacco product sales made prior to joining the MSA.  (Holt Decl. ¶ 14, 19, 35; Bulow Decl. ¶ 41).  Thus, the grandfathered SPMs, which built their respective grandfathered market shares through billions of dollars in sales before joining the MSA – during the period of 1998 and before, when, according to the Settling States' claims, the alleged tortious and wrongful conduct in the tobacco industry occurred – have zero payment obligation to the Settling States for those sales.  (Holt Decl. ¶ 19, 20, 21; 22, 23 Bulow Decl. ¶ 16, 23-28, 29, 30, 31, 35).  General Tobacco and other non-grandfathered SPMs that entered the industry after 1998, by contrast, are required by the Settling States to make hundreds of millions of dollars in payments to the Settling States for all of their MSA sales prior to joining the MSA (the "purported back-payment obligation").  (Holt Decl. ¶ 19, 21, 35, 36; Denman Decl. ¶ 9,12; Bulow Decl. ¶ 41).  The purported back-payment obligation exists even though the Settling States have never asserted any claim of tortious or other wrongful conduct against General Tobacco similar to the claims asserted by the Settling States against the tobacco industry – including certain grandfathered SPMs – in the litigation settled in 1998.  (Denman Decl. ¶ 17).

The second reason there is disparity between grandfathered and non-grandfathered SPMs lies in the fact that a grandfathered SPM is not required to make any payments to the Settling States for current cigarette sales in any year until such sales exceed in that year the greater of its market share from the year before it joined the MSA (i.e., 1997) or 125% of its market share from the year it joined the MSA (i.e., 1998).  (See MSA § IX(i); Holt Decl. ¶ 19, 20).  This exemption, known as a "grandfathered market share", was made available solely to SPMs that joined during the Preferential Signing Period.  (Holt Decl. ¶ 7, 19, 20; Bulow Decl. ¶ 16).  Thus, whereas grandfathered SPMs have not had to make any going-forward payment to the Settling States on sales each year that do not exceed their grandfathered shares, the non-grandfathered SPMs, such as General Tobacco, are purportedly

required to make an MSA payment on every carton sold (including cartons sold in non-MSA States) and, as a result, have paid hundreds of millions to the Settling States not required of the grandfathered SPMs.[5]  (Holt Decl. ¶ 19, 21; Denman Decl. ¶ 14).

A third aspect of the MSA's discriminatory structure which impacts General Tobacco is the purported requirement that General Tobacco make quarterly deposits into an escrow account (the "escrow deposit requirement") for its annual MSA payment for tobacco product sales, even though such payment is not purportedly due to be paid to the Settling States until the April following the year when such sales are made.  (Holt Decl. ¶ 19, 21, 41; Denman Decl. ¶ 11).  Such a requirement, which is not imposed on the OPMs or grandfathered SPMs, negatively impacts General Tobacco's working capital on a recurring basis.  (Id.)  For example, as noted, in 2008 the Settling States have already insisted that General Tobacco pay $36,000,000.00 into escrow while the OPMs and grandfathered SPMs have not been required to make any such payment.  (Denman Decl. ¶ 11).

As a result of these three factors – the purported back-payment obligation, the grandfathered market shares and the purported escrow deposit requirement – the terms for entry into and participation in the MSA are substantially more onerous for non-grandfathered SPMs such as General Tobacco than they are for grandfathered SPMs such as by way of example, Liggett Group, LLC ("Liggett").  (Holt Decl. ¶ 19, 21, 35, 36, 37, 38; Bulow Decl. ¶ 16; Denman Decl. ¶ 15).  For example, in 2005 alone, for the same number of cigarettes sold by the non-grandfathered SPMs, the grandfathered SPMs paid to the Settling States only approximately half as much as that paid by the non-grandfathered SPMs.  In that year, Liggett sold more cigarettes than General Tobacco yet had to pay only $14.8 million to the Settling States, while General Tobacco paid $107 million.  (Denman Decl. ¶ 14).  The substantially lower MSA payment obligations of grandfathered SPMs like Liggett Group, LLC ("Liggett") and

---

[5]  These payments are based on a "per unit" assessment.  Accordingly, General Tobacco is purportedly required to make the same payment "per unit" as any other OPM or SPM pays on their products, even though General Tobacco's products are significantly less expensive to the consumer (and carry a much lower margin of profit) than the products sold by OPMs and many other SPMs.  (Denman Decl. ¶ 11.)

Commonwealth Brands, Inc. ("Commonwealth Brands") allow them to sell cigarettes at prices below what it costs a non-grandfathered SPM like General Tobacco to comply with its MSA payment obligations, even before its manufacturing costs are included.  (Holt Decl. ¶ 22, 28, 29, 31; 37, 41 Bulow Decl. ¶ 34, 44; Denman Decl. ¶ 15).

      **2.**      **General Tobacco's Negotiations With The Settling States.**

For more than two years, General Tobacco was in discussions with the Settling States and officials at the National Association of Attorneys General ("NAAG") to reach agreement on ways to ameliorate the discriminatory treatment of non-grandfathered SPMs under the MSA.  (Denman Decl. ¶ 20).  In order to facilitate negotiations, the Settling States and General Tobacco entered into a Forbearance Agreement dated August 18, 2006 (filed as Exhibit J to the Complaint) and an Extension of Due Date and 2004 NPM Escrow Payment Agreement (filed as Exhibit K to the Complaint).  These Agreements were followed by a Memorandum of Understanding (filed as Exhibit L to the Complaint), whereby General Tobacco's original Adherence Agreement (filed as Exhibit B to the Complaint), which set forth the specific terms for Plaintiff to join the MSA, would be superseded by an Amended Adherence Agreement (filed as Exhibit M to the Complaint), to address in part, among other things, the onerous back-payment obligations that General Tobacco must carry as a non-grandfathered SPM. (See Memorandum of Understanding; Denman Decl. ¶ 24).

As part of its understanding with the Settling States, General Tobacco immediately began performing under the terms of the Amended Adherence Agreement upon its execution by General Tobacco on November 20, 2007, and for over eleven months, the Settling States accepted General Tobacco's payments under the Amended Adherence Agreement and took no adverse actions with respect to General Tobacco's brands.  (Denman Decl. ¶ 25).  General Tobacco, in reliance on the representations of the Settling States, has, since November, 2007, performed pursuant to the terms of the Amended Adherence Agreement.  (Id.)

The Settling States, however, would not agree to execute the Amended Adherence Agreement unless and until all OPMs and a unspecified number of SPMs had agreed to waive whatever rights, if any, they may have under the MSA's LMFN provision, MSA § XVIII(b). (Id. ¶ 22).  NAAG officials, on behalf of the Settling States, expressed concern that an OPM or SPM might claim its LMFN rights to be triggered by the change in terms for General Tobacco's MSA membership effected by the Amended Adherence Agreement.  (Id. ¶ 21).

Following General Tobacco's execution of the Amended Adherence Agreement in November, 2007, at the Settling States' request, General Tobacco provided Notice to each of the OPMs and SPMs of the proposed Amended Adherence Agreement.  A copy of one such Notice, by way of example, is attached to the Complaint as Exhibit N.  In that Notice, General Tobacco requested that the OPMs and SPMs agree to the waiver of their purported LMFN rights, as required by the Settling States before they would execute the Agreements.  None of the OPMs or grandfathered SPMs provided the requested waiver, however, and the Settling States have taken the position that absent the LMFN waivers from at least the OPMs and an unspecified number of grandfathered SPMs, the Settling States will not execute the Amended Adherence Agreement.  (Id. ¶ 22, 23).

### 3.    The Settling States' 30-Day Notice of Intent to Sue.

On October 27, 2008, the Attorney General of Arkansas abruptly sent General Tobacco a 30-day Notice of Intent (filed as Exhibit C to the Complaint), pursuant to Section VII(c) of the MSA.  The letter stated that it was sent on behalf of the Attorneys General of Arkansas, Arizona, California, Colorado, Connecticut, Delaware, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, Wisconsin, and the U.S. Virgin Islands.  The letter further stated "that one or more of the Attorneys General for the foregoing Settling States may bring an action to enforce the provisions of the

MSA and the terms of the Adherence Agreement against General Tobacco."  The Settling States have made this demand notwithstanding the fact that they had previously accepted General Tobacco's performance under the Amended Adherence Agreement, including tens of millions of dollars in payments throughout 2008, up to a week before the 30-day Notice of Intent was issued.

4.      **General Tobacco's Claims.**

As alleged in the Complaint, the preferential treatment granted to the grandfathered SPMs in comparison to non-grandfathered SPMs under the MSA violates:  (a)  Sections 1 and 3(a) of the Sherman Act, 15 U.S.C. §§ 1, 3(a); (b) the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution; (c) the Due Process Clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution; (d) the Compact Clause of the U. S. Constitution (Art. I, Sec. 10); and (e) the Commerce Clause of the U.S. Constitution (Art. I, Sec. 8, cl. 3).

