UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| VIBO CORPORATION, INC. d/b/a GENERAL TOBACCO | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 3:08-CV-571-C |
| v. | ) ) | |
| JACK CONWAY, in his official capacity as Attorney General of the Commonwealth of Kentucky, *et. al.* | ) ) ) ) | *(ELECTRONICALLY FILED)* |
| Defendants. | ) ) ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT
ATTORNEYS GENERAL'S MOTION TO DISMISS PURSUANT TO
FEDERAL RULES OF CIVIL PROCEDURE 12(B)(2) AND 12(B)(3)**

Respectfully submitted,

John K. Bush
Christie A. Moore
Helen A. Thompson
Brigid O. Gies
GREENEBAUM DOLL & MCDONALD PLLC
3500 National City Tower
101 South Fifth Street
Louisville, KY  40202
502.589.4200
jkb@gdm.com
cm@gdm.com
hat@gdm.com
bog@gdm.com

COUNSEL FOR PLAINTIFF,
VIBO CORPORATION, INC., d/b/a
GENERAL TOBACCO

# TABLE OF CONTENTS

Page

Introduction ....................................................................................................... 1

Argument ......................................................................................................... 4

I.  THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANT
ATTORNEYS GENERAL............................................................................. 4

  A.  General Tobacco Has Satisfied Its Burden of Establishing a *Prima Facie*
Case For Personal Jurisdiction Over Defendant Attorneys General ..................... 4

  B.  Defendant Attorneys General Are Subject To Personal Jurisdiction In
Kentucky Pursuant To The Conspiracy Theory Doctrine .................................... 5

    1.  General Tobacco Has Sufficiently Pleaded The Existence Of
A Conspiracy ...................................................................................... 6

      a.  The Constitutional Conspiracy ..................................................... 7

      b.  The Antitrust Conspiracy............................................................. 9

    2.  General Tobacco Has Sufficiently Pleaded That Defendant Attorneys
General Either Participated In Or Agreed To Join The Conspiracy ......... 12

    3.  General Tobacco Has Sufficiently Pleaded That An Overt Act In
Furtherance of The Conspiracy Took Place Within The Commonwealth
Of Kentucky ...................................................................................... 15

II.  THIS COURT HAS OTHER GROUNDS BESIDES THE CONSPIRACY THEORY
DOCTRINE TO EXERCISE PERSONAL JURISDICTION OVER DEFENDANT
ATTORNEYS GENERAL PURSUANT TO THE KENTUCKY
LONG-ARM STATUTE.............................................................................. 18

  A.  General Tobacco Has Properly Alleged Personal Jurisdiction Pursuant to the
Kentucky Long-Arm Statute........................................................................... 19

  B.  This Court's Exercise of Personal Jurisdiction Over Defendants Complies
With Due Process .......................................................................................... 22

III.  VENUE IS PROPER IN THE WESTERN DISTRICT OF KENTUCKY...................... 26

Conclusion ....................................................................................................... 30

## TABLE OF AUTHORITIES

Cases                                                                                                    Page

Action Embroidery Corp. v. Atlantic Embroidery, Inc., 368 F.3d 1174 (9th Cir. 2004) .............. 28

American Greetings Corp. v. Cohn, 839 F.2d 1164 (6th Cir. 1988) ................................................. 4

American Tobacco Co. v. U.S., 328 U.S. 781 (1946) ..................................................................... 6

Beach v. National Football League, 331 F. Supp. 249 (SDNY 1971) ......................................... 29

Brewer v. Lincoln Int'l Corp., 148 F. Supp. 2d 792 (W.D. Ky. 2000) ....................................... 12

Burger King v. Rudzewicz, 471 U.S. 462 (1985) ........................................................................ 23

Calphalon Corp. v. Rowlette, 228 F.3d 718 (6th Cir. 2000) ...................................................19,23

Caribbean Broad. Sys. Ltd. v. Cable & Wireless P.L.C.,
    148 F.3d 1080 (D.D.C. 1998) ........................................................................................ 4

Chrysler Corp. v. Fedders Corp., 643 F.2d 1229 (6th Cir. 1981) ............................................... 12

CompuServe, Inc. v. Patterson, 89 F.3d 1257 (6th Cir. 1996) .................................................... 22

Crusader Marine Corp. v. Chrysler Corp, 281 F. Supp. 802 (E.D. Mich. 1968) ........................ 28

Dean v. Motel 6 Operating L.P.,
    134 F.3d 1269 (6th Cir. 1998) ................................................................................passim

Edmond v. United States Postal Serv. Gen. Counsel, 949 F.2d 415(D.C. Cir. 1991) ................... 6

Elemary v. Holzmann A.G., 533 F. Supp. 2d 144 (D.D.C. 2008) ............................................... 28

Fazoli's Franchising Sys., LLC v. JBB Inv., LLC,
    2008 WL 4525433 (E.D. Ky. 2008 .................................................................................. 5

First of Mich. Corp. v. Bramlet, 141 F.3d 260 (6th Cir. 1998) ................................................... 30

First Nat'l Bank of Louisville v. J.W. Brewer Tire Co., 680 F.2d 1123 (6th Cir. 1982) ............. 23

Grand Rivers Enters. Six Nations, LTD v. Pryor, 425 F.3d 158 (2d Cir. 2005) ......................... 20

Gulf Oil Corp. v. Gilbert, 330 U.S. 501 (1947) .......................................................................... 26

Handley v. Ind. & Mich. Elec. Co., 732 F.2d 1265 (6th Cir. 1984) ............................................ 22

In Re New Motor Vehicles Canadian Export Antitrust Litig.,
    307 F. Supp. 2d 145 (D. Maine 2004) ........................................................................... 28

In re Peachtree Lane Assocs., Ltd, 150 F.3d 788 (7th Cir. 1998)................................... 27

Info-Med, Inc. v. Nat'l Healthcare, Inc., 669 F. Supp. 793 (W.D. Ky. 1987)............................ 23

Int'l Shoe Co. v. Washington, 326 U.S. 310 (1945) ...................................................... 22

Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020 ( D.C. Cir. 1997)................ 12

Kentucky Speedway, LLC v. Nat'l Ass'n Stock Car Auto Racing, Inc.,
    410 F. Supp. 2d 592 (E.D. Ky. 2006) ....................................................................passim

Lamb Enters., Inc. v. Toledo Blade Co., 461 F.2d 506 (6th Cir. 1972) .................................... 6,14

MCM Partners, Inc. v. Andrews-Bartlett & Assoc., Inc., 62 F.3d 967 (7th Cir. 1995) ................. 2

Milliken v. Meyer, 311 U.S. 457 (1940) ................................................................. 22

Mitrano v. Hawes, 377 F.3d 402 (4th Cir. 2004) ........................................................ 27

Murphy v. Schneider Nat'l, Inc., 362 F.3d 1133 (9th Cir. 2004) .................................... 27

Myers v. American Dental Ass'n, 695 F.2d 716 (3d Cir. 1982)........................................ 27

National Hockey League Players' Ass'n v. Plymouth Whaler's Hockey Club,
    166 F. Supp. 2d 1155 (E.D. Mich. 2001) ......................................................... 28

Nationwide Mut. Ins. Co. v. Tryg Int'l Co., Ltd., 91 F.3d 790 (6th Cir. 1996)............................ 5

Neogen Corp. v. Neo Gen Screening, Inc., 282 F.3d 883 (6th Cir. 2002) .................................. 4,6

Neogen Corp. v. U.S. Dept. of Justice, 2006 WL 3422691 (E.D. Ky. Nov. 28, 2006)..........passim

Paper Sys., Inc. v. Mitsubishi Corp., 967 F. Supp. 364 (E.D. Wis. 1997) ................................. 29

Picker Int'l, Inc. v. Travelers Indem. Co., 35 F. Supp. 2d 570 (N.D. Oh. 1998)........................ 27

Professional Adjusting Sys. of Am., Inc. v. General Adjustment Bureau, Inc.,
    352 F. Supp. 648 (E.D. Pa. 1972)................................................................. 29

Purdue Research Found v. Sanofi-Synthelado, S.A.,
    338 F.3d 773 (7th Cir. 2003)................................................................. 4,5

Rutherford v. Goodyear Tire and Rubber Co., 943 F. Supp. 789 (W.D. Ky. 1996)...............26,30

Siegel v. Homestore, Inc., 255 F. Supp. 2d 451 (E.D. Pa. 2003).............................................. 26

Simon v. Ward, 80 F. Supp. 2d 464 (E.D. Pa. 2000) ................................................. 27

Southern Mach. Co. v. Mohasco Indus., Inc., 401 F.2d 374 (6th Cir. 1968) ..........................22,25

Spectator's Commc'n Network Inc. v. Colonial Country Club,
        253 F.3d 215 (5th Cir. 2001) ............................................................... 14

Third Nat'l Bank in Nashville v. WEDGE Group, Inc., 882 F.2d 1087 (6th Cir. 1989) ............. 23

U.S. v. Paramount Pictures, Inc., 334 U.S. 131 (1948) ............................................ 14

Welsh v. Gibbs, 631 F.2d 436 (6th Cir. 1980) ....................................................... 5,23

Codes

15 U.S.C. § 15(a) ......................................................................................... 28

28 U.S.C. § 1391 ......................................................................................... 28

Rules

Fed. R. Civ. P. 12(b)(2) .................................................................................. 3

Fed. R. Civ. P. 12(b)(3) .................................................................................. 3

Statutes

C.P.L.R. § 302(a)(1) ..................................................................................... 20

KRS 454.210 ........................................................................................19,20,21

## Introduction

Plaintiff, Vibo Corporation d/b/a General Tobacco ("General Tobacco"), respectfully opposes the Motion of Defendant Attorneys General to dismiss the Complaint for lack of personal jurisdiction and improper venue pursuant to Federal Rules of Civil Procedure 12(b)(2) and (b)(3).[1]

This case is unique in that it seeks to bring seventy-one Defendants, from fifty-two different jurisdictions, before one Court.  While Defendant Attorneys General attempt to portray this effort as impossible, it is actually a rather simple endeavor that fully comports with applicable principles of Kentucky and Federal law.  As alleged in the Complaint and Amended Complaint, all seventy-one Defendants, including the Attorneys General of the Settling States,[2] the Original Participating Manufacturers ("OPMs")[3] and the grandfathered Subsequent Participating Manufacturers ("grandfathered SPMs")[4], participated in at least two conspiracies involving the exploitation of certain provisions of the Master Settlement Agreement ("MSA") to further each conspirator's own interests as well as the interests of its co-conspirators, in violation

---

[1] All Defendant Attorneys General except for the Attorney General of Kentucky, who does not contest personal jurisdiction or venue,  join in the subject Motion.  (See Memorandum of Law In Support of Motion By Defendant Attorneys General To Dismiss The Complaint For Lack of Personal Jurisdiction And Improper Venue ("AG's Memo." [DE 208] at 1). Movants are referred to herein as Defendant Attorneys General.

[2] The Settling States are forty-six States (i.e., all States except Florida, Minnesota, Mississippi and Texas), the District of Columbia, and five U.S. island territories (American Samoa, Guam, the Northern Marianas, Puerto Rico and the U.S. Virgin Islands). (See Com. ¶ 1; Am. Com. ¶1).

[3] The Original Participating Manufacturers were Philip Morris Inc. ("Philip Morris"), R.J. Reynolds Tobacco Co. ("Reynolds"), Brown & Williamson Tobacco Corp. ("B&W"), and Lorillard Tobacco Co. ("Lorillard").  (See Com. ¶ 3; Am. Com. ¶ 5).  Reynolds has assumed the rights and obligations of B&W under the MSA. (Am. Com. ¶ 120).

[4] The grandfathered Subsequent Manufacturers are the seventeen tobacco manufacturers that joined the MSA within the ninety-day "Preferential Signing Period" following the execution of the MSA by the Settling States and the OPMs.  (See Com. ¶ 6; Am. Com. ¶ 8)

of constitutional and antitrust law.  (See Com. ¶¶ 26, 27; Am.. Com. ¶¶ 27, 28).[5]  While some Defendants were the leaders the conspiracies and others had smaller roles, the full effects of the conspiracies could not have been obtained without the participation and involvement of each and every Defendant, including all fifty-two Defendant Attorneys General.

