IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

_____
)
VIBO CORPORATION, INC. d/b/a/          )
GENERAL TOBACCO,                        )
                                        )
                    Plaintiff,          )
                                        )
             v.                         )        No. 3:08-CV-00571-JBC
                                        )
JACK CONWAY, in his official            )        FILED ELECTRONICALLY
capacity as Attorney General, Commonwealth )
of Kentucky, *et al.*,                  )
                                        )
                    Defendants.         )
_____)

---

DEFENDANT SPMs' MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

---

Merrill S. Schell                       Robert J. Brookhiser
WYATT, TARRANT & COMBS, LLP             Elizabeth B. McCallum
500 West Jefferson Street, Suite 2800   HOWREY LLP
Louisville, Kentucky 40202-2898         1299 Pennsylvania Ave., NW
502.589.5235 (phone)                    Washington, DC 20004-2402
502.589.0309 (fax)                      202.783.0800 (phone)
mschell@wyattfirm.com                   202.383.6610 (fax)
                                        brookhiserb@howrey.com


Counsel for Defendant SPMs Commonwealth Brands, Inc., Liggett Group LLC, Vector Tobacco
Inc., Imperial Tobacco Limited/ITL (USA), Japan Tobacco International U.S.A., Inc., King
Maker Marketing, Inc., Lane Limited, Lignum-2, Inc., P.T. Djarum, Premier Manufacturing, Inc.,
Santa Fe Natural Tobacco Co., Sherman's 1400 Broadway N.Y.C., Inc., and Top Tobacco, L.P.

## TABLE OF CONTENTS

I.     **INTRODUCTION** ........................................................................................... 1

II.    **FACTS** ........................................................................................................... 2

   A.   The MSA ..................................................................................................... 2

   B.   SPMs Join the MSA ................................................................................... 5

   C.   NPMs Compete Vigorously Under the MSA .............................................. 6

       1.   NPM Growth Under the MSA ............................................................ 7

       2.   The Consequences to the States from NPM Growth ........................... 8

       3.   NPMs Continue to Compete Successfully .......................................... 9

   D.   General Has Consistently Taken Advantage of and Benefited from the MSA ............... 11

       1.   Explosive Share Growth from 2000 to 2004 .................................... 11

       2.   General Joins the MSA ..................................................................... 14

       3.   General Is Competitive as an SPM .................................................... 15

   E.   General's Suit and Its Request for Preliminary Injunctive Relief ................... 17

III.   **ARGUMENT** ............................................................................................. 17

   A.   General Tobacco Has Not Demonstrated a Strong Likelihood of Success ..................... 18

       1.   General Has No Likelihood of Success on Claims it Has Waived ............... 19

       2.   General Has No Likelihood of Success on its Antitrust Claim .................... 19

       3.   General Has No Likelihood of Success on its Constitutional Claims ........... 26

       4.   General Has No Likelihood of Success on its Fraudulent Inducement Claim ............. 30

       5.   General Is Not Likely to Succeed on its Requested Relief ........................... 31

   B.   General Tobacco Will Not Suffer Irreparable Harm Absent a Preliminary Injunction .... 31

   C.   A Preliminary Injunction Will Substantially Harm the Defendants ................. 38

IV.   **CONCLUSION** ......................................................................................... 40

# TABLE OF AUTHORITIES

## CASES

*A.D. Bedell Wholesale Company, Inc. v. Philip Morris Inc*,
   263 F.3d 239 (3d Cir. 2001)......................................................................................20

*APJ Assoc., Inc. v. N. Am. Philips Corp.*,
   317 F.3d 610 (6th Cir. 2003) .................................................................................30

*Abney v. Amgen, Inc.*,
   443 F.3d 540 (6th Cir. 2006) .................................................................................32

*Advanced Accessory Sys., LLC v. Gibbs*,
   71 Fed. Appx. 454 (6th Cir. 2003)..........................................................................30

*Alaska Airlines v. United Airlines, Inc.*,
   948 F.2d 536 (9th Cir. 1991) .................................................................................22

*Beverage Mgmt., Inc. v. Coca-Cola Bottling Corp.*,
   653 F. Supp. 1144 (S.D. Oh. 1986) .......................................................................21

*Blaylock v. Checker Oil Co.*,
   547 F.2d 962 (6th Cir. 1976) .................................................................................35

*Bliss Collection LLC v. Latham Cos., LLC*,
   No. 05-287, 2006 WL 196970 (W.D. Ky. Jan. 24, 2006).......................................18

*Cablevision of Boston, Inc. v. Pub. Improvement Comm'n of the City of Boston*,
   38 F. Supp. 2d 46 (D. Mass. 1999) ........................................................................37

*Califano v. Yamasaki*,
   442 U.S. 682 (1979)................................................................................................35

*Campbell v. PMI Food Equip. Group, Inc.*,
   509 F.3d 776 (6th Cir. 2007) .................................................................................20

*Caplan v. Fellheimer Eichen Braveman & Kaskey*,
   68 F.3d 828 (3d Cir. 1995)................................................................................36, 37

*Carter v. Carolina Tobacco Co., Inc.*,
   873 N.E.2d 611 (Ind. Ct. App. 2007)......................................................................34

*Charley's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc.*,
   810 F.2d 869 (9th Cir. 1987) .................................................................................20

iii

*Club Italia Soccer & Sports Org., Inc. v. Charter Township of Shelby, Mich.*,
470 F.3d 286 (6th Cir. 2006) .................................................28

*Coal Res., Inc. v. Gulf & W. Indus., Inc.*,
756 F.2d 443 (6th Cir. 1985) .................................................30

*Commonwealth v. Patriot Tobacco Co.*,
No. 02-CI-00876 (Ky. Franklin Cty. Cir. Ct. July 16, 2003)........................................... *passim*

*Diamond "D" Constr. Corp. v. McGowan*,
282 F.3d 191 (2d Cir. 2002).................................................34

*Diversified Mortgage Investors v. U.S. Life Title Insurance Co. of N. Y.*,
544 F.2d 571 (2d Cir. 1976).................................................35

*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000).................................................2

*Forces Action Project LLC v. State*,
Case No. 99-0607, 2000 WL 20977 (N.D. Cal. Jan. 5, 2000) ................................28

*FreeEats.com, Inc. v. Indiana*,
502 F.3d 590 (7th Cir. 2007) .................................................34

*Friendship Materials, Inc. v. Mich. Brick, Inc.*,
697 F.3d 100 (6th Cir. 1982) .................................................31

*Frisch's Rest. v. Shoney's Inc.*,
759 F.2d 1261 (6th Cir. 1985) .................................................18

*Gambrel v. Ky. Bd. of Dentistry*,
689 F.2d 612 (6th Cir. 1982) .................................................20

*Gen. Elec. Co. v. Latin Am. Imports*,
No. 03-5137, 2005 WL 293660 (6th Cir. Feb. 8, 2005) ................................30

*Georgia v. Chattanooga*,
264 U.S. 472 (1924).................................................35

*Grand River Enter. Six Nations, Ltd. v. Beebe*,
418 F. Supp. 2d 1082 (W.D. Ark. 2006).................................................28

*Heller v. Doe*,
509 U.S. 312 (1993).................................................26

*Hise v. Philip Morris Inc.*,
    46 F. Supp. 2d 1201 (N.D. Okla. 1999),
    *aff'd*, 208 F.3d 226 (10th Cir. 2000) ......................................................................20

*Holifield v. Beverly Health &  Rehab. Serv.*,
    2008 U.S. Dist. LEXIS 47909 (W.D. Ky. June 20, 2008)......................................31

*Hoover v. Ronwin*,
    466 U.S. 558 (1984)................................................................................................20

*Hosey v. Club van Cortlandt*,
    299 F. Supp. 501 (S.D.N.Y. 1969)........................................................................35

*Inland Bulk Transfer Co. v. Cummins Engine Co.*,
    332 F.3d 1007 (6th Cir. 2003) ...............................................................................31

*Int'l Tobacco Partners, Ltd. v. Beebe*,
    420 F. Supp. 2d 989 (W.D. Ark. 2002)..................................................................28

*Int'l Tobacco Partners, Ltd. v. Kline*,
    475 F. Supp. 2d 1078 (D. Kan. 2007)....................................................................25

*JamSports and Entm't LLC v. Pasadena Prods., Inc.*,
    336 F. Supp. 2d 824 (N.D. Ill. 2004))...................................................................22

*Justice Res. Ctr. v Louisville-Jefferson County Metro. Gov't.*,
    2007 WL 1302708 (W.D. Ky. 2007) .....................................................................18

*KT&G Corp. v. XCaliber Int'l Ltd.*,
    535 F.3d 1114 (10th Cir. 2008) .................................................................. *passim*

*Liggett Group v. Commonwealth*,
    232 S.W.3d 559 (Ky. Ct. App. 2007) ........................................................ *passim*

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525 (2001).................................................................................................2

*Mariana v. Fisher*,
    338 F.3d 189 (3d Cir. 2003)...................................................................................20

*Mason County Med. Ass'n v. Knebel*,
    563 F.2d 256 (6th Cir. 1977) .................................................................................18

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997)...............................................................................................18

*MCI Commc'ns v. AT&T Co.*,
708 F.2d 1081 (7th Cir. 1983) ...................................................................21

*Metro. Publ'g Co. v. San Jose Mercury News*,
Case No. 18462, 1993 WL 266785 (N.D. Cal. July 19, 1993) .........................................22, 37

*Metronet Servs. Corp. v. Qwest Corp.*,
383 F.3d 1124 (9th Cir. 2004) ...................................................................22

*Midkiff v. Adams County Reg'l Water Dist.*,
409 F.3d 758 (6th Cir. 2005) ...................................................................26

*Miller's Bottled Gas v. Borg-Warner Corp.*,
955 F.2d 1043 (6th Cir. 1992) ...................................................................31

*Nader v. Blackwell*,
230 F.3d 833 (6th Cir. 2000) ...................................................................18

*National Lead, Inc. v. Spector*,
428 F.2d 91 (3rd Cir. 1971) ...................................................................35

*Ne. Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*,
467 F.3d 999 (6th Cir. 2006) ...................................................................18

*New York v. Philip Morris, Inc.*,
42 A.D.3d 353 (N.Y. App. Div. 2007) ...................................................................7

*North Carolina v. Philip Morris USA, Inc.*,
666 S.E.2d 783 (N.C. Ct. App. 2008) ...................................................................31

*Odetics v. Storage Tech. Corp.*,
14 F. Supp. 2d 785 (E.D. Va. 1998) ...................................................................33

*Overstreet v. Lexington Fayette Urban County Gov't*,
305 F.3d 566 (6th Cir. 2002) ...................................................................18, 34

*PTI Inc. v. Philip Morris, Inc.*,
100 F. Supp. 2d 1179 (C.D. Cal. 2000) ...................................................................20, 28

*Parker v. Brown*,
317 U.S. 341 (1943) ...................................................................20

*Premium Tobacco Stores v. Fisher*,
51 F. Supp. 2d 1099 (D. Colo. 1999) ...................................................................28

*Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*,
   113 S.W.3d 636 (Ky. Ct. App. 2003) ...................................................................31

*S&M Brands, Inc. v. Summers*,
   393 F. Supp. 2d 604 (M.D. Tenn. 2005),
   *aff'd*, 228 Fed. Appx. 560 (6th Cir. 2007)...............................................20, 21, 28

*S&M Brands, Inc. v. Summers*,
   228 Fed. Appx. 560 (6th Cir. 2007)...........................................................3, 20, 21

*Salt Lake Tribune Publ'g Co, LLC. V. AT&T Corp.*,
   320 F.3d 1081 (7th Cir. 2003) ...................................................................36, 37

*Sanders v. Brown*,
   504 F.3d 903 (9th Cir. 2007) ...............................................................................20

*Second City Music, Inc. v. Chicago*,
   333 F.3d 846 (11th Cir. 2003) ...................................................................36, 37

*Star Sci., Inc. v. Beales*,
   278 F.3d 339 (4th Cir. 2002) .............................................................4, 27, 28

*Summit County Democratic Cent. & Exec. Comm. v. Blackwell*,
   388 F.3d 547 (6th Cir. 2004) ...............................................................................18

*Travis v. Pennyrile Rural Elect. Coop.*,
   399 F.2d 726 (6th Cir. 1968) ...............................................................................34

*TriHealth, Inc. v. Bd. of Comm'rs, Hamilton County, Ohio*,
   430 F.3d 783 (6th Cir. 2005) ...............................................................................28

*Tritent Int'l Corp. v. Commonwealth*,
   467 F.3d 547 (6th Cir. 2006) ................................................................. *passim*

*United States v. Miami Univ.*,
   294 F.3d 797 (6th Cir. 2002) ...................................................................32, 36

*Verizon Comm'ns Inc. v. Trinko*,
   540 U.S. 398 (2004)...................................................................................21, 22

*Warner v. Cent. Trust Co.*,
   715 F.2d 1121 (6th Cir. 1983) .............................................................................32

*Winmar Co. v. Teachers Ins. & Annuity Ass'n of Am.*,
   870 F. Supp. 524 (S.D.N.Y. 1994).......................................................................19

*Winter v. Natural Resources Defense Council, Inc.*, -- S. Ct. --, Case No. 07-1239, 2008
    WL 4862464 (Nov. 12, 2008) ........................................................................................32

*Xcaliber Int'l Ltd. v. Edmondson*,
    2005 U.S. Dist. LEXIS 26705 (N.D. Okla. May 20, 2005) ......................................25

## STATUTES

Colo. Rev. Stat. § 24-4-104(2) (2008) ......................................................................................34

Ga. Code Ann. § 10-13A-6(d) (2008) ......................................................................................34

Ind. Code Ann. § 24-3-5.4-14(e) (2008) ......................................................................................34

Ky. Rev. Stat. Ann. § 131.602 (2008) ......................................................................................4

Ky. Rev. Stat. § 131.610(6) (2008) ......................................................................................34

Ky. Rev. Stat. § 131.624(l) (2008) ......................................................................................34

Model State Administrative Procedure Act §§ 1-102(4), 4-105 (1981) ...........................34

N.C. Gen. Stat. §§ 150B-2, -3 & -23 (2008) ..............................................................................34

Ohio Rev. Code Ann. § 1346.05(B)(2)(a) (2008) ....................................................................34

S.C. Code Ann. §§ 1-23-10, -370 (2008) ..................................................................................34

Tenn. Code Ann. § 67-4-2606(a) (2008) ..................................................................................34

Va. Code. Ann. § 3.2-4206(C) (2008) ......................................................................................34

W. Va. Code § 16-9D-3(b)(3)(A) (2008) ..................................................................................34

W. Va. Code § 16-9D-9(a) (2008) ............................................................................................34

The defendants joining this motion are smaller tobacco manufacturers and importers that joined the Master Settlement Agreement ("MSA") as Subsequent Participating Manufacturers ("SPMs").[1]  All of them signed the MSA within 90 days of its execution in November 1998, so all of them have contractual rights to the "grandfathered share" which is the primary focus of plaintiff Vibo Corporation Inc. d/b/a General Tobacco's ("General") complaint.  The SPMs respectfully request that this Court deny General's motion for preliminary injunctive relief.

