UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| VIBO CORPORATION, INC. d/b/a GENERAL TOBACCO | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 3:08-cv-571-C |
| v. | ) ) | |
| JACK CONWAY, in his official capacity as Attorney General of the Commonwealth of Kentucky, *et. al.* | ) ) ) ) | |
| Defendants. | ) ) ) ) | (Electronically Filed) |

**PLAINTIFF'S REPLY TO OPMS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

## Introduction

Plaintiff, Vibo Corporation d/b/a General Tobacco ("General Tobacco"), respectfully replies to the OPMs' opposition to Plaintiff's motion for preliminary injunctive relief.[1] Defendants' objections to General Tobacco's claim that the MSA is an essential facility, though voluminous, are notable for what they do <u>not</u> address. Indeed, Defendants fail to cite to any credible authority to dispute that (1) the Grandfathered SPMs obtained their exemptions through highly questionable means of artificially padding market share;[2] (2) the grandfathered exemptions give the Grandfathered SPMs a huge pricing advantage over non-Grandfathered SPMs and legally compliant NPMs;[3] and (3) the Grandfathered

---

[1]  General Tobacco hereby incorporates by reference its Replies to Defendant Attorneys General's and Grandfathered SPMs' Responses to Plaintiff's Motion for Preliminary Injunction ("AGs' PI Opp.", "SPMs' PI Opp."). This Reply specifically addresses the argument that General Tobacco cannot succeed on its claim that the MSA is an essential facility, and responds herein to the Defendant AG's & Grandfathered SPMs arguments regarding this issue.

[2]  <u>See</u> Declaration of Jeremy I. Bulow ("Bulow Decl.") at 21-23; 25-30.

[3]  Amended Declaration of Krista F. Holt ("Holt Am. Decl.") at ¶¶ 19-23; Supplemental Declaration of Krista F. Holt ("Holt Suppl. Decl.:) ¶¶ 5, 8, 13, attached as Exhibit A; Supplemental Declaration of Jeremy I.Bulow ("Bulow Suppl. Decl.") ¶¶ 3,6, attached as Exhibit B.

SPMs can price their discount cigarettes below what General Tobacco needed to charge in order to make its MSA payments and other regulatory costs.[4]

Also wholly absent from Defendant manufacturers' brief is any explanation as to why they would be entitled to <u>anything</u> under the Limited Most Favored Nations ("LMFN") provision if the Defendant Attorneys General had implemented the Amended Adherence Agreement with General Tobacco. Indeed, the OPMs' admission that the LMFN "provision applies only where the subsequently settling NPM receives terms that are overall more favorable, and even then provides only that the OPMs will receive terms that are overall as favorable as the favored NPM" (OPMs' PI Opp. at 22-23) makes it clear that Defendants' repeated threats about invoking their LMFN "rights" with respect to General Tobacco's terms with the Settling States are baseless.

Instead of addressing these fundamental issues, Defendants argue that General Tobacco cannot succeed on its claim that the MSA is an essential facility because Plaintiff supposedly (1) has every pricing advantage, compared to the OPMs and Grandfathered SPMs and (2) engaged in questionable business practices as an NPM and then again as an SPM. Defendants' sole argument, therefore, is to blame the Plaintiff, claiming that the business practices of General Tobacco, not its grossly discriminatory treatment under the MSA, led to Plaintiff's current predicament. Defendants' argument is not only wrong, it borders on the frivolous. As explained below, the MSA is indeed an essential facility to which Plaintiff has been denied equal access. Accordingly, Defendants' argument that General Tobacco created its own predicament is pure fiction.

### <u>Argument</u>

Contrary to Defendants' assertions otherwise, it is well settled that General Tobacco must merely show that there is a "likelihood" of success on the merits in order to succeed on its motion for preliminary injunctive relief. The Court is not required to determine General Tobacco's ultimate success to some predetermined mathematical probability, particularly when, as here, other factors

---

[4] <u>See</u> Holt. Supp. Decl. ¶¶ 5,8, 13; Bulow Suppl. Decl. 3,6.

weigh heavily in favor of injunction.  See Friendship Materials, Inc. v. Michigan Brick, Inc., 679 F.2d

100, 105 (6th Cir. 1982); Express One Int'l, Inc. v. U.S. Postal Serv., 814 F. Supp. 87, 88 (D.D.C.

1992).  In fact, General Tobacco is not required to show 50 percent or greater chance of success.

Medtronic v. Gibbons, 527 F. Supp. 1085, 1092 (D. Minn. 1982), aff'd, 684 F.2d 565 (8th Cir. 1982).

Given that the harm to General Tobacco is indeed quite serious, it is only necessary that there be "fair

chance of success" on merits.  William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 526

F.2d 86, 88 (9th Cir. 1975); see also Cox v. Brown, 498 F. Supp. 823, 828 (D.D.C. 1980) (if harm is

substantial, relief may be granted even if court's view of merits is markedly different than the

plaintiff's).

### GENERAL TOBACCO'S ESSENTIAL FACILITY CLAIM IS LIKELY TO SUCCEED

#### A.    The MSA Is An Essential Facility.

In order to show a likelihood of success on its claim that the MSA is an essential facility,

General Tobacco must simply show:  "(1) control of the essential facility by a monopolist; (2) a

competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the

use of the facility to a competitor; and (4) the feasibility of providing the facility."  MCI Commc'n

Corp. v. American Tel. & Tel. Co., 708 F.2d 1081, 1132-1133 (7th Cir. 1982); Hecht, 570 F.2d at 992-

93.

Defendants, repeating the same unsuccessful arguments included in their motion to dismiss the

Verified Complaint, continue to rely on Verizon Communications Inc. v. Law Offices of Curtis V.

Trinko, LLP, 540 U.S. 398 (2004) ("Trinko") as sufficient authority to challenge General Tobacco's

likelihood of success on its essential facilities claim.  (See OPMs' PI Opp. at 19-21; SPMs' PI Opp. at

21-22).[5]  Trinko, however, actually underscores that the essential facilities doctrine is appropriately

applied to this case.  In Trinko, the Supreme Court emphasized that essential facilities cases involving

---

[5]  Defendants continued reliance on Areeda and Hovenkamp's antitrust treatise is also misplaced, as those works considered
an essential facility challenged under Sherman Act § 2, not § 1, as is the case here.  (See OPMs' PI Opp. at 19, fn. 8.)

concerted action by competitors challenged under Sherman Act § 1, as exists here, are much more

nefarious and present more anticompetitive concerns than a monopolist's control of such a facility,

which would be scrutinized under Sherman Act § 2. See 540 U.S. at 410. The Trinko Court

concluded that under these circumstances, which "present greater anticompetitive concerns", the most

reasonable remedy is one that simply requires "that the outsider be granted nondiscriminatory

admission to the club." Id. at 410. In short, the Trinko Court *did not* question the application of an

essential facilities doctrine where, as here, a group of competitors control access to the facility and they

offer no valid business reasons for denying equal competitor access.  The same approach is required

here.[6]

      1.    General Tobacco's Competitors Control the MSA And the Market.

General Tobacco has already provided overwhelming evidence that the OPMs and

Grandfathered SPMs essentially control entry to the market through the exploitation and misuse of the

Limited Most Favored Nations ("LMFN") provision of the MSA.  The Sixth Circuit has found that

most favored nations clauses can be violative of Section 1 of the Sherman Act if there exists "(1) a

contract, combination or conspiracy among two or more parties, that (2) unreasonably restrains trade."

