UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CIVIL ACTION NO. 08-571-C

VIBO CORPORATION, INC.,                                                    PLAINTIFF,

V.                              MEMORANDUM OPINION AND ORDER

JACK CONWAY, ET AL.,                                                    DEFENDANTS.

* * * * * * * * * *

This matter is before the court upon motions to dismiss filed by the various

defendants and one motion to quash service.[1]  These motions are: (1) motion to

dismiss complaint filed by defendants Lorillard Tobacco Co., Philip Morris, Inc., and

R.J. Reynolds Tobacco Co. (DE 154); (2) motion to dismiss filed by defendants

Commonwealth Brands, Inc., Imperial Tobacco Limited/ITL, Japan Tobacco

International USA, Inc., King Maker Marketing, Lane Limited, Liggett Group, LLC,

Lignum-2, Inc., P.T. Djarum, Premier Manufacturing Inc., Santa Fe Natural Tobacco

Co., Sherman's 1400 Broadway N.Y.C., Inc., Top Tobacco, LP, and Vector

Tobacco, Inc. (DE 156); (3) motion to dismiss for lack of subject-matter jurisdiction

and failure to state a claim by defendant Jack Conway, Attorney General of

Kentucky (DE 149); (4) motion to dismiss for lack of personal jurisdiction and

_____

[1]After these motions were filed, but before the plaintiff filed its responses, the
plaintiff filed an Amended Complaint ("Am. Compl.").  The parties concede that the
motions to dismiss apply equally to the Complaint (DE 1) and the Amended
Complaint (DE 234).  The court therefore addresses its attention to the Amended
Complaint.

improper venue and contingent joinder in defendant Conway's motion to dismiss by the Attorneys General of the remaining forty-five states, five territories, and the District of Columbia (DE 208); (5) motion to dismiss for improper service of process by defendant Peter Nickles (DE 210); and (6) motion to quash purported service on defendant Jeremiah W. Nixon (DE 215).

I.     **Background**[2]

In the mid-1990s a number of states sued the four largest tobacco manufacturers in the United States.[3]  The states' claims "centered on allegations that the manufacturers targeted youth in their advertising; knew of, controlled, and failed to disclose research into harmful effects of cigarette smoke; and knew nicotine in cigarettes was addictive and marketed their cigarettes with those addictive properties in mind."  Am. Compl.¶105.  In 1998, the parties resolved the litigation and signed the Master Settlement Agreement ("MSA").

The MSA originally was negotiated by eight states' Attorneys General and then was released to other states so that they might decide whether they wished to join it.  *Id.* ¶¶ 109, 110.  Additional states took action to enjoy the benefits of

---

[2]The court will take the plaintiff's factual allegations as true for purposes of this motion to dismiss. *See Erickson v. Pardus*, — U.S. —, —, 127 S.Ct. 2197, 2200 (2007) (noting, "when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint" (citations omitted)).

[3]These companies were Philip Morris, Inc. ("Philip Morris"), R.J. Reynolds Tobacco Co. ("Reynolds"), Brown & Williamson Tobacco Corp. ("B&W"), and Lorillard Tobacco Co. ("Lorillard.").  Reynolds subsequently acquired B&W. Am. Compl. ¶ 3 n.3.

the MSA, and a total of fifty-two states and territories, through their Attorneys General, eventually signed on to the MSA.  These states are collectively known as the "Settling States."[4]  Kentucky, like other Settling States without a case already pending against the tobacco manufacturers, instigated litigation and then settled it by asking a state court to enter an agreed order approving the MSA and dismissing with prejudice the state's claims.  *Id.* ¶ 119.  According to the terms of the MSA, in return for a tobacco manufacturer's agreement to the terms of the MSA, which included making substantial payments to the Settling States, a state agreed to release the company from all claims arising out of certain past and future conduct relating to its tobacco manufacturing business.  *See* MSA § II(nn) (defining "released claims" and listing all types of conduct for which a manufacturer was released from liability).[5]  Those manufacturers agreeing to the MSA are known as "Participating Manufacturers" ("PMs").  The four tobacco companies that were sued in the initial lawsuits and with which the states reached the initial settlement are known as the Original Participating Manufacturers ("OPMs").  Those that joined the MSA later are known as Subsequent Participating Manufacturers ("SPMs").

---

[4]The Settling States include 46 states (all states except Florida, Minnesota, Mississippi, and Texas), five territories (American Samoa, Guam, Northern Mariana Islands, Puerto Rico, and the Virgin Islands), and the District of Columbia.

[5]The Master Settlement Agreement was attached as Exhibit A to the plaintiff's amended complaint.  It is also available on the website of the National Association of Attorneys General (NAAG) at http://www.naag.org/backpages/naag/tobacco/msa/msa-pdf/1109185724_1032468605_cigmsa.pdf.

The OPMs feared that by signing the MSA, and thus incurring significant costs that would require an accompanying price increase of their products, they would be creating a significant market opportunity for tobacco manufacturers that did not sign the MSA.  Am. Compl. ¶ 127.  That is, the OPMs anticipated that those companies who did not sign (known as Non-Participating Manufacturers, or "NPMs") and thus had no payment obligations would be able to price their products below the OPMs' market price, thereby taking sales away from the OPMs.  *Id.*  In order to address these concerns and encourage participation in the MSA by tobacco companies other than the OPMs, the Settling States agreed to several provisions of the MSA.  *Id.*  It is these aspects of the MSA that give rise to the instant plaintiff's claims.

First, the Settling States agreed to release claims not only against the PMs but also against tobacco retailers, suppliers, and distributors to the extent of their dealings in the PMs' products.  *See* MSA § II(oo) (defining "released parties" to include suppliers, retailers, and distributors of the PMs' products).  This provision encouraged sellers of tobacco products to carry only products made by PMs.  *See* Am. Compl. ¶ 128.

Second, to ensure that those companies not participating in the MSA have financial obligations to the states similar to those of the companies that are participating, the MSA includes a mechanism designed to equalize the potential profits of PMs and NPMs.   The MSA provides that the states may enact "Escrow Statutes" or "Qualifying Statutes."  *See* MSA § IX(d)(2).  In general terms, the

4

Escrow Statute of a state obligates the tobacco companies that do not sign the MSA (NPMs) to make annual deposits into an escrow account, based on their sales volume in the state.  *See id.*  The principal amounts are held in escrow for twenty-five succeeding years and, if there is no judgment against or settlement with a particular NPM on certain kinds of claims, the amounts remaining in escrow are to be returned to that NPM.  *See* Am. Compl. ¶ 143; *see also* Am. Compl., Exhibit A, MSA, Exhibit T, Model Statute.  However, as originally enacted, the Escrow Statutes allowed an NPM to obtain a refund of the amount paid into escrow, to the extent that the amount paid to a state by the NPM exceeded the amount it would have paid that state under the MSA.[6]  Am. Compl.¶ 146.  This characteristic of the statutory scheme made it possible for an NPM to operate profitably by concentrating its business in only a few states.  *Id.*  States, including Kentucky, have enacted amendments to their Escrow Statutes in order to address this situation.  *Id.* ¶ 147; *see, e.g.*, KRS § 131.604 *et seq.*

---

[6]The defendant Attorney General of Kentucky has provided the following explanation for how the mechanism worked:

> Every Participating Manufacturer makes a single annual settlement payment based on its total shipments or sales of cigarettes in the United States during the previous year. That payment is allocated among Settling States according to percentages for each State ("Allocable Share"), which Allocable Share bears no relationship to the PM's actual sales in the State. The original Escrow Statutes, however, allowed each NPM to obtain an immediate release of any excess (a) of its annual escrow deposit for sales in a State over (b) what would have been the State's Allocable Share of the hypothetical MSA payment the NPM would have made for those sales had it been an SPM. This could effectively eliminate an NPM's escrow obligation. For example, an NPM that made 50 percent of its cigarette sales in Kentucky could obtain a release of the difference between (a) an escrow deposit based on 50 percent of its sales and (b) Kentucky's Allocable Share of 1.7611586% of the NPM's total sales, which difference would result in a release of about 96.5 percent of the NPM's escrow deposit in Kentucky.

DE 149, p. 7 n.9.

Another such provision is the "back-payment" requirement.  Pursuant to the terms of the MSA, every participating manufacturer upon signing the MSA must make any payment "that it would have been obligated to make in the intervening period had it been a signatory as of the MSA Execution Date."  MSA § II(jj).  The PMs signing the MSA as of its execution date were obligated to make annual settlement payments based on their nationwide sales beginning in 1999, with payments coming due each year.  *Id.* § IX(I).  The back-payment provision creates a disincentive for a tobacco manufacturer to delay signing the MSA while building a market share, as it will, upon signing, become liable under the MSA for any sales made since 1999.