In addition, according to the Complaint, the MSA's requirement that General Tobacco pay each Settling State for cigarette sales outside that State, including in the four States that do not participate in the MSA, violates General Tobacco's rights under the Due Process and Commerce Clauses.  Finally, even if no other relief were warranted, General Tobacco submits that it would be entitled to rescission of the Adherence Agreement, pursuant to which it joined the MSA, because it was fraudulently induced by the Settling States and their representatives at NAAG to join the MSA.

## Argument

General Tobacco asks that this Court grant a preliminary injunction to prevent the Defendant Attorneys General while this litigation ensues from (a) de-listing General Tobacco's various brands of cigarettes or failing to certify these brands on approved governmental lists, and (b) attempting to take possession of any of General Tobacco's escrowed funds based on any claimed rights under the MSA or any other agreement between General Tobacco and the Settling States.

Pursuant to the MSA, each State enacted what are called "Complementary Statutes," codified in Kentucky at KRS 131.604 – KRS 131.630.  The Complementary Statutes serve, among other things,

to ban the sales of brands of any tobacco manufacturer that is a member of the MSA ("Participating Manufacturer") that does not make its required payments under the MSA.  Each Settling State maintains a directory of approved cigarette brands that may be sold in its jurisdiction and only those brands deemed in compliance with the Complementary Statutes are allowed on the list.  (See, e.g., http://revenue.ky.gov/business/tobaccotax.htm, attached hereto as Exhibit 4)

The result of a State's de-listing or failure to certify a brand for listing is that no law-abiding distributor or retailer will carry or sell the non-listed brand lest it incur liability and penalties for doing so.  (Denman Decl. ¶ 6, 26).  The Defendant Attorneys General are permitted to de-list or not certify brands sold by an MSA manufacturer that has not made its MSA payment obligations for a certain period of time.  See, e.g., KRS 131.604, et. seq.  Although no Defendant Attorney General has yet to de-list or fail to certify any of General Tobacco's brands, General Tobacco has reason to believe such action is imminent because certain Attorneys General now maintain that General Tobacco is not compliant with its MSA payment obligations.  (See Denman Decl. ¶ 26).  Indeed, the Attorneys General of 41 States (including Kentucky) and the U.S. Virgin Islands have purportedly given notice through the October 27, 2008 letter from the Arkansas Attorney General to General Tobacco, that those Settling States may bring litigation to enforce the MSA and Adherence Agreement against General Tobacco.

General Tobacco also has reason to believe that the Defendant Attorneys General will attempt to take possession of General Tobacco's escrowed funds totaling approximately $36,000,000.00 currently on deposit at Sun Trust Bank in Miami, Florida.  (Id. ¶ 28).

A preliminary injunction enjoining the Defendant Attorneys General from de-listing or failing to certify General Tobacco's brands and from attempting to take possession of General Tobacco's escrowed funds is therefore requested to maintain the *status quo* until the Court resolves the issues pending in this action.  The grant of a preliminary injunction, pursuant to Federal Rule of Civil

Procedure 65, is a matter left to the sound discretion of the trial court.  See Friendship Materials, Inc. v. Michigan Brick, Inc., 679 F.2d 100, 105 (6th Cir. 1982).  The requirements for injunctive relief are:

> (1) a substantial likelihood of success on the merits;

> (2) that irreparable injury will result if the preliminary injunction is not granted;

> (3) that a greater injury will result from denial of the injunction than from it being granted; and

> (4) that an injunction will serve the public interest.

Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992); Martin-Marietta Corp. v. Bendix Corp., 690 F.2d 558, 564 (6th Cir. 1982); see also In re Delorean Motor Co., 755 F.2d 1223, 1229 (6th Cir. 1985) (four factors are to be balanced; factors are not prerequisites that must be met).  As explained below, each of the four factors is satisfied in this case.

## I.   GENERAL TOBACCO HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

### A.   General Tobacco Is Likely To Prove That The MSA Is An Essential Facility And Therefore Its Discriminatory Payment Requirements Between SPMs Violate The Sherman Act.

There is a substantial likelihood that General Tobacco will prevail on its claim that the MSA, as it applies to General Tobacco and other non-grandfathered SPMs, violates sections 1 and 3(a) of the Sherman Act, which prohibit any contract, combination in the form of trust or otherwise, or conspiracy, in unreasonable restraint of trade.  See 15 U.S.C. §§ 1, 3(a).  As explained below, membership in the MSA is a critical means for a tobacco product manufacturer to have meaningful access to all of the U.S. cigarette market; it therefore must be offered on equal terms to all SPMs.[6]

The MSA is what is known under antitrust law as an "essential facilities doctrine", which is "a facility that cannot reasonably be duplicated and to which access is necessary if one wishes to compete."  Fishman v. Estate of Wirtz, 807 F.2d 520, 539 (7th Cir. 1986); In re Air Passenger

---

[6] The law does not require that OPMs have as favorable payment terms as SPMs for many reasons, including of course, that SPMs such as General Tobacco have never been sued for or accused of engaging in any of the tortious and other wrongful conduct that was the basis of the claims against the OPMs that were settled by the MSA.

Computer Reservations Sys. Antitrust Litig., 694 F.Supp. 1443, 1451 (C.D.Cal.1988).  "To be 'essential' a facility need not be indispensable; it is sufficient if duplication of the facility would be economically infeasible and if denial of its use inflicts a severe handicap on potential market entrants." Directory Sales Mgmt. Corp. v. Ohio Bell Tel. Co., 833 F.2d 606, 612 (6th Cir. 1987) (quoting Hecht v. Pro-Football, Inc., 570 F.2d 982, 992 (D.C. Cir. 1977), cert. denied, 436 U.S. 956 (1978)).

For example, in United States v. Terminal R.R. Ass'n, 224 U.S. 383 (1912), the Supreme Court found that the combination of railway terminal facilities in St. Louis under single ownership, when considered in light of "the geographical and topographical situation", made it "as a practical matter, impossible for any railroad company to pass through, or even enter St. Louis, so as to be within reach of its industries or commerce, without using the facilities entirely controlled by the [t]erminal [c]ompany."  Id. At 397.  Based on these conditions, the Court held that the Sherman Act mandated that all railroad competitors have equal access to the facilities.

Terminal Railroad Association and subsequent cases have established the essential facilities doctrine, also known as "the bottleneck principle", which "states that where facilities cannot practicably be duplicated by would-be competitors, those in possession of them must allow them to be shared on fair terms."  Id.  By "fair terms", it is meant that access to the facility must be offered on a "non-discriminatory" basis.  See Fishman, 807 F.2d at 539; see also Byars v. Bluff City News Co., 609 F.2d 843, 858 (6th Cir. 1979) (where "a group of competitors control an indispensable facility which cannot be easily duplicated," the "bottleneck theory" holds that "[a]bsent valid business reasons, equal access is required for all.").

As discussed below, General Tobacco is likely to show the MSA is an essential facility for the cigarette industry because the large majority of distributors and retailers in that industry will not carry a cigarette brand if its manufacturer is not a member of the MSA.  (See Holt Decl. ¶ 11, 18, 34; Bulow Decl. ¶ 40; Denman Decl. ¶ 6).  These distributors and retailers refuse to deal in product from cigarette manufacturers that are not MSA members (the "Non-Participating Manufacturers" or "NPMs")

12

because of the MSA's release of the Settling States' claims against distributors and retailers that sell tobacco products of Participating Manufacturers.  (Holt Decl. ¶ 11; Bulow Decl. ¶ 40; Denman Decl. ¶ 6).  More specifically, the MSA's release "does not apply to retailers, suppliers or distributors to the extent of any liability arising from the sale or distribution of" tobacco products of NPMs.  (See MSA §§ XI(a)(8), II(oo) and XI(a)).  Thus, distributors and retailers that purchase tobacco products from NPMs have no protection from future lawsuits brought by the Settling States.

Furthermore, when the Allocable Share Release ("ASR") provisions of the Escrow Statutes were repealed and such repeal was made retroactive, it became impossible for a tobacco manufacturer that was fully compliant with the Escrow Statutes to stay in business and compete in the Settling States without joining the MSA.  (See Holt Decl. ¶¶ 14-17; Bulow Decl. ¶ 39, 40); See, e.g., Freedom Holdings, Inc. v. Spitzer, 2004 WL 2035334*12 (S.D.N.Y. 2004) (recognizing that "the recent repeal of the Allocable Share Release provision threatens to jeopardize the ability of the NPMs to compete with SPMs and OPMs, and thereby to cause them serious and irreparable injury").[7]  This fact also demonstrates that General Tobacco is likely to prevail on the merits that the MSA is an essential facility.