Although the MSA was represented by Defendant Attorneys General and OPMs to be merely settlement of litigation, it was much more than that.   Indeed, the MSA was the culmination of a conspiracy by certain tobacco product manufacturers to create unjustifiably unequal terms for access by competitors to the U.S. cigarette market by enticing the Settling States with large revenues for their respective jurisdictions to allow those tobacco product manufacturers to control the terms for such competitor access. (See Com. ¶¶ 1, 26; Am. Com. ¶¶ 2, 26).  Although Defendant Attorneys General suggest they did not intend to "restrain trade" or cause harm to General Tobacco or other non-grandfathered SPMs, their intent is a non-issue. Because they admittedly joined the conspiracy, they can be held accountable for their unlawful acts and those of their co-conspirators.  See MCM Partners, Inc. v. Andrews-Bartlett & Assoc., Inc., 62 F.3d 967, 975 (7th Cir. 1995) (there is sufficient evidence of a conspiracy when one conspirator lacks a direct interest in precluding competition, but is enticed or coerced into knowingly curtailing competition by another conspirator who has an anticompetitive motive). Defendant Attorneys General aided the OPMs and their anticompetitive efforts by, in part, agreeing to provisions of the MSA that enable the disparate treatment of similarly situated SPMs. (See Com. ¶ 111; Am. Com. ¶ 114).  Defendant Attorneys General also acceded to the threats of the OPMs and grandfathered SPMs, who flaunted their purported "rights" under the Limited Most Favored Nations ("LMFN") provision, MSA § XVIII(b), paralyzing the Settling States

---

5 General Tobacco has filed a Verified Amended Complaint ("Am. Com.") [DE 234]; therefore, both it and the Complaint ("Com.") are cited herein.

with fear of the consequences if they took any action to eliminate the discriminatory treatment of non-grandfathered SPMs, such as executing the Amended Adherence Agreement they had negotiated with General Tobacco. (See Com. ¶¶ 164, 172, 178; Am. Com. ¶¶ 15, 150, 188, 190, 191, 199, 254, 255).

Defendant Attorneys General argue that dismissal of General Tobacco's Complaint is necessary because it would be improper for this Court to exercise jurisdiction over the Attorneys General of fifty-two different jurisdictions, suggesting that there is no single judicial forum where all of them could have "purposefully availed" themselves and could "reasonably" have anticipated being "haled" into court when they joined the MSA. (AGs' Memo. at 3, 6). Defendant Attorneys General's position, however, disregards their involvement in the conspiracies and blatantly ignores the numerous activities that took place in or were directed to Kentucky. Defendant Attorneys General's mere conclusory statements that they did not "purposefully avail" themselves of the benefits or privileges of Kentucky law, or that they did not "transact business" within the Commonwealth, are meaningless, especially in light of the fact that General Tobacco has satisfied its burden of properly pleading numerous facts in its Complaint that contradict these baseless assertions.

Kentucky is a proper forum for this action. Not only have overt acts taken in furtherance of the conspiracies occurred in Kentucky, but Defendant Attorneys General have the minimum contacts with Kentucky necessary for this Court to exercise jurisdiction. General Tobacco has satisfied its burden of establishing a prima facie case for personal jurisdiction and venue, and Defendant Attorneys General's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(3) should be denied in its entirety.

<u>Argument</u>

I.     **THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANT ATTORNEYS GENERAL**

    A.     **General Tobacco Has Satisfied Its Burden of Establishing A *Prima Facie* Case For Personal Jurisdiction Over Defendant Attorneys General**

There is no merit to Defendant Attorneys General's suggestion that General Tobacco has not met its burden as to personal jurisdiction over them.

As an initial matter, under Federal Rule of Civil Procedure 8(a), a plaintiff must merely allege the basis of the court's subject matter jurisdiction; there is no requirement that the complaint allege the basis for personal jurisdiction.  See, e.g., Caribbean Broad. Sys. Ltd. v. Cable & Wireless P.L.C., 148 F.3d 1080, 1090 (D. D.C. 1998) ("[plaintiff] had no obligation to make specific allegations relevant to personal jurisdiction in its complaint because lack of personal jurisdiction is an affirmative defense, so it must be raised by the defendant."); Purdue Research Found. v. Sanofi-Synthelado, S.A., 338 F.3d 773, 781-82 (7th Cir. 2003).  It is not until a defendant challenges personal jurisdiction that the plaintiff bears the burden of establishing that jurisdiction exists.  American Greetings Corp. v. Cohn, 839 F.2d 1164, 1168-69 (6th Cir. 1988).

Although this burden must ultimately be met by a preponderance of the evidence, Dean v. Motel 6 Operating L.P., 134 F.3d 1269, 1272 (6th Cir. 1998), the plaintiff's burden is "relatively slight" at the pleading stage if the district court does not conduct an evidentiary hearing on the issue, in which case, the plaintiff need only make a prima facie showing of jurisdiction. American Greetings, 839 F.2d at 1169; Neogen Corp. v. Neo Gen Screening, Inc., 282 F.3d 883, 887 (6th Cir. 2002).  In such circumstances, a court must view the pleadings and affidavits, if any, in the light most favorable to the plaintiff and not consider the controverting assertions of the defendant when deciding whether to dismiss for lack of personal jurisdiction.  American Greetings, 839 F.2d at 1168-69.

Here, Defendant Attorneys General have not submitted an affidavit or any other evidence to support their challenge to personal jurisdiction. Accordingly, all that is required is that General Tobacco make a proffer that would be sufficient to support a claim of personal jurisdiction. See, e.g., Purdue Research Found., 338 F.3d at 782. In considering the proffer, the Court should accept all of Plaintiff's well-pleaded allegations as true, and factual disputes are to be resolved in General Tobacco's favor. See Nationwide Mut. Ins. Co. v. Tryg Int'l Co., Ltd., 91 F.3d 790 (6th Cir. 1996); Purdue Research Found., 338 F.3d at 782-83. For the reasons set forth more fully below, General Tobacco has fully satisfied the "relatively slight" burden of establishing a prima facie case for personal jurisdiction over Defendant Attorneys General.

## B. Defendant Attorneys General Are Subject To Personal Jurisdiction In Kentucky Pursuant to the Conspiracy Theory Doctrine

As recognized by Defendant Attorneys General, "when determining whether personal jurisdiction exists over a defendant, 'a federal court must apply the law of the state in which it sits . . . .'" (AGs' Memo. at 4 (quoting Fazoli's Franchising Sys., LLC v. JBB Invs., LLC, 2008 WL 4525433, at *3 (E.D. Ky. Sept. 30, 2008)); see also Welsh v. Gibbs, 631 F.2d 436, 439 (6th Cir. 1980), cert. denied, 450 U.S. 981 (1981).[6] Important to this Court's consideration is the fact that Kentucky courts have embraced and applied the conspiracy theory doctrine of personal jurisdiction. See Kentucky Speedway, LLC v. Nat'l Ass'n Stock Car Auto Racing, Inc., 410 F. Supp. 2d 592, 598-99 (E.D. Ky. Sept. 30, 2006); Neogen Corp v. U.S. Dep't of Justice, 2006 WL 3422691 (E.D. Ky. Nov. 28, 2006). Indeed, in both Kentucky Speedway and Neogen, Kentucky courts reaffirmed the principle that "acts undertaken within the forum by one co-conspirator in furtherance of an alleged conspiracy may subject a non-resident co-conspirator to personal

---

[6] Because the conspiracy theory of personal jurisdiction exists under Kentucky law, it is unnecessary to respond to Defendants' attempt to avoid the impact of Kentucky law by citing to authority in jurisdictions such as Wisconsin, Arizona, Montana and Ohio (see AGs' Memo. at 9-10), as the law of those States is wholly inapplicable here.

jurisdiction under the long-arm statute." Kentucky Speedway, 410 F. Supp. 2d at 599; Neogen, 2006 WL 3422691 at *6.

As previously recognized by this Court (sitting in the Eastern District) in Neogen, a plaintiff seeking to apply the conspiracy theory of personal jurisdiction must plead three elements:

> (1) the existence of a conspiracy; (2) the nonresident's participation in or agreement to join the conspiracy; and (3) an overt act taken in furtherance of the conspiracy within the forum's boundaries.

Neogen, 2006 WL 3422691 at *6 (citing Kentucky Speedway, 410 F. Supp. 2d at 599; Edmond v. United States Postal Serv. Gen. Counsel, 949 F.2d 415, 425 (D.C. Cir. 1991)).   General Tobacco has sufficiently pleaded all three elements of the conspiracy theory doctrine of personal jurisdiction.

### 1. General Tobacco Has Sufficiently Pleaded The Existence of a Conspiracy

A conspiracy is found to exist "where two or more persons enter into a plan or partnership to accomplish an illegal act. . . ." Kentucky Speedway, 410 F. Supp. 2d at 598 (internal citations omitted).  "It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful.  Acts done to give effect to the conspiracy may be in themselves wholly innocent acts.  Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy . . . they [are prohibited]." Lamb Enters., Inc. v. Toledo Blade Co., 461 F.2d 506, 518 (6th Cir. 1972) (quoting American Tobacco Co. v. U.S., 328 U.S. 781 (1946)).  In its Verified Complaint and Verified Amended Complaint, General Tobacco alleges that all Defendants, including Defendant Attorneys General, the OPMs and the grandfathered SPMs, engaged in two illegal conspiracies "which established and maintains the MSA as an essential facility with discriminatory terms of access imposed on non-

grandfathered SPMs that violate federal antitrust and constitutional law. . . ."  (See Com. ¶ 26; Am. Com. ¶ 28).  The first conspiracy (the "Constitutional Conspiracy"), as alleged in the Complaint and Amended Complaint, was initiated by the OPMs and the Settling States, and later joined by the grandfathered SPMs, to establish a scheme (the MSA), that illegally discriminates against similarly situated companies with no rational basis for the disparate treatment.[7]  (See Com. ¶ 111; Am. Com. ¶ 114).  As further alleged in the Complaint and Amended Complaint, the second conspiracy (the "Antitrust Conspiracy"), stems from the manipulation and abuse of the LMFN provision, MSA § XVIII(b), by the OPMs and grandfathered SPMs, to coerce the decision making of the Defendant Attorneys General, which in turn destroys the ability of non-grandfathered SPMs like General Tobacco to compete or succeed in the market in any significant degree. (See Com. ¶ 164, 172, 178; Am. Com. ¶ 15, 150, 188, 190, 191, 199, 254, 255).

### a.    The Constitutional Conspiracy

The MSA is the culmination of the Constitutional Conspiracy, of which the OPMs, Liggett and the Settling States (acting through Defendant Attorneys General) were the leaders. (See Com. ¶¶ 120, 167, 171, 182; Am. Com. ¶¶ 2, 3, 15, 28, 30, 112, 118, 122, 129).  These leaders intended the MSA to settle various lawsuits that had been filed or could be filed by the Settling States against the OPMs, grandfathered SPM Liggett Group, LLC ("Liggett") and others

---

[7] General Tobacco recognizes that at the time the MSA was executed in 1998, the Settling States did not "contemplate that new tobacco product manufacturers like General Tobacco would enter the market as significant competitors, given that there had not been any significant new market entrants for many decades in the tobacco industry." (Com. ¶ 112; Am. Com. ¶ 114).  Defendant Attorneys General argue, on at least two separate occasions in their memorandum, that this acknowledgement by General Tobacco "contradict[s] the contention that the Attorneys General illegally agreed to control the cigarette market because "all the acts which Plaintiff alleges constitute a conspiracy against it occurred years before Plaintiff even existed as a corporation."  (See AGs' Memo. at 12-14).  Defendant Attorneys General's reasoning, however, is fatally flawed.  The fact that General Tobacco did not enter the cigarette market until two years after the execution and implementation of the MSA is of no of consequence as to whether or not Defendants conspired in executing the MSA.  In regards to the unconstitutional implications arising directly from the conspiracy culminating in the MSA, General Tobacco does not contend that Defendants conspired against it specifically, but, instead, that Defendants conspired to establish a scheme that discriminates against cigarette manufacturers that did not join the MSA within the 90-day Preferential Signing Period.  (See Com. ¶¶ 6, 8, 13, 123, 131; Am. Com. ¶¶ 8, 10, 131, 140).

to recoup medical expenses incurred by the States for treatment of alleged smoking related illnesses.  (<u>See</u> Com. ¶ 103; Am. Com. ¶¶ 105, 126).  Quite cleverly, the OPMs, Liggett and the Settling States developed a plan where these parties could benefit significantly from their settlement agreement by imposing obligations on unassuming tobacco manufacturers that not only were not parties to their litigation, but had never been sued, nor threatened with a lawsuit, by the Settling States.  (<u>See</u> Com. ¶ 120; Am. Com. ¶ 127).   By developing the MSA, the Settling States secured a significant and steady revenue stream, obtaining money for their respective jurisdictions from more than ninety percent of cigarettes sold in the United States and its territories, including from sales of numerous manufacturers that the Settling States had never sued for conspiracy, fraud or deception.  (<u>See</u> Com. ¶¶ 103, 120; Am. Com. ¶¶127, 197).  Implementation of the MSA similarly benefited the OPMs by settling the various lawsuits brought against them by the States and precluding other similar suits from being brought by other States.  (<u>See</u> Com. ¶ 113; Am. Com. ¶ 115).   Furthermore, as set forth specifically below, the Constitutional Conspiracy is clearly evidenced by the disparate terms of the MSA for similarly situated tobacco companies, resulting in blatant violations of constitutional law.