## I.    INTRODUCTION

General's motion for preliminary injunctive relief should be denied because General has not carried its burden of demonstrating that relief is appropriate under any of the required factors.  First and foremost, General has no likelihood of success on its challenge to the MSA.  The Court should dismiss those claims as a matter of law for all the reasons stated in the pending motions to dismiss – the same reasons that have led courts around the country repeatedly to dismiss similar challenges.  The available evidence confirms the conclusion that the claims have no chance of success.  It shows among other things that, contrary to General's claims that it is "impossible" for companies to compete without joining the MSA, NPMs have grown significantly under the MSA, continue to compete effectively, have access to distributors and retailers all over the country, and do not face a pricing disadvantage as compared to PMs.  Indeed, General concedes that the MSA is not "essential" for NPMs to compete, by asking the Court to rescind its MSA joinder and make it an NPM again.

Nor can General show that it will be irreparably injured – or injured at all – in the absence

---

[1] The "Original Participating Manufacturers" ("OPMs") – the three largest manufacturers who were original MSA participants – and SPMs are collectively called the "Participating Manufacturers" or "PMs."  The SPM defendants joining this opposition are Commonwealth Brands, Inc., Liggett Group LLC, Vector Tobacco Inc., Imperial Tobacco Limited/ITL (USA), Japan Tobacco International U.S.A., Inc., King Maker Marketing, Inc., Lane Limited, Lignum-2, Inc., P.T. Djarum, Premier Manufacturing, Inc., Santa Fe Natural Tobacco Co., Sherman's 1400 Broadway N.Y.C., Inc., and Top Tobacco, L.P.

of preliminary injunctive relief.  Among other things, General's claimed injury is entirely self-

created – it chose to join the MSA without implementing a cost and pricing structure that would

allow it to pay the obligations to which it agreed.  Moreover, any adverse action the States may

take against General – to delist its products, for example – is entirely speculative, and in any

event will occur only after appropriate process that would provide General with an adequate

remedy at law, so there is no need for injunctive relief <u>now</u> to preclude such actions.

On the other hand, the proposed injunction <u>will</u> threaten substantial harm to the

defendants, because it will permit General to avoid payment obligations under the MSA, in

derogation of the States' contractual rights to receive such payments and the MSA's goal of

compensating them for the health-related costs of smoking.  Finally, a preliminary injunction

would be contrary to the public interest because, among other things, it would undermine and

perhaps terminate a "landmark" public health agreement, *Lorillard Tobacco Co. v. Reilly*, 533

U.S. 525, 533 (2001), that addressed "one of the most troubling public health problems facing

our Nation today," *Food and Drug Admin. v. Brown & Williamson Tobacco Corp*., 529 U.S.

120, 125 (2000).

## II.      FACTS

### A.        The MSA

The MSA serves public health objectives:  "to prevent youth smoking, to promote public

health, and to secure monetary payments from the tobacco manufacturers."  *Trident Int'l Corp. v.*

*Commonwealth,* 467 F.3d 547, 549 (6th Cir. 2006); *accord* MSA preamble at 1, 2.  It imposes

stringent advertising and marketing restrictions on participants, MSA § III, and requires them to

make substantial annual payments to the Settling States – approximately $6.75 billion last year,

with similar annual payments in perpetuity – to offset the health-related costs of smoking, MSA

2

§ IX.  This money funds a variety of health-related and other public programs.[2]  Currently, over

50 tobacco companies, including General, are Participating Manufacturers ("PMs") under the

MSA.  Numerous courts, including the Sixth Circuit, have rejected antitrust and constitutional

challenges to the MSA during its ten-year existence.  *See, e.g., Trident,* 467 F.3d 547; *S&M*

*Brands, Inc. v. Summers*, 228 Fed. Appx. 560 (6th Cir. 2007).

     The MSA contains several provisions intended to address the fact that there were a

number of smaller manufacturers in the market – most of whom had <u>not</u> been sued by the States

– that were not initially parties to the MSA.  *Trident,* 467 F.3d at 550.  The States were concerned

that the MSA's public health purposes would be subverted by companies choosing to stay

outside the MSA, not observing its conduct restrictions, and "regulat[ing] their sales so as to stay

afloat financially while at the same time being effectively judgment-proof."  *Id.*  If such Non-

Participating Manufacturers ("NPMs") increased market share and PM volume decreased, the

payments to the States would decrease as a result of the MSA's "volume adjustment."  MSA §§

II(aaa), IX(j).  The PMs, in turn, were concerned about the potential competitive advantage the

MSA might give companies that remained outside, "both because they would not be bound by

the advertising and other restrictions in the MSA and because they would not be required to

make payments to the settling states."  *Trident*, 467 F.3d at 550.

     To address these concerns, the MSA includes a one-time "incentive" for the smaller

manufacturers to join it – the "grandfathered share."  Companies that joined the agreement

within 90 days of its execution are entitled to a "grandfather" exemption, under which they do

not have to make MSA payments except to the extent their market share exceeds their market

---

[2] In Kentucky, MSA funds are used for smoking cessation programs, for public health programs including cancer research, to assist tobacco farmers, and other public purposes.  MSA funds have helped 50,000 farmers.  *Governor Beshear Appoints Members to Agricultural Development Board*, Press Release, June 20, 2008; Joe Walker, *Funds Boost Business Programs*, The Paducah Sun, Ky., Nov. 23, 2008 (McCallum Dec. Ex. 1-2).  Kentucky has received over $1 billion in MSA payments so far.

share when they joined the MSA (either 125% of 1997 share or 1998 share, whichever is larger). MSA § IX(i)(1), (4).[3] *See Commonwealth v. Patriot Tobacco Co.*, No. 02-CI-00876, slip op. at 2-3 (Ky. Franklin Cty. Cir. Ct. July 16, 2003) (McCallum Dec. Ex. 3) (grandfathered share was "incentive to encourage tobacco companies to immediately join the MSA"); *KT&G Corp. v. XCaliber Int'l Ltd.,* 535 F.3d 1114, 1120 (10th Cir. 2008) (same); *Star Sci., Inc. v. Beales*, 278 F.3d 339, 353 (4th Cir. 2002).

The MSA also addressed the concern that some manufacturers might choose to operate outside it by providing an incentive for States to enact and enforce escrow statutes. *Trient*, 467 F.3d at 551; MSA § IX(d)(2)(E). These statutes require companies that do not join the MSA to make escrow deposits. Escrowed funds can be used to pay judgments against the NPM for the health-related costs of smoking, or will be returned after 25 years if the State does not obtain such a judgment. MSA Ex. T Model Statute, Requirements (a), (b); Ky. Rev. Stat. Ann. § 131.602. The statutes are intended to ensure that "financial burdens imposed on the State by cigarette smoking [are] borne by tobacco product manufacturers" – preventing manufacturers who do not join the MSA from "us[ing] a resulting cost advantage to derive large, short-term profits in the years before liability may arise without ensuring that the State will have an eventual source of recovery from them. . . ." MSA, Ex. T, Model Statute, Findings and Purposes (d), (f). By imposing such costs on NPMs, the escrow statutes were intended to "effectively and fully neutralize[] the cost disadvantages that the Participating Manufacturers experience vis-à-vis Non-Participating Manufacturers as a result of" the MSA. MSA § IX(d)(2)(E); *accord Liggett Group v. Commonwealth*, 232 S.W.3d 559, 563 (Ky. Ct. App. 2007); Michael G. Hering, NAAG, *Why the CITMA Proposal is Wrong for Kentucky*, Powerpoint Presentation, Jan. 19,

---

[3] Initially the MSA provided the grandfathered share to any SPM that joined within 60 days of the MSA's execution. It was later amended to extend the window for joining the agreement to 90 days.

2006, slide 7 (McCallum Dec. Ex. 4) (escrow intended to "level the playing field").

Finally, the MSA provides for the so-called "back payment" obligation:  Any manufacturer joining the MSA after its execution date must, "within a reasonable period of time after signing this Agreement, make[] any payments . . . that it would have been obligated to make in the intervening period had it been a signatory as of the MSA Execution Date."  MSA § II(jj).  Absent such a requirement, NPMs could gain market share outside the MSA and then join the agreement without any requirement that they pay the States for the smoking-related costs of those sales.  The back payment obligation removes that incentive, because it requires every manufacturer, regardless of when it joined the MSA, to pay the States for market share gained after the MSA's execution.

### B.        SPMs Join the MSA

The "grandfathered" SPMs that are defendants to General's lawsuit were approached by the State' Attorneys General and invited to join the MSA shortly before its November 1998 execution date.  Most of them had never been sued by any State.  The SPMs had a minuscule combined aggregate share of the market – less than 3%.  They were faced with a fundamental change in how they would be able to conduct their business in the future and how the cigarette market would operate.  In connection with this change, they were urged to accept a "take-it-or-leave-it" choice on the same terms as all other smaller manufacturers – whether to join the MSA according to its terms and agree to make its substantial yearly payment obligations and to conform their conduct to its advertising and marketing limitations.  Joining the MSA would mean not only accepting these new responsibilities – including substantial annual payments to the States on all product sold in perpetuity – but also relinquishing important First Amendment rights such as being able to lobby state legislatures on important legislative issues.  In return

SPMs would receive a release of <u>potential</u> future liability – in contrast to the OPMs, who received releases from then-pending litigation which in some cases was rapidly approaching the time when the jury would decide the issues.

The grandfathered share provided a financial inducement for these companies to join the MSA and accept the new and significant burdens imposed on them.  It also appropriately recognized that all but one of the SPMs had never been sued for the improprieties alleged against the OPMs.[4]  Furthermore, it assured the SPMs that they would only have payment obligations to the extent that they managed to gain market share <u>after</u> the MSA's execution.  When they joined the MSA, the SPMs expressly relied on this incentive.  They also expressly relied on the MSA provisions (the back payment obligation and the escrow statutes) that required all manufacturers to make payments to the States for market share gained <u>after</u> the MSA's execution and that the manufacturers that chose to remain outside the agreement operated on a relatively level playing field vis-à-vis the manufacturers who joined.

## C.        NPMs Compete Vigorously Under the MSA

Contrary to the allegations of the complaint, the MSA has not reduced competition or forced companies to join.  Just the opposite:  there are <u>more</u> companies competing in the marketplace today than there were when the MSA was signed.  Many of these companies did not even exist in 1998, and owe their existence to the MSA.  Moreover, the market share of the companies who signed the MSA in 1998 has dropped substantially.

---

[4] Liggett had been named in many of the State suits, but it had entered earlier settlements with over 40 of the States in 1996, 1997, and early 1998, and had as part of those settlements agreed to provide the States with cooperation in their ongoing lawsuits.  Liggett's cooperation included providing the States with documents and information not previously within the public domain, and agreeing to comply with significant advertising restrictions.  When Liggett joined the MSA as an SPM, it agreed to replace its existing agreements with the MSA's terms, even though the economic terms of the MSA, including the grandfathered share, were less favorable to Liggett than the terms of its pre-existing settlement agreements.

1.      **NPM Growth Under the MSA**

NPM market share grew from close to zero in 1998, when the MSA was signed, to 8% in 2003 and 2004.  Lam Dec. Ex. A.   (General alone increased its market share from zero to nearly 2% by 2003.  Complaint ¶ 146.)  Although NPM share then dropped to about 6.4% in 2004, that was almost entirely because General's and another NPM (Farmers' Tobacco Company of Cynthiana) with collective market share of over 2% joined the MSA and became SPMs.  NPM share has stayed relatively steady since then, between 5.5% and 6%, and even increased slightly from 2006 to 2007.  Lam Dec. Ex. A.   In stark contrast, OPM share has fallen from 96.9% in 1997 to 84.8% in 2007.  *Id.*  The independent economic consulting firm responsible for making certain determinations under the MSA has determined that the MSA was a "significant factor" in this explosive NPM growth.[5]

As the complaint alleges, part of this growth was due to the fact that the escrow statutes as originally drafted had a provision that unintentionally allowed some NPMs a significant competitive advantage vis-à-vis the PMs.  Originally, the statutes provided that an NPM could get a refund of escrow deposits representing the difference between the percentage of its sales in a particular State and that State's "allocable share" of the MSA's proceeds.  MSA Ex. T, Model Statute, § II(b)(2)(B).  If an NPM had national sales, escrow payment obligations would be roughly the same as PMs' MSA payments.  However, many NPMs, including General, exploited the provision by concentrating their sales in only a few states (*see* Complaint ¶¶ 137, 145), thus obtaining refunds of almost their entire escrow payments.  *See Trient*, 467 F.3d at 552 (provision permitted NPMs to "reclaim most of the funds they placed in escrow," in turn allowing them to "artificially lower their prices" and make their cigarettes "more attractive to

---

[5]   *E.g., New York v. Philip Morris, Inc.*, 42 A.D.3d 353, 354-55 (N.Y. App. Div. 2007) (economic consulting firm found "the disadvantages suffered under the MSA were a 'significant factor' contributing to the market share loss").

'price-sensitive youth"); Complaint Ex. H (Wilson Aff. ¶ 20) (same).