Blue Cross v. Klein, 117 F.3d 1420, 1997 WL 400095, *3 (6th Cir. 1997).  Here, the restraint is even

worse because it involves the misuse of an LMFN provision whereby the private parties – the OPMs

and Grandfathered SPMs - gain unfettered control over access to the MSA, as such misuse gives veto

power to those companies over a competitor's entry "fee."  When a MFN provision is exploited, as it is

here, it can be considered "manifestly anticompetitive[,]" thus requiring a *per se* condemnation under

the antitrust laws.  Id., n. 1.

---

[6]  The cases cited by Defendants are inapposite.  Unlike the situation here, those cases (1) dealt with unilateral conduct
under Section 2 of the Sherman Act, not concerted action under Section 1; and (2) involved either a facility that was
regulated by the FTC with no private restriction on the regulatory authority or a facility that was created as the result of a
single entity's capital investment and ingenuity.

Most favored nations clauses are highly disfavored "because they often inhibit compromise and settlement." Cintech Indus. Coatings, Inc. v. Bennette Indus., Inc., 85 F.3d 1198, 1203 (6th Cir. 1996). Because of the disruptive nature of these clauses, courts "may have to consider voiding or limiting [most favored nation clauses] if enforcement becomes inequitable." Id. (quoting Manual for Complex Litigation (Third) § 23.23 at 182 (1995)). [7] See also Connell Const. Co., Inc. v. Plumbers & Steamfitters Local Union No. 100, 421 U.S. 616, 623 & n.1 (1974) (noting that most favored nations provisions have the promise and effect of reducing or eliminating competition).[8]

In United Mine Workers v. Pennington, 381 U.S. 657, 668 (1965), the Supreme Court struck down a most-favored-nations provision in a union contract because it restricted the freedom of action in later bargaining and was, thus, anticompetitive. The Court found indefensible any MFN provision that required a party to surrender its freedom of action, advising such a provision would run afoul of antitrust laws because it would constitute a "restraint[] upon the freedom of [parties] to act according to their own choice and discretion" Id. at 668. The LMFN provision here, as abused by Defendant manufacturers' false interpretation, has the same salient characteristics of the clauses condemned in Pennington and In Re Chicken: the misuse of the LMFN ties Defendants Attorneys General's hands and surrenders their freedom to act with respect to their bargaining policies.

Moreover, while Defendants claim they have acted unilaterally with respect to invocation of their purported (yet unspecified) LMFN "rights", the facts belie this assertion. For example, in February 2007, John Long, writing on behalf of no less than six of the largest Grandfathered SPMs, demanded that the National Association of Attorneys General ("NAAG") take enforcement action

---

[7] The Manual for Complex Litigation has admonished that "the complications and even inequities which 'most favored nations' clauses almost always generate make their use undesirable" and "absent extraordinary and very special circumstances, [such clauses] should be avoided[.]" Manual for Complex Litigation, § 1.46 at 62-64 (1977).

[8] See also Reazin v. Blue Cross & Blue Shield of Kan., 899 F.2d 951, 970-71 & n. 30 (10th Cir. 1990) (holding that a jury was entitled to give credence to testimony that most favored nations provisions hindered competition, slowed down the introduction of alternative delivery systems and gave the insurer significant power over price.); In Re Chicken Antitrust Litig., 560 F. Supp. 943, 947-48 (N.D. Ga. 1979) (the impact of the most-favored-nations provision "strait-jacketed" plaintiffs, who in turn, "lost the freedom to act in their own self-interests in accordance with changing bargaining situations").

against General Tobacco.  (See Exhibit O to Amended Complaint).  Philip Morris followed up with the same demand just before the states sent its October 27, 2008 Notice Letter.  These demands resulted in Defendant manufacturers' collective "veto" of the execution of the Amended Adherence Agreement, even though the Settling States had already agreed to its terms.[9]

The Grandfathered SPMs, undaunted, continue to argue - collectively - that they have unspecified LMFN "rights" that would be triggered "if General is relieved of its obligations to 'make payments as provided' in the MSA."  (SPMs' PI Opp. at 38).  Similarly, the OPMs collectively argue that their LMFN "rights" would entitle them to some additional benefit if non-Grandfathered SPMs' terms of access were equalized with those of Grandfathered SPMs.  Nowhere in their briefs, however, do Defendant manufacturers identify or describe the LMFN "rights" to which they would be entitled.

2.    The MSA Cannot Be Practically Or Reasonably Duplicated.

The test to determine whether an essential facility is subject to being duplicated is not impossibility, but economic feasibility.  See Hecht, 570 F.2d at 992 (citing Helix Milling Co. v. Terminal Flour Mills Co., 523 F.2d 1317, 1320 (9th Cir. 1975).  It cannot be seriously disputed that there is no other, comparable conduit for entry into the entire U.S. cigarette market.  (See Bulow Suppl. Decl. ¶ 2).  A manufacturer that wishes to sell in all of the market is required to join the MSA because a substantial majority of cigarette retailers and distributors refuse to purchase or sell NPM brands.  (Id. ¶ 2; Holt Suppl. Dec. ¶¶ 15, 16).  The repeal of the ASR has made it impossible for a legally compliant NPM to gain any significant market share in the Settling States.  (Bulow Supp. Decl. ¶ 2.  As a result, an NPM's already limited access to the market has been reduced even further.  Thus, because of the MSA's liability release provision and limitation of an NPM's ability to access the

_____

[9]  The Defendants' strategy is not new.  The coordinated refusal of the Grandfathered SPMs to waive their purported LMFN "rights" when General Tobacco joined the MSA resulted in a lawsuit, filed by these same Grandfathered SPMs, seeking to set aside General Tobacco's Adherence Agreement as more favorable than their own terms.  The Kentucky Court of Appeals determined that the LMFN provision was not implicated and that the Grandfathered SPMs had no such rights to demand.  See Liggett Group, Inc. v. Commonwealth of Kentucky, 232 S.W.3d 559, 562 (Ky. App. 2007).

6

market through repeal of the ASR provision, General Tobacco is likely to prevail on its claim that the MSA has become an essential facility that cannot be practically or reasonably duplicated.

3.    Failure To Offer The MSA On Non-Discriminatory Terms To All SPMs Is An Effective Denial Of Access To The Facility.

Because the MSA is an essential facility, MSA membership must be offered to all manufacturers on an equal basis.  Yet, Defendants wholly fail to meet their burden to show why it is reasonable to discriminate against non-Grandfathered SPMs with respect to access to the MSA facility. See United States v. American Tel. & Tel. Co., 524 F. Supp. 1336, 1361 (D.D.C. 1981).[10]  General Tobacco does not seek access in the most profitable manner, as the OPMs contend (see OPMs' PI Opp. at p. 23), but rather in the manner "upon such just and reasonable terms and regulations as will, in respect of use, character and cost of services, place every such company upon *as nearly as equal plane as may be*."  United States v. Terminal R.R. Ass'n, 224 U.S. 383, 411 (1912) (emphasis added). Moreover, for an essential facilities claim to succeed, it will suffice if the terms of the offer to deal are unreasonable.  See Nobody In Particular Presents, 311 F. Supp. 2d at 1112.  The terms of the MSA unquestionably fail this fundamental test because Defendants single out General Tobacco and other non-Grandfathered SPMs for unequal treatment.  This inequity - resulting from the back-payment requirement, the grandfathered exemptions, and escrow-fund requirement - effectively operates as a refusal to deal.  See Terminal Railroad, supra.