As a part of the goal of encouraging smaller tobacco companies not sued in the original lawsuit to join the agreement, the MSA was structured to give NPMs the opportunity to join the MSA with a reduced payment obligation.  Per the terms of the MSA, any SPM that joined the MSA within ninety days of its initial execution was not obligated to make payments to the extent that its market share in a particular year is less than its 1998 market share (or 125% of its 1997 market share, if that is higher).  *See* MSA § IX(I).  If the SPM's sales exceed this "grandfathered share," then it incurs payment obligations that are the same as other PMs, calculated on a per-unit basis for all cigarettes sold above the floor amount of its grandfathered share.  *Id.*  The plaintiff terms those SPMs that joined within ninety days the "grandfathered SPMs."

6

The plaintiff, Vibo Corporation, doing business as "General Tobacco," did not operate as a tobacco manufacturer at the time of the settlement.  It began selling tobacco products in 2000, and until 2004, it operated as an NPM; that is, it sold cigarettes without signing on to the MSA.  Am. Compl. ¶¶ 151-54.  Despite the circumstances created by the MSA, because the plaintiff concentrated its sales in Kentucky and a few other states, the plaintiff was able to operate profitably until 2004, when the states began to implement amended escrow statutes. *Id.* ¶¶ 155, 157.  As of 2004, the plaintiff had a market share of two percent.  *Id.* ¶ 156.  In 2004, the plaintiff decided to apply for membership in the MSA.  *Id.* ¶ 160.

The plaintiff became a party to the MSA effective July 1, 2004.  *Id.* ¶ 167. It did so pursuant to the terms set forth in the "Adherence Agreement."  *See* DE 234, Exhibit B.  The Adherence Agreement specified the terms under which the plaintiff would meet its back-payment obligations and how it would make payments going forward.  *Id.*  Specifically, the Agreement provided that the plaintiff would make quarterly escrow payments toward its payment obligations.  *See id.* ¶ 10.

The present case arises from the failed attempt by General Tobacco to execute with the Settling States an Amended Adherence Agreement, granting it more favorable terms than those originally agreed to in the Adherence Agreement. General Tobacco and the Settling States had negotiated the new agreement successfully, Am. Compl. ¶ 180, but the Settling States refused to execute the agreement without the OPMs' and a number of the SPMs' having waived any rights they might have under the MSA that would be triggered by the proposed amended

7

terms of the plaintiff's membership in the MSA.   Am. Compl. ¶ 181.   The rights

at issue were those provided by the MSA's "Limited Most-Favored Nation"

("LMFN") clause. *Id.*; *see* MSA § XVIII(b).[7]  When the manufacturers made known

that they intended to invoke LMFN privileges – that is, that they would not agree to

waive any of their rights that might be triggered by the Amended Adherence

Agreement – the Settling States refused to execute the new Agreement.  Am.

Compl. ¶ 184.  In addition to alleging disparate treatment of SPMs such as itself

and the "grandfathered" SPMs, the plaintiff contends that the PMs' "misuse" and

---

[7]In pertinent part, the LMFN clause provides:

(b)  Limited Most-Favored Nation Provision.

(2) If any Settling State resolves by settlement Claims against any Non-Participating Manufacturer after the MSA Execution Date comparable to any Released Claim, and such resolution includes overall terms that are more favorable to such Non-Participating Manufacturer than the terms of this Agreement (including, without limitation, any terms that relate to the marketing or distribution of Tobacco Products and any term that provides for a lower settlement cost on a per pack sold basis), then the overall terms of this Agreement will be revised so that the Original Participating Manufacturers will obtain, with respect to that Settling State, overall terms at least as relatively favorable (taking into account, among other things, all payments previously made by the Original Participating Manufacturers and the timing of any payments) as those obtained by such Non-Participating Manufacturer pursuant to such resolution of Claims. The foregoing shall include but not be limited: (a) to the treatment by any Settling State of a Future Affiliate, as that term is defined in agreements between any of the Settling States and Brooke Group Ltd., Liggett & Myers Inc. and/or Liggett Group, Inc.("Liggett"), whether or not such Future Affiliate is merged with, or its operations combined with, Liggett or any Affiliate thereof; and (b) to any application of the terms of any such agreement (including any terms subsequently negotiated pursuant to any such agreement) to a brand of Cigarettes (or tobacco-related assets)as a result of the purchase by or sale to Liggett of such brand or assets or as a result of any combination of ownership among Liggett and any entity that manufactures Tobacco Products. Provided, however, that revision of this Agreement pursuant to this subsection (2) shall not be required by virtue of the subsequent entry into this Agreement by a Tobacco Product Manufacturer that has not become a Participating Manufacturer as of the MSA Execution Date. Notwithstanding the provisions of subsection XVIII(j), the provisions of this subsection XVIII(b)(2) may be waived by (and only by) unanimous agreement of the Original Participating Manufacturers.

[ . . . . ]

(4) If at any time any Settling State agrees to relieve, in any respect, any Participating Manufacturer's obligation to make the payments as provided in this Agreement, then, with respect to that Settling State, the terms of this Agreement shall be revised so that the other Participating Manufacturers receive terms as relatively favorable.

MSA §XVIII(b).

"exploitation" of the LMFN provision was anti-competitive behavior in violation of the Sherman Act.

The plaintiff brings this action against a total of seventy defendants.  These defendants are: (1) the three OPMs;[8] (2) fifteen "grandfathered" SPMs;[9] and (3) the fifty-two Attorneys General of the Settling States.

The plaintiff asserts that it does not challenge the MSA itself, only the preferential treatment given to the "grandfathered" SPMs and the allegedly wrongful utilization by the PMs of the LMFN clause of the MSA.  The plaintiff challenges these aspects of the MSA and the failure of the Settling States to execute the Amended Adherence Agreement, making claims based on both antitrust and constitutional grounds.  The plaintiff requests relief, under 42 U.S.C. § 1983, for violations of its civil rights by the Attorneys General.

## II.    Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests.  *Bell Atlantic*

---

[8]The OPMs include: Philip Morris USA, Inc., R.J. Reynolds Tobacco Co., and Lorillard Tobacco Co.

[9]The "grandfathered" SPMs include: Commonwealth Brands, Inc., Liggett Group LLC, Vector Tobacco Inc., Imperial Tobacco Limited/ITL (USA), Japan Tobacco International USA, Inc., King Maker Manufacturing, Inc., Lane Limited, Lignum-2, Inc., M/S Dhanraj, P.T. Djarum, Premier Manufacturing, Inc., Santa Fe Natural Tobacco Co., Societe National D'Exploitation Industrielles des Tobacs et Allumettes (SEITA)  Sherman's 1400 Broadway N.Y.C., Inc., and Top Tobacco, L.P. Defendant SPMs M/S Dhanraj and SEITA did not join the other SPMs in their motion to dismiss. *See* DE 156.

9

*Corp. v. Twombly,* 550 U.S. 544, —, 127 S.Ct. 1955, 1964 (2007) (citing *Conley*

*v. Gibson,* 335 U.S. 41, 47 (1957)).  In order to avoid a dismissal under Rule

12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff has an obligation to

provide the grounds of his entitlement to relief, which requires more than labels and

conclusions; a formulaic recitation of the elements of a cause of action will not do.

*Id.* at 1964-65.  This does "not require a heightened fact pleading of specifics, but

only enough facts to state a claim to relief that is plausible on its face."  *Id.* at

1974.  "[W]hen ruling on a defendant's motion to dismiss, the court must accept

as true all of the factual allegations contained in the complaint."  *Erickson v.*

*Pardus,* — U.S. —, —, 127 S.Ct. 2197, 2200 (2007) (citations omitted).  The

court's "inquiry is limited to the content of the complaint."  *Ohio Bell Telephone Co.*

*v. CoreComm Newco., Inc.*, 214 F.Supp. 2d 810, 812 (N.D. Ohio 2002).  "[A]

well-pleaded complaint may proceed even if it strikes a savvy judge that actual

proof of those facts is improbable . . . ."  *Bell Atlantic*, 127 S.Ct. at 1965.


## III.     Analysis

## A.     Antitrust Claims (counts one and eight of plaintiff's Amended Complaint).

The plaintiff alleges that the defendants have violated sections 1 and 3(a) of

the Sherman Act, 15 U.S.C. §§ 1, 3(a).  Count one concerns the formation and

provisions of the MSA itself and alleges wrongdoing by both the defendant

Attorneys General and the defendant manufacturers.  The allegations of count eight

10

concern actions taken only by the defendant manufacturers, not by any of the Settling States.

1.     **Antitrust Claims Against the Participating Manufacturers**

The plaintiff asserts claims against the defendant manufacturers for violation of the Sherman Act in two counts of its complaint.  The claims are interconnected but require separate analysis.  First, the plaintiff challenges the PMs' involvement in the creation of the MSA and the inclusion in it of allegedly discriminatory provisions.  Am. Compl. ¶¶ 195, 203.   Second, the plaintiff seeks to hold the PMs liable for the more recent actions they took to influence the states not to execute the Amended Adherence Agreement.  Am. Compl.¶¶ 198, 199, 251-57.