---

[7]  The MSA mandated that the Settling States pass an Escrow Statute, which is codified in Kentucky as KRS 131.602.  (Holt Decl. ¶ 13; Bulow Decl. ¶ 18).  Kentucky's Escrow Statute, like similar laws of the other Settling States, requires all tobacco product manufacturers either to join the MSA or to pay substantial sums of money into a qualified escrow account based upon the number of cartons sold in the State during the year.  (Holt Decl. ¶ 13; Bulow Decl. ¶ 18).  The Escrow Statutes generally prohibit the NPMs' access to any escrow deposit for twenty-five years purportedly so that such funds would be available to pay a judgment or settlement in any future lawsuit brought by a Settling State or its subdivisions.  (Bulow Decl. ¶ 36).  The original version of the Escrow Statutes contained an ASR provision, which allowed for the NPM to obtain a refund of a portion of its escrow payments each year to the extent that the funds deposited for that given year in the escrow account established in a Settling State exceeded that Settling State's allocable share of the total payments that the NPM would have been required to make in that year had the manufacturer been an SPM subject to the MSA (Holt Decl. ¶ 12; Bulow Decl. ¶ 38).  The ASR provision allowed an NPM to concentrate its sales in a relatively small number of Settling States and, by virtue of the allocable share refund, have average costs that permitted the NPM to price its tobacco products competitively with those of the grandfathered SPMs receive under the MSA.  (Holt Decl. ¶ 12; Denman Decl. ¶ 5).  Beginning in 2003, however, virtually all of the Settling States (including Kentucky) acceded to the demands of the OPMs and grandfathered SPMs by repealing the ASA provision of the Escrow Statute.  (Holt Decl. ¶ 13; Bulow Decl. ¶ 39; Denman Decl. ¶ 5).  This repeal eliminates most if not all of the escrow refund that NPMs previously could obtain that allowed them to price competitively with the grandfathered SPMs.  (Holt Decl. ¶ 14; Bulow Decl. ¶ 39-40; Denman Decl. ¶ 5).

A contract or agreement will qualify as an essential facility if the following elements are demonstrated: "(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." MCI Commc'n Corp. v. American Tel. & Tel. Co., 708 F.2d 1081, 1132-1133 (7th Cir. 1982); Hecht, 570 F.2d at 992-93; see e.g. Otter Tail Power Co. v. United States, 410 U.S. 366 (1973); United States v. Terminal R.R. Ass'n, 224 U.S. 383, 409 (1912).

As explained more fully below, General Tobacco will likely meet each and every element required to show that MSA is an essential facility.

### 1.    General Tobacco's Competitors Control the MSA And the Market.

The entities that control the essential facility must constitute a monopoly in the relevant market, and those entities must be competitors of the plaintiff. See e.g., Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC, 148 F.3d 1080, 1088 (D.C.Cir. 1998); Advanced Health Care Servs., Inc. v. Radford Cmty. Hosp., 910 F.2d 139, 151 (4th Cir. 1990).

There can be no question that the MSA is controlled by General Tobacco's competitors, with combined market shares that constitute the vast majority of the relevant market. Indeed, the MSA was negotiated by the OPMs, which at the time of the MSA's creation had combined market shares of the 97.5% of the U.S. cigarette market. (See Holt Decl. ¶ 15, 32). When the market shares of the grandfathered SPMs are factored in, the companies that joined the MSA within ninety days of its inception constituted virtually 100% of the market. (Id. ¶¶ 7, 30). And the OPMs and grandfathered SPMs continue to control over 90% of the market today. (Id. ¶ 30).

The OPMs and grandfathered SPMs have complete control over terms of access by competitors to the MSA. This control is exercised through the OPMs' and grandfathered SPMs' invocation of the LMFN provision, MSA § XVIII(b). The LMFN provision allows the OPMs and grandfathered SPMs effectively to veto any agreements by the Settling States with non-grandfathered SPMs regarding MSA

14

membership which contain terms more favorable than the OPMs and the grandfathered SPMs agreed would be required by the MSA.  Accordingly, the LMFN provision allows the OPMs and grandfathered SPMs to control the terms of <u>any</u> agreement that the Settling States could potentially execute with other manufacturers to vary the terms for MSA participation.  For example, if the Settling States were to offer General Tobacco any terms to ameliorate its discriminatory treatment under the MSA, the OPMs and grandfathered SPMs would have the final say as to whether their competitor, General Tobacco, could obtain such relief.

Indeed, it is the exercise of this control that prompted this litigation.  As noted, for over two years, General Tobacco negotiated with the Settling States, through the NAAG ("NAAG"), to amend General Tobacco's Adherence Agreement (Exhibit B to the Complaint), which purports to impose the MSA's onerous and discriminatory terms and obligations on General Tobacco – requirements not imposed on any grandfathered SPM.  (Denman Decl. ¶¶ 20-25).  The Settling States negotiated the terms of an Amended Adherence Agreement that would reduce somewhat General Tobacco's discriminatory treatment under the MSA (<u>see</u> Amended Adherence Agreement, filed as Exhibit M to the Complaint), but the Settling States refused to execute the Amended Adherence Agreement unless and until all of the OPMs and an unspecified number of SPMs agreed to waive whatever rights, if any, they may have under the LMFN provision.  (Denman Decl. ¶ 21).  <u>None</u> of the OPMs or grandfathered SPMs agreed waive the LMFN rights.  (Denman Decl. ¶ 22).  But for the OPMs and grandfathered SPMs' refusal to provide such a waiver, the Settling States would have executed the Amended Adherence Agreement long ago.  It is clear from this circumstance alone that General Tobacco's competitors that have the lion's share of the market also control access to the MSA, which is an essential facility to reach the substantial majority of the U.S. market.

### 2.    <u>The MSA Cannot Be Practically Or Reasonably Duplicated.</u>

The test to determine whether an essential facility is subject to being duplicated is not impossibility, but economic feasibility.  <u>See</u> <u>Hecht</u>, 570 F.2d at 992 (citing <u>Helix Milling Co. v.</u>

Terminal Flour Mills Co., 523 F.2d 1317, 1320 (9th Cir. 1975)); Otter Tail Power Co. v. United States, 410 U.S. 366, 378 (1973); Nobody In Particular Presents, Inc. v. Clear Channel Commc'ns., Inc., 311 F.Supp. 2d 1048, 1111 (D. Colo. 2004).  The MSA qualifies as an essential facility under this test because it is not economically feasible to duplicate the MSA as a conduit to the U.S. retail cigarette market.  In fact, while General Tobacco need not make the stronger showing, there is ample evidence that it is impossible to duplicate the MSA.

First, it cannot be disputed that there is no other, comparable conduit for entry into the entire U.S. cigarette market.  A manufacturer that wishes to sell in all of the market is required to join the MSA because a substantial majority of cigarette retailers and distributors refuse to purchase or sell NPM brands.  (Holt Decl. ¶ 11, 18; Bulow Decl. ¶ 40; Denman Decl. ¶ 6).  As noted, the MSA's release of the Settling States' claims applies only to retailers and distributors that sell products of MSA members.  An NPM cannot feasibly provide the protection to retailers offered to them under the MSA because of the uncertainties and risks associated with litigation.  (Bulow Decl. ¶ 40).  The Settling States have taken the position that they cannot release their claims against General Tobacco – on any terms other than those set forth in the MSA absent LMFN waivers from the OPMs and an unspecified number of grandfathered SPMs.

For a time, new market entrants could compete in a small segment of the Settling States as NPMs because the Escrow Statutes, as originally enacted with the ASR provision, allowed NPMs to price their products competitively with grandfathered SPMs.  The Settling States and the OPMs, however, considered the market opportunity created by the ASR provision of the Escrow Statute to be a "loophole".  The repeal of the ASR has made it impossible for a legally compliant NPM to gain any significant market share in the Settling States.  As a result, the NPMs' already limited access to the market has been reduced even further.  Thus, because of the MSA's liability release provision and limitation of NPMs' ability to access the market through repeal of the ASR provision, General

Tobacco is likely to prevail on its claim that the MSA has become an essential facility that cannot be practically or reasonably duplicated.