In support of the existence of the Constitutional Conspiracy, General Tobacco further alleges:

- In developing the MSA, the Settling States and the OPMs desired other current tobacco manufacturers to join the Conspiracy, thereby increasing the revenue generated for the Settling States and ensuring the OPMs protection of their respective market shares. (<u>See</u> Am. Com. ¶ 129).
- The MSA included a "Preferential Signing Period," allowing for preferential terms to any SPMs that joined the MSA within 90 days after its execution.  Seventeen tobacco manufacturers, the grandfathered SPMs, joined the MSA to receive these preferential terms. (<u>See</u> Com. ¶¶ 6, 8; Am. Com. ¶¶ 8, 10).
- Pursuant to these preferential terms, the grandfathered SPMs are exempt from making up-front payments to the Settling States for tobacco product sales prior to joining the MSA, and each grandfathered SPM received a "grandfather share" equal to "the greater of" (1) its

8

"Market Share" as defined in the MSA from the year it joined the MSA; or (2) 125 percent of its Market Share from the prior year, subject to the provisions of subsection (i)(4) of the MSA.  <u>See</u> MSA § IX(i).  (<u>See</u> Com. ¶¶ 6, 123; Am. Com. ¶¶ 10, 131).

- As intended by the Settling States and OPMs in developing the MSA, and as intended by the grandfathered SPMs upon joining the MSA, these preferential terms have not been offered to any tobacco manufacturer who sought to join the MSA after the Preferential Signing Period. (<u>See</u> Com. ¶¶ 6, 123; Am. Com. ¶¶ 10, 131).

- The "grandfathered shares" allow the grandfathered SPMs to sell billions of cigarettes a year without making any payment to the Settling States.  (<u>See</u> Com. ¶ 128; Am. Com. ¶ 137).

- The Constitutional Conspiracy (<u>i.e.</u>, Defendants' agreement to impose discriminatory payment terms for non-grandfathered SPMs under MSA) was intended to, and in fact does, treat similarly situated tobacco product manufacturers (grandfathered SPMs vs. non-grandfathered SPMs) differently with no rational basis for the disparate treatment.  (<u>See</u> Com. ¶ 137; Am. Com. ¶¶ 10, 140).

Based on the foregoing allegations in the Complaint and Amended Complaint, General Tobacco has clearly demonstrated the existence of the Constitutional Conspiracy, some of the acts taken to implement Conspiracy, as well as  the unconstitutional effects of the Conspiracy.

### b.    <u>The Antitrust Conspiracy</u>

In further assurance that the OPMS as well as Liggett and other grandfathered SPMs would maintain or at least minimize their loss of market share from execution of the MSA and that the Settling States would maintain their steady revenue stream under that agreement, the conspiracy leaders agreed to the inclusion of the LMFN provision, which has provided the OPMs and grandfathered SPMs with the power to misuse that provision and effectively veto any attempt made by the Settling States to reduce the MSA's discriminatory payment impact on any other tobacco product manufacturer seeking to join, or modify its terms of membership in, the MSA.  (<u>See</u> Com. ¶¶ 171, 178; Am. Com. ¶¶ 150, 188, 190, 191).  The practical effects of the LMFN provision were not fully realized until 2004, when Defendants, working together, devised and obtained an amendment to the Escrow Statutes that departed from the original wording of those laws as set forth in  the Model Statute attached as Exhibit T to the MSA. This amendment modified a provision of the Escrow Statutes that had previously allowed NPMs to compete with

the grandfathered SPMs if they confined their sales to particular Settling States.  (See Com. ¶¶ 137-140; Am. Com. ¶ 147).  In effect, this amendment to the Escrow Statutes slammed (and locked) the door on a legally compliant NPMs' only viable path to compete in even a limited degree in the Settling States.  (Id.)

Having abolished any means by which the NPMs could compete in the Settling States, membership in the MSA became an "essential facility" to compete in any significant fashion in the U.S. cigarette market.  (See Com. ¶¶ 11, 12, 26, 176, ; Am. Com. ¶ ¶ 13, 14, 28, 197).  Defendants' concerted effort to bar entry of law-abiding competitors to that market in the Settling States except through the MSA's terms that unlawfully discriminate against later market entrants constitutes the Antitrust Conspiracy.

In support of the evidence of the Antitrust Conspiracy, General Tobacco further alleges:

- In 2004, as a direct result of the amendment to the Escrow Statutes in Kentucky and other States, General Tobacco sought to join the MSA.   In doing so, it executed an Adherence Agreement purporting to set forth the specific terms of its membership.  (See Com. ¶ 150, 165; Am. Com. ¶ 180).

- In hopes to see General Tobacco foreclosed from the market with the new amendment to the Escrow Statutes, the grandfathered SPMs invoked their purported LMFN "rights" and opposed General Tobacco's membership in the MSA, claiming General Tobacco had received terms more favorable than they had received.  (See Com. ¶ 129; Am. Com. ¶ 164).

- Despite the grandfathered SPMs' refusal to waive their purported "rights" under the LMFN provision, the Settling States executed the Adherence Agreement thereby confirming General Tobacco's membership in the MSA.  (See Com. ¶¶ 166, 178; Am. Com. ¶ 164).

- Disgruntled, the grandfathered SPMs filed a lawsuit in Kentucky against the Commonwealth of Kentucky and General Tobacco alleging "financial favoritism" and  seeking enforcement of the MSA.  The court did not find the grandfathered SPMs backhanded attempts to exclude their competition compelling.  As such, Kentucky and General Tobacco prevailed in Franklin Circuit Court, and the Kentucky Court of Appeals affirmed this ruling. (See Com. ¶ 129; Am. Com. ¶ 138).

- At the time General Tobacco joined the MSA, it was unaware of the substantial effects of the preferential payment terms bestowed upon the grandfathered SPMs.  It was not long, however, before General Tobacco learned that it could not survive unless the disparity in purported MSA payment terms between it and the grandfathered SPMs was eliminated. (See Com. ¶¶ 2, 165; Am. Com. ¶¶ 24, 169).

- In order to facilitate negotiations to reduce General Tobacco's purported MSA obligations, Settling States and General Tobacco entered into a Forbearance Agreement, an Extension of Due Date Agreement and a 2004 NPM Escrow Payment Agreement. These agreements were followed by a Memorandum of Understanding whereby General Tobacco's original Adherence Agreement would be superseded by an Amended Adherence Agreement, to address, <u>inter alia</u>, a portion of the onerous purported MSA payment obligations of General Tobacco in contrast to the grandfathered SPMs' exemptions. (<u>See</u> Com. ¶ 165; Am. Com. ¶ 180).

- The Settling States, however, refused to execute the Amended Adherence Agreement unless and until all OPMs and an unspecified number of SPMs had agreed to waive their purported "rights" under the MSA's LMFN provision. Ironically, neither the OPMs nor the grandfathered SPMs have any significant "rights" under the LMFN provision – indeed, there do not appear to be <u>any</u> such "rights" -  that would be triggered by the Defendant Attorneys General's implementation of General Tobacco's Amended Adherence Agreement. (<u>See</u> Com. ¶ 166; Am. Com. ¶ 181).

- Not wanting General Tobacco to receive any treatment that would allow it to compete fairly in the market, the OPMs and grandfathered SPMs together agreed not to waive their purported "rights" under the LMFN. (<u>See</u> Com. ¶ 167; Am. Com. ¶ 184).

- Because the OPMs and grandfathered SPMs refused to waive their purported "rights" pursuant to the LMFN, the Settling States declined to execute the Amended Adherence Agreement. Contrary to their position, however, the Settling States had recently executed a an amended adherence agreement for four other SPMs, yet did not require a LMFN waiver from General Tobacco, an SPM, in order to do so. (<u>See</u> Com. ¶¶ 162-164; Am. Com. ¶¶ 177-179).

- The conspiracy of the OPMs and grandfathered SPMs to abuse the LMFN provision violates antitrust law. Defendant manufacturers threaten Defendant Attorneys General that if any steps are taken to make the MSA equally accessible to all SPMs, then the OPMs and grandfathered SPMs would be entitled to more contractual benefits. Such threats are unlawful because the MSA does not provide Defendant manufacturers the LMFN "rights" that they claim. (<u>See</u> Com. ¶¶ 171, 172, 178; Am. Com. ¶¶ 15, 150, 181, 188, 190, 191, 199, 254).

By acquiescing to the OPMs and grandfathered SPMs' conspiracy to abuse the LMFN provision of the MSA in violation of antitrust law, Defendant Attorneys General have aided in furthering the Antitrust Conspiracy and are liable for the acts of their co-conspirators.

Despite the detailed allegations describing the existence of the conspiracies that are expressly laid out in the Complaint and Amended Complaint, Defendant Attorneys General argue that General Tobacco has "fail[ed] to specifically establish that the Defendants conspired to illegally discriminate against SPMs such as Plaintiff." (AGs' Memo at 12). While General

Tobacco may be required to "plead with particularity the conspiracy," <u>Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan</u>, 115 F.3d 1020, 1031 (D.C. Cir. 1997), which it has in fact properly done, it is not required at this stage of the proceeding to submit conclusive evidence of the existence of such.  <u>See</u> <u>Brewer v. Lincoln Int'l Corp.</u>, 148 F. Supp. 2d 792, 813 (W.D. Ky. 2000) (for a motion to dismiss, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims")

As the Court has already recognized in <u>Neogen</u>, proper pleading of the elements with a "minimal factual showing" is sufficient to survive a motion to dismiss. 2006 WL 3422691 at *6-*7 (<u>citing</u> <u>Dean</u>, 134 F.3d at 1272; <u>Chrysler Corp. v. Fedders Corp.</u>, 643 F.2d 1229, 1237 (6th Cir. 1981)).  Accordingly, General Tobacco has sufficiently pleaded, with particularity, that all Defendants, including Defendant Attorneys General, conspired together to execute and maintain the MSA in violation of constitutional and antitrust law.  Therefore, the first element of the conspiracy theory doctrine is satisfied with respect to both conspiracies.

> **2.** ***General Tobacco Has Sufficiently Pleaded That Defendant Attorneys General Either Participated In Or Agreed to Join the Conspiracy***

The Complaint and the Amended Complaint state, in part, that "[e]ach defendant participated in and agreed to join this conspiracy. . . ."  (<u>See</u> Com. ¶ 26; Am. Com. ¶ 28). Defendant Attorneys General do not deny this and, in fact, admit that they entered into the MSA (which is alleged to be the culmination of the Constitutional Conspiracy) on behalf of their respective States.  (AGs' Memo at 13).  In a futile attempt to minimize their participation in the Conspiracy, Defendants note that only eight of them initially negotiated the MSA with the OPMs.  (<u>Id.</u> at 14).  This fact, however, is immaterial as it relates to this element.  The issue is not whether each and every Defendant Attorney General "participated in" the negotiations or planning of the conspiracy, but rather whether each Defendant Attorney General "participated

in" or "agreed to join" the conspiracy.  Kentucky Speedway, 410 F. Supp. 2d at 599.  As the Defendant Attorneys General acknowledge, the Complaint alleges that each of them joined the MSA and took specific actions to implement the requirements of the MSA in their respective States.  (AGs' Memo. at 13).

It is further alleged that Kentucky and the other Settling States that did not participate in the initial negotiations of the MSA were faced with the prospect that if they did not sign the MSA, their citizens would pay into the MSA anyway because the MSA imposes payments on the participating manufacturers for sales in every state.  (See Com. ¶ 110; Am. Com. ¶ 112).[8]  Thus, even if a Settling State did not join the conspiracy, its citizens would nonetheless bear the financial burden of the price increases imposed by the Participating Manufacturers to account for their MSA payment obligations.  (See Com. ¶ 110; Am. Com. ¶ 112).  The non-joining jurisdictions, however, would not receive the financial windfall granted to each Settling State for sales of cigarettes made in all other States and territories.  As such, all fifty-two Defendant Attorneys General willingly joined the Conspiracy so that they could reap the financial benefits guaranteed to them by the MSA. (See Com. ¶ 110; Am. Com. ¶ 112).

Defendant Attorneys General also suggest that each of them must have knowingly conspired with other Defendants to harm General Tobacco or other grandfathered SPMs in order to satisfy this element.  (AGs' Memo. at 13).  While Defendant Attorneys General fully appreciate that the Constitutional Conspiracy provides for substantially disparate treatment of similarly situated tobacco companies[9] and are fully aware of the direct implications that the

---

[8]  Notably, this settlement is curious in that it is not the OPMs that have been burdened with paying the settlement for their alleged bad acts; instead, it is the consumers who foot the bill.  (See Com. ¶ 200; Am. Com. ¶ 221).