As the National Association of Attorneys General ("NAAG") explained, these NPMs' decision to structure their business models in order to obtain refunds "created a huge price advantage for certain NPMs and as a result those NPMs pay into escrow only two or three cents per pack." Memo from William H. Sorrell to All Attorneys General, Feb. 12, 2004, at 1 (McCallum Dec. Ex. 4). In Kentucky, the effect of the allocable share provision was that in 2003, NPMs deposited only 35 cents into escrow for every $4.02 that the PMs paid under the MSA – that is, the NPMs paid only 8.7% of what the PMs paid for the same sales. Michael G. Hering, NAAG, *Why the CITMA Proposal is Wrong for Kentucky*, Powerpoint Presentation, Jan. 19, 2006, slide 9 (McCallum Dec. Ex. 4).[6]

### 2.    The Consequences to the States from NPM Growth

The massive NPM growth under the MSA had at least two consequences that were directly contrary to the MSA's goals of protecting public health, decreasing youth smoking, and providing the States with funds to offset the health-related consequences of smoking.

First, NPM growth reduced payments to States substantially. NPMs do not pay the States directly, but rather pay into escrow. In addition, NPM growth at the expense of PMs reduced the PMs' payments to the States under the MSA's "volume adjustment" provision. MSA §§ II(aaa), IX(j). As NAAG explained in a September 2003 memo to the Settling States, "sales by . . . NPMs have increased by many billions of cigarettes" and "continue to grow and to reduce settlement payments to the States." Memo from William H. Sorrell to All Attorneys

---

[6] Also as alleged in the complaint, another reason for the NPM share growth was the fact that some NPMs did not comply with the escrow statutes and a number of States did not diligently enforce the escrow requirements. Complaint ¶ 159. *See* Citigroup Analyst Report 8-9 (Aug. 4, 2003) (McCallum Dec. Ex. 7) ("Due to many new entrants into the cigarette industry not being compliant, states have been losing money as the compliant manufacturers' market share declines have led to lower MSA payments. . . . Recently, more and more small manufacturers have been slipping through the cracks and have not been contributing to the MSA.").

General, Sept. 12, 2003, at 2 (McCallum Dec. Ex. 6).  In 2006, NAAG estimated that the States collectively lost $2.32 billion from 1999 to 2004 through the volume adjustment "due to NPM growth in sales."  Kentucky alone lost $41.89 million.  Michael G. Hering, NAAG, *Why the CITMA Proposal is Wrong for Kentucky*, Powerpoint Presentation, Jan. 19, 2006, slide 10 (McCallum Dec. Ex. 4).

Second, the NPM growth meant that there were more and more companies that had not agreed to follow the MSA's restrictions on advertising and marketing cigarettes, in derogation of the MSA's goals to protect public health and reduce smoking.[7]  For example, during this period NAAG has alleged that certain NPMs parked vans across the street from elementary schools and gave away free cigarettes.  *See* NAAG, "The Allocable Share Amendment:  Getting the Facts," at 2 (McCallum Dec. Ex. 8).  Others marketed their cigarettes with merchandise branded with cigarette brand names – including a bicycle, T-shirts, hats, and knives.  Michael G. Hering, NAAG, *Why the CITMA Proposal is Wrong for Kentucky*, Powerpoint Presentation, Jan. 19, 2006, slide 15 (McCallum Dec. Ex. 4); Photos, Bailey's Merchandise (McCallum Dec. Ex. 10). NAAG also pointed out that the ultra-discount prices permitted by NPMs avoiding full escrow obligations "frustrates the fundamental objectives of the Model Escrow Statute" and "is very attractive to kids, whose cigarette usage is sensitive to price."  NAAG, "Changes to the Allocable Share Provision of the Model Escrow Statute, at 3 (McCallum Dec. Ex. 9).

### 3.      NPMs Continue to Compete Successfully

In 2003 and 2004, most of the States passed amendments to their escrow statutes so that NPMs could no longer exploit the original language to obtain huge refunds.  As NAAG

---

[7] Among other things, the MSA prohibits any marketing to youth, the use of cartoon characters, brand name sponsorships, outdoor/transit advertising, brand name merchandise, giving away samples except in an adult only facility, and product placement in movies and other entertainment.  MSA § III.

explained:

> Enactment of the proposed change to the [escrow statutes] is necessary to avoid hundreds of millions of dollars in losses to the States' tobacco payments under the MSA. The proposed change is also important to ensure that the central public health purposes of the MSA are met. The Model Escrow Statute was enacted to ensure that Settling States would receive the benefits of the MSA and that companies that refused to enter into the MSA would not thereby be able to profit unfairly from such refusal. Some companies that neither make MSA payments to the States nor observe any of the public health restrictions in the MSA are profiting from a loophole in the current law that allows them to avoid any significant responsibility under the State's . . . [e]scrow [s]tatute. This amendment is designed to ensure that the . . . [e]scrow [s]tatutes operate evenhandedly as originally intended, thereby advancing the legitimate health and safety goals contemplated by the MSA.

*Id.* at 1.

Contrary to the allegations of the complaint, these allocable share amendments did not make it "impossible" for NPMs to compete without joining the MSA. PI Mem. at 13. To the contrary, NPM share has remained steady since the statutes were amended, and even increased slightly from 2006 to 2007. Lam Dec. Ex. A (NPM share was 6% in 2005, 5.6% in 2006, and 5.7% in 2007).

Nor does the fact that the MSA's release provision extends to resellers of PM but not NPM product require NPMs to join the MSA in order to distribute and sell their products. Complaint ¶ 121; PI Mem. at 12-13, 16. NPMs grew from almost zero to almost 8% market share in four years. Lam Dec. Ex. A. Such growth would not have been possible without ample access to distribution and retail outlets around the country. For example, as an NPM, General itself had sufficient distribution to grow its volume from less than 60 million cigarettes in 1999 to over 7.68 billion in 2003 (a 12,500% increase), its revenue from almost nothing to $400 million a year, and its market share from zero to 2%.[8] In Kentucky, General apparently had a

---

[8] Complaint ¶¶ 144-46; *General Tobacco Launches Champion Brand Cigarettes*, Press Release, Oct. 12, 2004 (McCallum Dec. Ex. 11).

22% market share before it joined the MSA, and was "offer[ing] GT ONE and BRONCO brands to consumers all over the country" – belying its claim that NPMs must join to obtain access to distribution and retail.  Letter from Antonio Farias, July 24, 2003 (McCallum Dec. Ex. 12).

In fact, there are hundreds of distributors that carry NPM product throughout the nation. *See* Shipe Dec. Ex. A, B (attaching a map showing nationwide distribution of distributors carrying NPM product, a map that does not include many distributors that do not appear in the relevant database and for which NPM products are a large portion of their sales).  Even General concedes that almost a third of all distribution outlets nationwide carry NPM product.  Bulow ¶ 40; Holt ¶ 11 n.6 (survey that allegedly shows 69% of distributors will not carry NPM product).

Similarly, there are retail outlets that sell NPM brands all over the country.  Current lists of brands "certified" for sale in individual States shows that 79 NPMs are certified to sell 304 brands in all forty-six MSA States, with dozens of NPM brands available in many States.  Lam Dec. Ex. E.  The maps attached as Exhibit G to the Lam declaration show the availability of NPM product nationwide.[9]  Nor are NPM sales limited to back-alley retailers and tobacco shops – NPM products are available in major retailers and chains like Sam's Clubs and the Pantry. Sam's Club Advertisement; Bailey's Pantry Advertisement (McCallum Dec. Ex. 14, 10).  Finally, as General concedes, NPM product is available in the four "previously settled states" that are not MSA members.  Holt Dec. ¶ 17.

### D.    General Has Consistently Taken Advantage of and Benefited from the MSA

#### 1.    Explosive Share Growth from 2000 to 2004

Like other NPMs, General took full advantage of the MSA to grow its volume and its

---

[9] The Tobacco Merchants Association also has gathered a list of 64 NPMs certified to sell 236 brands in all 46 MSA States.  NPMs Brands Per State Chart (McCallum Dec. Ex. 13).   Moreover, several NPMs certify products for sale in multiple MSA States.  KT&G has certified its Carnival brand in 39 States.  Lam Dec. Ex. D, at 37-38.  National Tobacco has certified its Zig-Zag cigarettes and its RYO product (which is a "cigarette" under the MSA and subject to escrow obligations) in 40 States.  *Id.*

market share after the MSA was signed.  General claims to have started selling cigarettes in 2000.  Complaint ¶ 142.[10]  Although it could have joined the MSA at that time, it did not.

Instead, General chose to operate as an NPM, increasing its volume by 12,500% to become the sixth largest tobacco company in America.  *See supra* at 7.[11]  It achieved this extraordinary success by deliberately adopting a strategy that depended on its ability to avoid the MSA payments its competitors were required to pay while also avoiding a substantial portion of the escrow payments required of NPMs.  By doing so, General avoided approximately $242 million in payments.  *See infra* at 14.

General avoided its full escrow obligations in at least three ways.  First, as it has conceded and the Kentucky MSA court found, General concentrated its cigarette sales in a few states and exploited the allocable share release provision in state escrow statutes to avoid most of the required payments, thereby gaining a substantial cost advantage over the PMs.  Complaint ¶¶ 137, 145; *Liggett Group*, 232 S.W.3d at 566 n.9 (attributing difference between General's escrow deposit and its back payment in part "to loopholes in the former escrow statutes of the Settling States," which "likely allowed [General] to obtain a competitive advantage over complying OPMs and SPMs") (emphasis added); *id.* at 563 n.5.  It concedes that, as a result of this strategy, it did not price its products at a level that would have enabled it to make its full escrow payments.  Complaint ¶ 147.

---

[10] There is evidence, however, that General actually began importing and selling cigarettes in 1997, before the MSA began.  Brandy Brinson, *American Dream*, Tobacco Reporter, July 2007, at 42 (reciting that General began importing cigarettes in 1997); Steve Lawson, *Realizing a Dream*, Reidsville Review Online, Feb. 15, 2008; *General Tobacco Accepted Into Industry's Master Settlement Agreement*, Business Wire, Aug. 20, 2004; *Remote Production Success*, World Tobacco, Mar. 2005, at 33 (McCallum Dec. Ex. 15-18).  If so, General has no standing to challenge the grandfathered share, as it could have joined the MSA and received such a share and simply decided not to do so.

[11] *See, e.g.*, *General Tobacco Launches New Vaquero Little Cigars, Wildberry Flavor*, Press Release, Sept. 2008 (McCallum Dec. Ex. 19); *General Tobacco Launches Roll Your Own Line*, Press Release, Sept. 2008 (McCallum Dec. Ex. 20); *Gary Ebert Joins General Tobacco as Chief Sales Officer*, Press Release Oct. 2008 (McCallum Dec. Ex. 21); Complaint ¶¶ 145-46.

Second, as the Kentucky MSA court also recognized, General failed "to properly make its escrow payments as a non-Participating Manufacturer." *Liggett Group*, 232 S.W.3d at 566 n.9; *accord* Complaint Ex. H (Wilson Aff. ¶ 10) (referring to General's "outstanding escrow and penalty issues relating to prior sales"). Indeed, General concedes that it joined the MSA in part to avoid litigation over escrow payments.[12]

In fact, General's affiliate Sun Tobacco was a known scofflaw that blatantly ignored its escrow obligations. Sun's sales are included with General's as part of General's MSA obligation and its escrow deposits were part of the fund turned over to the States when General joined the MSA. *See* Complaint Ex. B (Adh. Agr. at 1-2). As NAAG wrote to Sun:

> Sun[ made a] conscious decision to ignore its legal obligations and thereby achieve a competitive advantage over law abiding firms.… Sun's course of conduct is a textbook example of a tobacco company's attempt to shirk that responsibility and use cost advantages resulting from its decision to ignore its legal obligations to derive large, short-term profits. Sun created its market by selling cigarettes at dirt-cheap prices that made no provision for payment obligations required by state statutes. <u>By brazenly ignoring its legal obligations, Sun gained an enormous advantage over companies that had decided to comply with the law</u>.

Letter from NAAG's David M. Horn to Rhonda Anderson, June 17, 2002 (emphasis added) (McCallum Dec. Ex. 22). Further, NAAG wrote, because "the market most sensitive to price is the youth market," Sun also "demonstrated total indifference at best to the devastating effects of youth smoking" by "offering cigarettes at rock-bottom prices." *Id.* Sun was sued by a number of States for escrow violations, including Kentucky.[13] Indeed, when General joined the MSA,

---

[12] *See* Denman Aff. ¶ 13 ("only by joining the MSA would [General] avoid litigation regarding escrow payments"); P.I. Mem. at 35 (States "led General Tobacco to believe that by joining the MSA it would avoid litigation regarding its NPM escrow payments").

[13] *Attorney General Collects over $270,000 From Tobacco Companies*, Kentucky Attorney General Press Release, Nov. 27, 2002 ("Sun Tobacco has paid $245,000 in fines"); *Kilgore Announce Suits Against Tobacco Companies*, Virginia Attorney General Press Release, Mar. 5, 2003 (noting Sun Tobacco not in compliance); *State and Sun Tobacco Settle*, Denver Business Journal, May 1, 2003 (noting Sun paid a $315,000 penalty); *The Sun Also Writhes*, South Florida Business Journal, Nov. 22, 2002 (noting that Ohio sued Sun Tobacco for $389,000 deficiency based on sales of GT One and Bronco cigarettes); Pennsylvania Attorney General Press Release, Feb. 26, 2004 (noting

Georgia's attorney general issued a release celebrating as a "major victor[y]" the fact that "Sun Tobacco will now be subject to the same marketing restrictions as other MSA participants, prohibiting them from marketing tobacco products to our youth." *$1.7 Billion Dollar Public Health Settlement With A Tobacco Company*, Press Release, Aug. 20, 2004 (McCallum Dec. Ex. 23).

Third, as the Kentucky MSA court explained, "prior to 2004 there was an ongoing dispute about whether GT was a manufacturer required to make escrow payments." *Liggett Group*, 232 S.W.3d at 563 n.5. As stated in an affidavit that General attached to its complaint, General "misrepresented its manufacturing status" to the States and accordingly "a number" of states "asserted claims against General for failing to make proper escrow payments." Complaint Ex. H (Wilson Aff. ¶¶ 8-9).[14]

## 2.   General Joins the MSA

Contrary to its claim that it was forced to join the MSA on unfairly discriminatory terms, General trumpeted its decision to join the MSA in August 2004 as an "investment in the future of our business" that "confirms [its] status as a national player in the industry and ensures that we have a solid foundation from which to grow." *General Tobacco Accepted Into Industry's Master Settlement Agreement*, Business Wire, Aug. 20, 2004 (McCallum Dec. Ex. 17). General expressly agreed, as required by the MSA, to make all payments that it would have made to the States had it been party to the MSA since it began. MSA § II(jj); Complaint ¶ 150 & Ex. B (Adh. Agr. ¶ 5). General's total "back-payment obligation" was approximately $320 million.