Here, the terms of the offer are substantially different as between the Grandfathered SPMs and the non-Grandfathered SPMs like General Tobacco, even though all of these SPMs are similarly situated, i.e., they were not original signatories to the MSA.[11]  Defendants have an uphill battle of demonstrating to the Court why the unequal treatment in allowing access to the MSA is reasonable.

[10]  Defendants essentially define a level playing field as one where no other market entrants have an opportunity to gain market share.  This definition does not comport with the law.

[11]  The Kentucky Court of Appeals has recognized the inequity in the MSA arising from, among other things, the grandfather exemptions and the Plaintiff's quarterly escrow requirement.  See Liggett Group, Inc., 232 S.W.3d at 562.

See U.S. v. American Tel. & Telegraph Co., 524 F. Supp. 1336, 1348 (D.D.C. 1981).  Defendants claim the exemption was a necessary incentive to convince the Grandfathered SPMs to join the MSA. Yet, the "incentive" is the gift that keeps on giving, into perpetuity.  The effect of the inequities is that the entry fee for access to the entire market paid by General Tobacco and other non-Grandfathered SPMs is much steeper – into perpetuity - than what Grandfathered SPMs must pay.  (See Holt Suppl. Decl. ¶ 14).[12]  Such inequities run contrary to well settled authority.[13]

4.    The MSA Discriminates As To Non-Grandfathered SPMs.

Relying almost solely on Prof. Carlton's pricing analysis, Defendants question General Tobacco's true financial predicament and instead argue that General Tobacco is pricing its product well below the OPMs and Grandfathered SPMs, and therefore should be experiencing great success as a non-Grandfathered SPM.  The fundamental flaws in Prof. Carlton's analysis, however, prove this argument to be meritless.  For example, in comparing General Tobacco's prices to those of Grandfathered SPMs, Prof. Carlton fails to differentiate between segments of the discount cigarette market, which is divided into three tiers: Mid-Price, Low-Price, and Deep Discount.  (See Holt Suppl. Decl. ¶ 8; Bulow Suppl. Decl. ¶ 6).  General Tobacco's products only compete at the Deep Discount level, which requires it to sell at or near the bottom of the market's price distribution.  (Holt Suppl. Decl. ¶ 8).  Prof. Carlton's calculations, however, wrongly include Mid-Price and Low-Price cigarettes in calculating General Tobacco's price disparity from its competitors.  (Id.)  Because these much higher priced products of the Defendant manufacturers are included, Prof. Carlton's conclusions show a much higher average price for the Grandfathered SPMs and do not truly reflect Deep Discount pricing methods, General Tobacco's, which the SPMs are undercutting.  (See Holt Suppl. Decl. ¶ 9).

---

[12]  Indeed, the reason 80% of Grandfathered SPMs enjoy such a large exemption is because in the year preceding the MSA, these SPMs enacted strategies to increase their market share by 80%.  This padding of their market share was done for the sole purpose of increasing the anticipated exemptions.  (See Holt Amen. Decl. ¶ 20).

[13] For purposes of this analysis, it does not matter whether the price of access has always been unequal or changed over time, as the OPMs argue in seeking to distinguish this case from Delaware Hudson and Nobody in Particular Presents.  (See OPMs' PI Opp. at p. 24).  Here, as in Terminal Railroad Association, the price of access has never been on an equal plane for similarly situated competitors and therefore is unlawful.

Prof. Carlton also compares apples to oranges by comparing "marginal costs" in an attempt to show that General Tobacco and other non-Grandfathered SPMs really are competing on a level playing field.[14]   Focusing solely on the marginal cost of units sold by Grandfathered SPMs *after* meeting their exemptions completely ignores the $5.07 MSA cost incurred by non-Grandfathered SPMs on *each and every carton sold*.  (See Holt Suppl. Decl. ¶ 11).  In fact, Prof. Carlton's does not account for the 53% of units on which Grandfathered SPMs paid nothing to the MSA from 2000-2007.  (Id.)  This is similar to claiming that a runner who enters a marathon at the beginning of the last mile has no advantage over a runner who has run all twenty six.  (Id.)  This 53% of their cigarettes under these exemptions, the 53% head start has been worth $2.2 billion to the Grandfathered SPMs in avoided MSA costs from 1999-2007 (id.), and clearly illustrates that the playing field is anything but level.

The proper approach, given the substantial exemptions enjoyed by the Grandfathered SPMs, would be to evaluate the *average* costs of product, because even a non-Grandfathered SPM must set its prices above its average total cost to avoid losing money annually.  (Id. ¶ 12; Bulow Suppl. Decl. ¶ 6).  Marginal MSA costs for Grandfathered SPMs were virtually zero on the 53% of units sold below their grandfathered shares.  (Holt Suppl. Decl. ¶ 12).  Therefore, even if marginal MSA costs are equal on units above the grandfathered threshold for SPMs, the major disparity in average cost puts non-Grandfathered SPMs at a major competitive disadvantage that seriously threatens their long-term financial viability.  (Id.)

The Grandfathered SPMs were, on average, only required to pay $7.05 in regulatory expenses per carton in 2007.  (Holt Suppl. Decl. ¶ 14).  By contrast, non-Grandfathered SPMs such as General Tobacco were forced to pay $10.68 per carton in regulatory costs in 2007.  (Id.)  Grandfathered SPMs therefore benefited from a $3.63 regulatory cost advantage over non-Grandfathered SPMs, on average.

---

[14] Prof. Carlton admits that "[t]he Grandfathered SPMs do not have payment obligations on sales below [their] exempt shares" but nonetheless makes his conclusions as if the Grandfathered SPMs were making payments for every carton. (Carlton Decl. ¶ 13).

(Id.)  This represents cost savings to Grandfathered SPMs that equal 28% of General Tobacco's average 2007 manufacturer's price. (Id.)  A 28% savings in any industry would represent a considerable windfall and the tobacco industry is no exception.  Since General Tobacco's regulatory costs are 83% of its average sales price,  a cost disadvantage representing 28% of average price has completely crippled Plaintiff's operations and caused the recent free fall of General Tobacco's revenue and profit.  (Id.)  Without this disadvantage, 45% of General's average sales price would be available to cover all non-regulatory costs such as payroll and manufacturing, instead of 17%.  (Id.)  In short, the truth about the discriminatory effect of the exemptions cannot be hidden by manipulating data to the advantage of Defendant manufacturers.

a.   General Tobacco's Current Financial Position Is Not The Result Of Its Own Mismanagement.

The majority of Defendants' arguments are tied to a single outrageous and desperate theme: that General Tobacco - not the discriminatory affects of the MSA - created its current economic predicament.  The OPMs, again relying on Prof. Carlton, claim that General Tobacco could have covered the cost of its back payment obligation if, in 2003, it had merely increased the prices of its cigarettes by 66 cents per pack.  That single increase, the OPMs claim, would have raised over $250 million in additional revenue in 2003, thus eliminating any need for a twelve-year payment plan to cover the purported back debt.  (See OPMs' PI Opp. at 12).  This argument defies logic.  If General Tobacco had adopted such an approach in 2003, it would have experienced a significant drop in sales, not a windfall.  (See Bulow Suppl. Decl. ¶ 3; Holt Suppl. Decl. ¶¶ 6,7).  Indeed, General Tobacco did incrementally raise its prices by 42 cents (49%) per pack over three years (Holt Decl. ¶ 7), which resulted in 50% loss in sales.  (Holt Suppl. Decl. ¶¶6, 7).[15]

---

[15]  Prof. Carlton's position in this instance is unexplainable, given that experts for Philip Morris, RJ Reynolds (Prof. Carlton) and Lorillard, in the NPM Adjustment hearings estimated that eliminating the so-called NPM "cost advantage" would lead to reductions of between 60 and 72 percent of NPM market share.  Eliminating the "cost advantage" would mean all of the NPMs would be required to increase their wholesale prices approximately 29 cents/pack.  If General Tobacco were the only NPM to raise its price to this extent, as is recommended by the OPMs, it would be left with no sales at all.