The defendant PMs contend that the *Noerr-Pennington* doctrine grants them immunity from both claims.[10]  In plainest terms, the *Noerr-Pennington* doctrine, named for the two Supreme Court cases from which it developed, protects private actors from liability under the Sherman Act for petitioning the government for action.  *See United Mine Workers v. Pennington*, 381 U.S. 657 (1965); *Eastern R.R. Presidents' Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961).  The doctrine rests on the individual's constitutional right to petition the government for action and the necessity, in a representative democracy, for citizens to communicate their needs and wants to the government.  *See Huron Valley Hosp., Inc. v. City of Pontiac*, 650 F.Supp. 1325, 1340 (E.D. Mich. 1986); *see also Prof.*

---

[10]Defendant manufacturers filed two separate motions, one by the three OPMs and one by thirteen of the SPMs. Their motions are almost identical substantively.

*Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 56 (1993)

(explaining the reasoning used by the *Noerr* court)*; City of Columbia v. Omni*

*Outdoor Advertising, Inc.*, 499 U.S. 365, 383 (1991) (describing *Noerr* immunity

as protecting "citizens' participation in government").

The motives of the parties are irrelevant to their protection by *Noerr-*

*Pennington*; the parties remain immune even if they had a deliberately anti-

competitive purpose in seeking government action. *See Campbell v. PMI Food*

*Equip. Group, Inc.*, 509 F.3d 776, 790 (6th Cir. 2007) (describing the "essence of

the doctrine" as "parties who petition the government for governmental action

favorable to them cannot be prosecuted under the antitrust laws even though their

petitions are motivated by anticompetitive intent" (citations omitted)); *Westmac,*

*Inc. v. Smith*, 797 F.2d 313, 315 (6th Cir. 1986) ("[G]enuine attempts to influence

passage or enforcement of laws are immune from antitrust scrutiny, regardless of

the anticompetitive purpose behind such attempts."(citations omitted)).  Immunity

exists regardless of any conspiracy between the private parties and government

actors that may be motivated by selfish interests. *City of Columbia*, 499 U.S. at

383.  And, importantly to the present case, the immunity provided private actors

by the doctrine extends to the effects of a successful petition: "'[W]here a restraint

upon trade or monopolization is the result of valid governmental action, as opposed

to private action,' those urging governmental action enjoy absolute immunity from

antitrust liability for the anticompetitive restraint." *Allied Tube & Conduit Corp. v.*

*Indian Head, Inc.*, 486 U.S. 492, 499 (1988) (citing *Noerr*, 365 U.S. at 143;

12

*Pennington*, 381 U.S. at 671).  Furthermore, the *Noerr-Pennington* doctrine applies to all of an individual's interactions with government, including its interactions with the executive branch and negotiations associated with the reaching of a settlement of litigation.  *See Noerr*, 365 U.S. at 136 ("[T]he Sherman Act does not prohibit two or more persons associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly."); *A.D. Bedell Wholesale Co., Inc. v. Philip Morris, Inc.*, 263 F.3d 239, 252 (3d Cir. 2001) (affirming district court's finding that defendant tobacco manufacturers' "negotiating the settlement was akin to petitioning the government"); *Campbell v. City of Chicago*, 823 F.2d 1182 (7th Cir. 1987) (ordinance implemented as result of settlement negotiations of case involving damages claim; settlement and accompanying lobbying efforts were "protected efforts to petition the government").

The defendant manufacturers enjoy immunity for their role in the creation of the Master Settlement Agreement and the provisions challenged by the plaintiff as discriminatory.  The MSA resulted from a lawsuit initiated by the state governments against the OPMs.  As a product of the settlement of that lawsuit, it, and all of its provisions, represent the result of the OPMs' active negotiations with state government officials.  The actions of the defendant OPMs in negotiating and executing the MSA were a "concerted effort by defendants to influence public officials, i.e., the states' Attorneys General, to accept a settlement in exchange for dismissing the numerous lawsuits pending against [them]," and, as such, these

13

actions cannot be a source of antitrust liability. *Hise v. Phillip Morris, Inc.*, 46 F. Supp. 2d 1201, 1207 (N.D. Okla. 1999), *aff'd* 208 F.3d 226 (10th Cir. 2000).  To the extent that the plaintiff alleges that the grandfathered SPMs also were involved in petitioning for the inclusion of provisions favorable to them, those provisions are the product of those SPMs' interactions with state government officials.  "[T]he doctrine would surely ring hollow if it failed to encompass private entities who, after having been sued by one or more states for similar conduct, jointly petition the states in order to achieve a mutually acceptable settlement . . . ." *Hise*, 46 F.Supp. 2d at 1207.

In so finding, this court agrees with others which have already considered the issue of whether the defendants are shielded by the *Noerr-Pennington* doctrine from any antitrust liability connected with their role in the creation of the MSA. *See Sanders v. Brown*, 504 F.3d 903 (9th Cir. 2007)*; PTI, Inc. v. Philip Morris, Inc.*, 100 F. Supp. 2d 1179 (C.D. Cal. 2000) (finding that "activities involved with the negotiation, execution, and attempts to implement the MSA" comprise "precisely the type of activity the doctrine was intended to protect"); *A.D. Bedell Wholesale Co., Inc. v. Philip Morris, Inc.*, 104 F. Supp. 2d 501 (W.D. Pa 2000) (concluding that "to the extent Plaintiff's claims are based upon the Defendants' actions in negotiating and executing the MSA, said actions fall within the category

14

of conduct protected by the *Noerr-Pennington* immunity doctrine"), *aff'd*, 263 F.3d 239 (3rd Cir. 2001); *Hise*, 46 F. Supp at 1206-07.[11]

The *Noerr-Pennington* doctrine likewise shields the defendants from liability for their more recent actions taken in order to influence the decision of the state Attorneys General to refuse to execute the plaintiff's Amended Adherence Agreement.  The plaintiff alleges that the defendant manufacturers have "misused and exploited the LMFN provision."  Am. Compl. ¶ 256.  Clarifying the factual contours of this claim at the motions hearing, plaintiff's counsel argued that although the defendants believe they are entitled to object to the agreement because they adjudge it gives the plaintiff more favorable terms under the MFA than they themselves enjoy, as a factual matter, the Amended Adherence Agreement actually does *not* grant the plaintiff more favorable terms under the MSA.  Therefore, the plaintiff's argument proceeds, under the plaintiff's interpretation of the LMFN clause, the defendant manufacturers actually have no rights to exercise.  *See* TR 121-22, 126-28.

Such details are irrelevant, however, to the court's resolution of the instant question.  Regardless of what rights are granted by the LMFN provision, regardless of whether the exact terms of the Amended Adherence Agreement result in the plaintiff's receiving "more favorable terms" than the other PMs, the defendant

---

[11]The plaintiff has attempted to distinguish its claims from those made in the cited cases based on differences between itself and the other plaintiffs.  As the relevant conduct at issue in this case, that is, the conduct of the defendant PMs in negotiating and executing the settlement, is identical, the differences in the situations of the plaintiffs is of no relevance to the court's reasoning.

manufacturers are immune under the *Noerr-Pennington* doctrine for any anti-competitive effects of the pressure that the plaintiff alleges they have asserted over the state Attorneys General.

Accepting all of the plaintiff's allegations as true, the plaintiff has merely alleged a classic example of a claim for which the *Noerr-Pennington* doctrine grants immunity.  The PMs – private actors – have exerted influence on the government actors; and, as a result of that influence, the government actors have declined to sign and execute the Amended Adherence Agreement.  This refusal, and the accompanying refusal to grant the plaintiff the terms of that agreement, have anti-competitive effects: the court accepts as true the plaintiff's allegations that it has been denied reasonable access to the MSA and that the MSA is an essential facility.[12]  However, simply put, the PMs have petitioned for, and received, certain government action that creates anti-competitive effects upon the plaintiff.  Under the *Noerr-Pennington* doctrine, the defendant manufacturers are entitled to immunity for the anti-competitive effects of their successful petition for government action.  *See Noerr*, 365 U.S. at 136.

The plaintiff alleges nothing beyond the PMs' agreement to persuade the defendant state actors to withhold access from the plaintiff, in restraint of trade. Importantly, any anti-competitive effects experienced by the plaintiff were caused by the government's *independent* action, not by the private action. *See PTI, Inc.,*

---

[12]Given the court's reliance on *Noerr-Pennington*, the court need not determine whether the plaintiff has stated a claim under the "essential facilities" doctrine, although the court briefly addresses the elements of that doctrine in n.18, *infra*.