> **3.      Failure To Offer The MSA On Non-Discriminatory Terms To All SPMs Is An Effective Denial Of Use Of The Facility.**

Because the MSA is an essential facility, MSA membership must be offered to all non-OPM tobacco manufacturers on an equal basis.  The terms of the MSA fail this fundamental test because they single out General Tobacco and other non-grandfathered SPMs for unequal treatment.  This inequity -- resulting from the back-payment requirement, the grandfathered market shares, and escrow-fund requirement -- effectively operates as a refusal to deal.  See Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 179-80 (2d Cir. 1990).  In fact, "there need not be an outright refusal to deal in order to find that denial of an essential facility occurred."  Id.  For an essential facilities claim to succeed, "[i]t is sufficient if the terms of the offer to deal are unreasonable."  Id.; see also Nobody In Particular Presents, 311 F. Supp. 2d at 1112.

Here the terms of the offer are substantially different as between the grandfathered SPMs and the non-grandfathered SPMs like General Tobacco, even though all of these SPMs are similarly situated, i.e., they were not original signatories to the MSA.  For example, General Tobacco was forced to assume hundreds of millions of dollars of back-payment obligations that were not imposed on the grandfathered SPMs.  (Holt Decl. ¶ 19, 37, 40; Denman Decl. ¶ 9).  Moreover, the non-grandfathered SPMs, General Tobacco included, are required to pay into the MSA for each and every carton of cigarettes sold after joining the MSA.  (Holt Decl. ¶ 37; Denman Decl. ¶ 10).  In contrast, a grandfathered SPM is not obligated to make any MSA payments for current sales except to the extent its annual sales exceed its grandfathered market share.  Finally, unlike the grandfathered SPMs, General Tobacco is required to make quarterly escrow deposits for its annual MSA payment for cigarette sales.  (Holt Decl. ¶ 19, 40; Denman Decl. ¶ 10, 11).  The effect of these inequities is that

price for access to the entire market paid by General Tobacco and other non-grandfathered SPMs is much steeper than what grandfathered SPMs must pay.

The ultimate, predictable and intended result is that General Tobacco has been unable to maintain its market share.  Because General Tobacco's more onerous MSA obligations prevent it from meeting the lower prices being offered by the grandfathered SPM, General Tobacco has seen a significant drop in market share, from almost 2% in 2004 to .9% in 2007.  This translates to an annual sales loss of approximately 20 million cartons or 4 billion cigarettes.  (Holt Decl. ¶ 39, 42; Denman Decl. ¶ 19).  The onerous and discriminatory MSA obligations have provided a tremendous advantage to the grandfathered SPMs not only against General Tobacco but also against any new entrants into the discount cigarette market, for which there is no exemption and for which operating successfully as an NPM in MSA States is no longer a viable course.  (See Holt Dec. ¶ 28, 31, 37; Bulow Decl. ¶ 35, 40.)

The Attorney General of Kentucky has acknowledged that grandfathered SPMs, Liggett, Commonwealth Brands, Vector Tobacco Inc. ("Vector"), King Maker Marketing, Inc. ("King Maker") and Sherman's 1400 Broadway N.Y.C.Ltd. ("Sherman's") "enjoy terms much more favorable than those imposed on General Tobacco".  (See Response to Motion By Liggett Group Inc., Vector Tobacco Inc., Commonwealth Brands, Inc., King Maker Marketing, Inc., and Sherman's 1400 Broadway N.Y.C. Ltd. to Enforce Master Settlement Agreement, in Commonwealth of Kentucky v. Brown & Williamson Tobacco Corp., Civil Action No. 98-CI-01579 (filed Sept. 12, 2005), filed as Exhibit G to the Complaint).  Indeed, the extent of the disparity of treatment of General Tobacco vis-à-vis the grandfathered SPMs has been candidly acknowledged by Kentucky, which stated in a 2005 court filing that

> for its 2005 sales, General Tobacco will owe MSA payments of approximately $4.20 per carton on *all* of its cigarette sales in the Commonwealth and elsewhere in the Untied States and in addition will have made millions of dollars in payment of principal and interest on its Back Payment amount, i.e., MSA payments impose retroactively and calculated as if General Tobacco had joined the MSA when it began to sell cigarettes. By contrast, Movants [i.e., Liggett, Commonwealth Brands, Vector, King Maker and Sherman's] will owe MSA payments only on sales above their grandfathered shares. If its MSA payment obligation for 2004 sales is any guide, Movant Vector

will likely owe *no* MSA payments at all for 2005 sales, whereas the average payment by the others will range between approximately $0.70 and $3.00 per carton.

Id. at 3-4.

In addition, according to the affidavit of Gary Wilson, who was offered as an expert by the Attorney General of Kentucky, "[i]n 2004, when the total sales of cigarettes in the United States were approximately 400 billion cigarettes, that meant that Movants [i.e., Liggett, Commonwealth Brands, Vector, King Maker and Sherman's], depending on the grandfathered share of each, were able to sell somewhere between 100 million and 6.4 billion cigarettes with no MSA payment obligation whatever." (See Affidavit of Gary Wilson ¶ 6, in Commonwealth of Kentucky v. Brown and Williamson Tobacco Corp., Civil Action No. 98-CI-01579 (filed Sept. 12, 2005), filed as Exhibit H to the Complaint).

These tremendous advantages afforded by the MSA to grandfathered SPMs but no other company, demonstrate that the MSA's discriminatory terms are an effective denial of the facility to General Tobacco and other non-grandfathered SPMs that do not receive the favored treatment afforded to grandfathered SPMs.

**4.    The MSA Should Be Revised To Provide All SPMs With Non-Discriminatory Terms For Access To The Market.**

The final element of General Tobacco's essential facilities claim – whether "there is a legitimate business justification for the refusal to provide the facility" City of Anaheim v. Southern Cal. Edison Co., 955 F.2d 1373, 1380 (9th Cir. 1992) – is also demonstrated by the proof.  There is no legitimate reason to deny access to the U.S. cigarette market under non-discriminatory terms.  Indeed, membership in the MSA does not require the discriminatory practices now in effect.  Eliminating the back-debt obligation imposed upon General Tobacco and the other non-grandfathered SPMs and applying the current payments requirements to all participants equally would simply place all SPMs on an equal playing field and would require the manufacturers to compete in a way that benefits consumers, not competitors such as the grandfathered SPMs.

The nature of the MSA as a contract does not eliminate the need to remedy a violation of the Sherman Act.  "The thrust of the antitrust laws cannot be avoided merely by claiming that otherwise illegal conduct is compelled by contractual obligations. Were it otherwise, the antitrust laws could be nullified. Contractual obligations cannot thus supersede statutory imperatives."  Associated Press v. Taft-Ingalls Corp., 340 F.2d 753, 759 (6th Cir. 1965) (internal quotations and citations omitted).  Based on these principles, the Sixth Circuit in Associated Press refused to enforce the provisions of a contract that were unlawful under the Sherman Act.  See also Gaines v. Carrollton Tobacco Bd. Of Trade, 386 F.2d 757 (6th Cir. 1967) (refusing to enforce a contract that was illegal under the antitrust laws). Similarly, this Court should refuse to enforce the anti-competitive discriminatory payment provisions of the MSA.

**B.    General Tobacco Is Likely To Prove That the MSA's Discriminatory Provisions Violate Equal Protection.**

**1.    The MSA Irrationally Discriminates Between Similarly Situated SPMs.**

Also likely to succeed is General Tobacco's equal protection claim because the MSA unjustifiably discriminates between General Tobacco and other similarly-situated SPMs.  There is no rational basis for the MSA to contain preferential payment terms based simply on the time when a competitor entered the industry.  Indeed, there are no conceivable facts under which the Settling States could justify the disparate treatment of General Tobacco and other similarly-situated tobacco companies on one hand, and the grandfathered SPMs on the other.

The Equal Protection Clause of the Fourteenth Amendment mandates that no State shall "deny to any person within its jurisdiction, the equal protection of the laws."  Peoples Rights Org., Inc. v. City of Columbus, 152 F.3d 522, 531 (6th Cir. 1998).  Although the Equal Protection Clause does not absolutely forbid classifications, it does keep "governmental decision-makers from treating differently persons who are in all relevant respects alike."  Id. at 531 (quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)) (emphasis added).  If there is no " reasonably conceivable state of facts that could provide a

20

rational basis for the classification," then the classification violates the Equal Protection Clause.  Board of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 367,  (2001) (quoting Heller v. Doe, 509 U.S. 312, 320, (1993)).[8]

Although judicial nullification of purely economic regulations under the Fourteenth Amendment is exceptional in this era, the "rational basis review, while deferential, is not toothless." Craigmiles v. Giles, 312 F.3d 220, 229 (6th Cir. 2002) (quoting Peoples Rights, 152 F.3d at 532. "[E]ven in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained.  The search for the link between classification and objective gives substance to the Equal Protection Clause."  Romer v. Evans, 517 U.S. 620, 632 (1996).