[9]  For example, the Kentucky Attorney General acknowledged in open court that grandfathered SPMs "enjoy terms much more favorable than those imposed on General Tobacco" as a non-grandfathered SPM. (See Com. ¶ 129; Am. Com. ¶ 138).

Antitrust Conspiracy and their failure to execute the Amended Adherence Agreement had on General Tobacco, General Tobacco's burden as it pertains to this element is not quite so high. As recognized above, acts done to give effect to the Conspiracy, while they may be "wholly innocent acts" not intended to cause harm, are considered a part of the conspiracy "if they are part of the sum of the acts which are relied upon to effectuate the conspiracy . . . ." Lamb Enterprises, 461 F.2d at 518.  Furthermore, courts have routinely recognized that the law "does not require identical motives among conspirators" and so long as they are acting in furtherance of the conspiracy, even if they have been coerced to do such acts, they are a co-conspirator. Spectator's Communication Network Inc. v. Colonial Country Club, 253 F.3d 215, 221 (5th Cir. 2001) (citing U.S. v. Paramount Pictures, Inc., 334 U.S. 131, 161 (1948) (refusing to distinguish between conspirators who fomented the conspiracy and those who only participated because they were coerced)).  Because Defendant Attorneys General willingly joined the MSA and purposefully allowed the OPMs and grandfathered SPMs to manipulate the LMFN provision in such a way to create the appearance of "rights" that they did not have, they cannot deny that they have either participated in or joined in both the Constitutional Conspiracy and the Antitrust Conspiracy.

**3.**     ***General Tobacco Has Sufficiently Pleaded That An Overt Act In Furtherance of the Conspiracy Took Place Within the Commonwealth of Kentucky***

It is well settled that "[e]very member of the conspiracy is liable for the acts of every other member because the law considers each member of the conspiracy to be the agent of the other members." Kentucky Speedway, 410 F. Supp. 2d at 598.  Accordingly, the conspiracy theory doctrine of personal jurisdiction only requires General Tobacco to plead "an overt act taken in furtherance of the conspiracy within the forum's boundaries." Id. at 599 (emphasis

added).  Therefore, <u>one</u> overt act by <u>one</u> co-conspirator is sufficient to satisfy this third prong.

Because General Tobacco has pleaded (with particularity) that numerous overt acts taken in

furtherance of both the Constitutional Conspiracy and the Antitrust Conspiracy occurred in

Kentucky, this element is easily satisfied.

As alleged in the Complaint and Amended Complaint, the Kentucky Attorney General,

an agent and co-conspirator of the Defendant Attorneys General, either acted or caused the

following actions in Kentucky in furtherance of the Constitutional Conspiracy:

- The Kentucky Attorney General executed the MSA in Kentucky, thereby affirming the Kentucky Attorney General's consent to join the conspiracy.  (<u>See</u> Com. ¶¶ 27, 30; Am. Com. ¶ 33)**.**

- The Kentucky Attorney General  filed a complaint in (Franklin Circuit Court) against the OPMs, Liggett and United States Tobacco, alleging the defendant tobacco companies engaged in deceptive practices regarding the health effects of tobacco, deceptive practices in targeting to youth, and conspiracy in restraint of trade.  (<u>See</u> Com. ¶ 116; Am. Com. ¶ 118).

- Upon settlement of the lawsuit, Franklin Circuit Court entered a Consent Decree approving and expressly incorporating the MSA, thereby permitting Defendants to impose the unconstitutional discriminatory payment structure of the conspiracy on non-grandfathered SPMs versus grandfathered SPMs.  (<u>See</u> Com. ¶¶ 117-122; Am. Com. ¶¶ 119-122).

- Franklin Circuit Court also issued an Agreed Order of Dismissal, which had been seen and agreed to by the Attorney General and Assistant Deputy Attorney General of Kentucky, on behalf of the Commonwealth, and by counsel for co-conspirators B&W, Liggett, Lorillard, Philip Morris and Reynolds. (<u>See</u> Com. ¶ 117; Am. Com. ¶ 119).

- The Kentucky Attorney General, OPMs and grandfathered SPMs successfully obtained enactment in Kentucky of the Model Statute (MSA Exhibit T) to establish escrow obligations for NPMs.  This "Escrow Statute" requires all tobacco product manufacturers either to join the MSA or to pay substantial sums of money into a qualified escrow account.  (<u>See</u> Com. ¶ 134; Am. Com. ¶ 143).

- The Kentucky Attorney General, OPMs and grandfathered SPMs also successfully obtained enactment in Kentucky of a "Complementary Statute", which serves to ban the sales of any manufacturer that does not make the required payments under the MSA or the Escrow Statute.  (<u>See</u> Com. ¶ 135; Am. Com. ¶ 144).

- In 2004, the Kentucky Attorney General further conspired with the OPMs, grandfathered SPMs and the Defendant Attorneys General to obtain an amendment to the Escrow Statute in Kentucky.   This amendment eliminated most if not all of the escrow fund refund that NPMs previously relied upon to price competitively with the grandfathered SPMs if they confined their sales to particular Settling States .  (<u>See</u> Com. ¶¶137-140; Am. Com. ¶¶ 147-148).

While the "overt acts" described above are more than sufficient to satisfy this prong of the test for the Constitutional Conspiracy, there are still even more acts undertaken in Kentucky by co-conspirators other than the Kentucky Attorney General in furtherance of the Constitutional Conspiracy:

- Substantial acts of certain Defendant manufacturers giving rise to the lawsuits which culminated in the MSA originated at B&W's headquarters in Louisville, Kentucky.  (See Com. ¶¶ 86, 126; Am. Com. ¶¶ 33, 119, 134).

- Upon information and belief, as an original signatory to the MSA, B&W engaged in substantial acts in furtherance of the conspiracy, including negotiations, phone calls, e-mails, facsimiles and person-to-person meetings that took place at B&W's Louisville headquarters throughout the time period that the provisions of the MSA were negotiated and finalized. (See Com. ¶¶ 27, 28; Am. Com. ¶¶ 29, 33, 123).

- After the MSA was executed, B&W made substantial payments to the MSA from its headquarters in Kentucky for its cigarettes sold in Kentucky and throughout the United States.  (See Com. ¶ 27; Am. Com. ¶ 124).

- Philip Morris, another original signatory to the MSA, maintained a substantial manufacturing facility and a materials conversion plant in Louisville, Kentucky at the time the original lawsuits were filed and throughout the time period that the MSA was negotiated and executed.  (See Com. ¶ 27; Am. Com. ¶¶ 29, 125).

- Substantial acts giving rise to the lawsuits that culminated in the MSA took place at Philip Morris' facilities in Kentucky, and, upon information and belief, substantial acts in furtherance of the conspiracy, including negotiations, phone calls, e-mails, facsimiles and person to person meetings also took place at Philip Morris' facilities in Kentucky.  (See Com. ¶ 27; Am. Com. ¶ 125).

- Grandfathered SPM, Commonwealth Brands, which has the second largest grandfathered exemption, was headquartered in Bowling Green, Kentucky at the time the MSA was negotiated and executed and remains headquartered there today.  (See Com. ¶¶ 27, 88; Am. Com. ¶¶ 29, 33, 90).

- Upon information and belief, substantial acts in furtherance of the conspiracy, including negotiations, phone calls, e-mails, facsimiles and in-person meetings took place in Kentucky at Commonwealth Brands headquarters in Bowling Green.  (See Am. Com. ¶¶ 33, 126).

- Since joining the MSA, Commonwealth Brands has received substantial benefits from the MSA's discriminatory payment structure and has made payments to the MSA, subsidized by the MSA exemption, from its headquarters in Kentucky for its cigarettes sold in Kentucky and throughout the United States.  (See Com. ¶¶ 27, 88, 156; Am. Com. ¶¶ 29, 30, 33, 126, 132).

16

- In addition to the money that is (or was) paid directly by B&W and Commonwealth Brands to the MSA from within Kentucky, each Settling State also derives substantial MSA revenue from sales generated and consummated in Kentucky, given that approximately 2/3 of the revenues generated from sales by Participating Manufacturers to Kentucky consumers are for the benefit of Settling States other than Kentucky.  (See Com. ¶ 108; Am. Com. ¶¶ 30, 108, 110).

  In addition to the numerous acts listed above, there are even more acts undertaken in

Kentucky by co-conspirators in furtherance of the Antitrust Conspiracy:

- The grandfathered SPMs filed suit in the Commonwealth of Kentucky against the Kentucky Attorney General and General Tobacco seeking to use their purported LMFN "rights" to prevent General Tobacco from initially joining the MSA in 2004 on terms it alleged were more favorable than their own. (See Com. ¶ 129; Am. Com. ¶ 138).  Franklin Circuit Court declined to find that General Tobacco had received any "financial favoritism" from the Settling States and the Court of Appeals affirmed.  (See Am. Com. ¶ 138).

- It was not long after it joined the MSA that General Tobacco began to realize the negative impact of the preferential payment terms bestowed upon the grandfathered SPMs. Accordingly, General Tobacco sought to re-negotiate its purported payment terms with the Settling States.  (See Com. ¶ 165; Am. Com. ¶¶ 169, 180).

- In order to facilitate negotiations, the Settling States and General Tobacco entered into a Forbearance Agreement and an Extension of Due Date and 2004 NPM Escrow Payment Agreement, both of which were negotiated and drafted, in part, in Kentucky by General Tobacco's counsel.  These agreements were followed by a Memorandum of Understanding, also negotiated and drafted in part in Kentucky by General Tobacco's counsel, whereby General Tobacco's original Adherence Agreement would be superseded by an Amended Adherence Agreement, to inter alia, address in part the onerous purported payment obligations that General Tobacco must bear, in contrast with the grandfathered SPMs' substantial exemptions.  (See Com. ¶ 165; Am. Com. ¶ 180).

- For over two years, the Settling States, generally through their representatives from the National Association of Attorneys General ("NAAG"), communicated and negotiated through e-mail, telephone calls and facsimiles with General Tobacco's attorneys, domiciled in Kentucky. (See Com. ¶ 165; Am. Com. ¶ 180).  A NAAG official, on behalf of the Settling States, came to Kentucky for in-person discussions with a representative of the Kentucky Attorney General and representatives of General Tobacco.  (See Am. Com. ¶ 180).

- It was the Settling States, through NAAG, that insisted that General Tobacco's attorneys send out a letter, which they did from their Kentucky offices, to all OPMs and grandfathered SPMs requesting a waiver of their purported LMFN "rights" so that the Settling States could execute the Amended Adherence Agreement.  (See Am. Com. ¶ 184).

- Upon receipt of these letters from Kentucky, every OPM and grandfathered SPM refused to waive their "rights" under the LMFN provision, which in turn, coerced the Settling States to decline to execute the Amended Adherence Agreement claiming that such execution would violate the MSA.  (See Com. ¶ 167; Am. Com. ¶ 184).

As the Court recognized in <u>Kentucky Speedway</u>, "so long as <u>any co-conspirator</u> commits at least one overt act in furtherance of the conspiracy in the forum jurisdiction, there is personal jurisdiction over <u>all members</u> of the conspiracy."  410 F.2d at 599 (emphasis added).  Clearly there have been numerous acts in furtherance of both the Constitutional Conspiracy and the Antitrust Conspiracy not only by Attorneys General, but also OPMs and even grandfathered SPMs that have taken place in Kentucky.  To say that these acts do not constitute at least <u>one</u> "overt act" within this forum is disingenuous.  Accordingly, Kentucky courts may properly exercise personal jurisdiction over Defendant Attorneys General because they are co-conspirators in both the Constitutional Conspiracy and the Antitrust Conspiracy.

II.     **THIS COURT HAS OTHER GROUNDS BESIDES THE CONSPIRACY THEORY DOCTRINE TO EXERCISE PERSONAL JURISDICTION OVER DEFENDANT ATTORNEYS GENERAL PURSUANT TO THE KENTUCKY LONG-ARM STATUTE**

As recognized in both <u>Kentucky Speedway</u> and <u>Neogen</u>, acceptance of the conspiracy theory doctrine of personal jurisdiction under the Kentucky long-arm statute and due process renders any further analysis of personal jurisdiction unnecessary.  <u>See</u> <u>Kentucky Speedway</u>, 410 F.2d at 598; <u>Neogen</u>, 2006 WL 3422691, *6-7 (a "minimal factual showing" of a non-resident's part in a conspiracy is all that is necessary before a court can *constitutionally* exercise personal jurisdiction, rendering any further analysis of personal jurisdiction unnecessary).

Notwithstanding the fact that personal jurisdiction has been established as set forth above, this Court may also exercise jurisdiction over Defendant Attorneys General using the traditional analysis of "minimum contacts."  Pursuant to this analysis, district courts resolving issues of personal jurisdiction must engage in a two-part analysis.  <u>Calphalon Corp. v. Rowlette</u>, 228 F.3d 718, 721 (6th Cir. 2000).  First, the court must determine whether there is jurisdiction over the defendant under the law of the state in which the district court sits.  <u>Id.</u>  If jurisdiction

does exist under the applicable state law, the court must then determine whether exercising

jurisdiction would be consistent with federal due process requirements.  Id.