---

$440,000 settlement with Sun Tobacco for escrow violations); Complaint, *Vermont v. Sun Tobacco, Inc.*, No. 487-8-02 (Super. Ct. 2002) (seeking penalties for escrow deficiencies) (McCallum Dec. Ex. 24-29).

[14] Notably, the States required General and Sun to cure all escrow violations and pay all outstanding amounts and penalties before permitting them to join the MSA. Complaint Ex. H (Wilson Aff. ¶¶ 9-10). The fact that the States conditioned MSA joinder on curing escrow violations further confirms the strong public policy rationale supporting incentives to encourage NPMs to become PMs.

Complaint ¶ 150.  However, because General and Sun had paid only about $78 million into escrow, *id.*, it still owed $242 million in back payments to the States.

The Adherence Agreement between the States and General provided General with extremely generous terms to make up these payments – terms unavailable to other PMs.  General was permitted to make its back payment over 12 years, backloaded so that General made exceedingly low payments for the first several years.  Complaint Ex. B (Adh. Agr. § 8).  As a result, in the first few years, General's required back payments were extremely small in relation to its total liability.[15]  Several SPMs challenged whether those terms were "reasonable," as the MSA requires.  MSA § II(jj).  The Kentucky Court of Appeals found that the 12-year period was at the "outer edge" of reasonableness.  *Liggett Group*, 232 S.W.3d at 564.

### 3.    General Is Competitive as an SPM

Contrary to its current claim that it is unable to compete as an SPM because it was not given a grandfathered share and was required to make its back payment on a lenient schedule, General remains competitive.  Since it joined the MSA, General has introduced several new brands.[16]  It has opened a "state-of-the-art" manufacturing facility in North Carolina for which it committed to invest $50 million and hire 140 new employees.[17]  It is expanding its sales force

---

[15] General received other favorable terms as well.  Among others, it was permitted to finance the first half of its required payment for 2004 as part of the lenient back payment schedule.  Complaint Ex. B (Adh. Agr. § 3(c)).

[16] *General Tobacco Launches New Product Line Extension: Vaquero Filtered Cigars*, Press Release, Oct. 2008 (McCallum Dec. Ex. 30); *General Tobacco Announces New Roll Your Own Line*, Press Release, Sept. 2008 (McCallum Dec. Ex. 20); *General Tobacco Launches New Vaquero Little Cigars Wildberry Flavor*, Press Release, Sept. 2008 (McCallum Dec. Ex. 19); *General Tobacco Continues Expansion of U.S. Manufactured Products At New Facility in Mayodan, NC*, Press Release, Mar. 24, 2008 (McCallum Dec. Ex. 31); *General Tobacco Unveils 32 Degrees Menthol Cigarettes*, Press Release, Oct. 10, 2006 (McCallum Dec. Ex. 32); *General Tobacco Launches Champion Brand Cigarettes*, Press Release, Oct. 12, 2004 (McCallum Dec. Ex. 11).

[17] *General Tobacco Announces New Manufacturing Facility in North Carolina*, Press Release, June 22, 2007 (investing as much as $50 million) (McCallum Dec. Ex. 33); *General Tobacco Moves Headquarters to North Carolina and Contributes In Excess of $25 Million to Master Settlement Agreement*, Press Release, Jan. 16, 2008 (McCallum Dec. Ex. 34); *General Tobacco Produces First U.S.-Manufactured Product*, The Business Journal of the Greater Triad Area, Mar. 5, 2008 (McCallum Dec. Ex. 35); *General Tobacco Continues Expansion of U.S.*

extensively – hiring new sales directors and announcing plans to hire 100 additional employees.[18]  It has established new headquarters in North Carolina and a satellite office in Kentucky.[19]  It plans to open "several" new warehouse distribution centers.[20]  Indeed, its public statements indicate it is doing just fine under the MSA – maintaining share, "growing," and predicting a 10% increase in 2007.[21]  On November 5, 2008, General informed the market, "As for the complaints that General is going out of business, we can assure you that we have no intention of going out of business or giving up the business in any way.  Just this year, we opened a new state of the art manufacturing facility in North Carolina.  We also added several new experienced sales directors to our existing sales staff, and plan to hire 100 more over the next four months."  Letter from J. Ronald Denman, General Tobacco, to Customers, Nov. 5, 2008 (McCallum Dec. Ex. 41).

Nor is there any basis for General's claim that the grandfathered SPMs have underpriced it since it joined the MSA.  To the contrary, evidence at the hearing will show that prices charged by the principal grandfathered SPMs have consistently been in excess of General's prices.

*Manufactured Products at Facility in North Carolina*, Press Release, Oct. 2008 (McCallum Dec. Ex. 36); Letter from J. Ronald Denman, General Tobacco, to Customers, Nov. 5, 2008 (McCallum Dec. Ex. 41).

[18] *Gary Ebert Joins General Tobacco as Chief Sales Officer*, Press Release, Oct. 2008 (hiring "will help secure and grow GT's position in the tobacco industry going forward.") (McCallum Dec. Ex. 21); *General Tobacco Appoints Jay Kusma As Sales Representative and Key Account Manager*, Press Release, Oct. 25, 2006 (McCallum Dec. Ex. 37); Letter from J. Ronald Denman, General Tobacco, to Customers, Nov. 5, 2008 (McCallum Dec. Ex. 41).

[19] *General Tobacco Moves Headquarters to North Carolina and Contributes In Excess of $25 Million to Master Settlement Agreement*, Press Release, Jan. 16, 2008 (McCallum Dec. Ex. 34).

[20] Letter from J. Ronald Denman, General Tobacco, to Customers, Nov. 5, 2008 (McCallum Dec. Ex. 41).

[21] Jaclyn Alcantara & Jaime Hernandez, *On Fire: General Tobacco is paying millions of dollars to immunize itself from class-action lawsuits, now it anticipates launching a premium brand*, South Florida CEO, June 1, 2005, at 23 (General's president: "[w]hen we made the decision to enter into the MSA, we knew that in one form or another it was going to affect our growth.  But it affected us very little, . . . We expected a 25 percent [drop in revenues].  I'll tell you that our sales at this point are at the same level they were at this time last year, and growing") (McCallum Dec. Ex. 38); *General Tobacco Continues Corporate Commitment to the MSA*, Press Release, June 6, 2006 ("Despite having had to substantially increase the price of our tobacco products when we joined the MSA in 2004, we were able to maintain the market share we had gained prior to joining because of our quality.") (McCallum Dec. Ex. 39); *Igniting a Trend*, South Florida CEO, Feb. 2007 (McCallum Dec. Ex. 40).

16

E.       General's Suit and Its Request for Preliminary Injunctive Relief

For the past three years, General failed to make its back payments, even under the extremely generous schedule the States gave it.  Complaint ¶ 169; Complaint Ex. C (States' 30-Day Letter).  It also failed to make its full current payment for 2007 sales when that payment came due in April 2008.  Complaint Ex. C (States' 30-Day Letter).  Evidently, that is because General continues to prices its products as though it were an NPM that did not have to make MSA or full escrow payments.

As a result, on October 27, 2008, the States gave General the 30-day notice required by the MSA that they might sue it for nonpayment.  *Id.*  General responded by bringing this suit – attaching the 30-day letter as an exhibit and issuing a press release.[22]  In the suit, General seeks to retain the benefits of the MSA – among others, the release from liability – while fundamentally rewriting the agreement to (1) relieve it of any back payment and (2) provide it with a "grandfathered share" for the almost 2% market share it grew by choosing to stay outside the MSA while avoiding MSA and full escrow payments.

In this motion, General seeks a preliminary injunction preventing the States from taking any action against it for its breach of MSA payment obligations while the suit is pending, and relieving it of the obligation to make any allegedly "discriminatory" payments.  PI Mot. at 2.

III.     ARGUMENT

This action should be dismissed in its entirety for the reasons stated in the State, SPM, and OPM motions to dismiss.  But even if it is not, the Court should nonetheless deny General's request for preliminary injunctive relief.

_____

[22] Brett Barrouquere, *NC Company Sues over Tobacco Master Settlement*, Forbes.com, Oct. 28, 2008; Richard Craver, *Mayodan-based General Tobacco Sues over Master Settlement Agreement*, Winston-Salem Journal, Oct. 28, 2008 (McCallum Dec. Ex. 42-43).

As this Court has stated, a preliminary injunction is "an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Justice Res. Ctr. v Louisville-Jefferson County Metro. Gov't,* Case No. 07-209-C, 2007 WL 1302708, at *5 (W.D. Ky. Apr. 30, 2007), *quoting Overstreet v. Lexington-Fayette Urban County Gov't,* 305 F.3d 566, 573 (6th Cir. 2002); *accord Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (per curiam) (preliminary injunction is "drastic" remedy that not be granted unless "the movant, by a clear showing, carries the burden of persuasion").  Courts consider four factors in determining whether to issue a preliminary injunction. *Summit County Democratic Cent. & Exec. Comm. v. Blackwell*, 388 F.3d 547, 550 (6th Cir. 2004).  Those factors are:  (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent a restraining order or injunction; (3) whether granting the motion would cause substantial harm to others; and (4) whether the public interest would be served by granting the motion. *Justice Res. Ctr.,* 2007 WL 1302708, at *5; *Ne. Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006); *Nader v. Blackwell*, 230 F.3d 833, 834 (6th Cir. 2000).

General has not carried its burden on <u>any</u> of these required elements.

## A.    General Tobacco Has Not Demonstrated a Strong Likelihood of Success

A finding that there is no likelihood of success on the merits is "usually fatal." *Bliss Collection LLC v. Latham Cos.,* Case No. 05-287, 2006 WL 196970, at *1 (W.D. Ky. Jan. 24, 2006).  A mere <u>possibility</u> of success is not enough. *Mason County Med. Ass'n v. Knebel*, 563 F.2d 256, 261 n.4 (6th Cir. 1977).  At the very least, the party seeking injunctive relief must demonstrate "at least serious questions going to the merits." *Frisch's Rest. v. Shoney's Inc.*, 759 F.2d 1261, 1270 (6th Cir. 1985).

As demonstrated in the States', SPMs', and OPMs' motions to dismiss, all of General's

claims should be dismissed as a matter of law for the same reasons the Sixth Circuit and numerous other courts have dismissed similar antitrust and constitutional challenges to the MSA in the past.  In addition, there is no <u>factual</u> basis for General's claims.  Accordingly, General cannot show <u>any</u> likelihood of success.

### 1.      General Has No Likelihood of Success on Claims it Has Waived

First and foremost, General has no likelihood of success on any of its claims because it has waived them, as explained fully in the various motions to dismiss.  *See* SPM Mem. in Supp. of MTD at 12-13; OPM Mem. in Supp. of MTD at 22; State Mem. in Supp. of MTD at 11-14. General agreed in the MSA to waive "any and all claims that the provisions of this Agreement violate the state or federal constitutions," and further agreed to "support the integrity and enforcement of the terms of this Agreement."   MSA §§ XV, XVIII(l).  General's attempt to escape from its own obligations under the MSA – or alternatively to rescind the agreement altogether – is in direct conflict with its express agreement in the MSA not to raise challenges to it and to support its "integrity and enforcement."  It joined the MSA after arms-length negotiations in which it was represented by sophisticated counsel, *see* MSA § XV; Complaint ¶ 150,[23] and it is bound by its agreement.  *See, e.g., Winmar Co. v. Teachers Ins. & Annuity Ass'n of Am.*, 870 F. Supp. 524, 537-38 (S.D.N.Y. 1994) (party "represented by sophisticated counsel who had the ability to read and understand" the contract held to the contractual terms).

### 2.      General Has No Likelihood of Success on its Antitrust Claim

### a.      The Antitrust Claim Is Barred As a Matter of Law

The motions to dismiss explained in full why General's "essential facilities" antitrust claim should be dismissed as a matter of law.  <u>First</u>, the Noerr-Pennington doctrine bars

---

[23] Joseph Finora, *General Tobacco on the March*, Tobacco International, Oct. 2007, at 37 (General's counsel "negotiated GT's entry into" the MSA, committing it "to pay as much as $1.7 billion dollars over the next ten years") (McCallum Dec. Ex. 44).