The OPMs and Prof. Carlton also claim that General Tobacco's strategy of offering low prices to consumers as a way to build its market share was imprudent.  (<u>See</u> OPMs' PI Opp. at 12).  To the contrary, consumers benefit when a company passes on savings to the consumer rather than "stockpiling" profits.  Moreover, until Defendants successfully eliminated the Allocable Share provision through the amendment of the Escrow Statutes (thus eliminating the only means by which General Tobacco could compete), General Tobacco had no reason to increase its prices to the detriment of consumers.

> 5.    The Success of NPMs Are Substantially Limited Following The Repeal Of The Allocable Share Provisions.

In a futile attempt to counter General Tobacco's evidence of discriminatory application of the MSA, Defendants attempt to paint General Tobacco as having enjoyed extensive advantages as an NPM.  (<u>See</u> OPMs' PI Opp. at 20).  However, the fact that General Tobacco operated successfully for years outside the MSA does not undermine the essential facilities claim.  General Tobacco alleges, and its proof will demonstrate, that the MSA did not become an essential facility until the Escrow Statutes were amended beginning in 2004; at that time, a legally compliant NPM's regulatory costs under the Escrow Statutes dramatically rose above the Grandfathered SPMs' regulatory costs under the MSA.  (<u>See</u> Bulow Suppl. Decl. ¶ 2).  Thus, General Tobacco's success as an NPM until the Escrow Statutes were amended (coupled with the subsequent inability of legally compliant NPMs to compete with the Grandfathered SPMs) supports, rather than disproves, the essential facilities claim.[16]

Moreeover, Defendants' claim that NPMs and General Tobacco are actually benefiting from the MSA to the detriment of the Grandfathered SPMs and OPMs is riddled with inaccuracies and misrepresentations.  For example, Prof. Carlton notes that NPMs have a substantial market advantage

---

[16] The OPMs further imply that General Tobacco acted wrongfully by taking "advantage" of the Allocable Share Release in the Escrow Statutes as they were worded before the amendments.  The OPMs conveniently ignore the fact that they and the Settling States were the ones that drafted the original wording of the Escrow Statutes, as set forth in Exhibit T to the MSA.  General Tobacco built its market share while acting in compliance with these Escrow Statutes, as agreed upon by the OPMs and the Settling States.

over the OPMs and Grandfathered SPMs, which has existed ever since the initial implementation of the Escrow Statutes.  (See Carlton Decl. ¶ 38-42).  This attempt to paint the OPMs and Grandfathered SPMs as *victims* should not be countenanced.  Defendants and Prof. Carlton fail to distinguish between the viability of NPMs *prior* to the repeal of the Allocable Shares provisions, which allowed the NPMs to enjoy success in limited markets, and, after that repeal, which made it impossible for an NPM to succeed without joining the MSA.  (See Bulow Supp. Decl. ¶ 2).

Defendants also claim that because a majority of their *wholesalers* carry NPM brands, the MSA is not essential to gain access to the nationwide market.  This argument misses the point.  The empirical evidence shows that NPM cigarettes are almost entirely unavailable at the *retail* level.  (See Holt Suppl. Decl. ¶ 16; Bulow Suppl. Decl. ¶ 2).  The overwhelming denial of market access to NPM brands presented General Tobacco with an impossible choice: either be excluded from 91% of retailers as an NPM or sell at unsustainable costs as a non-Grandfathered SPM.  (Holt Suppl. Decl. ¶ 16; Bulow Suppl. Decl. ¶ 2).

6.     Defendants' Attempt To Show That General Tobacco Is Undeserving Of Equal Treatment Is Both Incorrect And Irrelevant To General Tobacco's Likelihood Of Success.

Throughout their papers, Defendant manufacturers attempt to portray General Tobacco as a renegade tobacco manufacturer that continuously "exploited" the law and the MSA for its own "competitive advantage."  (See OPMs' PI Opp. at8-16; SPMs' PI Opp.at 11-15).  This inaccurate image is an mere attempt to distract the Court from the blatant inequities of the MSA that violate the Constitution and promote anticompetitive behavior.  Indeed, as explained below, General Tobacco has always fully complied with its obligations, whether it be as an NPM prior to joining the MSA or as a SPM since joining the MSA.[17]

---

[17]  Defendant SPMs have also argued that General Tobacco's discount products are favored by young people.  To the contrary, according to BMJ Publishing Group Ltd. Marlboro is the brand choice for ages 12 and up.  See BMJ Figure 1, attached Exhibit D.

a.     General Tobacco Fully Complied With Its Obligations as an NPM.

Defendants first claim that General Tobacco failed "to make its escrow payments as a non-Participating Manufacturer." (See OPM Response, 9, SPM Response 12-13.)  In a weak attempt to bolster this unfounded argument, the OPMs rely on assertions contained in the affidavit of Gary Wilson, an expert retained by the Commonwealth of Kentucky in Liggett Group, Inc., et. al. v. Kentucky, 232 S.W.3d 559 (Ky. App. 2007),  as if Mr. Wilson were making admissions on behalf of General Tobacco.  Contrary to what the OPMs would like the Court to believe, Mr. Wilson was the expert for the Commonwealth, and not for General Tobacco.  Therefore, any statements made by him are in no way an "acknowledgment" by General Tobacco of its actions or its reasons for joining the MSA. [18]

Defendants also inaccurately claim General Tobacco could have and should have joined the MSA in 1998, thereby allowing it access to the grandfathered exemptions. (See SPMs' PI Opp. at 12). The company was founded in 1997, but was a distributor at that time and not entitled to MSA membership.  (See Third Supplemental Declaration of J. Ronald Denman ("Denman Suppl. Decl.") ¶ 2, attached as Exhibit C).

In another attempt to mislead the Court, Defendants imply that the alleged bad acts of Sun Tobacco are properly attributed to General Tobacco.  (See OPMs' PI Opp. at 9-10; SPMs' PI Opp. at 13-14).  In truth, General Tobacco acted merely as a distributor for Sun Tobacco.  (See Denman Suppl. Decl. ¶¶ 2, 3).  When it learned that Sun Tobacco was failing to fully comply with its escrow obligations, General Tobacco tried to certify itself as the manufacturer of the brands it was purchasing from Sun Tobacco so that it could fully comply with the escrow statutes obligations.  (Id.)  The States refused because General Tobacco was *not* a manufacturer and only a manufacturer could comply with

---

[18] See also SPMs' PI Opp. at 14 (The SPMs also suggest that Mr. Wilson's affidavit was submitted as evidence of General Tobacco's reasons for joining the MSA.  This is incorrect.   The affidavit was attached to the Complaint for the sole purpose of showing that the States recognize the discriminatory treatment of the MSA that favors the Grandfathered SPMs. It is not an acknowledgment of why General Tobacco joined the MSA).

the escrow statutes.  (<u>Id.</u>)  Accordingly, in early 2002, General Tobacco was forced to purchase Sun Tobacco.  By 2003, prior to joining the MSA, General Tobacco had deposited millions into escrow accounts for the various States, and was paying millions in penalties and attorneys fees to the States. (<u>Id.</u> ¶¶ 3, 8.)  To suggest that General Tobacco had any part in Sun Tobacco's alleged failure to make its escrow payments is misleading and completely unsupported.