100 F.Supp.2d at 1194 (distinguishing *Allied Tube* because the trade restraint imposed against the plaintiff in that case had been imposed by private persons, not by public officials).  *Cf. FTC v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411 (1990) (finding no immunity under *Noerr-Pennington* where the anti-competitive effects of the competitors' boycott were caused directly by the respondents, not by an independent government action).[13]

The plaintiff emphasizes that its claims against the defendant manufacturers could constitute *per se* antitrust violations.  TR 124-25.  The *Noerr-Pennington* doctrine affords no exception, however, for the PMs' petitioning for the state's permission to commit *per se* antitrust violations.  *See S&M Brands, Inc. v. Summers*, 393 F. Supp. 2d 604, 629 (M.D. Tenn. 2005)("Even if the MSA could be challenged as a *per se* Sherman Act violation, however, such a challenge would be barred by the *Noerr-Pennington* doctrine."); *A. D. Bedell*, 263 F.3d at 250-66 (holding action by the defendant tobacco company protected by the *Noerr-Pennington* doctrine even where it may not have been protected by the state-action

---

[13]As a result, it is not actually clear that the wrong alleged even falls within the scope of the Sherman Act. *See* section II(A)(1), *infra*, for a discussion of the state action doctrine, also known as *Parker* immunity, and its applicability to the instant case.  However, to whatever extent the wrong alleged does fall within the scope of the *Noerr-Pennington* doctrine, the defendant manufacturers are immune from liability. *See City of Columbia*, 499 U.S. at 1355 ("As we have described, *Parker* and *Noerr* are complementary expressions of the principle that the antitrust laws regulate business, not politics; the former decision protects the States' acts of governing, and the latter the citizens' participation in government.").

doctrine due to state's failure to actively supervise the authorization it granted the manufacturers to commit *per se* violations).

The plaintiff has also argued that the *Noerr-Pennington* doctrine should not apply because the defendants' actions in influencing the government action fit the "sham" exception to the doctrine.  DE 239, p.11.  Despite the applicability of the *Noerr-Pennington* doctrine, courts nevertheless hold defendants liable for the anti-competitive effects of their actions when the defendants have "use[d] the governmental *process* – as opposed to the *outcome* of that process – as an anticompetitive weapon." *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380 (1991).  "A 'sham' situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action, not one who genuinely seeks to achieve his governmental result, but does so *through improper means*." *Id.* at 380 (internal quotations omitted)(citation omitted).  The plaintiff does not allege that the creation of the MSA itself was a sham; nor could it do so successfully.  *See PTI, Inc.,* 100 F.Supp.2d at 1193 ("Far from an objectively baseless attempt to harm its competitors through the abuse of governmental process, the M.S.A. reflects a genuine, ultimately successful attempt to settle extensive current and potential litigation with the states.").  Beyond its claim of the PMs' allegedly wrongful assertion of LMFN rights, already addressed by the court, the plaintiff fails to allege any facts that would support the application of the "sham" exception; rather, it fully acknowledges throughout all pleadings and at the hearing on the motions that the defendants truly sought the anti-competitive

18

effects of the states' denial.  The "sham" exception, therefore, does not apply to the instant case.[14]

Given this resolution of the defendants' motions as to the antitrust claims against the defendant manufacturers, the court finds it unnecessary to consider their other arguments for dismissal of these claims.

**2.    Antitrust Claims Against the States**

The court next will consider the antitrust claims made against the states.[15] The plaintiff challenges the involvement of the defendant Attorneys General in

---

[14]At the hearing on the motions, the plaintiff also argued that the defendants were not immune because the MSA is a commercial agreement between the defendant PMs and the states.  "[N]o such 'commercial exception' exists to the Noerr-Pennington doctrine." *PTI, Inc.*, 100 F.Supp.2d at 1193 n.12 (citing *In re Airport Car Rental Antitrust Litigation*, 693 F.2d 84, 88 (9th Cir. 1982)); *see also Greenwood Utilities Comm'n v. Mississippi Power Co.*, 751 F.2d 1484, 1505 (5th Cir. 1985).

[15]The court will attempt to address thoroughly such claims, although it is not entirely clear that the plaintiff intended to make them.  At the hearing on the motions, plaintiff's counsel apparently disavowed such claims, stating that "[t]he antitrust conspiracy here is not state action." TR 55, ln 14-15.  He added, "So we're not challenging state action here.  We're challenging the inability of the states to act as they want to act with us, because the Defendant manufacturers have banded together and they're preventing the states from acting."  TR 58, ln 2-5.  Furthermore, in the plaintiff's response to the defendants' motions to dismiss, the plaintiff did not specifically address the argument of the defendant Attorneys General that state-action immunity applies to any antitrust claim against the states. At the hearing, however, the court asked the plaintiff whether counts one and eight were alleged against the states, to which counsel for the plaintiff replied: "Count 1 is against the states.  Count 8 is not." TR 51, 18-19.  The only antitrust claim that at all implicates the states is count one of the plaintiff's complaint. Am. Compl. ¶¶ 195, 196, 199, 200, 203.  What follows is the court's attempt to reconcile these inconsistencies.

creating the MSA, with its resulting discriminatory impact on the plaintiff, as well as their enforcement of the MSA.  The plaintiff also challenges the states' refusal to execute the Amended Adherence Agreement.  Although the plaintiff generally characterizes that decision as a result of an antitrust violation by the defendant manufacturers, the rejection of the Amended Adherence Agreement by the state Attorneys General was an action taken by the states, and the states' decision to deny access is somewhat implicated in the plaintiff's complaint.  *See* Am. Compl. ¶¶ 199, 200.

The defendant Attorneys General plead immunity under the doctrine of state-action immunity, as articulated in *Parker v. Brown*, 317 U.S. 341 (1943).  To the extent the plaintiff has responded to that argument, it maintains that the states have wrongfully allowed the defendant manufacturers to influence the states' decision to refuse to implement the Amended Adherence Agreement.

a.    The state-action doctrine: the basics

When acting in its capacity as a sovereign entity, a state cannot violate antitrust laws.  *Parker v. Brown*, 317 U.S. at 352 (1943).  The Sherman Act was not enacted to curtail the sovereign activities of states.  *Id.* at 351 ("The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state.").  When a state imposes a trade restraint, it has "imposed the restraint as an act of government" and has not in so governing "entered into [a] conspiracy in restraint of trade or . . . establish[ed] [a] monopoly."  *Id.* at 352 (citing *Olsen v. Smith*, 195 U.S. 332

20

(1904)). "Under the so-called 'state action doctrine,' it is well established that antitrust law does not apply to states acting as sovereigns . . . . The Supreme Court has determined that principles of federalism and state sovereignty provide blanket protection for states." *Jackson, Tenn. Hosp. Co., LLC v. West Tenn. Healthcare, Inc.*, 414 F.3d 608, 611 (6th Cir. 2004) (citing *Parker*, 317 U.S. at 341).

However, in certain situations, the challenged actions must be further scrutinized. If the state, through a statute, has created some law or regulatory scheme that authorizes private actors to engage in antitrust violations, that statute may be pre-empted by the Sherman Act, pursuant to the Supremacy Clause of the U.S. Constitution. *See Trient Intern. Corp. v. Kentucky*, 467 F.3d 547, 554 (2006) (determining that where the state had passed a statute challenged as being a violation of the Sherman Act, the court must first engage in traditional pre-emption analysis in order to ascertain "whether there exists an irreconcilable conflict between federal and state regulatory schemes"(quoting *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982))). When such a statute is pre-empted, the state may nevertheless retain immunity if the state, acting in its sovereign capacity, remains sufficiently involved such that the regulatory scheme and its antitrust effects retain the character of direct state action. *Id.* The court must resolve this question using the two-prong test crafted by the court in *California Retail Liquor*

*Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980).[16]  Similarly,

when a plaintiff directly challenges the actions of private actors or a state agency

that claim they are acting according to some state authorization, the court also

uses the *Midcal* test to determine whether the challenged actions are so closely

connected to the sovereign state that they are acts of the state warranting state-

action immunity.  *See, e.g.*, *First Amer. Title Co. v. Devaugh*, 480 F.3d 438 (6th

Cir. 2007).

     b.   <u>*Midcal* is not applicable to the present case.</u>

     Where the plaintiff challenges acts taken directly by a state, however, the

court does not apply the *Midcal* two-part test.  *See Hoover v. Ronwin*, 466 U.S.

558, 568-69 (1984); *see also Sanders v. Brown*, 504 F.3d 903, 917 (9th Cir.

2007) (concluding that in *Hoover*, the Supreme Court established that "the *Midcal*

test does not apply to sovereign state acts, which are immune from antitrust

liability so long as they [are not pre-empted due to their having] authoriz[ed] *per se*

illegal activities"); *see also* Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law*

¶217b (3d ed. 2006) (explaining the relationship among *Midcal*, *Rice*, and *Parker*

and describing the inquiries required by those cases as "fundamentally consistent

but sequential").[17]

---

[16]According to *Midcal*, "First, the challenged restraint must be one articulated and
affirmatively expressed as state policy; second, the policy must be actively
supervised by the State itself." *Trident*, 467 F.3d at 555 (quoting *Midcal*, 445 U.S.
at 105).