A grandfather clause is a provision that "confers an economic advantage on those engaged in a given activity at a specified date as against all those who participate in the activity for the first time after the date."  Delaware River Basin Comm'n v. Bucks County Water & Sewer Authority, 641 F.2d 1087, 1095 (3d Cir. 1981).  Facially, these clauses, including the grandfather clause here, seem to be "the product of a political arrangement 'that does no more than favor one interest at the expense of another.'"  Id. at 1096 (quoting Robert W. Bennett, *"Mere" Rationality in Constitutional Law: Judicial Review and Democratic Theory*, 67 Cal. L. Rev. 1049, 1049 n.1 (1979)).  Further, in instances where the grandfather provision inures to the benefit of the group that is regulated and not the public, the dangers of favoritism are inherently great.  Id. at 1096.  Grandfather provisions that serve to permanently exempt one party from performing a certain act which another similarly situated party has

---

[8]  Under the rational basis review, numerous federal courts have struck down illegal government classifications as violating the Equal Protection Clause.  See, e.g., Allegheny Pittsburgh Coal Co. v. County Comm'n of Webster County, W.Va., 488 U.S. 336 (1989); Williams v. Vermont, 472 U.S. 14 (1985); City of Cleburne, Tex. v. Cleburne Living Ctr., Inc., 473 U.S. 432 (1985); Zobel v. Williams, 457 U.S. 55 (1982); Craigmiles v. Giles, 312 F.3d 220 (6th Cir. 2002); Ranchsburg v. Toan, 709 F.2d 1207 (8th Cir. 1983); United States Dep't of Agric. v. Moreno, 413 U.S. 528 (1973).

to perform are highly disfavored.[9]  See Delaware River Basin Comm'n v. Bucks County Water & Sewer Auth., 641 F.2d 1087 (3d Cir. 1981); Sklar v. Byrne, 727 F.2d 633 (7th Cir. 1984).

The MSA violates equal protection guarantees because it treats similarly situated persons on extremely varied terms without any rational basis for such distinctions.  There is no legitimate reason for the disparate treatment between SPMs under the MSA.

Grandfather clauses that have been upheld also benefit the general public.  Delaware River Basin, 641 F.2d at 1096, n. 18.  In contrast, the grandfather exemptions and other preferential treatment at issue here benefit only the very class of companies the Settling States are attempting to somewhat regulate.  This fact alone makes the MSA's preferential treatment of grandfathered SPMs highly dubious.  "This congruence between class of persons regulated and the class of beneficiaries makes the favoring of some regulatees through adoption of a 'grandfather' provision particularly questionable."  Id. at 1096, fn. 18.

Indeed, it is such favoritism that the Supreme Court disapproved of in Mayflower Farms, Inc. v. Ten Eyck, 297 U.S. 266 (1936).  In Mayflower Farms, a New York statute establishing minimum prices for the sale of milk gave special pricing privileges to certain dealers that had been in the industry as of a particular date.  The Court found substantial significance in the fact that the group which the legislature sought to regulate was the same group to which the legislature gave preference through legislation.  The Court held that under the circumstances, the legislation was wholly arbitrary because the disparate treatment was based solely on when a dealer entered the industry.  See Mayflower Farms, 297 US. at 274.

---

[9]  Generally, in the instances where a court has upheld a grandfather provision notwithstanding an equal protection challenge, the clause at issue was temporary in nature.  The legislation was focused with doing away with a particular practice at issue and could only do so on a gradual basis.  This step-by-step approach was to protect the reliance interests of those exempted by the grandfather clause.  See City of New Orleans v. Dukes, 427 U.S. 297, 305 (1976); United States R.R. Bd. v. Fritz, 449 U.S. 166 (1980); Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 467-468 (1981); Hennessey v. National Collegiate Ass'n, 564 F.2d 1136, 1144-45 (5thCir. 1977); Sklar v. Byrne, 727 F.2d 633 (7th Cir. 1984).

Likewise, in <u>Delaware River Basin Comm'r v. Bucks County Water & Sewer Auth.</u>, 641 F.2d 1087 (3d Cir. 1981), the Third Circuit remanded a judgment in favor of the State of Delaware that upheld an arbitrary grandfather provision in which some users of water drawn from the Delaware River were charged a certain rate and similarly-situated users were exempted from payment.  The court held that such an exemption was not rationally related to the fulfillment of a legitimate state purpose.  Additionally, in <u>Peoples Rights Org., Inc. v. City of Columbus</u>, 152 F.3d 522 (6th Cir. 1998), the Sixth Circuit invalidated a grandfather provision that had no rational basis for its distinction between persons who registered their firearms under a former assault weapons ordinance during a thirty-day window in 1989 and persons who did not.  The court concluded that such a grandfather clause "fails, indeed defies," even the most deferential of constitutional review.  <u>Id.</u> at 532.

In the case at bar, the MSA's payment preferences for grandfathered SPMs are permanent and based solely on when an SPM joined the MSA.  They are not in the form of step-by-step erosion of an undesired practice, but rather grant complete and permanent relief from payment obligations, simply because the grandfathered SPMs were in the market, and therefore able to join the MSA, earlier than General Tobacco and other subsequent market entrants.  The grandfathered SPMs' payment exemptions are solely for their economic protection at the expense of their competitors.  This cannot be a valid state purpose.

"Courts have repeatedly recognized that protecting a discrete interest group from economic competition is not a legitimate governmental purpose."  <u>Craigmiles</u>, 312 F.3d at 224 (6th Cir. 2002) (citing <u>City of Philadelphia v. New Jersey</u>, 437 U.S. 617, 624 (1978); <u>H.P. Hood & Sons, Inc. v. DuMond</u>, 336 U.S. 525, 537-38 (1949); <u>Energy Reserves Group, Inc. v. Kansas Power & Light Co.</u>, 459 U.S. 400, 411 (1983)).  The MSA is "a naked attempt to raise a fortress protecting the monopoly" profits of the OPMs and grandfathered SPMs and freeze any competition among the tobacco companies at the expense of consumers.  <u>Craigmiles</u>, 312 F.3d at 229.  "This attempt to privilege

23

certain business[persons] over others at the expense of consumers is not animated by a legitimate governmental purpose and cannot survive even rational basis review." Id.

The grandfathered SPMs' exemptions at issue here are also very similar to a state dividend distribution statute that was struck down by the Supreme Court as violative of the Equal Protection Clause because it favored established residents of Alaska over newer residents of the same state.  In Zobel et ux v. Williams, Commissioner of Revenue of Alaska, et. al., 457 U.S. 55 (1982), the Supreme Court, applying rational basis review, found that a state dividend distribution statute violated equal protection because it favored established residents over new residents.  The Court found that the proffered justifications for the statute had no rational basis and that sole justification for retrospective aspect of Alaska's dividend distribution program, favoring established residents over new residents, was constitutionally insufficient.[10]

Like the unconstitutional statutes in Zobel, and other cases cited above, the preferences at issue are based upon time of entry in the State.  The MSA favors those SPMs that were already in existence in the Settling States at the time the MSA was executed, and the MSA precludes subsequent market entrants from garnering those benefits.  This outcome is directly contrary to the equal protection principle that "it is not a legitimate state purpose to confer benefits based solely on past residency at a particular time." Soto-Lopez, 755 F.2d at 274.  General Tobacco is, therefore, likely to succeed on its equal protection claim also.

_____

[10]   Similarly, in Wal-Mart Stores, Inc. v. Knicrehm, 101 F.Supp.2d 749 (E.D. Ark. 2000), the court held that a state's two-tiered reimbursement formula with respect to pharmacy reimbursement violated the Equal Protection Clause because the state treated similarly-situated pharmacies disparately without a rational basis for so doing.  See also Hooper v. Bernalillo County Assessor, 472 U.S. 612, 623-24 (1985) (a New Mexico statute violated Equal Protection by granting a tax exemption to Vietnam veterans who lived in the state before a specific date.); Soto-Lopez v. New York City Civil Serv. Comm'n, 755 F.2d 266, 278, 280-81 (1985) (holding that a New York statute which gave preference to longer-term veteran residents over newer veteran residents was unconstitutional and further finding that the proper remedy "is to require the State and its agents to extend the veteran preference to otherwise qualifying veterans who were not residents of New York at the time they entered the armed forces").

**C.     General Tobacco Is Likely To Prove That The MSA's Discriminatory Provision Violates Due Process.**

There is likelihood of success for General Tobacco's due process claims as well.  As a matter of substantive due process.  General Tobacco is likely to prove that the MSA's discriminatory payment structure takes General Tobacco's property without due process of law because, as discussed, there is no rational basis for such discrimination.  As a matter of procedural due process, General Tobacco is likely to prevail as well because its property is taken by the MSA's payment requirements implemented by consent decrees that did not afford General Tobacco proper notice or opportunity to be heard.