### A.   General Tobacco Has Properly Alleged Personal Jurisdiction Pursuant to the Kentucky Long-Arm Statute

There can be no doubt that the Kentucky long-arm statute allows for jurisdiction over

Defendant Attorneys General.  The statute, KRS 454.210, states, in part:

> A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a claim arising from the person's:
>
> 1. Transacting any business in this Commonwealth;
>
> * * *
>
> 3.  Causing tortious injury by an act or omission in this Commonwealth;
>
> 4.  Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he . . . derives substantial revenue from goods used or consumed or services rendered in this Commonwealth, provided that the tortious injury occurring in this Commonwealth arises out of the . . . derivation of substantial revenue within the Commonwealth.

KRS 454.210(2)(a)(1), (3), (4) (emphasis added).  Defendant Attorneys General could be subject

to personal jurisdiction pursuant to any of the three sections of the Kentucky long-arm statute

listed above, as evidenced by their numerous contacts with Kentucky as set forth in sections

I(B)(1), I(B)(2) and I(B)(3), *supra*, and fully incorporated herein.  For example, negotiating a

contract within a state, executing a contract within a state and "settling a civil suit seeking

compensation for healthcare costs" are all activities that constitute "transacting business" within

the state.  See Grand Rivers Enters. Six Nations, LTD v. Pryor,  425 F.3d 158, 166-67 (2d Cir.

2005) (applying New York long-arm statute, C.P.L.R. § 302(a)(1), which is similar in all

material aspects to Kentucky's long-arm statute, KRS 454.210(2)(a)(1), to hold that 31 Attorneys

General "transacted business" in New York, and thus a New York court had personal jurisdiction over them, because of acts by them and on their behalf to negotiate the MSA in New York).

As discussed above, activities related to negotiation and execution of the MSA by Defendant Attorneys General, OPMs and grandfathered SPMs not only took place in Kentucky at B&W's headquarters and Philip Morris's facilities with Attorneys General acting as agents and co-conspirators of one another, but the Defendant Attorneys General, via their agent NAAG, also negotiated the Forbearance Agreement, the Memorandum of Understanding and the Amended Adherence Agreement, in part, in Kentucky and their communications were directed to Kentucky. (See Am. Com. ¶ 180).  Moreover, to implement the MSA, the Kentucky Attorney General, as agent and co-conspirator of Defendant Attorneys General, filed a lawsuit in Kentucky seeking compensation for alleged healthcare costs, which was settled and agreed to by the Kentucky Attorney General and Deputy Attorney General as well as counsel for co-conspirators OPMs and grandfathered SPM Liggett.  (See Com. ¶¶ 116-117; Am. Com. ¶¶ 118-119).  All of these activities constitute "transacting business" under the Kentucky long-arm statute.

Defendant Attorneys General are also subject to personal jurisdiction in Kentucky for their tortious acts both inside and outside of the Commonwealth.  KRS 454.210(2)(a)(3) & (4). As discussed above, substantial acts taken by Defendant Attorneys General in negotiating, finalizing and executing the conspiracy took place in and caused injury in Kentucky. Furthermore, in an effort to wrongfully advance their anticompetitive aspirations through the misuse of the LMFN provision, the grandfathered SPMs brought a lawsuit in Kentucky, which they lost. (See Com. ¶¶ 129-130; Am. Com. ¶¶ 138-139).  Accordingly, Defendant Attorneys

General are subject to personal jurisdiction for their actions within the State pursuant to KRS 454.210(2)(a)(3).

Defendants claim, however, that no significant acts took place within the Commonwealth. (AGs' Memo. at 8, 16-17).  While that is wholly untrue, it would not prevent this Court from exercising jurisdiction pursuant to section (2)(a)(4) of the Kentucky long-arm statute for all the tortious acts that took place outside of Kentucky and caused injury within the State.  See KRS 454.210(2)(a)(4).  In addition to all of the acts in furtherance of the conspiracy described above, the Defendant Attorneys General cannot deny that as a direct result of the execution and implementation of the MSA, each of their respective States derive substantial revenue from cigarettes used or consumed in this Commonwealth, thereby subjecting them to jurisdiction pursuant to Kentucky's long-arm statute.  See KRS 454.210(2)(a)(4).  In fact, since the inception of the MSA, more than $2 billion has been paid into the MSA for cigarette sales in Kentucky alone. (See Com. ¶ 28; Am. Com. ¶ 30).   Of this mammoth amount, only one-third has gone to the Commonwealth of Kentucky while two-thirds (approximately $1.3 billion) has been distributed accordingly to the Settling States. (See Com., ¶ 28; Am. Com. ¶ 110).   Given that the MSA, albeit consummated and implemented through tortious and illegal acts of, inter alia, the Defendant Attorneys General, is the exclusive means by which the Settling States receive these substantial revenues, it would defy logic to find that the Kentucky long-arm statute, which allows for jurisdiction over those who derive "substantial revenue" from Kentucky, would not subject the Defendant Attorneys General to personal jurisdiction in Kentucky.

### B.     This Court's Exercise of Personal Jurisdiction Over Defendants Complies With Due Process

When a defendant is amenable to suit under the Kentucky long-arm statute, the court must then determine if exercise of such jurisdiction would comply with the due process

requirements of the Constitution.  CompuServe, Inc. v. Patterson, 89 F.3d 1257, 1262 (6th Cir.

1996).  Because the Kentucky long-arm statute has been construed to reach the jurisdictional

limits permitted by the Constitution, the only necessary analysis is whether the requirements of

the Due Process Clause are satisfied.  See Handley v. Ind. & Mich. Elec. Co., 732 F.2d 1265,

1271 (6th Cir. 1984).

The crucial constitutional inquiry, given the facts of the case, is whether the nonresident

defendant has sufficient contacts with the forum state that the district court's exercise of

jurisdiction would comport with " 'traditional notions of fair play and substantial justice.'" Int'l

Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)(quoting Milliken v. Meyer, 311 U.S. 457,

463,(1940)).  In the Sixth Circuit, courts apply a three-part test to determine if these "minimum

contacts" have been met:

> First, the defendant must purposefully avail himself to the privilege of acting in
> the forum state or causing a consequence in the forum state.  Second, the cause of
> action must arise from the defendant's activities there.  Finally, the acts of the
> defendant or consequences caused by the defendant must have a substantial
> enough connection with the forum state to make the exercise of jurisdiction over
> the defendant reasonable.

Southern Mach. Co. v. Mohasco Indus., Inc., 401 F.2d 374, 381 (6th Cir. 1968) ("Mohasco").

"The three-prong test is intended to be a framework for analysis and is not susceptible to

mechanical application."  Info-Med, Inc. v. National Healthcare, Inc., 669 F.Supp. 793, 796

(W.D. Ky. 1987) (citing Welsh v. Gibbs, 631 F.2d 436, 440 (6th Cir. 1980)).  "Furthermore, the

first and second prongs may be considered as one due to their inter-relatedness."  Id.  When the

first and second prongs of the test are satisfied, "an inference arises that the third, fairness, is also

present."  First Nat'l Bank of Louisville v. J.W. Brewer Tire Co., 680 F.2d 1123, 1126 (6th Cir.

1982).

The "purposeful availment" and "inter-relatedness" prongs of the test establish whether the defendants have sought to invoke the benefits and protections of the forum state, thus subjecting themselves to jurisdiction, while ensuring that a defendant will not be compelled into court as the result of "random" or "fortuitous" events or contacts. <u>Dean</u>, 134 F.3d at 1273; <u>Calphalon Corp.</u>, 228 F.3d at 721-22.  The absence of physical contacts within the state, however, will not defeat jurisdiction in that state when the defendant's efforts are purposefully directed there and the cause of action has a substantial connection with the defendant's activities directed at the forum.  <u>Burger King v. Rudzewicz</u>, 471 U.S. 462, 476 (1985); <u>Third Nat'l Bank in Nashville v. WEDGE Group, Inc.</u>, 882 F.2d 1087, 1091 (6th Cir. 1989).   In fact, a defendant may be found to have "purposefully availed" itself of the benefits of acting within Kentucky not only when it deliberately engages in significant activities within Kentucky, but also when it creates <u>continuous obligations</u> between itself and the citizens of the Commonwealth.  <u>Info-Med</u>, 669 F.Supp. 793, 796 (W.D. Ky. 1987).

Although Defendant Attorneys General keep repeating that they have not "purposefully availed" themselves of the privilege of conducting business in Kentucky, the Court need not look far to see some substantial factors that show otherwise.  At its most simple level, every Defendant Attorney General from a jurisdiction outside Kentucky purposefully entered into a contract with, <u>inter alia</u>, the Attorney General of Kentucky and two citizens of Kentucky, OPM B&W and grandfathered SPM Commonwealth Brands.  (<u>See</u> Com., ¶ 110; Am. Com. ¶ 112).  Notably, B&W and Commonwealth Brands not only resided in, but maintained their headquarters in Kentucky at the time of the execution of the contract, and likely executed their respective contracts within the forum. (<u>See</u> Com. ¶ 88; Am. Com. ¶¶ 33, 90, 123, 126).  Moreover, the MSA is not the only contract negotiated and entered into in Kentucky by the

Settling States.  Since General Tobacco has joined the MSA, the Settling States have directed innumerable numbers of e-mails, phone calls and other correspondence to General Tobacco's counsel in Kentucky in an attempt to negotiate the Forbearance Agreement, the Memorandum of Understanding and the Amended Adherence Agreement.  (See Com. ¶ 165; Am. Com. ¶ 180).  To say that the Defendant Attorneys General did not purposefully enter into a contract with Kentucky residents and that this contract is not sufficiently related to General Tobacco's causes of action is contrary to the facts stated in the Complaint.

Furthermore, this contract specifically provided for Kentucky to enact legislation modeled after the MSA.  (See Com. ¶ 134; Am. Com. ¶ 143).  These laws, based on model legislation detailed in the MSA and implemented and enforced in Kentucky, directly benefit the Attorneys General in every Settling State by imposing regulations regarding the sales of cigarettes within the forum and requiring payments to be made to the Attorneys General (via the MSA) for each and every sale.   (See Com. ¶¶ 134-140; Am. Com. ¶¶ 143-149).  Accordingly, the Defendant Attorneys General "invoke the benefits and protections" of these Kentucky laws continuously, which, in and of itself, is "purposeful availment."  See Dean, 134 F.3d at 1273.  As such, the Defendant Attorneys General cannot assert persuasively that they do not "benefit" from the laws of Kentucky or the "privilege" of business conducted in Kentucky, nor can they say with any good reason that they have not caused a lasting "consequence" in the Commonwealth that is directly related to the present action.  Hence, the first two prongs of the Mohasco test are satisfied.

The final prong requires that the exercise of jurisdiction in the forum be "reasonable."  This prong is oftentimes inferred if the first two prongs have been satisfied.  Mohasco, 401 F.2d at 381.  Defendant Attorneys General assert that, as non-residents, they did "not have a

reasonable expectation of being haled into court" in Kentucky. (See AG's Memo. at 8). Because of the diverse citizenship of Defendants involved in this action, this statement could be made of any court that the Defendant Attorneys General were sued, thereby serving as an artificial shield of immunity for challenging all the conspirators responsible for the unconstitutional treatment and anticompetitive effects of the MSA in one single forum. If the Defendant Attorneys General did not have a "reasonable expectation" that they could be sued in Kentucky - the very state that OPM B&W and grandfathered SPM Commonwealth Brands were headquartered; the very state where Philip Morris had major manufacturing facilities; the very state where every OPM and grandfathered SPM sold a substantial amount of product given Kentucky's notoriety as leading the nation in its number of smokers, per capita; and the very state where substantial negotiations, phone calls, e-mails, and meetings were held in negotiating, finalizing and executing the MSA, the Forbearance Agreement, the Memorandum of Understanding and the Amended Adherence Agreement - then where in the world would the Defendant Attorneys General find it "reasonable" to be sued? The Defendant Attorneys General entered into a contract, to continue in perpetuity, with citizens of fifty-two different jurisdictions, and would have this Court hold that they cannot ever be sued in a single forum for their conspiratorial acts. To embrace this defective theory is to commend their unlawful actions. To "hale" the Defendant Attorneys General into court in Kentucky - while it may be unusual - is not unreasonable, nor unlawful, especially given that each of them purposefully and willingly became a party to an unconstitutional and anticompetitive contract affecting the laws and rights of Kentucky citizens.[10]   Therefore, because Defendant Attorneys General are subject to personal

---

[10] Defendant Attorneys General also conclude, without reason, that Kentucky has no "particular interest in adjudicating this matter." (AGs' Memo. at 8.) This blanket conclusion is far from true. Kentucky and its citizens are directly impacted by the MSA and any adjudication of the MSA that could result in modifications to the agreement are of "particular interest" to this Commonwealth.

jurisdiction pursuant to the Kentucky long-arm statute, and exercise of such jurisdiction does not violate due process, personal jurisdiction over Defendant Attorneys General is proper in Kentucky.