General's claim.  *See* SPM Mem. in Supp. of MTD at 13-15; OPM Mem. in Supp. of MTD at 9-17.  General claims defendants' conduct in negotiating, agreeing to, and implementing the terms of the MSA with the States violates the antitrust laws.  Complaint ¶ 171; PI Mem. at 14-20.  Under Noerr-Pennington principles, such conduct cannot form the basis of an antitrust claim, because "parties who petition the government for governmental action favorable to them cannot be prosecuted under the antitrust laws" even if "their petitions are motivated by anticompetitive intent."  *Campbell v. PMI Food Equip. Group, Inc.*, 509 F.3d 776, 790 (6th Cir. 2007).  The Sixth Circuit and other courts have repeatedly dismissed challenges to the MSA and its related statutes under Noerr-Pennington.[24]

Second, the state action doctrine also bars General's antitrust claim.  *See* SPM Mem. in Supp. of MTD at 15-17; OPM Mem. in Supp. of MTD at 18-21; State Mem. in Supp. of MTD at 14-18.  The MSA is a contract to which the States are parties – a classic example of direct action by the States which is immune from antitrust laws under *Parker v. Brown*, 317 U.S. 341, 351 (1943), and *Hoover v. Ronwin*, 466 U.S. 558, 568 (1984).  When, as here, private parties act in direct conformance with the State – they are parties to the same contract and are bound by the same terms – their actions are also protected by the state action doctrine.  Otherwise plaintiffs would be able to subvert it simply by naming private parties rather than the state.  *Sanders*, 504 F.3d at 913-19; *Charley's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc*., 810 F.2d 869, 876 (9th Cir. 1987); *Gambrel v. Ky. Bd. of Dentistry*, 689 F.2d 612, 618-19 (6th Cir. 1982).  And, as the motions to dismiss explain in full, the Sixth Circuit and other courts have dismissed antitrust

---

[24] *See, e.g., Sanders v. Brown*, 504 F.3d 903, 913-919 (9th Cir. 2007); *Mariana v. Fisher*, 338 F.3d 189, 200 (3d Cir. 2003); *A.D. Bedell*, 263 F.3d at 254-66; *PTI Inc. v. Philip Morris, Inc.*, 100 F. Supp. 2d 1179, (C.D. Cal. 2000); *Hise v. Philip Morris Inc.*, 46 F. Supp. 2d 1201, 1206 (N.D. Okla. 1999), *aff'd*, 208 F.3d 226 (10th Cir. 2000); *S&M Brands, Inc. v. Summers*, 393 F. Supp. 2d 604, 629 (M.D. Tenn. 2005) ("Even if the MSA could be challenged as a *per se* Sherman Act violation . . . such a challenge would be barred by the Noerr-Pennington doctrine."), *aff'd,* 228 Fed. Appx. 560 (6th Cir. 2007).

challenges to the MSA and its related statutes under the state action doctrine as well.[25]

Third, even if General's "essential facilities" claim were not barred by the Noerr-Pennington and state action doctrines, it remains legally defective. General contends that the MSA, with its terms adjusted to General's liking, is an "essential facility" to compete in the US market for cigarettes. Complaint ¶ 176; PI Mem. at 11-13. As the SPMs showed in their motion to dismiss, the Supreme Court has never adopted the "essential facilities" doctrine (*Verizon Commc'ns Inc. v. Trinko*, 540 U.S. 398, 411 (2004)) and it has never been applied by any court to any remotely similar situation. *See* SPM Mem. in Supp. of MTD at 17-18; OPM Mem. in Supp. of MTD at 9; State Mem. in Supp. of MTD at 19.

### b. General Cannot Prove that the MSA Is An "Essential Facility"

General's own admissions and the evidence at the preliminary injunction hearing will demonstrate that General cannot prove that the MSA is an "essential facility."

The lower courts that have addressed the "essential facilities" doctrine have indicated that in order to establish an "essential facilities" claim, General must prove: "(1) control of the essential facility by a business or group of businesses; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *Beverage Mgmt., Inc. v. Coca-Cola Bottling Corp.*, 653 F. Supp. 1144, 1156 (S.D. Ohio 1986), *citing MCI Commc'ns v. AT&T. Co.*, 708 F.2d 1081, 1132-33 (7th Cir. 1983).

General will not be able to demonstrate these required elements, for a variety of reasons. First, and on the most basic level, General has conceded that the MSA is not "essential" by its request that the Court rescind its joinder to the MSA and allow it to operate as an NPM again.

---

[25] *See, e.g., S&M Brands, Inc. v. Summers*, 228 Fed. Appx. 560 (6th Cir. 2007), *aff'g* 393 F. Supp. 2d 604, 622 (M.D. Tenn. 2005); *Trident*, 467 F.3d at 558; *Patriot Tobacco Co.*, slip op. at 11 (McCallum Dec. Ex. 3).

Complaint, Prayer for Relief ¶ (g).   If it is "impossible" for NPMs to stay in business without joining the MSA, as General claims, General would not have requested NPM status.

Second, General already has access to the allegedly "essential" facility.  It is an MSA participant and has been since mid-2004.  Indeed, it gained access to the MSA on extremely generous terms not provided to any of the other participants – terms that the Kentucky MSA court found were at the "outer edge" of reasonable.  *Liggett*, 232 S.W.3d at 564.  Accordingly, General cannot prove the third required element of its essential facilities claim.

General claims, however, that participation in the MSA is not enough; rather it claims that the MSA must be customized to provide it with even more favorable treatment than it has already received.  Contrary to this assertion, as the motions to dismiss explained, the essential facilities doctrine does not guarantee access to the facility on whatever favorable terms the plaintiff may desire.  *See* SPM Mem. in Supp. of MTD at 17-18; OPM Mem. in Supp. of MTD at 9; State Mem. in Supp. of MTD at 19; *Verizon*, 540 U.S. at 411; *Metronet Servs. Corp. v. Qwest Corp.,* 383 F.3d 1124, 1130 (9th Cir. 2004) (no guarantee of "access to the essential facility in the most profitable manner."); *Alaska Airlines*, 948 F.2d at 545 (no essential facilities claim when airlines permitted access to computerized reservation system on economically disadvantageous terms); *JamSports and Entm't LLC v. Pasadena Prods., Inc.*, 336 F. Supp. 2d 824, 839 (N.D. Ill. 2004) ("Essential means essential; it does not mean the most economical . . . Nor does it mean 'best' or 'preferable.'").

Third, General's claim that competitors must have access to the MSA in order to compete is simply wrong.  The undisputed evidence shows the exact opposite.  The MSA made it possible for a host of new companies that did not exist and have never been MSA members to emerge and grow explosively.  *See supra* at 6-7, 9-11.  The market share of these companies went from close

to zero in 1998 when the MSA was signed to almost 8% in 2003.  Lam Dec. Ex. A.  As the Tenth

Circuit explained, "it is the MSA, in combination with the original escrow statute, that provided

the environment in which Plaintiffs were able to develop their business niche. . . .  NPMs . . .

were able to flourish under that scheme."  *KT&G*, 535 F.3d at 1143.

    Nor is it the case, as General claims, that agreement to the MSA became "essential" to

compete after the ASR statutes were passed.  *E.g.*, PI Mem. at 13.  If that were correct, one

would expect a sharp decline in NPM market shares.  But NPM market share has remained

steady, between 5.5 and 6%, since the escrow statutes were amended.  Lam Dec. Ex. A;[26] s*ee*

*also* Holt Dec. Attachment 2, Ex. I (NPM market share of 5.37% in 2007).  In addition, there are

at least 79 NPMs certified to sell 304 brands in the MSA States, *see supra* note 9; Lam Dec. Ex.

E, and, as General concedes, NPMs sell throughout the four States that are not MSA participants,

Holt Dec. ¶ 17.

    Nor is General correct when it claims that MSA membership is necessary to obtain

adequate distribution.  That claim is conclusively refuted by the fact that NPMs have garnered

and maintained a substantial share of the total market – all of which happened <u>after</u> the MSA was

first signed.  Indeed, while it was an NPM General grew from 0 to 2% of the nationwide market

– easily surpassing in sales and share all but 2 of the 15 grandfathered SPMs who were members

of the allegedly "essential" MSA.  Moreover, NPM share of the market remains substantial <u>after</u>

the escrow statutes were amended to reflect the ASR provision.  None of this could have

happened if NPMs did not have the ability to distribute their products.

    The linchpin of General's claim is the allegation that a "substantial majority" of

---

[26] The reduction in NPM share from almost 8% in 2003 to 6.4% in 2004 is due almost entirely to the fact that General, with 2% share, along with NPM Farmer's Tobacco, joined the MSA as SPMs so they were no longer counted as NPMs.

distributors and retailers will not sell NPM product, allegedly because the MSA's release

provision with respect to claims against distributors and retailers extends only to sales of PM

product.  Complaint ¶¶ 121, 148; PI Mem. at 12-13, 16.  Even accepting General's evidence at

face value, however, it shows that approximately 1/3 of the nation's distributors and retailers do

carry NPM products.  Bulow ¶ 40; Holt ¶ 11 n.6.[27]  It is not necessary that <u>every</u> retailer and

every distributor carry NPM product in order for NPMs to compete.  Many retailers and

distributors do not carry the products of most SPMs either.

      In fact, NPM product is currently carried by hundreds of distributors located throughout

the United States, including many of the same distributors that carry the OPMs' and the SPMs'

products.  *See supra* at note 9; Shipe Dec. ¶ 3 & Ex. A.   There are also numerous distributors

that do not report their sales to the usual database but sell substantial quantities of NPM

cigarettes.  Shipe Dec. ¶ 6.  Consistent with this, NPM product is sold in retail outlets in <u>every</u>

State in the country – four years after the ASR legislation that General alleges made it

"impossible" for NPMs to "stay in business and compete . . . without joining the MSA."  PI

Mem. at 13.  *See supra* note 9; Lam Dec. Ex. E (summarizing brands that NPMs have certified

for sale in individual states); (McCallum Dec. Ex. 13) (TMA list of NPMs and brands).

      <u>Fourth</u>, even if the law permitted a plaintiff to demand access to the alleged essential

facility on terms tailored to its specifications (*but see supra* at 15), General will not be able to

prove that MSA membership with a grandfather share is essential.  To the contrary, the evidence

at the preliminary injunction hearing will definitively refute General's claim that it is

substantially competitively disadvantaged as compared to SPMs with a grandfathered share.  If

General was correct that MSA membership with a grandfather share is essential to compete, one

---

[27] The Court need not credit this evidence, however.  It consists solely of a faulty self-reported "survey" of
distributors from 2002.  Bulow ¶ 40; Holt ¶ 11 n.6.

would expect NPM share to have declined at the expense of grandfathered SPM share, but that is not what has happened.  Instead, NPMs grew from almost zero to 8% in 2004, and their share has remained steady at between 5.5 and 6% in the 3 years since General joined the MSA.  *See supra* at 7; Lam Dec. Ex. A.

Nor is it the case, as General suggests, that grandfathered SPMs utilize their grandfathered share to underprice General Tobacco, other non-grandfathered SPMs, and NPMs in the marketplace.  Exactly the opposite - General has consistently underpriced the SPMs, as an NPM and subsequently as a PM.  Once a grandfathered SPM's volume exceeds its grandfathered share, its marginal cost is the same as a non-grandfathered SPM and an NPM.  It is a fundamental principle of economics that a company will expand output and sell additional product as long as the price at which it can sell the next, or incremental, unit of that product is greater than the cost of producing it.[28]  Once an SPM reaches its grandfathered share, it pays the same MSA payment on every additional cigarette it produces and sells as do non-grandfathered SPMs.  These payments are also slightly higher than the payments that an NPM making full escrow payments makes (and obviously substantially higher than payments made by NPMs that do not comply with escrow statutes).  *KT&G Corp*, 535 F.3d at 1122 (noting that SPMs pay "slightly more than the NPMs").  Accordingly, the incremental costs for grandfathered SPMs, non-grandfathered SPMs, and NPMs are the same, or nearly so.

Basic economics require that for sales in excess of the grandfathered share, the prices of grandfathered SPMs must reflect the same marginal cost as non-grandfathered SPMs and NPMs.  And, in fact, that is exactly what has happened.   Far from pricing below General, as General

---

[28] *See Xcaliber Int'l Ltd. v. Edmondson*, Case No. 04-CV-0922, 2005 U.S. Dist. LEXIS 26705, at *16-17 (N.D. Okla. May 20, 2005) (all cigarette manufacturers' price based on marginal cost and therefore price and output are not affected by the grandfathered share given to some SPMs), *aff'd sub nom.*, *KT&G*, 535 F.3d 1114; *Int'l Tobacco Partners, Ltd. v. Kline*, 475 F. Supp. 2d 1078, 1088 (D. Kan. 2007) (same).

alleges, the evidence at the hearing will show that grandfathered SPMs' prices are consistently, and often considerably, greater than General's.

General's own statements also refute its claim that MSA membership with a grandfathered share is essential to being able to compete.  According to its press releases and letters to the trade, General has opened a state-of-the-art new manufacturing facility (committing to a $50 million investment) in North Carolina, introduced a number of new brands, opened a new headquarters, opened a satellite office in Kentucky, reorganized its sales force, hired several new sales directors and plans to hire 100 more, and plans to add several new warehouse distribution centers.  *See supra* at 15-16 & notes 16-20.

### 3.   General Has No Likelihood of Success on its Constitutional Claims

General also has no likelihood of success on its constitutional challenges.  These claims can and should be dismissed as a matter of law for all the reasons set out in the motions to dismiss and the numerous court decisions dismissing similar constitutional challenges.

General's primary constitutional claims are that the grandfathered share, the back payment obligation, and the requirement that it make quarterly deposits in escrow to cover current sales violate guarantees of equal protection and due process by treating General differently from other SPMs.  General cannot prevail on those claims, however, unless it can "negate all possible rational justifications" for the challenged provisions.  *Midkiff v. Adams Cty. Reg'l Water Dist.*, 409 F.3d 758, 771 (6th Cir. 2005); *Heller v. Doe*, 509 U.S. 312, 320 (1993); SPM Mem. in Supp. of MTD at 21; OPM Mem. in Supp. of MTD at 24-26; State Mem. in Supp. of MTD at 21-26.  General admits that it would be "extraordinary" to succeed in challenging (as here) economic classifications under current law.  PI Mem. at 21.

In the motions to dismiss, the States, the SPMs, and the OPMs explained the compelling basis for the challenged provisions, rooted in the MSA's goals of discouraging youth smoking,

preserving public health, obtaining payments for the States to cover the health-related costs of smoking, and ensuring that manufacturers that join the agreement do not suffer a competitive disadvantage by doing so.  The grandfathered share was a one-time "incentive" to encourage smaller manufacturers and importers to sign the MSA soon after it was signed – thereby agreeing to be bound by its conduct restrictions and paying the States directly to offset the health-related consequences of smoking.  It makes no sense to extend "grandfathered" treatment to General and others for market share gained after the MSA – they have no pre-MSA share to "grandfather." Moreover, providing an exemption for market share developed after the MSA was executed would give NPMs an incentive to stay outside the MSA as long as possible, building up market share that they could later "grandfather" and protect from annual payments in perpetuity.  *See* SPM Mem. in Supp. of MTD at 22; OPM Mem. in Supp. of MTD at 26; State Mem. in Supp. of MTD at 24.  Such an incentive was plainly rational.  *See Patriot Tobacco Co.*, slip op. at 2-3 (McCallum Dec. Ex. 3); *KT&G Corp.,* 535 F.3d at 1120; *Star Sci.*, 278 F.3d at 353.

Similar rationales support the back payment obligation:  it ensures that all parties who join the MSA pay the States in full for the health-related costs of smoking for all market share gained after they enter the MSA, and thus gives NPMs an incentive to enter the agreement quickly before building up a substantial back payment.  *See* SPM Mem. in Supp. of MTD at 23-24; OPM Mem. in Supp. of MTD at 26-27; State Mem. in Supp. of MTD at 24-25.