The Defendants also misleadingly suggest that General Tobacco failed to pay into escrow on all of its sales, prior to joining the MSA in 2004.  (<u>See</u> OPMs' PI Opp. at 10; SPMs' PI Opp. at 12-14). General Tobacco had approximately $78 million in escrow at the time it joined the MSA in 2004, the amount required under the then existing Escrow Statutes.  (<u>See</u> Com. at ¶ 150, Am. Com. at ¶ 160; Denman Suppl. Decl. ¶ 7).  In mid-2004, however, the states repealed the allocable shares provision, making the repeal retroactive, which left General Tobacco with a shortfall for that year.  General Tobacco could not have foreseen, at the beginning of the year, that the States would repeal the allocable shares provisions requiring additional funds to be paid into escrow**.**  (<u>See</u> Holt Am. Decl. [DE 226] at ¶¶ 12-14; Bulow Decl. [DE 15-2] at ¶¶ 37-40; Denman Suppl. Decl. ¶ 7).  General Tobacco complied with the very statute (MSA Exhibit T) that <u>had been drafted</u> and agreed upon by the OPMs and Settling States that dictated General Tobacco's escrow payments to total approximately $78 million in 2004.  To claim that General Tobacco's inability to predict the future and the repeal of the allocable share provision was somehow a "violation" (OPM's PI Opp. at 10) of its escrow obligations is patently false and not supported by the evidence.

          b.      <u>General Tobacco Fully Complied With Its Obligations As An SPM.</u>

The Defendant manufacturers would also have this Court believe that General Tobacco has repeatedly defaulted on its MSA obligations since joining in 2004.  <u>Id.</u>  General Tobacco does not deny that once it joined the MSA and had access to the "confidential" PriceWaterhouse Coopers information, it quickly realized how onerous the MSA's payment terms were, especially in light of the substantial benefits offered to the Grandfathered SPM competitors.  The truth is, however, that General

14

Tobacco had entered into a Forbearance Agreement with the Settling States on August 18, 2006, <u>prior to</u> the payment being due, to arrange alternatives for paying the full $17 million on August 30, 2006. Moreover, General Tobacco always made arrangements in advance to pay any anticipated shortfall in other MSA payments, with interest, on terms agreed upon by the Settling States. Therefore, General Tobacco has fully complied with terms agreed to by the Settling States for payment of purported MSA obligations.

<u>Conclusion</u>

General Tobacco is likely to succeed on its claim that the MSA constitutes an essential facility and that the Defendant manufacturers have conspired to exploit and misuse the LMFN provision to improperly control the facility. Prof. Carlton's flawed analysis cannot salvage Defendants' otherwise meritless arguments. The Court should, therefore, grant General Tobacco's motion for preliminary injunctive relief.

Respectfully submitted,

/s/ John K. Bush.
John K. Bush
Christie A. Moore
Helen A. Thompson
Brigid O. Gies
GREENEBAUM DOLL & McDONALD PLLC
3500 National City Tower
Louisville, KY 40202
(502) 589-4200

COUNSEL FOR PLAINTIFF,
VIBO CORPORATION, INC.
D/B/A GENERAL TOBACCO

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of December, 2008, I served the foregoing on all counsel of record identified below in the manner specified, via transmission of Notice of Electronic Filing generated by CM/ECF to the following:

**ALABAMA**
James M. Steinwinder
Assistant Attorney General
Office of Attorney General
500 Dexter Avenue
Montgomery, AL 36130
334.353.9131
jsteinwinder@ago.state.al.us

**ALASKA**
Chris Poag
Assistant Attorney General
P.O. Box 110300
Juneau, AK 99801
907.465.4132
Chris.poag@alaska.gov

**ARIZONA**
Kelly M. Peloquin
Ann Uglietta
Assistant Attorney General
Arizona Attorney General's Office
1275 W. Washington Street
Phoenix, AZ 85007-2926
317.232.6239
Kelly.peloquin@azag.gov
Ann.uglietta@azag.gov

**ARKANSAS**
Eric B. Estates
Regina Harelson
Assistant Attorney General
323 Center Street, Ste 200
Little rock, AR 72201
501.682.8090
Eric.estes@arkansasag.gov

**CALIFORNIA**
Michelle Hickerson
Deputy Attorney General
Public Rights Division
110 W. A Street, Ste 1100
San Diego, CA 92101
Michelle.hickerson@doj.ca.gov

**COLORADO**
Brian L. Laughlin
Assistant Attorney General
Tobacco Settlement Enforcement
Colorado Department of Law
1525 Sherman Street – Seventh Floor
Denver, CO 80203
303.866.3994
303.866.4916 (fax)
Brian.laughlin@state.co.us

**CONNECTICUT**
Rupal Shah Palanki
Asst. Attorney General
Office of the Attorney General
55 Elm Street, P O Box 0120
Hartford, CT 6141-0120
860.808.5270
860.808.5385 (fax)
Rupal.shahpalanki@po.state.ct.us

**DELAWARE**
Thomas Brown
Deputy Attorney General
Delaware Deputy of Justice
820 North French Sate 6th Floor
Wilmington, DE 19801
302.577.8400
thomase.brown@state.de.us

**DISTRICT OF COLUMBIA**
Brian R. Caldwell
Asst. Attorney General
Office of the Attorney General
  For the District of Columbia
4441 Fourth Street, NW Ste 650 N
Washington, TC  20001
202.727.6211
Brian.caldwell@dc.gov

**GEORGIA**
Sidney R. Barrett, Jr.
Senior Asst. Attorney General
Robin G. Cohen
Asst. Attorney General
Office of the Attorney General
40 Capital Square, SW
Atlanta, GA 30334
404.656.3202
404.656.4190
sbarrett@law.ga.gov
rcohen@law.ga.gov

**HAWAII**

**IDAHO**
Brett t. DeLange
Deputy Attorney General
State of Idaho
Consumer Protection Division
954 W. Jefferson, 2nd Floor
Boise, ID 83702
P.O. Box 83720
Boise, ID 83720-0010
208.334.2424
Brett.delange@ag.idaho.gov

**ILLINOIS**
Marylyn A. Keuper
Chief, Tobacco Enforcement Bureau
Office of the Attorney
500 S. 2nd Street
Springfield, IL 62706
217.785.8541
217.524.4701 (fax)
mkueper@atg.state.il.us

**INDIANA**
Lawrence J. Carcare II
Deputy Attorney General
Tobacco Enforcement
IGC-South, 5th Floor
302 W. Washington Street
Indianapolis, IN  46204
Lawrence.carcare@atg.in.gov

**IOWA**
Kristie Remster Orme
McDowell, Rice, Smith & Buchanan, PC
605 W. 47th Street, Ste 350
Kansas City, MO 64112-1905
korme@mcdowellrice.com

**KANSAS**
Patrick Broxterman, Director
Tobacco Enforcement Unit
120 SW 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
785.368.8452
Patrick.broxterman@ksag.org

**KENTUCKY**
Hon. Michael Plumley
James M. Herrick
Hon. Tad Thomas
Office of the Attorney General

**LOUISIANA**
Patricia H. Wilton
Asst. Attorney General
Sanettria Pleasant (phone contact person)
Asst. Attorney General

17

Office of Civil & Environmental Law
The Capital Building
700 Capital Avenue, Ste 118
Frankfort, KY 40601
Phone:  502.696.5627
Email:  michael.plumley@ag.ky.gov
        james.herrick@ag.ky.gov
        tad.thomas@ag.ky.gov