[17]The cited material also discusses *Fisher v. City of Berkeley, California*, 475 U.S.
260 (1986), which established the concept of a "hybrid restraint."  A "hybrid

Here, as far as the antitrust claims against the states go, neither of the two scenarios calling for the *Midcal* analysis is present.  The plaintiff has neither challenged a statute nor alleged that the MSA itself is pre-empted by the Sherman Act because it authorizes the PMs to violate antitrust laws.[18]

_____

restraint" "exists when the state passes laws that enforce companies' decisions to collude on prices, to dictate prices by which other companies must abide, or to otherwise violate the Sherman Act." *Sanders*, 504 F.3d at 918.  Plaintiff's counsel vaguely alluded to the ideas of *Fisher* at the hearing on the motions, in the context of the plaintiff's claims against the PMs. *See* TR 146, ln 18-19.  Because the court does not understand the plaintiff to have alleged that the MSA is a hybrid restraint, it will not address *Fisher* or any relevance it may have to the present dispute.

[18]The court here attempts to address any confusion on this point.

At the hearing on the motions, in response to the court's question as to whether the plaintiff was alleging that the MSA or any portion of it constituted an antitrust violation, plaintiff's counsel stated, "We are alleging that the disparate payment terms for Subsequent Participating Manufacturers under the Master Settlement Agreement constitutes an antitrust violation." TR 54, ln 10-12.  Counsel then elaborated, "The case law says that . . . an essential facilities claim . . . is a per se violation of the antitrust laws." TR 54, ln 14-16.

When a state authorizes an antitrust violation by private actors in all situations, that law is pre-empted by the Sherman Act. *See Trident*, 467 F.3d at 554-56.  In *Trident*, the plaintiff alleged that Kentucky's complementary legislation violated the Sherman Act.  467 F.3d at 548-49. Finding that the case was a "typical preemption case," the Sixth Circuit sought to determine "whether there exist[ed] an irreconcilable conflict between the federal and state regulatory schemes." *Id.* at 554 (quoting *Rice*, 458 U.S. at 659).  Guided by *Rice*, the *Trident* court concluded that the state legislation was not pre-empted by the Sherman Act. *Id.* at 556-58.  The court emphasized that for such pre-emption to exist, a statute must mandate illegal activity "in all cases," and ultimately held that Kentucky's statute was not pre-empted because it did not do so. *Id.* 554-56.

Count one is the only count that the plaintiff asserts is against the states, and so any claim that the states have acted wrongfully because the MSA authorizes antitrust violations would have to come from this count.  Count one concerns the plaintiff's "essential facilities" allegations.  The basic elements of an "essential facilities" antitrust violation are that a competitor has denied the plaintiff reasonable access to some facility the competitor controls and that is necessary to compete in their shared market. *See, e.g.*, *Ohio Bell Telephone Co. v. CoreComm Newco, Inc.* 214 F.Supp.2d 810, 818 (N.D.Ohio, 2002) (citing *Ideal Dairy Farms,*

c.   The states are immune from liability for anti-competitive effects of all
acts the plaintiff alleges were wrongful.

The states' negotiation, execution, and enforcement of the MSA and their

decision not to enter into the Amended Adherence Agreement are all direct state

action, and the states are immune from liability for those actions.

A state simply is *incapable* of entering an agreement that violates the

Sherman Act.[19]  The state-action doctrine traditionally is applied to acts of the

legislature or regulatory schemes constructed by states.  However, it also applies to

_____

*Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 748 (3d Cir.1996)) (describing the
"elements necessary to establish an essential facilities claim").

The court will assume for the sake of argument that the MSA and its
provisions are a "regulatory scheme" created by a state and capable of being pre-
empted by federal law.  The plaintiff has not alleged that the MSA authorizes its
competitors to deny it access to the MSA.  Rather, the plaintiff has argued that the
state Attorneys General have allowed themselves, *unnecessarily*, and in violation of
the rights actually created by the LMFN clause, to be influenced by the PMs'
threats to invoke their LMFN rights.  Even when the court construes all facts in
favor of the plaintiff, the plaintiff has not argued that the MSA itself authorizes
what the PMs have done.  *See* Am. Compl. ¶ 197, 198, 199, 203.  And it certainly
has presented no facts to show that the MSA authorizes a violation "in all cases."

On the contrary, the plaintiff admits that the MSA does not give the
plaintiff's competitors the ability to decide whether or on what terms a company
will have access to the MSA.  Counsel for the plaintiff analogized the MSA to a
bridge to the market, with the "Attorneys General . . . sitting in the tollbooth
controlling the gate.  But standing over their shoulders . . . [are] the manufacturers"
influencing the decision-making of the Attorneys General.  TR 130, ln 17-24.  The
facts of the present case, as presented by the plaintiff, are simply that the states
have allowed the PMs to influence their decision.  And that decision, as indicated
above, is direct state action for which the state remains immune.  Thus, the
plaintiff's "essential facilities" claim cannot constitute an allegation that the MSA
should be pre-empted by the Sherman Act, nor would it succeed.

[19]The state is not incapable of entering into an agreement, or passing a law, that
presents constitutional problems.  The alleged constitutional defects of the
agreement, however, do not implicate the Sherman Act and will be addressed by
the court in a subsequent section of this opinion.

24

actions by officials in the state's executive branch.  *See Neo Gen Screening, Inc. v. New England Newborn Screening Program*, 187 F.3d 24, 28-29 (1st Cir. 1999); *Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.*, 810 F.2d 869 (9th Cir. 1987); *see also Berger v. Cuyahoga County Bar Ass'n*, 983 F.2d 718 (6th Cir. 1993) (finding state-action immunity for actions taken by state supreme court because it was regulating the practice of law pursuant to constitutional grant of power).

A state attorney general, as a member of the executive branch of government, is entitled to immunity for his or her executive actions.  Any decision made by the defendant Attorneys General, therefore, either in negotiating and executing the MSA or in deciding not to execute the Amended Adherence Agreement, is direct state action falling completely outside the scope of the Sherman Act.  This conclusion is supported by the plaintiff's choice to sue the defendant Attorneys General in their official capacity.  *See Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71, (1989) (finding that a suit against a state official in his or her official capacity is a suit against the state).  Other courts have held that the acts of the Attorneys General in negotiating and entering into the MSA are direct state action.  *See Sanders,* 504 F.3d 903; *Sanders v. Lockyer*, 365 F. Supp. 2d 1093, 1099 (N.D. Cal. 2005).

The plaintiff also alleges that the state's enforcement of the MSA's discriminatory terms, including refusing to list the plaintiff on a list of approved manufacturers and attempts to take possession of the plaintiff's escrowed funds

25

"violate[] Plaintiff's legal rights." Am. Compl. ¶ 196.  This claim, to the extent it suggests a potential violation of the Sherman Act, likewise targets direct state action, outside the scope of the Sherman Act.

The plaintiff's allegations that the MSA was created as part of a conspiracy entered by the Settling States with the PMs or that these actors conspired to prevent enactment of the Amended Adherence Agreement have no effect on the state's entitlement to immunity.  *See City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 379 (1991) ("[W]e affirm our rejection of any interpretation of the Sherman Act that would allow Plaintiffs to look behind the actions of state sovereigns to base their claims on 'perceived conspiracies to restrain trade.'"(quoting *Hoover*, 466 U.S. at 580)).  The motives of the state in taking the action it took are simply irrelevant to the court's inquiry.  *See Hoover*, 466 U.S. at 579–80 ("[W]here the action complained of . . . was that of the state itself, the action is exempt from antitrust liability regardless of the State's motives in taking the action.").

In summary, the negotiation, execution, and enforcement of the MSA and the associated decisions of the Attorneys General, as challenged by the plaintiff, are  acts of the sovereign state.  While such acts are not immune from *every* kind of challenge, they are immune from challenge as violations of the antitrust laws.

Given the court's conclusion that the states are entitled to *Parker v. Brown* state-action immunity for any antitrust claims made by the plaintiff, the court will not reach the additional arguments for dismissal made by the defendant Attorneys

General.  The court now turns to one challenge to which the states' acts remain

vulnerable: the plaintiff's claims that the MSA violates the U.S. Constitution.


**B.    Constitutional Claims (counts two, three, four, and five of the plaintiff's amended complaint).**

The plaintiff seeks relief on the following constitutional grounds: (1) Equal

Protection Clause; (2) Due Process Clause; (3) Commerce Clause; and (4) Compact

Clause.  The plaintiff brings these claims against all of the defendant Attorneys

General.[20]

**1.    Plaintiff Waived Constitutional Challenges to Provisions of the MSA.**

The defendant Attorneys General argue that through the operation of section

XV of the MSA, the plaintiff has waived any constitutional challenges to the MSA.