It is a well settled rule that "one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." Richards v. Jefferson County, Ala., 517 U.S. 793, 798 (1996) (citing Hansberry v. Lee, 311 U.S. 32, 40 (1940)).  This well-settled rule is part of our "deep rooted historic tradition that everyone should have his own day in court." Id. (citing 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure §4449, p. 417 (1981))  Therefore, "[a] judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings." Id.  (quoting Martin v. Wilks, 490 U.S. 755, 762 (1989))[11].

This guidance is especially applicable here because the MSA was effectuated in each Settling State through consent decrees that failed to give General Tobacco proper notice or any opportunity to be heard.  For example, General Tobacco was not a party to the consent decree entered by the Franklin Circuit Court on December 21, 1998, which effectively concluded the tobacco litigation between the Kentucky Attorney General and the OPMs.[12] In fact, General Tobacco was not even qualified as a

---

[11]  Congress overrode the Martin decision in the specific context of employment discrimination suits when it enacted the Civil Rights Act of 1991… Martin's holding remains intact outside of the employment discrimination setting." Kourtis v. Cameron, 419 F.3d 989, 999, n. 6 (9th Cir. 2005).

[12]  Each of the original 46 states adopting the MSA were individually required to enter a consent decree as part of the settlement agreement.  (See MSA § XIII).

cigarette manufacturer until 2000, years after the implementation of the MSA.   By signing this consent decree, whereby the MSA was adopted in Kentucky, the Attorney General of Kentucky (and the Attorneys General of the other Settling States) forced the Settling States' settlement agreement with the OPMs on all tobacco manufacturers, including General Tobacco.

General Tobacco was thus effectively bound by the purported terms and conditions of the MSA as implemented by consent decrees entered into each Settling State without any opportunity for General Tobacco to be heard.  General Tobacco is therefore likely to prevail on its claim that the MSA violated General Tobacco's procedural due process rights.

Nor were General Tobacco's interests adequately represented by any other party to the consent decree.  In <u>Rutherford v. City of Cleveland</u>, 137 F.3d 905, 909 (6th Cir. 1998), the Sixth Circuit was faced with the fundamental question of how to determine whether a party's interests were adequately represented by another.  In relying on a report provided by the House Committee, the court adopted a standard analogous to that of Federal Rule of Civil Procedure 23 (class actions) and "permit[ed] preclusion of subsequent challenges to court decrees by persons whose interests 'were adequately represented by another person who challenged such judgment or order prior to or after entry.'"  <u>Id</u>.  In order to further understand the nature of "adequate representation", the Sixth Circuit looked to <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 625-26 (1997), which recognized "[a] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." <u>Rutherford</u>, 137 F.3d at 909.  Therefore, in order to meet the adequate representation requirement under the rule, "there must be an absence of a conflict of interest and the presence of common interests and injury." <u>Id</u>.

Here, there is no commonality of interest between General Tobacco and any of the tobacco manufacturers that were parties to the consent decree.  The OPMs and Liggett, a grandfathered SPM, were the alleged tortfeasors in the underlying tobacco litigation which resulted in the creation of the MSA, which was effectuated through entry of the consent decree.  Their primary interest in negotiating

the MSA was to end the expensive and burdensome litigation while maintaining market share (and control) in the industry.

In stark contrast, General Tobacco was not even in the industry at the time of the settlement. General Tobacco was never accused of any wrongdoing, was not involved in any tobacco litigation and had no reason to join the MSA for the purpose of limiting its liability to the States.  The purpose for General Tobacco to join the MSA was singularly related to entry into the tobacco market through the only means available, the MSA.  Thus, the interests of General Tobacco and other tobacco companies that entered the market after 1998 are drastically different than any of the interests represented by those parties that signed the consent decree.

Furthermore, there is no commonality of injury between General Tobacco and the OPMs and the grandfathered SPMs.  The OPMs willingly made payments to the MSA as a means of restitution for their prior alleged illegal acts.  The grandfathered SPMs, who were also in business at the time of the settlement, have no financial obligations under the MSA unless their market share increases significantly.  General Tobacco, in contrast, must pay fees to the Settling States for all cigarettes sold within the United States despite the fact it (a) was not a manufacturer at the time of implementation of the MSA, (b) it was not a party to the tobacco litigation, (c) it has not been accused of committing the illegal acts the OPMs were accused of, and (d) was never given the opportunity to benefit from the grandfather exemptions and other preferences given to other manufacturers.

Because there is no commonality of interest or injury, General Tobacco was not adequately represented at the time of entry of the consent decree effectuating the MSA, and there is no applicable exception to the fundamental rule that "a judgment or decree… does not conclude the rights of strangers." Martin, 490 U.S. 762.

As a non-party, General Tobacco is not precluded from challenging a consent decree where its interests were not adequately represented.  Rutherford, 137 F.3d at 910.  As the Supreme Court explained in Richards, "it would violate the Due Process Clause of the Fourteenth Amendment to bind

litigants to a judgment rendered in an earlier litigation to which they were not parties and in which they were not adequately represented." 517 U.S. at 794. In relying on the Supreme Court's opinion in Richards, the Sixth Circuit held that persons applying to the police department of the City of Cleveland could challenge a consent decree regulating the way the City made its hiring decisions, because these persons, adversely affected by the consent decree, were not parties to the previous litigation and had not been adequately represented. Rutherford, 137 F.3d at 906. In a similar case involving a consent decree which regulated the City's affirmative action policy, the Sixth Circuit likewise recognized that a person not a party to a consent decree who suffers some detriment as a direct result of the decree, may challenge such decree on the grounds that its "substantive provisions unlawfully infringe upon the rights of the complainant." Vogel v. City of Cincinnati, 959 F.2d 594, 598-599 (6th Cir. 1992).

General Tobacco is therefore likely to prove that its due process rights were violated by the forceful restraints of consent decrees, entered in each Settling State to which it was never a party. The fundamentals of procedural due process require notice and an opportunity to be heard. "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." Hamdi v. Rumsfeld, 542 U.S. 507, 533 (2004).

### D. General Tobacco Is Likely To Prove That The MSA Imposes Extraterritorial Taxes In Violation Of The Commerce Clause And Due Process.

General Tobacco also has a likelihood of success for its Commerce Clause and Due Process challenge to the extraterritorial impact of the MSA. The MSA violates the Commerce Clause and Due Process for at least two reasons. First, the MSA discriminates based simply upon the date residency (i.e., market entry) was established in a Settling State. Second, because Participating Manufacturers are required to pay to a Settling State for sales outside of that jurisdiction, including in States that have not even joined the MSA, the MSA regulates commerce in direct contravention of the Commerce Clause and the Due Process Clause.

1.   **The MSA Violates The Dormant Commerce Clause Because It Discriminates In Favor Of Early Market Entrants.**

In <u>Southern Wine and Spirits of Tex., Inc. v. Steen</u>, 486 F. Supp. 2d 626, 628 (W.D.Tex. 2007), the court held that the one-year durational residency and citizenship provision of the Texas Alcoholic Beverage Code "impermissibly impinge on the Commerce Clause by mandating differential treatment for in-state and out-of-state wholesalers of alcoholic beverages, and concludes that Southern Wine of Texas's request for declaratory and injunctive relief should be granted."  Southern Wine of Texas ("Southern Wine"), a Texas domestic for-profit corporation, had applied for certain Texas permits and licenses it needed to conduct its wholesale operations in Texas.  Southern Wine was refused the permits and licenses solely on the basis that it failed to meet Texas's one-year durational residency and citizenship requirements.  The Texas Alcoholic Beverage Commission ("TABC") argued to no avail that the residency requirements are "necessary [to] ensure that those who distribute a dangerous product, alcohol, have a stake in the welfare of the community in which they operate."  <u>Id.</u> at 631.  The court found the justifications insufficient under Commerce Clause jurisprudence, holding that it was "without evidentiary support or explanation" . . . and that the "TABC has failed in its burden to prove that no discriminatory alternative means are available to Texas to address the state's interest in ensuring that those who distribute alcoholic beverages have a stake in the welfare of the community in which they operate."  <u>Id.</u> at 632.

The MSA's facially discriminatory provision as to later entrants is very much like the durational residency requirement which was struck down as violative of the Commerce Clause in <u>Southern Wine</u>.  Indeed, the MSA discriminates between SPMs on the sole basis of whether or not they were in existence at the time of its execution.  For example, the grandfathered SPMs received the benefit of the grandfather exemption merely because they have been in the business longer.  Accordingly, General Tobacco is likely to demonstrate that the MSA violates the Commerce Clause because the Settling States have no legitimate justifications for distinguishing between the

grandfathered SPMs and later entrants, like General Tobacco, into the cigarette manufacturing business.