## III.   VENUE IS PROPER IN THE WESTERN DISTRICT OF KENTUCKY

Although the Court has discretion to dismiss or transfer any civil action to any other district or division where the action could have been brought, the plaintiff's right to choose the forum should rarely be taken away.[11]  As the Chief Judge of the Western District of Kentucky, and Chairman of the Panel on Multidistrict Litigation, John G. Heyburn, II, explained: "Unless the balance [of convenience] is <u>strongly</u> in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." <u>Rutherford v. Goodyear Tire and Rubber Co.</u>, 943 F. Supp. 789, 791 (W.D. Ky. 1996) (emphasis added) (<u>quoting</u> <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501, 508, 67 S. Ct. 839, 843 (1947)); <u>see also</u> <u>Siegel v. Homestore, Inc.</u>, 255 F. Supp. 2d 451, 454-55 (E.D. Pa. 2003)(cited by Defendant Attorneys General on page 18 of their Memorandum) (stating that "[a]nalysis of any motion to dismiss or transfer for venue purposes must begin with acknowledgement of the well-settled principles that a plaintiff's choice of forum is not to be lightly disturbed and that the burden of establishing the need for transfer rests with the movant."); <u>Picker Int'l, Inc. v. Travelers Indem. Co.</u>, 35 F. Supp. 2d 570, 573 (N.D. Ohio 1998) (denying motion to transfer venue).

---

[11] Defendant Attorneys General refer to the "MSA's explicit jurisdiction provisions (MSA § VII(a)," but those apply only to claims to enforce the MSA.  General Tobacco's claims, in contrast, challenge the discriminatory payment structure and Defendant manufacturers' wrongful concerted efforts to thwart Defendant Attorneys General's efforts to change that scheme.  General Tobacco's claims are rooted in federal antitrust law, which cannot be brought in state court.  Furthermore, General Tobacco's constitutional claims are not based on the implementation or enforcement of the MSA, but rather based on the unconstitutionality of the MSA which treats similarly situated companies differently, with no rational basis for doing so.  Therefore, the "jurisdiction provisions" of the MSA are inapplicable to the present case.

Venue is presumed to be proper in the district in which a case is filed, and the party challenging venue bears the burden of establishing by preponderance of evidence that the district chosen by plaintiff was an improper venue.  In re Peachtree Lane Assocs., Ltd., 150 F.3d 788, 794 (7th Cir. 1998).  See also Myers v. American Dental Ass'n, 695 F.2d 716, 724 (3d Cir. 1982) (venue is an affirmative, dilatory defense, so that defendant has burden of proof); Simon v. Ward, 80 F. Supp. 2d 464, 466-468 (E.D. Pa. 2000) (defendant is required to make evidentiary showing that venue is improper in order to gain dismissal).  Indeed, the facts alleged in the complaint should be taken as true, and the court should make all favorable inferences in favor of upholding venue.  Mitrano v. Hawes, 377 F.3d 402, 405 (4th Cir. 2004) (to survive motion to dismiss, a plaintiff need make only prima facie showing of venue); Murphy v. Schneider Nat'l, Inc., 362 F.3d 1133, 1137-1140 (9th Cir. 2004) (when determining motion to dismiss for improper venue, court must draw all reasonable inferences and resolve all factual conflicts in favor of non-moving party).  As such, General Tobacco's choice to bring this lawsuit in Kentucky "must be given 'great weight' when considering whether to transfer venue."  Picker, 35 F. Supp. 2d at 573.

Throughout their Memorandum, Defendant Attorneys General ignore on-point and controlling authority.   Rather, they cite to inapplicable authority to purportedly support their general proposition that a court should not consider the use of the co-conspirators' acts to establish venue.  (See generally AG's Memo. at 18-19).[12]  Further, the cases cited by Defendants

---

[12] In some instances, Defendant Attorneys General ignore the analyses and holdings of the very cases to which they cite.  For example, they cite Elemary v. Holzmann A.G., 533 F. Supp. 2d 144 (D.D.C. 2008) for the proposition that a plaintiff must demonstrate proper venue for "each cause of action and each [defendant]."  (See AGs' Memo. at 18).  Defendant Attorneys General fail to note that the Elemary Court stated in the following sentence: But when venue lies for some of the plaintiff's claims, the doctrine of pendent venue may allow the court to hear the rest."  Id. at 149.  The Elemary Court also noted that "[c]ourts ordinarily accord significant deference to a plaintiff's choice of forum" and that "[t]he place where the alleged harm occurred is also relevant for purposes of venue" and that "[t]o determine where transactional venue will lie in a tort action, courts typically look to where

are wholly inapplicable.[13]   However, this Court need not go further than the clear language of the

Clayton Act[14] itself which provides that "any person who shall be injured in his business or

property by reason of anything forbidden in the antitrust laws may sue thereof in any district

court of the United States in the district in which the defendant resides or is found or has an

agent[15] . . . ."  15 U.S.C. §15(a).[16]   Courts have interpreted the intent of the clear language of the

venue section of the Clayton Act to "enlarge the venue and broaden the choice of forum

available in antitrust actions."  Crusader Marine Corp. v. Chrysler Corp., 281 F. Supp. 802, 803

(E.D. Mich. 1968); National Hockey League Players' Ass'n v. Plymouth Whaler's Hockey Club,

166 F. Supp. 2d 1155, 1160 (E.D. Mich. 2001) (noting that "the Clayton Act expanded the

venues within which antitrust actions could be brought" and that the purpose of broadening the

venue choices was to relieve injured parties through violations of the antitrust laws from the

"'often insuperable obstacle' of resorting to distant forums for redress of wrongs done in the

places of their business or residence"); Professional Adjusting Sys. of Am., Inc. v. General

Adjustment Bureau, Inc., 352 F. Supp. 648, 651 (E.D. Pa. 1972) (holding that the "reason for the

---

the allegedly tortious actions occurred and … where the harms were felt."  Id. at 150-51 (quotation marks and citations omitted).

[13] For instance, Defendants cite to In Re New Motor Vehicles Canadian Export Antitrust Litig., 307 F. Supp. 2d 145 (D. Maine 2004) for the proposition that the "use of co-conspirator's acts to establish venue is frowned upon."  See AGs' Memo. at 18).  However, Defendants fail to clarify that the Motor Vehicles court was limited to an analysis of personal jurisdiction, and not venue, and was predicated on the notion that "the First Circuit has never recognized the conspiracy doctrine."  Motor Vehicles, 307 F. Supp. 2d at 158.  Here, Kentucky federal courts, among numerous others, have recognized the conspiracy doctrine for personal jurisdiction and as such, Motor Vehicles does not apply.

[14] General Tobacco brought its antitrust claims pursuant to the enforcement provisions of the Clayton Act.

[15] As set forth more fully in the Complaint, Amended Complaint and supra, each Defendant is an agent for the other as co-conspirators, including Attorney General Jack Conway and Commonwealth Brands, which is located in the Western District of Kentucky.  (See Com. ¶¶ 25-29, 32, 88; Am. Com. ¶¶ 27-31, 35, 90).

[16] Numerous courts have held that the special, broader venue provisions of the Clayton Act are in addition to the breadth of the venue provisions of 28 U.S.C. § 1391.  Therefore, venue is proper if the requirements of either the Clayton Act venue provisions or 28 USC § 1391 are satisfied.  See e.g., Action Embroidery Corp. v. Atlantic Embroidery, Inc., 368 F.3d 1174, 1178 (9th Cir. 2004).

broad scope of the Clayton Act venue provisions was to give plaintiff the widest possible selection of venue for his benefit, to promote a 'private attorney general' type policy for exposing and policing combinations in restraint of trade"); Paper Sys., Inc. v. Mitsubishi Corp., 967 F. Supp. 364, 368 (E.D. Wis. 1997) ("In the case of the antitrust laws, it makes no sense to tie a district court's jurisdiction to the state in which it sits; it neither promotes the enforcement of the antitrust laws nor the management of litigation.")

Moreover, Defendants fail to cite to a single authority in the controlling jurisdiction and ignore the on-point authority allowing claims brought under antitrust theories to rely on the conspiracy doctrines.[17]  Indeed, the United States District Court for the Eastern District of Kentucky denied a motion to dismiss alleging improper venue in Kentucky Speedway where venue was based on damages to a Kentucky business as "an effect of the alleged conspiracy, monopoly and anti-competitive conduct."  410 F. Supp. 2d at 597-598.  The Court reasoned that "the plain language of the statute [for establishing venue] makes clear that the district where the action is brought need not be the only district where such 'events or omissions' occurred, or even the district where the substantial part occurred, and that more than one district may have proper venue."  Id. at 598 (citing First of Michigan Corp. v. Bramlet, 141 F.3d 260, 263 (6th Cir. 1998)).  The Kentucky Speedway court further noted that the "legislative history makes clear that the intent of the quoted [venue] statutory language was to expand the scope of venue in

---

[17] Other courts have also upheld the Plaintiff's choice of venue while using the co-conspiracy theory.  For instance, Beach v. National Football League, 331 F. Supp. 249 (S.D.N.Y. 1971), considered claims brought under the Sherman Act and the Clayton Act by a football player against the Cleveland Browns, the National Football League, and 15 other football teams alleged to be "co-conspirators" in a court in New York (where the National Football League resided).  The defendants in the Beach case sought dismissal based on improper venue, arguing that the principal witnesses resided in Cleveland, and that a trial in New York would be highly inconvenient if held during football season and was more convenient to be held in Cleveland.  Id.  The Court denied defendants' venue motion and held that where there is a "private antitrust suit the plaintiff generally has a wide choice of venue."  Id. at 251.  The Court further held that "[u]nless the balance of convenience of parties and witnesses and the interests of justice is strongly in favor of the defendants the action should not be transferred," and this rule "is particularly true in private antitrust suits" Id.

federal actions" and that the "plaintiff may file his complaint in any forum where a substantial part of the events or omissions giving rise to the claim arise; this includes any forum with a substantial connection to the plaintiff's claim." Id. (emphasis omitted).  As discussed above, significant acts giving rise to General Tobacco's claims occurred in Louisville and Bowling Green, Kentucky, thereby making the Western District of Kentucky a proper venue.  (See Com. ¶¶ 88, 108, 116, 117, 129, 156; Am. Com. ¶¶ 29, 33, 90, 108, 118, 119, 123-126, 132, 138).  While, given the nature of this case, there may be other districts where venue may also be proper, Kentucky's courts have recognized that the "plaintiff's choice of forum should rarely be disturbed." Rutherford, 943 F. Supp. at 791.

In sum, this Court should give great deference to General Tobacco's choice to bring this lawsuit in the United District Court for the Western District of Kentucky.  This is particularly so given General Tobacco's antitrust allegations, and given the connection between General Tobacco's claims and Kentucky.  As such, Defendants Attorneys General's argument that there is improper venue should fail.

### Conclusion

For the foregoing reasons, General Tobacco has fully satisfied its burden of establishing personal jurisdiction over the Defendant Attorneys General pursuant to either the conspiracy theory doctrine of personal jurisdiction or the traditional minimum contacts analysis. Furthermore, General Tobacco has properly brought this suit in the Western District of Kentucky where venue is proper.  Accordingly, Defendant Attorneys General's Motion to Dismiss for lack of personal jurisdiction and improper venue pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(3), should be dismissed in its entirety.