Finally, the rationale for the quarterly payment obligations is obvious:  as State expert Gary Wilson explained in an affidavit attached to General's complaint, the States required General to escrow quarterly to cover its next current payment because, given the substantial size of its back payment obligation, they were understandably concerned to ensure payment of the current obligations going forward.  Complaint Ex. H (Wilson Aff ¶ 15); *accord* SPM Mem. in

Supp. of MTD at 24; OPM Mem. in Supp. of MTD at 27; State Mem. in Supp. of MTD at 25.

Accordingly, General's constitutional claims must be dismissed because General cannot "negate all possible rational justifications" for the challenged provisions – as numerous other courts have done in rejecting similar constitutional challenges to the MSA and its related statutes.[29]  "Under rational basis review, the defendant 'has no obligation to produce evidence to sustain the rationality of its actions; its choice is presumptively valid and may be based on rational speculation unsupported by evidence or empirical data.'  The burden falls square to the plaintiff who must overcome the presumption of rationality by alleging that the defendant acted in a manner clearly contrary to law."  *Club Italia Soccer & Sports Org., Inc. v. Charter Township of Shelby, Mich.*, 470 F.3d 286 (6th Cir. 2006) (citations omitted); *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton County, Ohio*, 430 F.3d 783, 791-92 (6th Cir. 2005) (plaintiff failed as a matter of law to carry its "heavy burden of negativing every conceivable basis" for law).

However, undisputed evidence from the market following the MSA confirms the rational basis for the MSA's incentives for companies to choose to join as quickly as possible.  The NPMs (the companies that did not join the MSA) grew explosively from 1998 to 2004, gaining market share at the expense of the PMs, resulting in sharply reduced payments to the States, in derogation of the MSA's goal of providing States with funds to offset health-related costs of smoking.  *See supra* at 6-9.  As NAAG explained, "[a]t the same time that sales by Participating Manufacturers are shrinking, sales by Non-Participating Manufacturers … continue to grow and

---

[29] *Star Sci.*, 278 F.3d at 349-50 (dismissing equal protection and due process challenges); *KT&G*, 535 F.3d at 1143 (same); *Patriot Tobacco Co.*, slip op. at 6 (McCallum Dec. Ex. 3) (Kentucky MSA court) (same); *Grand River Enters. Six Nations, Ltd. v. Beebe*, 418 F. Supp. 2d 1082, 1096 (W.D. Ark. 2006) (same); *Int'l Tobacco Partners, Ltd. v. Beebe*, 420 F. Supp. 2d 989, 998-99 (W.D. Ark. 2002) (equal protection); *S&M Brands, Inc. v. Summers*, 393 F. Supp. 2d 604, 635-37 (M.D. Tenn. 2005) (equal protection); *PTI, Inc. v. Philip Morris Inc.*, 100 F. Supp. 2d 1179, 1207-08 (C.D. Cal. 2000) (equal protection); *Forces Action Project LLC v. California*, Case No. 99-0607, 2000 WL 20977, *6 (N.D. Cal. Jan. 5, 2000) (equal protection); *Premium Tobacco Stores v. Fisher*, 51 F. Supp. 2d 1099, 1106-07 (D. Colo. 1999) (same).

to reduce settlement payments to the States."  Memo from William H. Sorrell to All Attorneys General, Sept. 12, 2003, at 2 (McCallum Dec. Ex. 5).  In fact, as a result of the MSA's volume adjustment, NPM growth in sales reduced payments to the States by $2.32 <u>billion</u> from 1999 to 2004, with Kentucky alone losing $41.89 million.  Michael G. Hering, NAAG, *Why the CITMA Proposal is Wrong for Kentucky*, Powerpoint Presentation, Jan. 19, 2006, slide 10 (McCallum Dec. Ex. 4).[30]

Companies that did not join the MSA also were not bound by the MSA's advertising and marketing restrictions.  Many of them ignored them by marketing their cigarettes with brand name merchandise like bicycles, hats, and T-shirts and even giving away free samples across from a school from a van emblazoned with company logos.  NAAG, "The Allocable Share Amendment:  Getting the Facts," at 2 (McCallum Dec. Ex. 8); Michael G. Hering, *Why the CITMA Proposal is Wrong for Kentucky*, Powerpoint Presentation, Jan. 19, 2006, slide 15 (McCallum Dec. Ex. 4); Photos of Bailey's merchandise (McCallum Dec. Ex. 10).

This evidence confirms that "[a]ll States have an interest in reducing NPM sales in every State" (Memo from William H. Sorrell to All Attorneys General, Sept. 12, 2003, at 2 (McCallum Dec. Ex. 5)) and the rational basis of the MSA provisions designed to encourage companies to join the MSA.[31]

---

[30] Much of this growth was caused by States failing to enforce their escrow statutes diligently and by companies like General exploiting the allocable share release provision in the original escrow, thereby gaining a substantial competitive advantage over MSA participants.  *See supra* at 7.  In Kentucky, NPMs deposited into escrow only 8.7% of what the PMs paid for the same sales in MSA payments.  Michael G. Hering, NAAG, *Why the CITMA Proposal is Wrong for Kentucky*, Powerpoint Presentation, Jan. 19, 2006, slide 9 (McCallum Dec. Ex. 4).  As NAAG explained, "[s]ome companies that neither make MSA payments to the States nor observe any of the public health restrictions in the MSA are profiting from a loophole in the current law that allows them to avoid any significant responsibility under the State's . . . [e]scrow [s]tatute."  NAAG, "Changes to the Allocable Share Provision of the Model Escrow Statute," at 1 (McCallum Dec. Ex. 9).

[31] General has no likelihood of success on the remainder of its grab bag of constitutional claims either, for the reasons stated in the motions to dismiss and in the OPMs' opposition to preliminary injunctive relief.  *See* SPM Mem. in Supp. of MTD at 25-30; OPM Mem. in Supp. of MTD at 28-34; State Mem. in Supp. of MTD at 26-32.

### 4.   General Has No Likelihood of Success on its Fraudulent Inducement Claim

General also has no hope of success on its claim that it was induced to enter the MSA by fraud.   As the defendants explained in their motions to dismiss, the Court does not even need to engage in a particularized analysis of General's allegations of fraud because:

(1) the Court has no subject matter jurisdiction over a fraudulent inducement claim against the States; and

(2) the claim is barred by General's agreement in the MSA that it "supersedes" all "prior" and "contemporaneous" "agreements and understandings" and that "no evidence of negotiations or discussions underlying" the MSA may be offered in evidence, MSA §§ XVIII(f), (y).  *See* State Mem. in Supp. of MTD at 33-38; SPM Mot Mem. in Supp. of MTD at 30-34; OPM Mem. in Supp. of MTD at 34-38.

Moreover, even if General's allegations are accepted at face value, General cannot prove the essential elements of a fraudulent inducement claim.  To state such a claim, a plaintiff must show "(1) a false representation as to a material fact, (2) the defendant actually knew or should have known that the representation was false, (3) the plaintiff reasonably and actually relied on the misrepresentations, (4) the plaintiff incurred foreseeable damages (5) caused by the defendant's misrepresentations."  *Gen. Elec. Co. v. Latin Am. Imports*, No. 03-5137, 2005 WL 293660, at *3 (6th Cir. Feb. 8, 2005) (applying Florida law).

For the reasons explained in detail in the motions to dismiss, General's allegations cannot satisfy this standard because:

(1) promises about future events cannot constitute fraud as a matter of law, *Coal Res., Inc. v. Gulf & W. Indus., Inc.*, 756 F.2d 443, 447 (6th Cir. 1985); *see also APJ Assoc., Inc. v. N. Am. Philips Corp.*, 317 F.3d 610, 615 (6th Cir. 2003), nor can statements of opinion, *Advanced*

30

*Accessory Sys., LLC v. Gibbs*, 71 Fed. Appx. 454, 469 (6th Cir. 2003); *Miller's Bottled Gas v. Borg-Warner Corp.*, 955 F.2d 1043, 1051 (6th Cir. 1992);[32]

(2) allegations of failure to disclose cannot constitute fraud as a matter of law unless there is some duty to disclose, *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. Ct. App. 2003);[33] and

(3) a party cannot claim it was fraudulently induced to enter a contract when the alleged misrepresentations relate to and conflict with terms in the written contract, *Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1016 (6th Cir. 2003); *Holifield v. Beverly Health & Rehab. Servs.*, No. 3:08-CV-147, 2008 U.S. Dist. LEXIS 47909, at *7 (W.D. Ky. June 20, 2008).

### 5.    General Is Not Likely to Succeed on its Requested Relief

Finally, General is not likely to succeed in its primary request for relief, *i.e.*, that the Court rewrite the terms of the contract it signed.  As the motions to dismiss discussed, courts may not rewrite contracts for the parties.  OPM Mem. in Supp. of MTD at 23; SPM Mem. in Supp. of MTD at 34-35.  If the Court nevertheless were to do so, the MSA contract must be renegotiated and potentially terminated.  MSA § XVIII(o).  *See North Carolina v. Philip Morris USA, Inc.* 666 S.E.2d 783, 787 (N.C. Ct. App. 2008) (State argument that had no authority to enter MSA "could result in the forfeiture of hundreds of millions of dollars").

### B.    General Tobacco Will Not Suffer Irreparable Harm

General Tobacco has also not demonstrated that it faces a threat of irreparable harm

---

[32] *E.g.*, that the Settling States "falsely stated their commitment to enforce diligently the Escrow Statutes against certain NPMs and MSA terms against certain other PMs" (Complaint ¶ 22); that the States led it to believe that by joining the MSA it would avoid litigation regarding its escrow deposits (PI Mem. at 35; Denman Dec. ¶ 13); and that the States led it to believe that by joining the MSA it would gain access to the "majority" of retailers that allegedly will only purchase from MSA participants and would be able to "compete on a national level as an SPM" (PI Mem. at 35; Denman Dec. ¶ 13).

[33] *E.g.*, that the States failed to disclose "the extent of the grandfathered shares and other benefits afforded to the OPMs and grandfathered SPMs under the MSA" and "led it to believe that it would be on a level playing field with all the other SPMs" (Complaint ¶ 160; *see also id.* ¶ 22; PI Mem. at 35; Denman Dec. ¶ 13).

absent a preliminary injunction.  Demonstration of irreparable injury is critical to obtaining preliminary injunctive relief.  *See Friendship Materials, Inc. v. Mich. Brick, Inc.*, 697 F.3d 100, 105 (6th Cir. 1982) ("Whatever the merits of the . . . "balance of hardships" test may be, the purpose of the test is surely not to eliminate the irreparable harm requirement. . . . A district court abuses its discretion when it grants a preliminary injunction without making specific findings of irreparable injury to the party seeking the injunction . . . .").  As the Supreme Court recently reiterated, the plaintiff must show that irreparable harm is "likely" absent an injunction, not merely that it is possible.  *Winter v. Natural Resources Defense Council, Inc.*, -- S. Ct. --, 2008 WL 4862464, at *12 (Nov. 12, 2008); *see also United States v. Miami Univ.*, 294 F.3d 797, 816 (6th Cir. 2002) ("'to obtain . . . a preliminary injunction, [a party] must demonstrate that failure to issue the injunction is likely to result in irreparable harm.'").

General seeks an order precluding the States from "enforcing any of the MSA's discriminatory terms," including (1) "imposing any penalty on General Tobacco, including the delisting" of its brands from the approved lists maintained by 45 MSA States by statute and (2) "attempting to take possession of any of General Tobacco's escrowed funds based on any claimed right under the MSA or any other agreement between General Tobacco and the Settling States."  PI Mot. at 2.  General claims that if it does not get this relief pending the outcome of this litigation, it will lose market share and be forced into bankruptcy.  PI Mem. at 35-37.

General has not demonstrated, and cannot demonstrate, that it faces irreparable injury warranting the "extraordinary" and "drastic" relief of a preliminary injunction.  First, General has failed to demonstrate that it "will suffer 'actual and imminent' harm rather than harm that is speculative or unsubstantiated."  *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006); *Warner v. Cent. Trust Co.*, 715 F.2d 1121, 1123 (6th Cir. 1983).

To begin with, General's in-court assertion of irreparable injury is totally inconsistent with its out-of-court actions and statements.  Thus, although General's preliminary injunction papers claim that it faces the possibility of bankruptcy, General told its customers on November 5 that its business prospects were rosy, boasting that it had recently "opened a new state of the art manufacturing facility" in North Carolina and a new "satellite office" in Kentucky; that it had "added several new sales directors . . . and plan[ned] to hire over 100 more over the next few months;" and that it had made $500 million in MSA payments, including a recent $27 million escrow deposit and weekly payments of $750,000.  *See supra* at 15-16 & notes 16-20.  *See Odetics v. Storage Tech. Corp.*, 14 F. Supp. 2d 785, 797 (E.D. Va. 1998) (casting doubt on the harm to defendant where plaintiff alleged that an injunction barring it from using plaintiff's patent "would have crippling effects on its business" was contradicted by a press release that defendant issued on the day that the jury announced its verdict in favor of injunction where the press release noted defendant's new technology to get around plaintiff's patent), *motion denied on other grounds by* 14 F. Supp. 2d at 800 (E.D. Va. 1998).