Gary D. Wilson
4636 30th Street
Washington, DC 20008-2127
202.362.7417
202.362.7417 (fax)
gary.d.wilson@verizon.net


**MAINE**
Jennifer A. Willis
Asst. Attorney General
Consumer Protection Division
Burton M. Cross Office Bldg.
111 Sewall Street
Augusta, ME 04333
jennifer.willis@maine.gov


**MASSACHUSETTS**
Elizabeth J. Koenig
Asst. Attorney General
Consumer Protection Division
Public Protection Bureau
One Ashburton Place
Boston, MA 02108
617.727.2200


**MISSOURI**
Curtis R. Stokes
Asst. Attorney General
P.o. Box 899
Jefferson City, MO 65102
573.751.1143
Curt.stokes@ago.mo.gov


**NEBRASKA**
Lynne R. Fritz
Asst. Attorney General
Nebraska Attorney General's Office

Tobacco Settlement Enforcement Unit
Louisiana Dept. of Justice
1885 N. Third Street, 4th Floor
P.O. Box 94005
Baton Rouge, LA 70804-9005
225.326.6300
225.326.6423 (Sanettria direct)
225.326.6495 (fax)
wiltonp@ag.state.law.us
pleasants@ag.state.la.us


**MARYLAND**
David Lapp, Chief Counsel
Tobacco Enforcement Unit
Office of the Attorney General of
Maryland
200 St. Paul Place, 20th Floor
Baltimore, MD 21202
410.576.7056
dlapp@aog.md.us


**MICHIGAN**
Brian D. Devlin
Administrative Law Section
P.O. Box 30212
Lansing, MI 48909
517.373.1123
devlinb@michigan.gov


**MONTANA**
Mark McLaverty
Montana Dept. of Justice
215 North Sanders
P.O. Box 201401
Helena, MT 201401
406.444.9514
mmclaverty@mt.gov


**NEVADA**
Victoria Thimmesch Oldenburg
Senior Deputy Attorney General
5420 Kietzke Lane, Ste 202

18

2115 State Capitol
PO Box 98920
Lincoln, NE 68509-8920
Lynne.fritz@nebraska.gov

**NEW HAMPSHIRE**
David A. Rienzo
Asst. Attorney General
Richard W. Head
Asst. Attorney General
33 Capitol Street
Concord, NH 03301
603.271.1249
david.rienzo@doj.nh.gov
richard.head@doj.nh.gov

**NEW MEXICO**
David K. Thomson
Deputy Attorney General
New Mexico Attorney General's Office
408 Galisteo Street
P.O. Drawer 1508
Santa Fe, NM 87504-1508
dthomson@nmag.gov

**NORTH CAROLINA**
Melissa L. Trippe
Special Deputy Attorney General
Richard L. Harrison
Special Deputy Attorney General
North Carolina Dept. of Justice
P O Box 629
114 W. Edenton St., 3rd Floor
Raleigh, NC 27602
919.716.6900
mtrippe@ncdoj.gov
rharris@ncdoj.gov

**OHIO**
Susan C. Walker
Asst. Attorney General
Chief, Tobacco Enforcement Section
30 E. Broad Street, 16th Floor
Columbus, OH 43215-3428
614.387.5600
614.397.5599 (fax)
scwalker@ag.state.oh.us

Reno, NV 89511
775.688.1818
voldenburg@ag.nv.gov

**NEW JERSEY**
Carol B. Jacobson
Sr. Deputy Attorney General
124 Halsey Street
PO Box 25029
Newark, NJ 07101
973.648.4447
carol.jacobson@dol.lps.state.nj.us

**NEW YORK**
Dana Biberman
Christine E. Morrison
Asst. Attorney Generals
Chief, Tobacco Compliance Bureau
120 Broadway, 25th Floor
New York, NY 10271
dana.biberman@oag.state.ny.us
christine.morrison@oag.state.ny.us

**NORTH DAKOTA**
Douglas A. Bahr
Solicitor General
Office of Attorney General
500 North 9th Street
Bismark, NJ 58501-4509
701.328.3640
dbahr@nd.gov

**OKLAHOMA**
E. Clyde Kirk
Asst. Attorneys General
Tobacco Enforcement Unit
313 Northeast 21st Street
Oklahoma City, OK 73105
405.521.3921
405.522.4534 (fax)
clyde.kirk@oag.ok.gov

**OREGON**
Lisa M. Udland
Asst. Attorney General
Oregon Dept. of Justice
1162 Court Street NE
Salem, OR 97301-4096
503.934.4400
503.373.7067 (fax)
lisa.udland@doj.state.or.us

**RHODE ISLAND**
Maureen G. Glynn
Asst. Attorney General &
Health Care Advocate
Rhode Island Dept. of Attorney General
150 S. Main Street
Providence, RI 02903-2907
401.274.4400, ext 2301
401.222.2995 (fax)
mglynn@riag.state.ri.us

**SOUTH DAKOTA**
Patricia Archer
Asst. Attorney General
South Dakota Attorney General's Office
1302 E. Highway 14, Suite 1
Pierre, SD 57501-8501
Pat.archer@state.sd.us

**UTAH**
Katherine H. Kinsman
Asst. Attorney General
160 E. 300 South, 5th Floor
P O Box 140857
Salt Lake City, UT 84114-0857
kkinsman@utah.gov

**VIRGINIA**
William E. Thro
Special Counsel
Office of the Attorney General
Christopher Newport University
1 University Place
Newport News, VA 23606
757.594.7571

**PENNSYLVANIA**
Joel M. Ressler
Chief Deputy Attorney General
Chief, Tobacco Enforcement Section
P O Office of the Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120
717.783.1794
jressler@attorneygeneral.gov

**SOUTH CAROLINA**
T. Parkin Hunter
Jonathan B. Williams
Asst. Attorney Generals
Office of the Attorney General
State of South Carolina
P O BXO 11549
Columbia, SC 29211-1549
803.734.3680
phunter@ag.state.sc.us
jwilliams@ag.state.sc.us

**TENNESSEE**
Rebekah A. Baker, Asst Attorney General
John H. Sinclair, Jr.
Asst. Attorney General
Stephen R. Butler,
Asst. Attorney General
Office of the Attorney General & Reporter
State of Tennessee
P.O. Box 20207
Nashville, TN 37202

**VERMONT**
Christy Taylor Mihaly
Asst. Attorney General
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609-1001
cmihaly@atg.state.vt.us

**WASHINGTON**
Robert J. Fallis
Asst. Attorney General
Administration Division
Washington Attorney General's Office
800 5th Avenue, Ste 2000, TB-14
Seattle, WA 98104-3188
rustyf@atg.wa.gov

757.594.7864 (fax)
wthro@cnu.edu

**WEST VIRGINIA**

**WISCONSIN**
Christopher J. Blythe
Asst. Attorney General
Wisconsin Dept. of Justice
17 W. Main Street
P.O. Box 7857
Madison, WI 53707-7857
blythecj@coj.state.wi.us

**WYOMING**
Douglas J. Moench
Senior Asst. Attorney General
Kenneth Miller
Asst. Attorney General
Wyoming Attorney General's Office
123 Capitol Avenue
Cheyenne, WY 82002
dmoenc@state.wy.us
kmille2@state.wy.us