In order to resolve this issue, the court must first determine whether the language

of the provision encompasses the types of constitutional claims currently before the

court.  If so, the court then must determine whether the plaintiff made a valid

waiver of those claims.

**a.    The waiver encompasses the plaintiff's Equal Protection, Due Process, and Commerce Clause claims.**

The plaintiff is bound to the MSA through the Adherence Agreement entered

into by the plaintiff and the Settling States in 2004.  *See* Am. Compl., Exhibit B.

---

[20]The plaintiff does not argue that the Settling States' refusal to enact the Amended Adherence Agreement violated its constitutional rights.  All of the plaintiff's constitutional claims pertain to the MSA itself.

27

The Adherence Agreement is a contract.  The MSA, likewise, is a contract.  *See, e.g.*, *Bamerilease Capital Corp. v. Nearburg*, 958 F.2d 150, 152 (6th Cir. 1992) (finding that a settlement agreement is a contract)(citations omitted).  In interpreting a contract, the court is guided by well-established principles of contract interpretation.  The court will apply Kentucky law on contract interpretation.[21]

Kentucky law on contract interpretation recently has been summarized succinctly as follows:

> Under Kentucky law, contract interpretation is a question of law for the Court to determine.  *Davis v. Siemens Med. Solutions USA, Inc.*, 399 F.Supp.2d 785, 792 (W.D. Ky. 2005). To interpret a contract, the Court looks to its language to determine the parties' intentions.  *See Abney v. Nationwide Mut. Ins. Co.*, 215 S.W.3d 699, 703 (Ky. 2006).  "Where no ambiguity exists in the contract" the Court looks "only as far as the four corner [sic] of the document to determine that intent."  *Id.*  Whether the contract is ambiguous is a question of law for the Court to determine.  *Id.*  "A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002).

*Dodd v. Dyke Industries, Inc.*, 2008 WL 1884081, at *5 (W.D. Ky. April 28, 2008).

Section XV of the MSA is entitled "Voluntary Act of the Parties" and provides as follows:

---

[21]The court does not sit in diversity jurisdiction for this action and therefore applies federal choice-of-law rules.  Federal choice-of-law rules dictate that the court must apply the law of the jurisdiction having the most significant relationship with the action.  *See, e.g.*, *In re Gaston & Snow*, 243 F.3d 599, 605 (2d Cir. 2001).  Neither party has suggested that it matters for the resolution of this issue which state's law of contract interpretation the court uses.  The court therefore will be guided by Kentucky law on contracts.

The Settling States and the Participating Manufacturers acknowledge and agree that this Agreement is voluntarily entered by each Settling State and each Participating Manufacturer as the result of arm's-length negotiations, and each Settling State and each Participating Manufacturer was represented by counsel in deciding to enter into this Agreement. Each Participating Manufacturer further acknowledges that it understands that certain provisions of this Agreement may require it to act or refrain from acting in a manner that could otherwise give rise to state or federal constitutional challenges and that, by voluntarily consenting to this Agreement, it (and the Tobacco-Related organizations (or any trade associations formed or controlled by any Participating Manufacturer)) waives for the purposes of performance of this Agreement any and all claims that the provisions of this Agreement violate the state or federal constitutions. Provided, however, that nothing in the foregoing shall constitute a waiver as to the entry of any court order (or any interpretation thereof) that would operate to limit the exercise of any constitutional right except to the extent of the restrictions, limitations or obligations expressly agreed to in this Agreement or the Consent Decree.

The plaintiff asserts that this provision does not operate as a waiver of its present constitutional claims because it is only "a waiver of a PM's constitutional rights with respect to requirements or restrictions <u>explicitly</u> imposed by the MSA with respect to the PM's <u>own</u> actions." DE 239, p.18. Noting that the first clause of the second sentence of section XV references actions of the PM itself, the plaintiff further elaborates that "MSA [section] XV does not waive the PM's rights to challenge the actions of <u>others</u> relating to the grandfathered SPMs' unjustified favoritism under the agreement." *Id.* The plaintiff contends that this waiver is primarily aimed at obtaining from the PMs a waiver of any First Amendment challenges to the MSA. *Id.*

The plaintiff's arguments fail. As a matter of law, this provision is unambiguous and operates as a broad waiver of the PMs' constitutional rights. The

29

provision explicitly states that a Participating Manufacturer "waives for the purposes of performance of this Agreement any and all claims that the provisions of this Agreement violate the state or federal constitutions." MSA § XV. The phrase "any and all claims" could not be broader. Had the parties intended the provision to extend only to the PMs' obligations under the contract that could implicate the PMs' rights under the First Amendment, the provision could have provided expressly that the PMs waived any and all claims that the provisions of the agreement violated the First Amendment and its counterparts in state constitutions. The provision does not limit its scope in this manner, and the court must take the meaning of the provision as it is presented by the words used in the document.

As pointed out by the plaintiff, the waiver extends only so far as the MSA makes requirements upon a participating manufacturer, as expressed by provisions of the agreement that a participating manufacturer must abide by in order to perform the agreement. However, the plaintiff's Equal Protection, Due Process, and Commerce Clause claims all implicate "provisions of [the] Agreement" that affect the plaintiff's performance under the contract. The court will consider each in turn, pointing to the provision of the MSA that requires the actions challenged by the plaintiff's claims.

### I.    *Equal Protection claim*

First, according to count two of the plaintiff's complaint, "[t]he MSA's unequal application of its purported back-payment requirements, grandfather exemptions and escrow requirements violates the rights of General Tobacco under

the Equal Protection Clause of the Fourteenth Amendment." Am. Compl.¶ 209.

The "grandfathered exemptions" are provided for by section IX(I) of the MSA,

wherein the agreement specifically explains that a Subsequent Participating

Manufacturer has payment obligations under the agreement "only in the event that

its Market Share in any calendar year exceeds the greater of (1) its 1998 Market

Share or (2) 125 percent of its 1997 Market Share . . . . " MSA § IX(I).  Because

the plaintiff's market share in 1998 was zero, and those SPMs the plaintiff terms

"grandfathered SPMs" had a market share in those years, its payment obligation

accordingly is higher than those other, older, SPMs.  The plaintiff's claim of an

Equal Protection Clause violation therefore involves the plaintiff's obligations under

this provision of the agreement.  To be more explicit, this provision of the

agreement requires the plaintiff to act (that is, make payments) in a way that the

plaintiff now wants to argue is a violation of its right to equal protection of the

laws under the federal constitution.  This claim is waived by section fifteen of the

MSA.  Similarly, the plaintiff's claim regarding its back-payment requirements

results from the requirement of a provision of the MSA that it act in a certain

manner. *See* MSA § II(jj).  In its provisions, the MSA also provides directions as to

the PMs' obligation to make payments to an escrow account.[22]  *See* MSA § IX(a).

---

[22]The plaintiff's Equal Protection challenge to the requirement that it make payments into the escrow account on a quarterly basis does not challenge a provision of the MSA; rather, it attacks a requirement that is specific to the plaintiff and is detailed in the Adherence Agreement, which makes the MSA run against the plaintiff. *See* Am. Compl., Exhibit B, ¶ 10.  Even if the plaintiff had not waived such a constitutional challenge, it would fail on its merits.  The parties agree that any Equal Protection  claim calls for rational-basis review.  The defendant Attorneys

The language of the plaintiff's complaint makes clear that its claim for violation of the Equal Protection Clause arises from provisions of the MSA, as it attributes the allegedly disparate treatment it suffers directly to the "MSA's unequal application" of certain requirements. Am. Compl. ¶ 209. Because all of those provisions require certain action of or restraint by PMs, the plaintiff has waived constitutional challenges to them.

## ii.    *Due Process claim*

Second, the plaintiff's Due Process claim implicates the same provisions as its Equal Protection claim. The plaintiff first takes issue with the "MSA's payment structure," arguing that the MSA has deprived the plaintiff of its substantive due process rights. Am. Compl. ¶ 214. This payment structure is created by provisions of the MSA, as discussed in the previous paragraph. Therefore, this claim is waived by section fifteen, as such provisions are provisions that require the plaintiff to "act or refrain from acting in a manner that could otherwise give rise to . . . constitutional challenges." MSA § XV. The plaintiff's procedural due process claim also is waived. *See* Am. Compl. ¶ 216. The plaintiff's argument that it has not received appropriate process regarding the MSA's requirements that it make certain payments implicates the MSA provisions that require it to make payments.

## iii.    *Commerce Clause claim*

General have stated a rational basis for requiring quarterly, rather than annual, payments into escrow: "[T]he States have learned since the signing of the MSA that quarterly deposits of both escrow and MSA payments encourage compliance." DE 149, p.25. The plaintiff's factual allegations do not contradict the soundness of this rationale. The claim is therefore without merit.