**2.      The MSA Violates The Dormant Commerce Clause and the Due Process Clause Because Participating Manufacturers Are Required To Pay Each Settling State For Out-of-State Sales For Sales In States That Have Not Even Joined The MSA.**

The MSA mandates that participants, like General Tobacco, make payments that enure to the benefit of each Settling State on <u>all U.S.  sales</u>, regardless of the jurisdiction where the sale occurred. In other words, each Settling State receives its allocable share of MSA payments obtained from cigarettes sold not only within the borders of that Settling State, but also in every other State, including Florida, Minnesota, Mississippi and Texas, none of which are non-MSA states.  (Holt Decl. ¶ 12; Bulow Decl. ¶ 39; Denman Decl. ¶ 10).  As such, each Settling State extracts value which accrued outside its borders.  The MSA, therefore, violates the Commerce Clause because it is overreaching and akin to an illegal extraterritorial tax.

There can be no question that the Constitution imposes limitations on each State's taxing jurisdiction, including a Settling State's ability to extract payments for sales of cigarettes occurring outside its boundaries.  Indeed, the Commerce Clause requires the existence of "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax." <u>Allied Signal, Inc. v. Div. of Taxation</u>, 504 U.S. 768, 777 (1992) (internal quotations omitted).  It is a fundamental constitutional principle that "a State may not tax value earned outside its borders…." <u>Id</u>. at 777.

A tax has been defined as "[a] monetary charge imposed by the government on persons, entities, transactions, or property to yield public revenue" or "all governmental impositions on the person, property, privileges, occupations, and enjoyment of the people, and includes duties, imposts, and excises."  Black's Law Dictionary, p. 1496 (8th ed. 2004).  The MSA functions as a tax because it is an extraction by each Settling State for its use.  The MSA payment obligation is virtually

30

indistinguishable in form and function from excise taxes imposed on sales of cigarettes.  Thus, the jurisdictional inquiry here is whether a Settling State has jurisdiction over the involved tax base - sales of cigarettes outside the State.

The answer to this question is a resounding "NO."  As noted above, the Commerce Clause limits a state's jurisdiction to impose a tax.  See Allied-Signal, 504 U.S. at 784 ("[T]he Constitution places limits on a State's power to tax value earned outside of its borders.").  This is especially so in these circumstances where the tax/payment obligation is imposed on cigarette sales in non-MSA jurisdictions.  Id. at 768.  ("[A] State may not tax value earned outside its borders.").  To survive Commerce Clause scrutiny, the state taxing measure in question – here, the MSA – will not be sustained if it is discriminatory and overreaching.  Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279 (1977).

The dormant Commerce Clause affords general protection to the national economy by protecting taxpayers, such as General Tobacco, engaged in interstate commerce.  "[T]he Commerce Clause and its nexus requirement are informed not so much by concerns about fairness for the individual defendant as by structural concerns about the effects of state regulation on the national economy."  Quill Corp. v. North Dakota, 504 U.S. 298, 312 (1992).  Of particular significance here, Congress alone has the power to regulate interstate commerce.[13]  In this regard, it is clear that "Congress certainly has the power to authorize state regulations that burden or discriminate against interstate commerce…."  Hillside Dairy Inc. v. Lyons, 539 U.S. 59, 66 (2003).[14]

Accordingly, Congress alone has the power to waive a Commerce Clause violation by a State, as the power granted by the Commerce Clause is that of Congress.  As such, an actual or potential

---

[13] See Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 2 (1824) ("The power to regulate commerce, so far as it extends, is exclusively vested in Congress…."); Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of the State of Or., 511 U.S. 93, 98 (1994) ("The Framers granted Congress plenary authority over interstate commerce….").

[14] See also Camps Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 572 (1997) (recognizing that Congress "unquestionably has the power to repudiate or substantially modify" dormant Commerce Clause tax adjudication); Quill, 504 U.S. at 318 ("Congress remains free to disagree with our conclusions.").

taxpayer cannot authorize or waive a Commerce Clause violation other than by joining with the nation's other citizens to amend the Constitution.[15]  Although an entity may consent to a state's *in personam* taxing jurisdiction (*i.e.,* as individual rights are conferred by the Due Process Clause), an entity's "consent" to a state's jurisdiction is irrelevant in the context of the Commerce Clause, which fundamentally plays the same role as subject-matter jurisdiction in the judicial context.

Applied to the facts here, the contractual character of MSA <u>does not</u> and <u>cannot</u> – under the Commerce Clause – function to allow an entity to consent, accede, or sanction the inclusion of the payment obligations arising from cigarette sales without any connection with the Settling States. General Tobacco is therefore also likely to succeed on its dormant Commerce Clause and Due Process Clause claim challenging the extraterritorial reach of the MSA.

### E.   <u>General Tobacco Is Likely To Prove That The MSA Violates The Compact Clause.</u>

The Compact Clause, found in Article 1, Section 10, Clause 3 of the Constitution, provides that "[n]o State shall, without the Consent of Congress … enter into any Agreement or Compact with another State."  States usurp federal power in violation of the compact Clause when they fail to seek congressional approval of an agreement which impacts the supremacy  rights of the United States. <u>People v. City of Chicago</u>, 942 F. Supp. 366, 371 (N.D.Ill. 1996).  In such circumstances, the States' agreement "violates the Compact Clause because it lacks or exceeds Congress's consent, and is therefore, unenforceable."  <u>Id.</u> at 371-72 (citing <u>Port Auth. Bondholders Protective Comm. v. Port of N.Y. Auth.,</u> 387 F.2d 259, 261 (2d Cir. 1967); <u>Cuyler v. Adams</u>, 449 U.S. 433, 439-440 (1981)).

The Compact Clause is applicable to agreements "directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States."  <u>City of Chicago</u>, 942 F. Supp. at 372 (internal citations and

---

[15] <u>See</u> <u>Granholm v. Heald</u>, 544 U.S. 460, 494 (2005) (Stevens, J., dissenting) ("If Congress may nevertheless authorize the States to enact such laws [violating the dormant Commerce Clause], surely the people may do so through the process of amending our Constitution."

quotations omitted).  The "procedural hurdle" of congressional consent is required "to prevent

conspiring states from usurping federal power[.]"  Id.  It "exists to allow Congress to screen attempts

by compacting states to regulate or cooperate in a uniquely federal area[.]"  Id.  See also People v.

Trans World Airlines, Inc., 728 F.Supp. 162, 182 (The Compact Clause implicates agreements

between the states "directed to the formation of any combination tending to the increase of political

power in the States, which may encroach upon or interfere with the just supremacy of the United

States.") (internal citations and quotations omitted).

     The standard for determining whether the Compact Clause has been violated is "whether the

Compact enhances state power quoad the National Government."  Id. at 183 (internal citations

omitted).  The Compact Clause is, therefore, directly in question where the interstate contract

"embraces actions a state could not take acting alone."  Id. (internal citations omitted).

     General Tobacco is likely to demonstrate that the MSA is an "Agreement or Compact" among

the States for purposes of the Compact Clause as it is an agreement between private parties and forty-

six states.  The MSA is in direct contravention of the Compact Clause as it was neither submitted to

nor approved by Congress.  The MSA establishes a complex national tax and regulatory scheme that

directly regulates interstate commerce beyond the borders of the Settling States.  See Grand River

Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 170 (2d Cir. 2005) (holding that plaintiffs stated a

claim under the dormant commerce clause where they alleged that the escrow statutes and the MSA

had an impermissible extraterritorial effect of regulating interstate commerce outside the borders of the

Settling States.  In so doing, it encroaches on the prerogatives and supremacy of the Federal

Government, enlarges the political power and influence of the Settling States collectively at the

expense of the Federal Government and the non-MSA States, and reduces the autonomy and

sovereignty of individual States).

     The MSA regulates access to the national cigarette market beyond the borders of each Settling

State and even beyond the borders of all the Settling States.  General Tobacco cannot sell its products

to the large majority of retailers and distributors absent MSA membership, which has been denied to them on reasonable terms.  The MSA is especially troubling for purposes of the Compact Clause because it encroaches upon areas of federal authority with respect to the antitrust laws.  The MSA encroaches upon federal supremacy by creating an essential facility for access to the national cigarette market but denying General Tobacco and other non-grandfathered SPMs reasonable access to that facility, in violation of sections 1 and 3(a) of the Sherman Act.  The MSA undermines the national policy of free competition in the cigarette market which the federal antitrust laws are specifically in place to protect.  The MSA also encroaches on the power of Congress under the Commerce Clause by establishing what is essentially a national tax on all of General Tobacco's sales, including sales in non-MSA States.  See Grand River Enters., supra.  The MSA, thus, enhances the power of the Settling States quoad the Federal Government as it encroaches on both the Federal Government's objectives in enforcing the antitrust laws and Congress' plenary powers in regulating commerce among the several states.