Respectfully submitted,


s/John K. Bush
John K. Bush
Christie A. Moore
Helen A. Thompson
Brigid O. Gies
GREENEBAUM DOLL & McDONALD PLLC
3500 National City Tower
Louisville, KY 40202
(502) 589-4200

COUNSEL FOR PLAINTIFF,
VIBO CORPORATION, INC. D/B/A
GENERAL TOBACCO

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of November, 2008, I served the foregoing on all counsel of record identified below in the manner specified, via transmission of Notice of Electronic Filing generated by CM/ECF to the following:

**ALABAMA**
James M. Steinwinder
Assistant Attorney General
Office of Attorney General
500 Dexter Avenue
Montgomery, AL 36130
334.353.9131
jsteinwinder@ago.state.al.us

**ALASKA**
Chris Poag
Assistant Attorney General
P.O. Box 110300
Juneau, AK 99801
907.465.4132
Chris.poag@alaska.gov

**ARIZONA**
Kelly M. Peloquin
Assistant Attorney General
Arizona Attorney General's Office
1275 W. Washington Street
Phoenix, AZ 85007-2926
317.232.6239
Kelly.peloquin@azag.gov

**ARKANSAS**
Eric B. Estates
Regina Harelson
Assistant Attorney General
323 Center Street, Ste 200
Little rock, AR 72201
501.682.8090
Eric.estes@arkansasag.gov

**CALIFORNIA**
Michelle Hickerson
Deputy Attorney General
Public Rights Division
110 W. A Street, Ste 1100
San Diego, CA 92101
Michelle.hickerson@doj.ca.gov

**COLORADO**
Brian L. Laughlin
Assistant Attorney General
Tobacco Settlement Enforcement
Colorado Department of Law
1525 Sherman Street – Seventh Floor
Denver, CO 80203
303.866.3994
303.866.4916 (fax)
Brian.laughlin@state.co.us

**CONNECTICUT**
Rupal Shah Palanki
Asst. Attorney General
Office of the Attorney General
55 Elm Street, P O Box 0120
Hartford, CT 6141-0120
860.808.5270
860.808.5385 (fax)
Rupal.shahpalanki@po.state.ct.us

**DELAWARE**
Thomas Brown
Deputy Attorney General
Delaware Deputy of Justice
820 North French Sate 6th Floor
Wilmington, DE 19801
302.577.8400
thomase.brown@state.de.us

32

**DISTRICT OF COLUMBIA**
Brian R. Caldwell
Asst. Attorney General
Office of the Attorney General
  For the District of Columbia
4441 Fourth Street, NW Ste 650 N
Washington, TC  20001
202.727.6211
Brian.caldwell@dc.gov

**HAWAII**

**ILLINOIS**
Marylyn A. Keuper
Chief, Tobacco Enforcement Bureau
Office of the Attorney
500 S. 2nd Street
Springfield, IL 62706
217.785.8541
217.524.4701 (fax)
mkueper@atg.state.il.us

**IOWA**
Kristie Remster Orme
McDowell, Rice, Smith & Buchanan, PC
605 W. 47th Street, Ste 350
Kansas City, MO 64112-1905
korme@mcdowellrice.com

**KENTUCKY**
Hon. Michael Plumley

**GEORGIA**
Sidney R. Barrett, Jr.
Senior Asst. Attorney General
Robin G. Cohen
Asst. Attorney General
Office of the Attorney General
40 Capital Square, SW
Atlanta, CA 30334
404.656.3202
404.656.4190
sbarrett@law.ga.gov
rcohen@law.ga.gov

**IDAHO**
Brett t. DeLange
Deputy Attorney General
State of Idaho
Consumer Protection Division
954 W. Jefferson, 2nd Floor
Boise, ID 83702
P.O. Box 83720
Boise, ID 83720-0010
208.334.2424
Brett.delange@ag.idaho.gov

**INDIANA**
Lawrence J. Carcare II
Deputy Attorney General
Tobacco Enforcement
IGC-South, 5th Floor
302 W. Washington Street
Indianapolis, IN  46204
Lawrence.carcare@atg.in.gov

**KANSAS**
Patrick Broxterman, Director
Tobacco Enforcement Unit
120 SW 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
785.368.8452
Patrick.broxterman@ksag.org

**LOUISIANA**
Patricia H. Wilton

33

James M. Herrick
Hon. Tad Thomas
Office of the Attorney General
Office of Civil & Environmental Law
The Capital Building
700 Capital Avenue, Ste 118
Frankfort, KY 40601
Phone:  502.696.5627
Email:  michael.plumley@ag.ky.gov
            james.herrick@ag.ky.gov
            tad.thomas@ag.ky.gov

Gary D. Wilson
4636 30th Street
Washington, DC 20008-2127
202.362.7417
202.362.7417 (fax)
gary.d.wilson@verizon.net

Asst. Attorney General
Sanettria Pleasant (phone contact person)
Asst. Attorney General
Tobacco Settlement Enforcement Unit
Louisiana Dept. of Justice
1885 N. Third Street, 4th Floor
P.O. Box 94005
Baton Rouge, LA 70804-9005
225.326.6300
225.326.6423 (Sanettria direct)
225.326.6495 (fax)
wiltonp@ag.state.law.us
pleasants@ag.state.la.us

**MAINE**
Jennifer A. Willis
Asst. Attorney General
Consumer Protection Division
Burton M. Cross Office Bldg.
111 Sewall Street
Augusta, ME 04333
jennifer.willis@maine.gov

**MARYLAND**
David Lapp, Chief Counsel
Tobacco Enforcement Unit
Office of the Attorney General of
Maryland
200 St. Paul Place, 20th Floor
Baltimore, MD 21202
410.576.7056
dlapp@aog.md.us

**MASSACHUSETTS**
Elizabeth J. Koenig
Asst. Attorney General
Consumer Protection Division
Public Protection Bureau
One Ashburton Place
Boston, MA 02108
617.727.2200

**MICHIGAN**
Brian D. Devlin
Administrative Law Section
P.O. Box 30212
Lansing, MI 48909
517.373.1123
devlinb@michigan.gov

**MISSOURI**
Curtis R. Stokes
Asst. Attorney General
P.o. Box 899
Jefferson City, MO 65102
573.751.1143
Curt.stokes@ago.mo.gov

**MONTANA**
Mark McLaverty
Montana Dept. of Justice
215 North Sanders
P.O. Box 201401
Helena, MT 201401
406.444.9514

mmclaverty@mt.gov

**NEBRASKA**
Lynne R. Fritz
Asst. Attorney General
Nebraska Attorney General's Office
2115 State Capitol
PO Box 98920
Lincoln, NE 68509-8920
Lynne.fritz@nebraska.gov

**NEVADA**
Victoria Thimmesch Oldenburg
Senior Deputy Attorney General
5420 Kietzke Lane, Ste 202
Reno, NV 89511
775.688.1818
voldenburg@ag.nv.gov

**NEW HAMPSHIRE**
David A. Rienzo
Asst. Attorney General
Richard W. Head
Asst. Attorney General
33 Capitol Street
Concord, NH 03301
603.271.1249
david.rienzo@doj.nh.gov
richard.head@doj.nh.gov

**NEW JERSEY**
Carol B. Jacobson
Sr. Deputy Attorney General
124 Halsey Street
PO Box 25029
Newark, NJ 07101
973.648.4447
carol.jacobson@dol.lps.state.nj.us

**NEW MEXICO**
David K. Thomson
Deputy Attorney General
New Mexico Attorney General's Office
408 Galisteo Street
P.O. Drawer 1508
Santa Fe, NM 87504-1508
dthomson@nmag.gov

**NEW YORK**
Dana Biberman
Christine E. Morrison
Asst. Attorney Generals
Chief, Tobacco Compliance Bureau
120 Broadway, 25th Floor
New York, NY 10271
dana.biberman@oag.state.ny.us
christine.morrison@oag.state.ny.us

**NORTH CAROLINA**
Melissa L. Trippe
Special Deputy Attorney General
Richard L. Harrison
Special Deputy Attorney General
North Carolina Dept. of Justice
P O Box 629
114 W. Edenton St., 3rd Floor
Raleigh, NC 27602
919.716.6900
mtrippe@ncdoj.gov
rharris@ncdoj.gov

**NORTH DAKOTA**
Douglas A. Bahr
Solicitor General
Office of Attorney General
500 North 9th Street
Bismark, NJ 58501-4509
701.328.3640
dbahr@nd.gov

**OHIO**

**OKLAHOMA**

Susan C. Walker
Asst. Attorney General
Chief, Tobacco Enforcement Section
30 E. Broad Street, 16th Floor
Columbus, OH 43215-3428
614.387.5600
614.397.5599 (fax)
scwalker@ag.state.oh.us

**OREGON**
Lisa M. Udland
Asst. Attorney General
Oregon Dept. of Justice
1162 Court Street NE
Salem, OR 97301-4096
503.934.4400
503.373.7067 (fax)
lisa.udland@doj.state.or.us

**RHODE ISLAND**
Maureen G. Glynn
Asst. Attorney General &
Health Care Advocate
Rhode Island Dept. of Attorney General
150 S. Main Street
Providence, RI 02903-2907
401.274.4400, ext 2301
401.222.2995 (fax)
mglynn@riag.state.ri.us

**SOUTH DAKOTA**
Patricia Archer
Asst. Attorney General
South Dakota Attorney General's Office
1302 E. Highway 14, Suite 1
Pierre, SD 57501-8501
Pat.archer@state.sd.us

**UTAH**
Katherine H. Kinsman
Asst. Attorney General
160 E. 300 South, 5th Floor

E. Clyde Kirk
Asst. Attorneys General
Tobacco Enforcement Unit
313 Northeast 21st Street
Oklahoma City, OK 73105
405.521.3921
405.522.4534 (fax)
clyde.kirk@oag.ok.gov

**PENNSYLVANIA**
Joel M. Ressler
Chief Deputy Attorney General
Chief, Tobacco Enforcement Section
P O Office of the Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120
717.783.1794
jressler@attorneygeneral.gov

**SOUTH CAROLINA**
T. Parkin Hunter
Jonathan B. Williams
Asst. Attorney Generals
Office of the Attorney General
State of South Carolina
P O BXO 11549
Columbia, SC 29211-1549
803.734.3680
phunter@ag.state.sc.us
jwilliams@ag.state.sc.us

**TENNESSEE**
Rebekah A. Baker, Asst Attorney General
John H. Sinclair, Jr.
Asst. Attorney General
Stephen R. Butler,
Asst. Attorney General
Office of the Attorney General & Reporter
State of Tennessee
P.O. Box 20207
Nashville, TN 37202

**VERMONT**
Christy Taylor Mihaly
Asst. Attorney General
Vermont Attorney General's Office

P O Box 140857
Salt Lake City, UT 84114-0857
kkinsman@utah.gov

109 State Street
Montpelier, VT 05609-1001
cmihaly@atg.state.vt.us

**VIRGINIA**
William E. Thro
Special Counsel
Office of the Attorney General
Christopher Newport University
1 University Place
Newport News, VA 23606
757.594.7571
757.594.7864 (fax)
wthro@cnu.edu

**WASHINGTON**
Robert J. Fallis
Asst. Attorney General
Administration Division
Washington Attorney General's Office
800 5th Avenue, Ste 2000, TB-14
Seattle, WA 98104-3188
rustyf@atg.wa.gov

**WEST VIRGINIA**

**WISCONSIN**
Christopher J. Blythe
Asst. Attorney General
Wisconsin Dept. of Justice
17 W. Main Street
P.O. Box 7857
Madison, WI 53707-7857
blythecj@coj.state.wi.us

**WYOMING**
Douglas J. Moench
Senior Asst. Attorney General
Kenneth Miller
Asst. Attorney General
Wyoming Attorney General's Office
123 Capitol Avenue
Cheyenne, WY 82002
dmoenc@state.wy.us
kmille2@state.wy.us

**AMERICAN SAMOA**

**GUAM**
**PUERTO RICO**

**COMMONWEALTH BRANDS, INC.**
Robert J. Brookhiser
Elizabeth B. McCallum
Howrey, LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004-2402
202.383.6958
202.383.7336

**NORTHERN MARIANA ISLANDS**
**US VIRGINI ISLANDS**

**PREMIER MANUFACTURING**
Robert J. Brookhiser
Elizabeth B. McCallum
Howrey, LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004-2402
202.383.6958
202.383.7336

202.257.3541 (McCallum cell)
202.383.6610 (fax)
brookhiserb@howrey.com
mccallumb@howrey.com

Merrill S. Schell
WYATT, TARRANT & COMBS, LLP
2800 PNC Plaza
500 W. Jefferson St.
Louisville, KY 40202
502.589.5235
502.589.0309 (fax)
mschell@wyattfirm.com

**LORILLARD**
Irving Scher
Lee Vanvoorhis
Idit Froim
Weil Gotshal & Manges LLP
767 5th Avenue
New York, NY 10153
212.310.8120
917.825.7279 (cell)
212.310.8007 (fax)
Irving.scher@weil.com
Lee.vanvoorhis@weil.com
Idit.froim@weil.com

Charles S. Cassis
Theresa A. Canaday
Frost Brown Todd LLC
400 W. Market Street, 32nd Floor
Louisville, KY 40202
502.589.5400 (main)
568.0233 (direct)
502.581.1087 (fax)
ccassis@fbtlaw.com
tcanaday@fbtlaw.com

**LIGGETT GROUP, LLC**
Robert J. Brookhiser
Elizabeth B. McCallum
Howrey, LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004-2402

202.257.3541 (McCallum cell)
202.383.6610 (fax)
brookhiserb@howrey.com
mccallumb@howrey.com

**RJ REYNOLDS**
Steve Patton
Douglas G. Smith
Elli Leibenstein
Barack Echols
Kirkland & Ellis LLP
200 E. Randolph Drive
Chicago, IL 60601-6636
312.861.2406 (direct)
312.861.2000 (main)
312.861.2200 (fax)
spatton@kirkland.com
dsmith@kirkland.com
eleibenstein@kirkland.com
bechols@kirkland.com