In any case, it is clear that General faces <u>no</u> immediate injury.  All that has happened so far is that 41 States have sent General a letter, as they are required to do by the MSA, informing General and all the other States and PMs that the States "may" bring an action against General for its admitted failure to make required payments.  Complaint Ex. C; MSA § VII(c)(2) (before initiating any action to enforce the MSA, party must give each State, each PM, and NAAG 30-days notice).  No State has sued General, and no State has threatened to delist General's products.  If the States were to go to court under the 30-day letter, or in the unlikely event that a State were to attempt to delist General's products before going to court, General would have notice and opportunity to present its defenses to such action.  For instance, the listing statute of

33

Kentucky (the only State over which this Court unquestionably has jurisdiction) requires 30 days advance notice before a brand may be delisted – giving General ample opportunity to object – and permits appeal to the Kentucky Circuit Court by a party aggrieved by a delisting.  *See, e.g.*, Ky. Rev. Stat. § 131.610(6), 624(l).[34]

Such notice and opportunity to present defenses if and when any State were to sue General or seek to delist any General brand completely eliminates any basis for this Court to enter a preliminary injunction prohibiting that action in advance.[35]  An "injunction against threatened legal action will not issue if the party will have an adequate opportunity to fully present his defenses and objections in the legal action he seeks to enjoin."  *Travis v. Pennyrile Rural Elec. Coop.*, 399 F.2d 726, 729 (6th Cir. 1968).[36]

---

[34] The same is true in other states.  Many states, like Kentucky, directly provide for notice and opportunity to be heard in their listing statutes.  *E.g.* Ohio Rev. Code Ann. § 1346.05(B)(2)(a) (2003) (requiring 10 days notice); Ind. Code Ann. § 24-3-5.4-14(e) (2004) (requiring 30 days notice) W. Va. Code § 16-9D-3(b)(3)(A) (2008) (requiring 7 days notice); Va. Code. Ann. § 3.2-4206(C) (2008) (providing 30 days notice); Ga. Code Ann. § 10-13A-6(d) (2008) (requiring 30 days notice).  In addition, many directly incorporate their administrative procedures act, thus creating administrative notice and review for delisting.  *See, e.g.,* Colo. Rev. Stat. § 24-4-104(2) (2008) (requiring administrative process including a hearing and 30 days notice); Tenn. Code Ann. § 67-4-2606(a) (incorporating Uniform Administrative Procedures Act); W. Va. Code § 16-9D-9(a).  Even in states where the delisting statute does not specifically mention notice, delisting is commonly covered under the same administrative procedure code section governing revocation of licenses, which incorporates notice and process.  *See, e.g.,* Model State Administrative Procedure Act §§ 1-102(4), 4-105 (1981) ("An agency may not revoke, suspend, modify, annul, withdraw, or amend a license unless the agency first gives notice and an opportunity for an appropriate adjudicative proceeding.") N.C. Gen. Stat. §§ 150B-2, -3 & -23 (delisting falls under definition of licensing, requiring at least 15 days notice of adverse action); S.C. Code Ann. §§ 1-23-10, -370 (2008) (delisting falls under definition of licensing, requiring notice before adverse action); *see also Carter v. Carolina Tobacco Co., Inc.*, 873 N.E.2d 611, 624 (Ind. Ct. App. 2007) (applying requirements of state Administrative Orders and Procedures Act to delisting question).

[35] As the States demonstrated in their motion to dismiss, moreover, the Court lacks personal jurisdiction over all of the State defendants other than Kentucky.  Accordingly, the Court only has jurisdiction to enjoin Kentucky.  Plaintiff does not contend, however, that it will suffer irreparable injury as a result of any action that Kentucky alone may take.  Nor could it because any injury it might suffer as a result of action by Kentucky would affect only a small portion of General's business and would be compensable by money damages.  It is well settled that when a plaintiff can be fully compensated through money damages, a preliminary injunction will be denied for lack of irreparable harm.  *See Overstreet v. Lexington Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).  Moreover, even if every Settling State were to attempt to delist its brands for non-payment of its MSA obligations, General would not suffer irreparable injury because it would still be able to sell in the four Previously Settling States, including Texas and Florida – two States in which it already has extensive sales.

[36] *See also, e.g., FreeEats.com, Inc. v. Indiana*, 502 F.3d 590, 600 (7th Cir. 2007) (refusing to address alleged irreparable harm where plaintiff's claimed injury could be reviewed in state court); *Diamond "D" Constr. Corp. v. McGowan*, 282 F.3d 191, 201-02 (2d Cir. 2002) (vacating preliminary injunction where plaintiff could have

Second, a preliminary injunction is not warranted because General does not seek to "maintain the status quo pending determination" on the merits. *Blaylock v. Checker Oil Co*., 547 F.2d 962, 965 (6th Cir. 1976). Rather it seeks to have the Court alter the status quo by rewriting General's contract so as to relieve it of MSA payment obligations. General seeks to enjoin enforcement of the allegedly "discriminatory" terms of the MSA. PI Mot. at 2. These terms include both General's "back payment" obligation and its obligation to make current payments so long as those do not include a "grandfather share" exemption. *See* Complaint, Prayer for Relief, (b), (c), (f). It is well-established, however, that a preliminary injunction cannot be used, as General seeks to do here, "as a device for creating a new contract between the parties." *Diversified Mortgage Investors v. U.S. Life Title Ins. Co. of N.Y.*, 544 F.2d 571, 576 (2d Cir. 1976). *See also Blaylock*, 547 F.2d at 965 (reversing preliminary injunction going "beyond a restoration of the status quo and imposes new obligations . . . not required by its previous contractual relationship").

Moreover, the preliminary injunction General seeks would totally alter General's relative position in the market and give it a unique competitive advantage available to no other company. If General is relieved of its allegedly "discriminatory" MSA payment obligations, as it apparently requests, it would have <u>no</u> payment obligations of any sort: it would have no MSA payment obligations (by virtue of the preliminary injunction) <u>and</u> it would have no payment obligations under state escrow statutes (by virtue of its status as an SPM rather than an NPM).[37]

---

appealed to Department of Labor's appellate division or sought relief in state court); *Nat'l Lead, Inc. Co. v. Spector*, 428 F.2d 91 (3rd Cir. 1971) (preliminary injunction denied for lack of irreparable injury when alleged injury could be addressed in subsequent proceeding); *Hosey v. Club van Cortlandt*, 299 F. Supp. 501 (S.D.N.Y. 1969) (preliminary injunction denied when tenant could raise claimed defense should the defendant attempt to evict him); *accord Georgia v. Chattanooga*, 264 U.S. 472, 483-84 (1924) (denying injunction because "suits in equity will not be sustained" where plaintiff "has a plain, adequate, and complete remedy in the condemnation proceedings instituted by the city").

[37] Indeed, the requested preliminary relief would impermissibly exceed any <u>permanent</u> relief to which General might ultimately be entitled if it ultimately prevails on its claims. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)

Far from preserving the status quo, the Court would be dramatically altering the parties' status.

Third, there is no basis for a preliminary injunction because the injury General claims is not caused or threatened by defendants; rather it is an injury that General has brought on itself and which it has always had the power to avoid if it wanted to do so.  That is not the sort of injury that will justify the "extraordinary" relief of a preliminary injunction.  "Self-inflicted wounds are not irreparable.  Only the injury inflicted by one's adversary counts. . . ."  *Second City Music, Inc. v. Chicago*, 333 F.3d 846, 849 (11th Cir. 2003); *Salt Lake Tribune Publishing Co, LLC. v. AT&T Corp.*, 320 F.3d 1081, 1106 (7th Cir. 2003) ("we will not consider a self-inflicted harm to be irreparable"); *Caplan v. Fellheimer Eichen Braveman & Kaskey*, 68 F.3d 828, 840 (3d Cir. 1995) ("if the harm complained of is self-inflicted," it is not "irreparable").

General complains that it cannot meet its required contractual payments under the MSA. If that is true, it is the direct result of General's own deliberate business decisions.  Because a PM's annual MSA payments are based on unit sales volumes, MSA §§ IX(c)(3), IX(i)(2)-(3), a PM always knows the amount of its required MSA payment on each carton it sells and it must take that into account when it prices its product – just as it must do for federal excise taxes, which are also assessed on a unit volume basis.  If General cannot meet its current MSA payment obligations, it has no one but itself to blame.  The same is true with respect to back payments. General well knows the amount of its annual back payment obligation – it is spelled out in detail in the Adherence Agreement General negotiated.  In recent years, this obligation consisted of

---

(injunctive relief should be narrowly-tailored to give only the relief to which plaintiff is entitled); *United States v. Miami Univ.*, 294 F.3d 797, 816 (6th Cir. 2002) ("If injunctive relief is proper, it should be no broader than necessary to remedy the harm at issue.").  If the MSA is amended as General requests, General would still be required to make current MSA payments (albeit adjusted, potentially, to reflect an alteration in the grandfathered share), but the proposed preliminary relief would relieve General of all current payment obligations.  Similarly, if the Court grants General's alternative request to void the Adherence Agreement and rescind its MSA joinder (Complaint, Prayer for Relief, ¶ g), it would then be an NPM subject to the escrow requirements in each of the States, and required to make escrow payments equivalent to those about which it complains under the MSA – something the requested preliminary relief omits.

only a few pennies per pack of cigarettes.  General could, and should, have priced its products at a level that would have enabled it make such payments – just as other SPMs with back payment obligations, such as Farmers, have done.

When, as here, a party has the ability to avoid the injury it claims, preliminary injunctive relief is not appropriate.[38]  *See Second City Music v. Chicago*, 333 F.3d 846, 850 (7th Cir. 2003) (injunction denied when plaintiff could have prevented harm by applying for license); *Salt Lake Tribune Publ'g v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) (injunction denied when harm resulted from contract negotiated by plaintiff); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) (injunction denied when parties "acted to permit this outcome which they find unacceptable"); *Cablevision of Boston, Inc. v. Pub. Improvement Comm'n of the City of Boston*, 38 F. Supp. 2d 46, 62 (D. Mass. 1999) (denying injunction because harm was "self-inflicted wound" when plaintiff failed to make adequate preparations).

<u>Finally</u>, General's last-minute claim that it has been irreparably harmed by the States' 30-day notice does not justify preliminary relief.  The 30-day notice is required by the MSA that General signed as a prerequisite to any action.  MSA § VII(c)(2).  It is not a confidential document, but rather must be provided to all the Settling States and all the PMs.  *Id.*  Moreover, it was General, not defendants, that attached the States' notice to the complaint and then issued press releases announcing its lawsuit.  Accordingly, General "may have created the confusion where none would have existed."  *Metro Publishing Co. v. San Jose Mercury News*, No. 18462, 1993 WL 266785, at *6 (N.D. Cal. July 19, 1993).  Finally, although General has told the Court that it lost sales and laid off employees as a result of the State's notice, General told the business

---

[38] It is no answer that General claims that it hoped it could "renegotiate" its payment obligations.  Complaint ¶ 165.  Unless and until its payments were, in fact, changed, its obligations were known and could have been met had General wished to do so.

community that its actions were a result of the "sweeping downturn in consumer spending" affecting "most U.S. industries," not the States' 30-day notice. *See supra* at 17 & note 22.

**C.     A Preliminary Injunction Will Substantially Harm the Defendants**

A broad preliminary injunction like the one requested by General will harm the States and the PMs.  Should the Court grant General's motion, it will be  relieved of MSA payment obligations while the litigation is pending.  That will deprive the States of benefit of payments to which they are entitled from General under the MSA – funds which Kentucky and other States use for public health programs, smoking cessation programs, public education, and other items in State budgets.  *See supra* note 2.  (In April 2007, General's current payment obligation to all States was $80.72 million; Kentucky's share of that payment was $1.42 million.)  Such a result undermines the MSA's public health purpose of providing funds to the States to offset the health-related costs of smoking.  *Trident*, 467 F.3d at 549; *accord Liggett Group*, 232 S.W.3d at 561, 564 (MSA "intended to help control the public health risk caused by tobacco" and "provide a fund . . . to offset the health costs of tobacco products").[39]

Indeed, the relief General seeks could threaten the integrity of the entire MSA and the payments the States receive from the other manufacturers.  As set forth in the SPMs' motion to dismiss, if General is relieved of its obligations to "make payments as provided" in the MSA, the MSA must "be revised so that the other Participating Manufacturers receive terms as relatively favorable."  MSA § XVIII(b)(4).  Moreover, the MSA provides that if any court "renders unenforceable" any "nonseverable provision" of the MSA – including specifically the payment requirements of section IX – then the MSA is subject to renegotiation and potentially

---

[39] Nor would General be making the escrow payments required of NPMs to assure that sufficient funds are available to offset the health-related costs of smoking for NPM sales.

termination.  MSA § XVIII(o)(1)-(2).[40]

The company defendants also face substantial harm, and substantial unfairness, if General's requested injunctive relief is granted.  If the Court grants General's request, General would not be required to make full MSA payments or equivalent escrow deposits (because it is not an NPM) on its sales.  In stark contrast, all of the other PMs would be required to make their MSA payments, and NPMs would be required to make escrow payments.  Only General would be relieved of payments.  Such a result would irreconcilably conflict with the contract rights that the other PMs have with the States and would give General a substantial and unfair advantage.

### D.    A Preliminary Injunction Is Not in the Public Interest

Finally, General's proposed injunction is not in the public interest.  The MSA exists to protect public health.  MSA, preamble, at 1.  The States (and PMs) are "committed to reducing underage tobacco use by discouraging such use and by preventing Youth access to Tobacco Products," and accordingly have "agreed to settle . . . pursuant to terms which will achieve for the Settling States and their citizens significant funding for the advancement of public health [and] the implementation of important tobacco-related public health measures."  MSA, preamble, at 2.  An order relieving General of its payment obligations for an indefinite period and precluding the States from delisting noncompliant product is contrary to that goal.

In particular, the MSA sought to reduce youth smoking.  If this Court relieves General of its payment obligations, under the MSA or escrow statutes, General is likely to "artificially lower [its] prices, which . . . [would make] its cigarettes more attractive to 'price-sensitive youth.'" *Tritent*, 467 F.3d at 552; *accord* Letter from NAAG's David M. Horn to Rhonda Anderson, June 17, 2002 (by "offering cigarettes at rock-bottom prices," General's affiliate "demonstrated total

---

[40] Nothing in MSA § XVIII(o) provides that the order "render[ing] unenforceable" any MSA provision must be a final or permanent one.

indifference . . . to the devastating effects of youth smoking") (McCallum Dec. Ex. 22).

General does not argue otherwise or even address the public health issues raised by the relief it seeks.  Instead, it makes only the unsupported claim that without the injunction the "tobacco industry will move toward a much more concentrated market" and consumers will be "forced to pay higher prices with fewer brand choices."  PI Mem. at 37.  That claim is conclusively contradicted by the undisputed fact that the cigarette market contains hundreds of competitors who compete vigorously.  *See supra* at 9-11; *accord* Statement of the Federal Trade Commission, *RJ Reynolds Tobacco Holdings, Inc./British Am. Tobacco p.l.c.*, File No. 041 00170, June 22, 2004, *available at* http://www.ftc.gov/os/2004/06/040622batrjstmt.pdf (closing investigation of merger of RJR and Brown & Williamson because "the transaction is [not] likely substantially to lessen competition in the U.S. market for cigarettes"; "[d]ozens of smaller domestic and foreign firms . . . sell cigarettes in the United States").