**AMERICAN SAMOA**

**GUAM**
**PUERTO RICO**

**NORTHERN MARIANA ISLANDS**
**US VIRGINI ISLANDS**

**COMMONWEALTH BRANDS, INC.**
Robert J. Brookhiser
Elizabeth B. McCallum
Howrey, LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004-2402
202.383.6958
202.383.7336
202.257.3541 (McCallum cell)
202.383.6610 (fax)
brookhiserb@howrey.com
mccallumb@howrey.com

**PREMIER MANUFACTURING**
Robert J. Brookhiser
Elizabeth B. McCallum
Howrey, LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004-2402
202.383.6958
202.383.7336
202.257.3541 (McCallum cell)
202.383.6610 (fax)
brookhiserb@howrey.com
mccallumb@howrey.com

Merrill S. Schell
WYATT, TARRANT & COMBS, LLP
2800 PNC Plaza
500 W. Jefferson St.
Louisville, KY 40202
502.589.5235
502.589.0309 (fax)
mschell@wyattfirm.com

**LORILLARD ("OPM")**
Irving Scher

**RJ REYNOLDS ("OPM")**
Steve Patton

Lee Vanvoorhis
Idit Froim
Weil Gotshal & Manges LLP
767 5th Avenue
New York, NY 10153
212.310.8120
917.825.7279 (cell)
212.310.8007 (fax)
Irving.scher@weil.com
Lee.vanvoorhis@weil.com
Idit.froim@weil.com

Charles S. Cassis
Theresa A. Canaday
Frost Brown Todd LLC
400 W. Market Street, 32nd Floor
Louisville, KY 40202
502.589.5400 (main)
568.0233 (direct)
502.581.1087 (fax)
ccassis@fbtlaw.com
tcanaday@fbtlaw.com

**LIGGETT GROUP, LLC ("SPM")**
Robert J. Brookhiser
Elizabeth B. McCallum
Howrey, LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004-2402
202.383.6958
202.383.7336
202.257.3541 (McCallum cell)
202.383.6610 (fax)
brookhiserb@howrey.com
mccallumb@howrey.com

Merrill S. Schell
WYATT, TARRANT & COMBS, LLP
2800 PNC Plaza
500 W. Jefferson St.
Louisville, KY 40202
502.589.5235
502.589.0309 (fax)
mschell@wyattfirm.com

Douglas G. Smith
Elli Leibenstein
Barack Echols
Kirkland & Ellis LLP
200 E. Randolph Drive
Chicago, IL 60601-6636
312.861.2406 (direct)
312.861.2000 (main)
312.861.2200 (fax)
spatton@kirkland.com
dsmith@kirkland.com
eleibenstein@kirkland.com
bechols@kirkland.com

Charles S. Cassis
Theresa A. Canada
Frost Brown Todd LLC
400 W. Market Street, 32nd Floor
Louisville, KY 40202
502.589.5400 (main)
568.0233 (direct)
502.581.1087 (fax)
ccassis@fbtlaw.com
tcanaday@fbtlaw.com

**PHILLIP MORRIS, USA, Inc. ("OPM")**
Charles S. Cassis
Theresa A. Canaday
Frost Brown Todd LLC
400 W. Market Street, 32nd Floor
Louisville, KY 40202
502.589.5400 (main)
568.0233 (direct)
502.581.1087 (fax)
ccassis@fbtlaw.com
tcanaday@fbtlaw.com

Douglas L. Wald
Michael B. Bernstein
Eric Shapland
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004-1206
202.942.5000 (wk)
202.942.5999 (fax)
Douglas.Wald@aporter.com
Michael.B.Bernstein@aporter.com
Eric.Shapland@aporter.com

**VECTOR ("SPM")**
Robert J. Brookhiser
Elizabeth B. McCallum
Howrey, LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004-2402
202.383.6958
202.383.7336
202.257.3541 (McCallum cell)
202.383.6610 (fax)
brookhiserb@howrey.com
mccallumb@howrey.com


      And I also hereby certify that on this 1st  day of December, 2008, I served the foregoing on all defendants identified by their email addresses below:

'brett.delange@ag.idaho.gov'; 'beth.kittelmann@ag.idaho.gov';
'james.herrick@ag.ky.gov'; 'gary.d.wilson@verizon.net'; 'dennis.hansen@ag.state.ar.us';
'bmeyer@ag.state.ia.us'; 'dstanle@ag.state.ia.us'; 'jambroz@ag.state.ia.us';
'korme@mcdowellrice.com'; scwalker@ag.state.oh.us; 'hannamang@ag.state.la.us';
pleasants@ag.state.la.us; phillipst@ag.state.la.us; wiltonp@ag.state.la.us;
cmihaly@atg.state.vt.us; 'swalker@ag.state.oh.us'; 'AGDSpencer@ag.state.sc.us';
'aqueen@ag.state.sc.us'; 'phunter@ag.state.sc.us'; 'Daniel.Hall@ago.mo.gov';
'Earl.Kraus@ago.mo.gov'; 'gregory.barnes@ago.mo.gov'; 'lynne.fritz@ago.ne.gov';
'jafarshee@ago.state.al.us'; 'cravanelli@ago.state.nm.us'; 'dthomson@ago.state.nm.us';
'eric.estes@arkansasag.gov'; 'jim.depriest@arkansasag.gov'; 'mkueper@atg.state.il.us';
'donna.learned@atg.in.gov'; 'lawrence.carcare@atg.in.gov'; 'jbrill@atg.state.vt.us';
'CamC1@atg.wa.gov'; 'David.Hankins@atg.wa.gov'; 'DougV@atg.wa.gov';
'rustyf@atg.wa.gov'; 'jressler@attorneygeneral.gov'; 'bennett.rushkoff@dc.gov';
'cathy.thurstonseignious@dc.gov'; 'dennis.eckhart@doj.ca.gov';
'michelle.hickerson@doj.ca.gov'; "edavis@doj.gov.vi'; 'mphelan@doj.gov.vi';
'ppaquin@doj.gov.vi'; 'david.rienzo@doj.nh.gov'; Richard.head@doj.nh.gov;
'lisa.udland@doj.state.or.us'; 'blythecj@doj.state.wi.us'; 'gibsoncj@doj.state.wi.us';
'wellslk@doj.state.wi.us'; 'christopher.roy@dor.state.wi.us'; 'tobacco@ksag.org';
Patrick.broxterman@ksag.org; 'Greg.Harkenrider@ky.gov'; 'jmichael.jones@ky.gov';
'Mary.Lassiter@ky.gov'; 'chris_poag@law.state.ak.us';
'cynthia_drinkwater@law.state.ak.us'; 'Alex.R.Barrett@hawaii.gov';
'Earl.R.Hoke@hawaii.gov'; jennifer.willis@maine.gov; 'hackneycd@michigan.gov';
mmclaverty@mt.gov; 'ctweeten@mt.gov'; mmclaverty@mt.gov; 'kosullivan@mt.gov';
'abarefoo@ncdoj.gov'; rharris@ncdoj.gov;  'jbkelly@ncdoj.gov'; 'Klong@ncdoj.gov';
'lemory@ncdoj.gov'; 'mtrippe@ncdoj.gov'; 'rharris@ncdoj.gov';
'mtrestman@oag.state.md.us'; 'clayton_eubanks@oag.state.ok.us';
'phil_stambeck@oag.state.ok.us'; 'ryan_chaffin@oag.state.ok.us';
'gconover@oag.state.va.us'; 'mwyatt@oag.state.va.us';
'wade.hope@revenue.alabama.gov'; 'jlee@riag.ri.gov'; 'kkinsman@utah.gov';
'John.Dalporto@wvago.gov'; 'Joelyn.Gast@iowa.gov'; 'jdiaz@justicia.gobierno.pr';
'laaparicio@justicia.gobierno.pr'; 'nramos@justicia.gobierno.pr';
'janis_hales@revenue.state.ak.us'; 'johanna_bales@revenue.state.ak.us';