Third, the plaintiff's claim for relief under the Commerce Clause is also waived because it involves provisions of the MSA that require it to act or refrain from acting for the purpose of performing the agreement.  The plaintiff alleges that the MSA violates the Commerce Clause due to its requirement that payments be "collected nationally and then apportioned among the Settling States" and therefore "each Settling State imposes a fee on each PM based upon sales not just in that State, but also in all the Settling States."  Am. Compl. ¶ 221.  As indicated by the language of the plaintiff's complaint, this claim involves a requirement made on the plaintiff by the provisions of the MSA.  *See* MSA § IX(a) (specifying the procedure by which all participating manufacturers are to make payments to a single designated escrow agent); *Id.* § IX(c)(2)(A) (directing that funds paid by OPMs will then be allocated among the Settling States according to certain formula); *Id.* § IX(i)(1)(©) (directing that payments made by SPMs will be allocated and distributed in the same manner as those made by the OPMs).  This claim, then, also concerns requirements made of the plaintiff by provisions of the MSA.  The plaintiff's second claim under the Commerce Clause, that the terms provide "preferential treatment to SPMs that were conducting business in the Settling States in 1998 to the detriment of later market entrants," involves the provisions of the MSA regarding the calculation of SPMs' market share for the purposes of performance of the agreement as discussed above in regards to the plaintiff's Equal Protection Clause claim.  The plaintiff has also waived this claim.

Other courts have touched upon this provision of the MSA.  *See People ex*

33

*rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 11 Cal. Rptr. 3d 317, 329 (Cal. Ct. App. 2004) (finding that injunction imposed on tobacco company consistent with the advertising restrictions company had agreed to in the MSA and therefore finding the company had waived its constitutional challenged to the injunction); *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 132 Cal. Rptr. 2d 151, 164 (Cal. Ct. App. 2003) (finding tobacco company had waived constitutional claim challenging interpretation of provisions of the MSA restricting commercial speech because "those express contract terms remained express provisions subject to Reynolds's knowing and intentional waiver of the right to contest their constitutionality"). While the present case has called for a more expansive interpretation of the waiver provision, this court's findings are consistent with the findings of these courts.

Because the court finds that the waiver of section fifteen extends only so far as a participating manufacturer's obligations created by the MSA, the plaintiff's claim that the existence of the MSA, that is, the MSA in its entirety and not the specific requirements any of its provisions make upon a participating manufacturer, is a violation of the Compact Clause is not waived.  This claim will be discussed below.

        b.    <u>The plaintiff's waiver was knowing, intelligent, and voluntary.</u>

The court now considers whether the plaintiff's waiver of these three constitutional claims is a valid waiver.  To be valid, a waiver of constitutional rights must be made "voluntarily, intelligently, and knowingly." *Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223, 226 (6th Cir. 2007) (quoting *Fuentes v. Shevin*,

34

407 U.S. 67, 94-95 (1972)); *see also D.H. Overmyer v. Frick Co.*, 405 U.S. 174

(1972) (holding that in order for a waiver of constitutional rights to be valid, it must

be made with an awareness of the consequences of the waiver).  The law

presumes against the waiver of constitutional rights, a presumption which only

clear evidence to the contrary can overcome.  *See Brookhart v. Janis*, 384 U.S. 1

(1966) (citations omitted).  In assessing the validity of a waiver of constitutional

rights, the court should consider the circumstances in which the waiver was made.

*See Fuentes*, 407 U.S. at 95; *see also Overmyer*, 405 U.S. at 186 (finding

significant to determination of validity of waiver that the waiving corporation was

represented by counsel).

 The terms of section fifteen recite that the waiver was made voluntarily,

with representation by counsel.  In agreeing to the provision, then, the plaintiff

agreed that it was entering the agreement voluntarily.  The provision also states

that the signing PM was represented by counsel.  The plaintiff does not contest

either that it entered the agreement voluntarily or that it was represented by

counsel.  The plaintiff argues that due to the facts alleged in connection with its

claim, it was fraudulently induced to enter into the agreement, so that it could not

have effected a knowing waiver.

 In its allegations of fraudulent inducement, the plaintiff alleges that "the

Settling States made material misrepresentations or omissions in order to induce

General Tobacco to join the MSA, all the while knowing that the Settling States

would hold General Tobacco to the MSA's purported discriminatory and onerous

terms and requirements not required of the grandfathered SPMs." Am. Compl. ¶ 247.  In its response to the defendants' motion to dismiss, the plaintiff alleges three misrepresentations: (1) that the plaintiff requested specific information about the extent of the exemptions granted to the grandfathered SPMs but was denied access to the information on grounds that it was confidential; *see* Am. Compl. ¶ 164; (2) that the plaintiff sought assurance that the Settling States were enforcing their Escrow Statutes and was so assured; *see* Am. Compl.¶ 165; and (3) that the Settling States represented to the plaintiff that the LMFN provision of the MSA would not affect the states' ability to grant the plaintiff entry into the MSA; *see* Am. Compl. ¶ 166.  *See* DE 239, p. 37.

A valid waiver can also be defined as the "intentional relinquishment or abandonment of a known right."  *See Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).  Accepting as true all of the plaintiff's allegations, no fact emerges that changes the voluntary, intelligent, and knowing nature of the plaintiff's waiver. Any misrepresentations by the states as to how diligently states were enforcing their Escrow Statutes or the impact of the LMFN clause have no relevance to the plaintiff's understanding of what rights it was giving up by signing on to the MSA. By alleging it did not know the extent of the exemptions granted to the SPMs, the plaintiff apparently asserts that it did not know the 1997 and 1998 market shares of the other SPMs.  This figure affects the exact amount that SPMs owe under the MSA, but it does not affect the knowledge the plaintiff had at the time it entered into the agreement: that the SPMs paid according to a formula dependent on their

36

1997 or 1998 market share.  The treatment of the SPMs is delineated fully in the terms of the MSA.  The fact of the disparate treatment is apparent on the face of the document.  The plaintiff knew that the MSA calculated the SPMs' payment obligations based upon this figure.  It also knew that, per the terms of its agreement, it was deemed to have a 1997 and 1998 market share of zero.  *See* Am. Compl., Exhibit B, p. 3.  Upon learning the exact market share claimed by each SPM, the plaintiff did not acquire a new constitutional challenge of which the plaintiff had been unaware without knowing the exact figures.  Its not having known each SPM's claimed market share does not affect the validity of the plaintiff's waiver.

Furthermore, the waiver at issue was initially executed by the original PMs, as part of a settlement of ongoing litigation between the states and the OPMs.  The waiver at issue was originally granted by the OPMs in exchange for the release of claims.  In exchange for entering into the MSA and agreeing to the waiver, the plaintiff was similarly released from future claims of misconduct.  "It is a well established principle that the law, and public policy, favor the settlement of disputes without litigation." *Echols v. Nimmo*, 586 F.Supp. 467, 468 (D.C. Mich. 1984) (citations omitted).  What the parties have agreed to as a fair resolution of the relevant claims should not be disturbed lightly.  The plaintiff has presented no persuasive argument that this waiver in the settlement agreement should be disturbed by the court.

37

2.     **Plaintiff's Compact Clause Claim.**

In count five of its amended complaint, the plaintiff alleges that the MSA is an interstate compact in violation of the Compact Clause.  The Compact Clause forbids any state from "enter[ing] into any Agreement or Compact with another State" without congressional consent.  U.S. Const. art. I, § 10, cl. 3. "Congressional consent is not required for interstate agreements that fall outside the scope of the Compact Clause."  *Cuyler v. Adams*, 449 U.S. 433, 440 (1981). This clause applies only to "any combination tending to the increase of political power in the states, which may encroach upon or interfere with the just supremacy of the United States."  *United States Steel*, 434 U.S. at 468 (quoting *Virginia*, 148 U.S.503, 519 (1893)).  Therefore, the court's central concern in any Compact Clause inquiry is whether the agreement at issue enhances state power to the detriment of the federal government's power.  *See United States Steel*, 434 U.S. at 473.  The Compact Clause does not "circumscribe modes of interstate cooperation."  *U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 460 (1978).

The plaintiff argues that the MSA encroaches on federal power by regulating interstate commerce through the establishment of a complex national tax and regulatory scheme; regulating access to the national cigarette market; and encroaching on federal supremacy with respect to antitrust laws.  The plaintiff asserts that as a result of the MSA, the Settling States have enlarged their collective power and influence at the expense of the federal government.