**F.**     **General Tobacco is Likely To Succeed On Its Fraud In the Inducement Claim.**

Another alternative ground for granting relief, even if the MSA survives federal antitrust and constitutional challenge, is that General Tobacco was fraudulently induced to join the MSA.  To establish a claim for fraud in the inducement, General Tobacco mush show "a) material representation; b) which is false; c) known to be false or made recklessly; d) made with inducement to be acted upon; e) acted in reliance thereon; and f) causing injury."  United Parcel Serv. Co. v. Rickert, 996 S.W.2d 464, 468 (Ky. 1999).  In addition, the inducement need not be only in the form of a representation.  Fraud can also come in the form of "willfully failing to disclose the truth."  Chamberlain v. National Life & Accident Ins. Co., 76 S.W.2d 628, 631 (Ky. 1934).  These elements must be shown by clear and convincing evidence, but "proof may be developed by the character of the testimony, the coherency of the entire case as well as the documents, circumstances and facts presented."  United Parcel Serv. Co., 996 S.W.2d at 468.

General Tobacco is likely to succeed in proving these elements of fraudulent inducement.  The Settling States and their representatives at NAAG led General Tobacco to believe that by joining the MSA, it would avoid litigation regarding its NPM escrow payments and would gain access to the majority of retailers that will only purchase product from MSA participants.  (See Denman Decl. ¶ 6). The Settling States and NAAG also led General Tobacco to believe that it would be on a level playing field with all of the other SPMs once it joined the MSA and would have an opportunity to compete fairly in the discount cigarette market.  What the Settling States failed to advise General Tobacco was that its terms of entry were substantially more onerous than that required of the grandfathered SPMs. In fact, General Tobacco was not allowed to review the terms offered to other SPMs.  (Id. ¶ 13).  The States intentionally omitted information regarding the extent of the grandfathered SPMs exemptions under the MSA.  (Id.) Had General Tobacco had access to this information, it would never have joined the MSA under the onerous terms thrust upon it.  (Id. ¶ 19).

General Tobacco was also assured that the Settling States were diligently enforcing their NPM statutes, thus inducing General Tobacco to conclude that the NPMs would not be able to undercut General Tobacco's prices after it became subject to MSA obligations.  (Id. ¶ 13, 18).  To the contrary, since General Tobacco has joined the MSA, it has lost significant market share to rogue NPMs that operate outside the requirements of the Settling States' escrow statutes with no effective enforcement by the Settling States.  (Id.)

## II.    UNLESS THE PRELIMINARY INJUNCTION ISSUES, GENERAL TOBACCO WILL SUFFER IRREPARABLE AND IMMEDIATE HARM

There can be no doubt that absent injunctive relief, General Tobacco will suffer irreparable injury.  While a showing of economic loss is generally not sufficient to show irreparable harm, economic loss will constitute irreparable harm when a plaintiff, as here, can show that "the economic loss would significantly damage its business above and beyond a simple diminution in profits."  World Duty Free Ams., Inc. v. Summers, 94 F. Supp. 2d 61, 67 (D.C. D.C. 2000).  Indeed, the Sixth Circuit

has unequivocally found that irreparable injury occurs where the potential economic loss is so great as to threaten the existence of the movant's business.  Performance Unlimited, Inc. v. Questar Publishers, Inc., 52 F.3d 1373 (6th Cir. 1995).

It is also well recognized that the "loss of market share is a 'potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'"  Novartis Consumer Health, Inc. v. Johnson & Johnson-Merk Consumer Pharms. Co., 290 F.3d 578, 596 (3rd Cir. 2002); Moltan Co. v. Eagle-Picher Indus., Inc., 55 F.3d 1171, 1175 (6th Cir. 1995); Cordis Corp. v. Medtronic, Inc., 835 F.2d 859, 864 (Fed. Cir. 1987); Opticians Ass'n v. Independent Opticians, 920 F.2d 187, 195 (3rd Cir. 1990).

If the requested preliminary injunctive relief is granted now, the Settling States will likely proceed to delist all of General Tobacco's brands from approved government lists, preventing General Tobacco from making any sales for consumers in any of the Settling States.  By delisting General Tobacco's brands, the Settling States will essentially be shutting down eighty-five percent (85%) or more of General Tobacco's business .  (See Denman Decl. at ¶ 25).  General Tobacco's sales in the non-MSA states currently constitute only approximately fifteen percent (15%) of its sales, and these sales will decrease even further if General Tobacco is delisted from the MSA because even in the non-MSA states, national and regional retailers will not carry non-MSA brands.  (Id.)

Bankruptcy would likely be the only remaining option for General Tobacco were this Court to deny a preliminary injunction.  That is because General Tobacco would not have the assets to pay the amounts that the Settling States would contend they are owed under the MSA.  It is expected that the Settling States would claim they are entitled to accelerate the entire amount of any payments they believe are due under the Adherence Agreement.  As evidenced by General Tobacco's complaint and this memorandum, General Tobacco disputes that it owes such payments.  Nevertheless, to the extent the Court does not grant a preliminary injunction, the Settling States will force General Tobacco to shut down its operations or file for bankruptcy because General Tobacco will not only be unable to

36

meet the Settling State's demands (if a court deems them to be valid) but it will be unable to pay its

non-disputed claims as they come due.  Clearly, the cessation of General Tobacco's business and/or

filing of bankruptcy represent irreparable damage.

## III.   THE ISSUANCE OF A PRELIMINARY INJUNCTION WILL NOT SUBSTANTIALLY HARM THE INTERESTS OF OTHERS

The issuance of injunctive relief will have no substantial adverse effects on the Settling States.

General Tobacco seeks only an opportunity to even the playing field as among SPMs.  Without relief,

General Tobacco will be facing bankruptcy.  In contrast, for the Settling States, temporary relief will

cause them no substantial harm.  General Tobacco would not object to depositing a sum into the

Court's registry to function essentially as a bond for the requested injunctive relief.  At the appropriate

time, General Tobacco will present evidence as to its financial condition in order to allow the Court to

determine the appropriate amount to go into the Court's registry.

## IV.   THE ISSUANCE OF A PRELIMINARY INJUNCTION WILL SERVE THE PUBLIC INTEREST

Finally, and most importantly, consumers will benefit if injunctive relief is granted.  If General

Tobacco's brands were delisted (as is likely if no preliminary injunction is issued), consumers in the

Settling States would no longer have those brands as a choice to purchase.  It is unlikely that General

Tobacco would be able to recover lost market share.  Without General Tobacco as a competitor, the

tobacco industry will move toward a much more concentrated market and the grandfathered SPMs will

have less restraint on price.  Ultimately, consumers will be forced to pay higher prices with fewer

brand choices.

## V.   NO SECURITY IS REQUIRED IN THESE CIRCUMSTANCES

In the Sixth Circuit, it has long been the rule that the district court possesses discretion over

whether to require the posting of security under Fed. R. Civ. P. 65(c), and the amount of the bond.

Roth v. Bank of the Commonwealth, 583 F.2d 527, 539 (6th Cir.1978), cert. dismissed, 440 U.S. 944

(1979); <u>Urbain v. Knapp Bros. Mfg. Co.</u>, 217 F.2d 810, 815-16 (6th Cir.1954), <u>cert. denied</u>, 349 U.S. 930 (1955).

In this case, there is absolutely no need for a bond. A bond is required only to protect a party from the wrongful issuance of injunctive relief. A bond provides security which guarantees, up to the amount of the bond, a measure of damages pre-determined by the Court. Here, General Tobacco asks this Court merely to enjoin the Defendant Attorneys General from taking action against General Tobacco with respect to General Tobacco's purported obligations under the MSA, including attempts to delist General Tobacco's brands or an attempt to take possession of General Tobacco's escrow account at SunTrust Bank. Such an order, even if wrongfully entered, will in no way cause injury to the Defendants such that money damages will provide compensation.

Even if Defendants could provide evidence that the injury could be remedied through money damages, which they cannot, General Tobacco is willing, as noted, to deposit a sum into the Court's Registry as security to justify imposition of injunctive relief.

<u>Conclusion</u>

For the foregoing reasons, the Court should grant General Tobacco's motion for a preliminary injunction.

Respectfully submitted,

s/ John K. Bush
John K. Bush
Christie A. Moore
Helen A. Thompson
GREENEBAUM DOLL & McDONALD PLLC
3500 National City Tower
Louisville, KY 40202
(502) 589-4200

COUNSEL FOR PLAINTIFF VIBO CORPORATION, INC. D/B/A GENERAL TOBACCO