Charles S. Cassis
Theresa A. Canada
Frost Brown Todd LLC
400 W. Market Street, 32nd Floor
Louisville, KY 40202
502.589.5400 (main)
568.0233 (direct)
502.581.1087 (fax)
ccassis@fbtlaw.com
tcanaday@fbtlaw.com

**PHILLIP MORRIS, USA, Inc.**
Charles S. Cassis
Theresa A. Canaday
Frost Brown Todd LLC
400 W. Market Street, 32nd Floor
Louisville, KY 40202

202.383.6958
202.383.7336
202.257.3541 (McCallum cell)
202.383.6610 (fax)
brookhiserb@howrey.com
mccallumb@howrey.com

Merrill S. Schell
WYATT, TARRANT & COMBS, LLP
2800 PNC Plaza
500 W. Jefferson St.
Louisville, KY 40202
502.589.5235
502.589.0309 (fax)
mschell@wyattfirm.com

**VECTOR**
Robert J. Brookhiser
Elizabeth B. McCallum
Howrey, LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004-2402
202.383.6958
202.383.7336
202.257.3541 (McCallum cell)
202.383.6610 (fax)
brookhiserb@howrey.com
mccallumb@howrey.com

502.589.5400 (main)
568.0233 (direct)
502.581.1087 (fax)
ccassis@fbtlaw.com
tcanaday@fbtlaw.com

Douglas L. Wald
Michael B. Bernstein
Eric Shapland
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004-1206
202.942.5000 (wk)
202.942.5999 (fax)
Douglas.Wald@aporter.com
Michael.B.Bernstein@aporter.com
Eric.Shapland@aporter.com

And I also hereby certify that on this 24th day of November, 2008, I served the foregoing on all defendants identified by their email addresses below:

'brett.delange@ag.idaho.gov'; 'beth.kittelmann@ag.idaho.gov';
'james.herrick@ag.ky.gov'; 'gary.d.wilson@verizon.net'; 'dennis.hansen@ag.state.ar.us';
'bmeyer@ag.state.ia.us'; 'dstanle@ag.state.ia.us'; 'jambroz@ag.state.ia.us';
'korme@mcdowellrice.com'; scwalker@ag.state.oh.us; 'hannamang@ag.state.la.us';
pleasants@ag.state.la.us; phillipst@ag.state.la.us; wiltonp@ag.state.la.us;
'vtoldenb@ag.state.nv.us'; cmihaly@atg.state.vt.us; 'swalker@ag.state.oh.us';
'AGDSpencer@ag.state.sc.us'; 'aqueen@ag.state.sc.us'; 'phunter@ag.state.sc.us';
'Daniel.Hall@ago.mo.gov'; 'Earl.Kraus@ago.mo.gov'; 'gregory.barnes@ago.mo.gov';
'lynne.fritz@ago.ne.gov'; 'jafarshee@ago.state.al.us'; 'cravanelli@ago.state.nm.us';
'dthomson@ago.state.nm.us'; 'eric.estes@arkansasag.gov';
'jim.depriest@arkansasag.gov'; 'mkueper@atg.state.il.us'; 'donna.learned@atg.in.gov';

'lawrence.carcare@atg.in.gov'; 'jbrill@atg.state.vt.us'; 'CamC1@atg.wa.gov';
'David.Hankins@atg.wa.gov'; 'DougV@atg.wa.gov'; 'rustyf@atg.wa.gov';
'jressler@attorneygeneral.gov'; 'bennett.rushkoff@dc.gov';
'cathy.thurstonseignious@dc.gov'; 'dennis.eckhart@doj.ca.gov';
'michelle.hickerson@doj.ca.gov'; 'edavis@doj.gov.vi'; 'mphelan@doj.gov.vi';
'ppaquin@doj.gov.vi'; 'david.rienzo@doj.nh.gov'; Richard.head@doj.nh.gov;
'lisa.udland@doj.state.or.us'; 'blythecj@doj.state.wi.us'; 'gibsoncj@doj.state.wi.us';
'wellslk@doj.state.wi.us'; 'christopher.roy@dor.state.wi.us'; 'tobacco@ksag.org';
Patrick.broxterman@ksag.org; 'Greg.Harkenrider@ky.gov'; 'jmichael.jones@ky.gov';
'Mary.Lassiter@ky.gov'; 'chris_poag@law.state.ak.us';
'cynthia_drinkwater@law.state.ak.us'; 'Alex.R.Barrett@hawaii.gov';
'Earl.R.Hoke@hawaii.gov'; 'jennifer.willis@maine.gov'; 'hackneycd@michigan.gov';
mmclaverty@mt.gov; 'ctweeten@mt.gov'; mmclaverty@mt.gov; 'kosullivan@mt.gov';
'abarefoo@ncdoj.gov'; rharris@ncdoj.gov;  'jbkelly@ncdoj.gov'; 'Klong@ncdoj.gov';
'lemory@ncdoj.gov'; 'mtrippe@ncdoj.gov'; 'rharris@ncdoj.gov';
'mtrestman@oag.state.md.us'; 'clayton_eubanks@oag.state.ok.us';
'phil_stambeck@oag.state.ok.us'; 'ryan_chaffin@oag.state.ok.us';
'gconover@oag.state.va.us'; 'jmclees@oag.state.va.us'; 'mwyatt@oag.state.va.us';
'wade.hope@revenue.alabama.gov'; 'jlee@riag.ri.gov'; 'kkinsman@utah.gov';
'John.Dalporto@wvago.gov'; 'Joelyn.Gast@iowa.gov'; 'jdiaz@justicia.gobierno.pr';
'laaparicio@justicia.gobierno.pr'; 'nramos@justicia.gobierno.pr';
'janis_hales@revenue.state.ak.us'; 'johanna_bales@revenue.state.ak.us';
'mglynn@riag.state.ri.us'; 'brian.laughlin@state.co.us'; 'jan.zavislan@state.co.us';
'thomase.brown@state.de.us'; pat.archer@state.sd.us; 'daniel.champney@ag.tn.gov';
'rebekah.baker@ag.tn.gov'; 'dmoenc@state.wy.us'; 'kmille2@state.wy.us;
ann.uglietta@azag.gov; kelly.peloquin@azag.gov; 'michael.plumley@ag.ky.gov';
'tad.thomas@ag.ky.gov'; 'attorney.general@state.co.us'; wthro@cnu.edu;
jwilliams@ag.state.sc.us;'rupal.shahpalanki@po.state.ct.us'; voldenburg@ag.nv.gov;
'law@guamattorneygeneral.com'; 'chris.poag@alaska.gov'; 'miag@michigan.gov';
'info@scattorneygeneral.com'; 'greg.abbott@oag.state.tx.us'; 'uag@utah.gov';
'atginfo@atg.state.vt.us'; 'kelly.ayotte@doj.nh.gov'; 'smoore@ncdoj.gov';
'kbergeron@riag.ri.gov'; 'mail@oag.state.va.us'; curt.stokes@ago.mo.gov;
'attorney.general@maine.gov'; 'jeanne.young@wvago.gov';
'attorney.general@state.co.us'; 'attorney.general@state.de.us'; 'smoore@ncdoj.gov';
'dena.spaulding@doj.state.or.us'; 'vfrazer@doj.vi.gov'; 'dthomson@nmag.gov';
'clarson@ag.state.ia.us'; 'janet.carter@ag.idaho.gov'; 'linda.mcewen@state.mn.us';
thomas.overton@state.mn.us; 'eric.estes@arkansasag.gov'; 'troyking@ago.state.al.us';
jsteinwinder@ago.state.al.us; 'sbarrett@law.ga.gov'; rcohen@law.ga.gov;
'mwebb@ago.state.ms.us'; 'vtoldenb@ag.state.nv.us'; 'rchaffin@oag.ok.gov';
clyde.kirk@oag.ok.gov;  'carol.jacobson@dol.lps.state.nj.us';
cathy.melitski@dol.lps.state.nj.us; 'Dana.Biberman@oag.state.ny.us';
'christine.morrison@oag.state.ny.us'; 'jlong@lvbrands.com';
'mbell@vectorgroupltd.com'; 'neal.beaton@hklaw.com'; 'barry@bboren.com';
'mark@gopremier.com'; 'Rnuckolls@mckennalong.com'; 'stanleyfriedman@mcf-
esq.com'; 'nallard@pattonboggs.com'; 'denise.keane@pmusa.com';
'Douglas.Wald@aporter.com'; michael.b.bernstein@aporter.com;

eric.shapland@aporter.com; 'irving.scher@weil.com'; 'lee.vanvoorhis@weil.com';
'Idit.Froim@weil.com'; 'mark@gopremier.com'; 'gbaka79@yahoo.com';
'ggahan@altadis.com'; 'jean-dominique.comolli@altadis.com';
'jack_henson@laneltd.com'; 'dlapp@oag.state.md.us'; 'jpcarriere@altadis.com';
'attysmiami@aol.com'; 'dhanrajusa@aol.com'; 'RALNASCO@aol.com';
'rangiuoli2@aol.com'; 'robwilkey@aol.com'; 'heatherj.wilson@po.state.ct.us';
'joseph.rubin@po.state.ct.us'; 'Rupal.ShahPalanki@po.state.ct.us'; 'barry@bboren.com';
'avramstc@bellsouth.net'; 'hcroemer@bellsouth.net'; 'sb@bolattigriffith.com';
'info@chancellor-tobacco.com'; 'mark@cigarettetobacco.com';
'juridico@citatabacos.com'; 'darce@compass.com.ph'; 'bunjoto.astono@djarum.com';
'grace.t.sennelius@djarum.com'; 'rachman.satya@djarum.com'; 'sigold@drl-ent.com';
'zrashwan@easternegypt.com'; 'info@farmerstobacco.com';
'jennifer@farmerstobacco.com'; 'davidchor@gdgroupinc.com';
'dominicchu@gdgroupinc.com'; 'mark@gopremier.com'; 'scoleman@gopremier.com';
'ayh@harksco.com'; 'nbeaton@hklaw.com'; 'brian.caldwell@dc.gov';
'brookhiserb@howrey.com'; 'mccallumb@howrey.com'; 'arnoldh3151@ipass.net';
'sdaniel@ipass.net'; 'amarks@kasowitz.com'; 'spatton@kirkland.com';
dsmith@kirkland.com; eleibenstein@kirkland.com; bechols@kirkland.com;
'bhavani.parameswar@kmm-inc.com'; 'markcassar@kretek.com';
'mikehousego@kretek.com'; 'seancassar@kretek.com'; 'jginsburg@levin-ginsburg.com';
'jweis@levin-ginsburg.com'; dbahr@nd.gov;'bgarner@libertybrandsllc.com';
'sfeit@libertybrandsllc.com'; 'acalso@lignum2.com'; 'kirinaga@lignum2.com';
'tmeyer@lignum2.com'; 'bmcginn@lortobco.com'; 'jlong@lvbrands.com';
'annette.boye@mac-baren.com'; 'per.buch@mac-baren.com'; 'stanleyfriedman@mcf-
esq.com'; 'rnuckolls@mckennalong.com'; 'exportaciones@montepaz.com.uy';
'jamesnooney@montepaz.com.uy'; 'moldes@montepaz.com.uy'; 'abrams52@msn.com';
's-m-johnson@msn.com'; 'wrtco@msn.com'; 'PLEVIN@NAAG.ORG';
'lcarbone@natsherman.com'; 'rmaraia@natsherman.com'; 'jlopezm@palermo.com.py';
'nallard@pattonboggs.com'; 'obermann@planta-tobacco.de'; 'rau@planta-tobacco.de';
'wiesenhuetter@planta-tobacco.de'; 'Anthony.Reale@pmusa.com';
'Blake.p.Auchmoody@pmusa.com'; 'denise.keane@pmusa.com';
'Emmitt.n.davis@pmusa.com'; 'poeschl@poeschl-tobacco.com';
'dspitzer@proskauer.com'; 'winnersales@qwest.net'; 'mckimt@rjrt.com';
'jfranzino@sfntc.com'; 'mjohnson@sfntc.com'; 'william.hunter@skofirm.com';
'dana.m.papillion@us.pwc.com'; 'ryan.harrell@us.pwc.com'; 'cathanasia@usthq.com';
'rkohlberger@usthq.com'; 'fferguson@valottery.com'; 'mbell@vectorgroupltd.com';
'dumbreit@von-eicken.com'; 'umbreit@von-eicken.com';
'Gary.Wilson@wilmerhale.com'; 'mgkoplow@wlrk.com'; 'inttobacco@yahoo.com';
'shigeru_jr@yahoo.com'; mschell@wyattfirm.com; ccassis@fbtlaw.com;
tcanaday@fbtlaw.com;

/s/ John K. Bush

COUNSEL FOR PLAINTIFF
VIBO CORPORATION, INC., d/b/a
GENERAL TOBACCO

3104158_3.doc