## IV.    CONCLUSION

For all the reasons set out above, the SPMs respectfully request that the Court deny General's motion for a preliminary injunction.

Dated November 24, 2008

Respectfully submitted,


__/s/Merrill S. Schell_____
Merrill S. Schell
WYATT, TARRANT & COMBS, LLP
500 West Jefferson Street, Suite 2800
Louisville, Kentucky 40202-2898
502.589.5235 (phone)
502.589.0309 (fax)
mschell@wyattfirm.com

Robert J. Brookhiser
Elizabeth B. McCallum
HOWREY LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004-2402
202.783.0800 (phone)
202.383.6610 (fax)
brookhiserb@howrey.com

Counsel for Commonwealth Brands, Inc., Liggett Group LLC, Vector Tobacco Inc., Imperial Tobacco Limited/ITL (USA), Japan Tobacco International U.S.A., Inc., King Maker Marketing, Inc., Lane Limited, Lignum-2, Inc., P.T. Djarum, Premier Manufacturing, Inc., Santa Fe Natural Tobacco Co., Sherman's 1400 Broadway N.Y.C., Inc., and Top Tobacco, L.P.

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing has been served upon the following, by CM/ECF system, on this the 24th day of November, 2008:

VIBO CORPORATION, INC.
d/b/a  GENERAL TOBACCO
John K. Bush
Christie A. Moore
Helen A. Thompson
Greenebaum Doll & McDonald PLLC
3500 Nation City Tower
Louisville, KY 40202
502.589.4200
jkb@gdm.com
cm@gdm.com
hat@gdm.com

PHILLIP MORRIS USA, INC.,
RJ REYNOLDS TOBACCO CO.,
LORRILARD TOBACCO CO.
Charles S. Cassis
Theresa A. Canady
Frost Brown Todd LLC
400 W. Market St., 32nd Floor
Louisville, KY 40202
502.589.5400
ccassis@fbtlaw.com
tcanady@fbtlaw.com


COMMONWEALTH OF KENTUCKY
Tad Thomas
James M. Herrick
Asst. Deputy Attorneys General
700 Capital Avenue, Ste. 118
Frankfort, KY 40601
502.696.5627
tad.thomas@ag.ky.gov
james.herrick@ag.ky.gov


and via e-mail to the following:

'brett.delange@ag.idaho.gov'; 'janet.carter@ag.idaho.gov';
'beth.kittelmann@ag.idaho.gov'; 'james.herrick@ag.ky.gov';
'dennis.hansen@ag.state.ar.us'; 'bmeyer@ag.state.ia.us'; 'dstanle@ag.state.ia.us';
'jambroz@ag.state.ia.us'; 'korme@ag.state.ia.us'; 'hannamang@ag.state.la.us';
''pleasants@ag.state.la.us''; ''phillipst@ag.state.la.us''; 'vtoldenb@ag.state.nv.us';
'swalker@ag.state.oh.us'; 'AGDSpencer@ag.state.sc.us'; 'aqueen@ag.state.sc.us';
'JThames@ag.state.sc.us'; 'phunter@ag.state.sc.us'; 'Daniel.Hall@ago.mo.gov';
'Earl.Kraus@ago.mo.gov'; 'gregory.barnes@ago.mo.gov'; 'lynne.fritz@ago.ne.gov';
'jafarshee@ago.state.al.us'; 'cravanelli@ago.state.nm.us'; 'dthomson@ago.state.nm.us';
'eric.estes@arkansasag.gov'; 'jim.depriest@arkansasag.gov';
'jeremy.johnson@atg.in.gov'; 'mkueper@atg.state.il.us'; 'donna.learned@atg.in.gov';
'lawrence.carcare@atg.in.gov'; 'cmihaly@atg.state.vt.us'; 'jbrill@atg.state.vt.us';
'CamC1@atg.wa.gov'; 'David.Hankins@atg.wa.gov'; 'DougV@atg.wa.gov';
'rustyf@atg.wa.gov'; 'jressler@attorneygeneral.gov'; 'ann.uglietta@azag.gov';

'bennett.rushkoff@dc.gov'; 'cathy.thurstonseignious@dc.gov';
'dennis.eckhart@doj.ca.gov'; 'michelle.hickerson@doj.ca.gov'; "edavis@doj.gov.vi';
'mphelan@doj.gov.vi'; 'ppaquin@doj.gov.vi'; 'david.rienzo@doj.nh.gov';
'lisa.udland@doj.state.or.us'; 'blythecj@doj.state.wi.us'; 'gibsoncj@doj.state.wi.us';
'wellslk@doj.state.wi.us'; 'christopher.roy@dor.state.wi.us'; 'bakkerl@ksag.org';
'Greg.Harkenrider@ky.gov'; 'jmichael.jones@ky.gov'; 'Mary.Lassiter@ky.gov';
'chris_poag@law.state.ak.us'; 'cynthia_drinkwater@law.state.ak.us';
'Alex.R.Barrett@hawaii.gov'; 'Earl.R.Hoke@hawaii.gov'; 'jennifer.willis@maine.gov';
'devlinb@michigan.gov'; 'hackneycd@michigan.gov'; 'ctweeten@mt.gov';
'mmclaverty@mt.gov'; 'kosullivan@mt.gov'; 'abarefoo@ncdoj.gov'; 'jbkelly@ncdoj.gov';
'Klong@ncdoj.gov'; 'lemory@ncdoj.gov'; 'mtrippe@ncdoj.gov'; 'rharris@ncdoj.gov';
'Kparker@oag.state.md.us'; 'mtrestman@oag.state.md.us';
'clayton_eubanks@oag.state.ok.us'; 'phil_stambeck@oag.state.ok.us';
'ryan_chaffin@oag.state.ok.us'; 'gconover@oag.state.va.us'; 'jmclees@oag.state.va.us';
'mwyatt@oag.state.va.us'; 'wade.hope@revenue.alabama.gov'; 'jlee@riag.ri.gov';
'kkinsman@utah.gov'; 'John.Dalporto@wvago.gov'; 'Joelyn.Gast@iowa.gov';
'jdiaz@justicia.gobierno.pr'; 'laaparicio@justicia.gobierno.pr';
'nramos@justicia.gobierno.pr'; 'janis_hales@revenue.state.ak.us';
'johanna_bales@revenue.state.ak.us'; 'mglynn@riag.state.ri.us';
'brian.laughlin@state.co.us'; 'jan.zavislan@state.co.us'; 'drue.chichi@state.de.us';
'renee.harris@state.de.us'; 'thomase.brown@state.de.us'; 'drew.lianopoulos@state.or.us';
'Pat.Archer@state.sd.us'; 'daniel.champney@ag.tn.gov'; 'rebekah.baker@ag.tn.gov';
'cteter1@state.wy.us'; 'rcoole@state.wy.us'; 'ralsop@tax.state.wv.us';
'ann.uglietta@azag.gov'; 'kelly.peloquin@azag.gov'; 'michael.plumley@ag.ky.gov';
'tad.thomas@ag.ky.gov'; 'attorney.general@state.co.us'; 'attorney.general@po.state.ct.us';
'attorney.general@state.de.us'; 'oag@dc.gov'; 'ag.mccollum@myfloridalegal.com';
'law@guamattorneygeneral.com'; 'general@ksag.org'; 'oag@oag.state.md.us';
'attorney.general@alaska.gov'; 'miag@michigan.gov'; 'ndahr@nd.gov';
'info@scattorneygeneral.com'; 'greg.abbott@oag.state.tx.us'; 'uag@utah.gov';
'atginfo@atg.state.vt.us'; 'kelly.ayotte@doj.nh.gov'; 'smoore@ncdoj.gov';
'kbergeron@riag.ri.gov'; 'mail@oag.state.va.us'; 'attorney.general@maine.gov';
'jeanne.young@wvago.gov'; 'attorney.general@state.co.us';
'attorney.general@state.de.us'; 'smoore@ncdoj.gov'; 'constituent@atg.in.gov';
'emailago@atg.wa.gov'; 'hardy.myers@doj.state.or.us'; 'vfrazer@doj.vi.gov';
'dthomson@nmag.gov'; 'clarson@ag.state.ia.us'; 'janet.carter@ag.idaho.gov';
'hawaiiag@hawaii.gov'; 'linda.mcewen@state.mn.us'; 'eric.estes@arkansasag.gov';
'troyking@ago.state.al.us'; 'agbaker@law.ga.gov'; 'mwebb@ago.state.ms.us';
'vtoldenb@ag.state.nv.us'; 'suzanne.winderman@lps.state.nj.us';
'lisa.udland@doj.state.or.us'; 'clyde.kirk@oag.ok.gov'; 'rchaffin@oag.ok.gov';
'citizens.services@lps.state.nj.us'; 'Dana.Biberman@oag.state.ny.us';
'christine.morrison@oag.state.ny.us'; '‘Elizabeth.Koenig@state.ma.us'’'; 'blixtc@rjrt.com';
'jlong@lvbrands.com'; 'mbell@vectorgroupltd.com'; 'neal.beaton@hklaw.com';
'barry@bboren.com'; 'mark@gopremier.com'; 'Rnuckolls@mckennalong.com';
'stanleyfriedman@mcf-esq.com'; 'nallard@pattonboggs.com';
'denise.keane@pmusa.com'; 'Douglas.Wald@aporter.com'; 'irving.scher@weil.com';
'brookhiserb@howrey.com'; 'lee.vanvoorhis@weil.com'; 'Idit.Froim@weil.com';

'mark@gopremier.com'; 'gbaka79@yahoo.com'; 'ggahan@altadis.com'; 'jean-dominique.comolli@altadis.com'; 'jack_henson@laneltd.com'; 'dlapp@oag.state.md.us'; 'jpcarriere@altadis.com'; 'attysmiami@aol.com'; 'dhanrajusa@aol.com'; 'RALNASCO@aol.com'; 'rangiuoli2@aol.com'; 'robwilkey@aol.com'; 'heatherj.wilson@po.state.ct.us'; 'joseph.rubin@po.state.ct.us'; 'Rupal.ShahPalanki@po.state.ct.us'; 'barry@bboren.com'; 'avramstc@bellsouth.net'; 'hcroemer@bellsouth.net'; 'sb@bolattigriffith.com'; 'info@chancellor-tobacco.com'; 'mark@cigarettetobacco.com'; 'juridico@citatabacos.com'; 'darce@compass.com.ph'; 'bunjoto.astono@djarum.com'; 'grace.t.sennelius@djarum.com'; 'rachman.satya@djarum.com'; 'sigold@drl-ent.com'; 'zrashwan@easternegypt.com'; 'info@farmerstobacco.com'; 'jennifer@farmerstobacco.com'; 'davidchor@gdgroupinc.com'; 'dominicchu@gdgroupinc.com'; 'mark@gopremier.com'; 'scoleman@gopremier.com'; 'ayh@harksco.com'; 'nbeaton@hklaw.com'; 'brian.caldwell@dc.gov'; 'brookhiserb@howrey.com'; 'mccallumb@howrey.com'; 'arnoldh3151@ipass.net'; 'sdaniel@ipass.net'; 'mgrandma@itl.ca'; 'amarks@kasowitz.com'; 'spatton@kirkland.com'; 'bhavani.parameswar@kmm-inc.com'; 'markcassar@kretek.com'; 'mikehousego@kretek.com'; 'seancassar@kretek.com'; 'jginsburg@levin-ginsburg.com'; 'jweis@levin-ginsburg.com'; 'bgarner@libertybrandsllc.com'; 'sfeit@libertybrandsllc.com'; 'acalso@lignum2.com'; 'kirinaga@lignum2.com'; 'tmeyer@lignum2.com'; 'bmcginn@lortobco.com'; 'jlong@lvbrands.com'; 'annette.boye@mac-baren.com'; 'per.buch@mac-baren.com'; 'stanleyfriedman@mcf-esq.com'; 'rnuckolls@mckennalong.com'; 'exportaciones@montepaz.com.uy'; 'jamesnooney@montepaz.com.uy'; 'moldes@montepaz.com.uy'; 'abrams52@msn.com'; 's-m-johnson@msn.com'; 'wrtco@msn.com'; 'PLEVIN@NAAG.ORG'; 'lcarbone@natsherman.com'; 'rmaraia@natsherman.com'; 'jlopezm@palermo.com.py'; 'nallard@pattonboggs.com'; 'obermann@planta-tobacco.de'; 'rau@planta-tobacco.de'; 'wiesenhuetter@planta-tobacco.de'; 'Anthony.Reale@pmusa.com'; 'Blake.p.Auchmoody@pmusa.com'; 'denise.keane@pmusa.com'; 'Emmitt.n.davis@pmusa.com'; 'poeschl@poeschl-tobacco.com'; 'dspitzer@proskauer.com'; 'winnersales@qwest.net'; 'mckimt@rjrt.com'; 'jfranzino@sfntc.com'; 'mjohnson@sfntc.com'; 'william.hunter@skofirm.com'; 'dana.m.papillion@us.pwc.com'; 'ryan.harrell@us.pwc.com'; 'cathanasia@usthq.com'; 'rkohlberger@usthq.com'; 'fferguson@valottery.com'; 'mbell@vectorgroupltd.com'; 'dumbreit@von-eicken.com'; 'umbreit@von-eicken.com'; 'Gary.Wilson@wilmerhale.com'; 'jmwintner@wlrk.com'; 'mgkoplow@wlrk.com'; 'inttobacco@yahoo.com'; 'shigeru_jr@yahoo.com'; 'aarong@znfinternational.com'; 'ccassis@fbtlaw.com'

/s/ Merrill S. Schell
Merrill S. Schell

Counsel for Defendants, Commonwealth
Brands, Inc., Liggett Group, LLC, Vector
Tobacco Inc., Imperial Tobacco
Limited/ITL (USA), Japan Tobacco
International U.S.A., Inc., King Maker
Marketing, Inc., Lane Limited, Lignum-2,
Inc., P.T. Djarum, Premier Manufacturing,
Inc., Santa Fe Natural Tobacco Co.,
Sherman's 1400 Broadway N.Y.C., Inc., and
Top Tobacco, L.P.