'mglynn@riag.state.ri.us'; 'brian.laughlin@state.co.us'; 'jan.zavislan@state.co.us';
'thomase.brown@state.de.us'; pat.archer@state.sd.us; 'daniel.champney@ag.tn.gov';
'rebekah.baker@ag.tn.gov'; 'dmoenc@state.wy.us'; 'kmille2@state.wy.us;
ann.uglietta@azag.gov; kelly.peloquin@azag.gov; 'michael.plumley@ag.ky.gov';
'tad.thomas@ag.ky.gov'; 'attorney.general@state.co.us'; wthro@cnu.edu;
jwilliams@ag.state.sc.us;'rupal.shahpalanki@po.state.ct.us'; voldenburg@ag.nv.gov;
'law@guamattorneygeneral.com'; 'chris.poag@alaska.gov'; 'miag@michigan.gov';
'info@scattorneygeneral.com'; 'greg.abbott@oag.state.tx.us'; 'uag@utah.gov';
'atginfo@atg.state.vt.us'; 'kelly.ayotte@doj.nh.gov'; 'smoore@ncdoj.gov';
'kbergeron@riag.ri.gov'; curt.stokes@ago.mo.gov; 'jeanne.young@wvago.gov';
'attorney.general@state.co.us'; 'attorney.general@state.de.us'; 'smoore@ncdoj.gov';
'dena.spaulding@doj.state.or.us'; 'vfrazer@doj.vi.gov'; 'dthomson@nmag.gov';
'clarson@ag.state.ia.us'; 'janet.carter@ag.idaho.gov'; 'linda.mcewen@state.mn.us';
thomas.overton@state.mn.us; 'eric.estes@arkansasag.gov'; 'troyking@ago.state.al.us';
jsteinwinder@ago.state.al.us; 'sbarrett@law.ga.gov'; rcohen@law.ga.gov;
'mwebb@ago.state.ms.us'; 'rchaffin@oag.ok.gov'; clyde.kirk@oag.ok.gov;
'carol.jacobson@dol.lps.state.nj.us'; cathy.melitski@dol.lps.state.nj.us;
'Dana.Biberman@oag.state.ny.us'; 'christine.morrison@oag.state.ny.us';
'jlong@lvbrands.com'; 'mbell@vectorgroupltd.com'; 'neal.beaton@hklaw.com';
'barry@bboren.com'; 'mark@gopremier.com'; 'Rnuckolls@mckennalong.com';
'stanleyfriedman@mcf-esq.com'; 'nallard@pattonboggs.com';
'denise.keane@pmusa.com'; 'Douglas.Wald@aporter.com';
michael.b.bernstein@aporter.com; eric.shapland@aporter.com; 'irving.scher@weil.com';
'lee.vanvoorhis@weil.com'; 'ldit.Froim@weil.com'; 'mark@gopremier.com';
'gbaka79@yahoo.com'; 'ggahan@altadis.com'; 'jean-dominique.comolli@altadis.com';
'jack_henson@laneltd.com'; 'dlapp@oag.state.md.us'; 'jpcarriere@altadis.com';
'attysmiami@aol.com'; 'dhanrajusa@aol.com'; 'RALNASCO@aol.com';
'rangiuoli2@aol.com'; 'robwilkey@aol.com'; 'heatherj.wilson@po.state.ct.us';
'joseph.rubin@po.state.ct.us'; 'Rupal.ShahPalanki@po.state.ct.us'; 'barry@bboren.com';
'avramstc@bellsouth.net'; 'hcroemer@bellsouth.net'; 'sb@bolattigriffith.com';
'info@chancellor-tobacco.com'; 'mark@cigarettetobacco.com';
'juridico@citatabacos.com'; 'darce@compass.com.ph'; 'bunjoto.astono@djarum.com';
'grace.t.sennelius@djarum.com'; 'rachman.satya@djarum.com'; 'sigold@drl-ent.com';
'zrashwan@easternegypt.com'; 'info@farmerstobacco.com';
'jennifer@farmerstobacco.com'; 'davidchor@gdgroupinc.com';
'dominicchu@gdgroupinc.com'; 'mark@gopremier.com'; 'scoleman@gopremier.com';
'ayh@harksco.com'; 'nbeaton@hklaw.com'; 'brian.caldwell@dc.gov';
'brookhiserb@howrey.com'; 'mccallumb@howrey.com'; 'arnoldh3151@ipass.net';
'sdaniel@ipass.net'; 'amarks@kasowitz.com'; 'spatton@kirkland.com';
dsmith@kirkland.com; eleibenstein@kirkland.com; bechols@kirkland.com;
'bhavani.parameswar@kmm-inc.com'; 'markcassar@kretek.com';
'mikehousego@kretek.com'; 'seancassar@kretek.com'; 'jginsburg@levin-ginsburg.com';
'jweis@levin-ginsburg.com'; dbahr@nd.gov;'bgarner@libertybrandsllc.com';
'sfeit@libertybrandsllc.com'; 'acalso@lignum2.com'; 'kirinaga@lignum2.com';
'tmeyer@lignum2.com'; 'bmcginn@lortobco.com'; 'jlong@lvbrands.com';
'annette.boye@mac-baren.com'; 'per.buch@mac-baren.com'; 'stanleyfriedman@mcf-esq.com'; 'rnuckolls@mckennalong.com'; 'exportaciones@montepaz.com.uy';
'jamesnooney@montepaz.com.uy'; 'moldes@montepaz.com.uy'; 'abrams52@msn.com';
's-m-johnson@msn.com'; 'wrtco@msn.com'; 'PLEVIN@NAAG.ORG';

'lcarbone@natsherman.com'; 'rmaraia@natsherman.com'; 'jlopezm@palermo.com.py';
'nallard@pattonboggs.com'; 'obermann@planta-tobacco.de'; 'rau@planta-tobacco.de';
'wiesenhuetter@planta-tobacco.de'; 'Anthony.Reale@pmusa.com';
'Blake.p.Auchmoody@pmusa.com'; 'denise.keane@pmusa.com';
'Emmitt.n.davis@pmusa.com'; 'poeschl@poeschl-tobacco.com';
'dspitzer@proskauer.com'; 'winnersales@qwest.net'; 'mckimt@rjrt.com';
'jfranzino@sfntc.com'; 'mjohnson@sfntc.com'; 'william.hunter@skofirm.com';
'dana.m.papillion@us.pwc.com'; 'ryan.harrell@us.pwc.com'; 'cathanasia@usthq.com';
'rkohlberger@usthq.com'; 'fferguson@valottery.com'; 'mbell@vectorgroupltd.com';
'dumbreit@von-eicken.com'; 'umbreit@von-eicken.com'; 'mgkoplow@wlrk.com';
'inttobacco@yahoo.com'; 'shigeru_jr@yahoo.com'; mschell@wyattfirm.com;
ccassis@fbtlaw.com; tcanaday@fbtlaw.com;

 /s/ John K. Bush_____
COUNSEL FOR PLAINTIFF
VIBO CORPORATION, INC., d/b/a
GENERAL TOBACCO

3125391_3.doc