38

The "encroachments" upon federal power alleged by the plaintiff are only the results of the enhanced bargaining power the Settling States enjoy as a result of the proliferation of the MSA.  An increase in the states' collective bargaining power does not result in an accompanying decrease of federal power.  See *Star Scientific v. Beales*, 278 F.3d 339, 360 (4th Cir. 2002) (discussing *Multistate Tax Comm'n*, 434 U.S. at 473 (1978)).  Importantly, "[e]ach participating state could have independently settled its litigation with the participating manufacturers and enacted both the Qualifying Statute and the Model Act."  *PTI, Inc. v. Philip Morris, Inc.*, 100 F.Supp. 2d 1179, 1198 (C.D. Cal. 2000).  That the effectiveness of each state's individual agreement is increased because fifty-one other states or territories made an identical agreement does not mean that the federal government's power has suffered a concomitant decrease.  Such a conclusion implies that the amount of power and influence in the United States is fixed and that the increase of a state's power must necessarily imply a decrease in federal power.

Nothing in the MSA steals power from the federal government.  Importantly, "the Master Settlement Agreement does not derogate from the power of the federal government to regulate tobacco.  Sections X and XVIII(a) of the agreement specifically anticipate that Congress may, in the future, pass laws regulating tobacco and provides for adjustments of the [MSA's] terms if that occurs."  *Star Scientific, Inc.*, 278 F.3d at 360 (dismissing claim that the MSA violates the Compact Clause); *see also PTI, Inc.*, 100 F.Supp. 2d 1179 (same).  This claim therefore will be dismissed.

39

Based on the above reasoning, all constitutional claims brought against the defendant Attorneys General will be dismissed.[23]  As conceded by the plaintiff, the dismissal of these claims means that the plaintiff's claim for relief under 42 U.S.C. § 1983 (count six of the Amended Complaint) must also be dismissed.

**C.**    **Fraudulent Inducement (count seven of the plaintiff's Amended Complaint).**

In count seven of its complaint, the plaintiff alleges that the Settling States fraudulently induced its agreement to join the MSA by making material representations or omissions.  The defendant Attorneys General claim entitlement to sovereign immunity from this claim, pursuant to the Eleventh Amendment.  The plaintiff counters that the defendants waived their immunity due to entering into the MSA.

"The Eleventh Amendment bars a suit against state officials when 'the state

---

[23]The nonresident Attorneys General requested this court to dismiss the claims against them pursuant to Fed. R. Civ. Pro. 12(b)(2) and 12(b)(3) and contingently joined the Attorney General of Kentucky's motion to dismiss pursuant to lack of subject-matter jurisdiction and Rule 12(b)(6).  DE 208.  Given the court's conclusion as to the plaintiff's constitutional claims, the court finds it unnecessary to reach the issues of whether venue in this district is appropriate and whether it has personal jurisdiction over the nonresident Attorneys General.  Regardless of how the court chose to rule on that motion, the claims against the nonresident Attorneys General would be dismissed because the plaintiff has failed to state any claim under the U.S. Constitution for which the court can grant relief, and so all of its constitutional claims against all defendant Attorneys General will be dismissed. Defendant attorney general Peter Nickles (District of Columbia) has represented to the court through plaintiff's counsel that he received process, so his motion to dismiss for improper service, as well as the remaining motion to quash, will be denied as moot.

is the real substantial party in interest." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) (citations omitted).  It follows, therefore, that a suit against a state official in his official capacity is a suit against the state, for it "is not a suit against the official but rather is a suit against the official's office." *S&M Brands*, 527 F.3d at 507 (quoting *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989)).

"The [Supreme] Court has recognized an important exception to this general rule: a suit challenging the constitutionality of a state official's action is not one against the State." *Pennhurst*, 465 U.S. at 102; *see Ex parte Young*, 209 U.S. 123 (1908).  The plaintiff's constitutional claims fall within this exception.[24]  The plaintiff's claim for fraudulent inducement, however, is a claim for relief under state law.  Importantly, the exception provided for by *Ex parte Young* "rests on the need to promote the vindication of federal rights." *Pennhurst*, 465 U.S. at 102 (citations omitted).

A state, and accordingly an official sued in his official capacity, therefore retains immunity from claims that an official has violated *state* law.

> A federal court's grant of relief against state officials on the basis of
> state law . . . does not vindicate the supreme authority of federal law.
> On the contrary, it is difficult to think of a greater intrusion on state
> sovereignty than when a federal court instructs state officials on how
> to conform their conduct to state law.  Such a result conflicts directly
> with the principles of federalism that underlie the Eleventh Amendment.

---

[24]And, indeed, no party has claimed that they do not.  The court makes this point merely to distinguish between the applicability of the sovereign-immunity doctrine to this claim by the plaintiff and not to its other claims against the states.

41

*Id.* at 105.

"There are three exceptions to a State's sovereign immunity: (a) when the State has consented to suit; (b) when the exception first set forth in *Ex parte Young* . . . applies; and ©) when Congress has properly abrogated a State's immunity." *S & M Brands, Inc.*, 527 F.3d at 507 (citing *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 817 (6th Cir. 2000)).  The plaintiff contends that the first exception applies to the present case.

Just as the federal government's waiver of sovereign immunity "cannot be implied but must be unequivocally expressed," *U.S. v. King*, 395 U.S. 1, 4 (1969), so must a state's waiver of its sovereign immunity be clear and unequivocal. *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 692 (1999).

Pursuant to the terms of the MSA, by entering into the agreement, the parties agreed that certain disputes with the state may be heard in the court in which the consent decree was entered.  The MSA, in its definitions, defines "Court" as the court where the consent decree entered.  MSA § II(p).  In Kentucky, the consent decree was entered in Fayette Circuit Court.  The plaintiff argues that because at other places in the document "court" with a lower-case "c" is used, and because the state could be subject to suit in the federal courts for challenges to the MSA related to federal law, the state has waived sovereign immunity and has consented to this court's jurisdiction over this pendent state-law claim.

No waiver is required for the federal court to have jurisdiction over federal-

42

law claims.  *See* 28 U.S.C. § 1331.   Any realization that state actions connected with the MSA could be challenged in federal court as violating federal law implies no accompanying consent for the federal court to hear state-law claims. Furthermore, the court does not find that the use of "court" rather than "Court" at places in the document operates as an express waiver of the state's sovereign immunity.

In addition, to the extent that the plaintiff has argued that the state has entered into a commercial arrangement, this allegation, even if true, would not abrogate the state's Eleventh Amendment immunity.  *See College Sav. Bank*, 527 U.S. at 692 (state cannot constructively waive its sovereign immunity).   The plaintiff also argues that the defendant consented to federal-court jurisdiction because the MSA is a contract between States and that federal court is the only court with jurisdiction to hear disputes between states.  This point is irrelevant, as the present dispute is not a dispute between states.  Similarly, it is not relevant that the MSA provides for the arbitration of certain disputes and that resulting awards would be subject to enforcement by federal courts pursuant to the Federal Arbitration Act, 9 U.S.C. § 9.  That the state may be subject to federal-court jurisdiction for those limited types of cases does not affect whether the state is subject to the court's jurisdiction over the present state-law claim.  Because the court finds no waiver of sovereign immunity sufficiently explicit to create subject-matter jurisdiction over this claim, the claim will be dismissed.

IV.     **Conclusion**

Accordingly,

**IT IS ORDERED**:

(1)     The motion to dismiss complaint filed by defendants Lorillard Tobacco Co., Philip Morris, Inc., and R.J. Reynolds Tobacco Co. (DE 154) is **GRANTED**.

(2)     The motion to dismiss filed by defendants Commonwealth Brands, Inc., Imperial Tobacco Limited/ITL, Japan Tobacco International USA, Inc., King Maker Marketing, Lane Limited, Liggett Group, LLC, Lignum-2, Inc., P.T. Djarum, Premier Manufacturing Inc., Santa Fe Natural Tobacco Co., Sherman's 1400 Broadway N.Y.C., Inc., Top Tobacco, LP, and Vector Tobacco, Inc. (DE 156) is **GRANTED.**

(3)     The motion to dismiss for lack of subject-matter jurisdiction and failure to state a claim by defendant Jack Conway, Attorney General of Kentucky (DE 149) is **GRANTED**.

(4)     The motion to dismiss for lack of personal jurisdiction and improper venue and contingent joinder in defendant Conway's motion to dismiss by the Attorneys General of the remaining forty-five states, five territories, and the District of Columbia (DE 208) is **DENIED as moot**.

(5)     The motion to dismiss for improper service of process by defendant Peter Nickles (DE 210) and the motion to quash purported service on defendant Jeremiah W. Nixon(DE 215) are **DENIED as moot**.

(6)     The court has not entered final judgment in this matter, as two defendants who have been served have failed to appear.  If the plaintiff moves to dismiss its action against those defendants, the court will grant the motion and enter final judgment.  If no action is taken within a year, the court will, absent cause, dismiss the action against those defendants for failure to prosecute this case against them and will enter final judgment at that time.

(7)The plaintiff's motion for preliminary injunctive relief (DE 2) is **DENIED as moot.**

Signed on  January 5, 2009

Jennifer B. Coffman, Judge
United States District Court